UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
PACIFIC CONNECTIONS OF CALIFORNIA, INC.                Docket No.

                                          Plaintiff,

          -against-

WILSONS LEATHER HOLDINGS INC.,
PREVU INCORPORATED,
                                          Defendants.
-------------------------------------------------------------------X

## DECLARATION OF VANO I. HAROUTUNIAN FOR ORDER TO SHOW CAUSE FOR AN ORDER OF ATTACHMENT AND PRELIMINARY INJUNCTION

**VANO I. HAROUTUNIAN,** an attorney admitted to practice before the courts of the State of New York and the United States District Court for the Southern District of New York, declares under penalty of perjury, as follows:

1.      I am a member of Ballon Stoll Bader & Nadler, P.C., counsel for plaintiff Pacific Connections of California Inc. ("PCI").

2.      I make this declaration in support of PCI's motion for a preliminary injunction against both defendants and an order of attachment against defendant PreVu Incorporated ("PreVu").

3.      Defendant PreVu is a Minnesota corporation with its headquarters located at 7401 Boone Ave. N., Brooklyn Park, MN 55428, as is shown in its June 8, 2008, 8-K Form filed with the Securities and Exchange Commission, (the "8-K") which is attached as **Exhibit 1**.

4.      PreVu was previously known as Wilsons The Leather Experts Inc. ("WLE") as evidenced by their July 8, 2008 press release which announced their name change.  The press release is attached as **Exhibit 2**.

5.      Upon information and belief, Defendant PreVu is not registered to do business in New York. A copy of a corporations search run on the website of the New York Secretary of State demonstrating this fact is attached as **Exhibit 3**.[1]

6.      Upon information and belief, Defendant PreVu was not qualified to do business in New York under its previous name WLE. A copy of a corporations search run on the website of the New York Secretary of State demonstrating this is attached as **Exhibit 4**.

7.      Defendants PreVu and its subsidiary Wilsons Leather Holdings Inc., ("WLH") (collectively "Wilsons") appear, by all indications, to be on the verge of bankruptcy. This fact is public information that Wilsons has reported in its SEC filings.

8.      Defendants' 2007 Annual Report, (the "annual report"), attached as **Exhibit 5**, explicitly states that "[i]f [Wilsons is] not able to obtain additional capital in the second quarter, [it] will not be able to continue our operations outside of bankruptcy."

9.      The annual report also admits that Wilsons' independent registered public accounting firm "expressed substantial doubts about [Wilsons's] ability to continue as a going concern."

10.      The one hope held out by Wilsons in its annual report is additional capital investment. Wilsons admits in its Annual Report that this would be very unlikely if Wilsons were to be delisted by NASDAQ.

11.      Wilsons 10-Q, which is attached as **Exhibit 6**, reporting on the quarter ending May 3, 2008, (filed June 17,2008) reported that Wilsons has been deemed subject to delisting for its violation of three NASDAQ rules:

---

[1] Defendant Wilsons Leather Holdings Inc. is a Minnesota corporation which is licensed to do business in New York. Plaintiff does not seek an attachment against defendant Wilsons Leather Holdings Inc. although it does seek a preliminary injunction against it.

2

"On June 3, 2008, we received a Nasdaq Staff Determination indicating that our securities are subject to delisting from The Nasdaq Global Market. We have requested a hearing before a Nasdaq Listing Qualifications Panel ("Panel") to review the Staff Determination. On April 15, 2008, Nasdaq advised us that we failed to comply with the minimum $10.0 million stockholders' equity requirement for continued listing on The Nasdaq Global Market as set forth in Marketplace Rule 4450(a)(3). We subsequently responded to Nasdaq on April 30, 2008, outlining a plan for regaining compliance and requesting an additional period of time to execute our plan before facing possible delisting from The Nasdaq Global Market. The June 3rd Nasdaq letter reported the Nasdaq Staff's determination that our plan did not demonstrate a definitive plan to achieve near term compliance or sustain compliance over an extended period.

Furthermore, on February 15, 2008, the Staff notified us that the closing bid price of our common stock had been below $1.00 for 30 consecutive trading days, and accordingly, that we did not comply with Marketplace Rule 4450(a)(5). In addition, on May 1, 2008, the Staff notified us that the minimum market value of our publicly held common shares had been below $5.0 million for 30 consecutive trading days, and accordingly, that we did not comply with Marketplace Rule 4450(a)(2).

We cannot provide any assurance that the Panel will decide to allow us to remain listed or that our actions will prevent the delisting of our common stock from The Nasdaq Global Market. Our common stock will remain listed under the symbol "WLSN" on The Nasdaq Global Market until the Panel makes a formal decision following the appeal hearing. Delisting of our common stock would have a negative effect on the market price for our shares and could limit our ability to raise additional capital." (*emphasis added*)

12.    Even if Wilsons win their current appeal of their delisting, they would still be vulnerable to delisting for the other two violations mentioned above.

13.    Wilsons admitted in the Annual Report that they would probably be delisted if their stock was not valued at $1.00 for 10 consecutive days prior to August 13, 2008.

14.    Since the release of the annual report, Wilsons' stock has continued to plummet, losing 90% of its value and reaching the current price of $0.09.[2]

15.    A chart[3] which includes Wilsons' stock price and other stock information is attached as **Exhibit 7**.

---

[2] This price is current as of the close of trading on July 17, 2008.
[3] This chart was posted by AOL Finance at http://finance.aol.com/quotes/wilsons-the-leather-experts-inc/wlsn/nas and was last viewed on July 17, 2008.

16.    Even in the unlikely event of Wilsons winning its current appeal of delisting, they will be delisted if they fail to increase their value tenfold in the next few weeks.

17.    Defendants also remain below 5 million dollars total listing with a current value of 3.59 million, as is shown in **Exhibit 7**.

18.    In addition, "[o]n July 8, 2008, the Company also entered into a Fifth Amendment to Fifth Amended and Restated Credit Agreement with General Electric Capital Corporation ("GECC") and the credit parties and lenders signatory thereto (the "Amendment"). The Amendment... made several changes... including reducing the lenders' revolving loan commitments from $115.0 million to $30.0 million, reducing the letter of credit sublimit from $75.0 million to $20.0 million." (Exhibit 1).

19.    This reduction of Wilsons' available credit (in contrast to the inflow of cash needed to stave off bankruptcy) renders Wilsons more susceptible to bankruptcy.

20.    Therefore, by defendants' own statements, defendants' bankruptcy is likely, if not inevitable.

21.    Wilsons' 10-Q also reiterated that the risk factors mentioned in its Annual Report remain true. One of these risk factors was the risk of bankruptcy discussed above.

22.    Wilsons' 2007 Annual Report and 10-Q contain extensive data showing that Wilsons' warnings of impending bankruptcy are fully supported by economic data.

23.    According to their annual report, Wilsons lost $33.1 million in 2006 and their losses more than doubled to $77.5 million in 2007.

24.    According to their 10-Q, Wilsons lost $ 22.4 million during the first quarter of the 2008 fiscal year.

25.     According to the 10-Q, the $22.4 million loss figure is an unaudited statement that may turn out to be higher when the numbers are reviewed by an independent auditor.

26.     The $22.4 million loss figure is nearly 6 times as much as Wilsons' total market capitalization as is shown by Exhibit 7.

27.     Wilsons has begun a fire sale of its assets including the racks belonging to PCI.

28.     At the time PCI purchased the racks, Wilsons had nearly 400 stores.

29.     According to its Annual Report, Wilsons is currently liquidating 158 of those stores, including fixtures (which includes PCI's racks)

30.     According to Wilsons' 10-Q, this sale has not solved Wilsons' liquidity problems and therefore Wilsons "is pursuing possible sources of funding, including possible sales of existing assets."

31.     On July 8, 2008 defendants announced that they sold 116 of their outlet stores to AM Retail Group, Inc., a wholly owned subsidiary of G-III Apparel Group, Ltd.

32.     In this sale, defendants sold all the fixtures contained in the outlet stores including plaintiff's racks.

33.     Defendants also sold their intellectual property, including rights to the Wilsons name in the sale.

34.     Defendants are required by the contract to change the name of all their subsidiaries and their stock ticker symbol to avoid confusion.

35.     Despite this sale of nearly all defendants' assets, defendants only received approximately $23 million in the sale, nearly the exact amount they lost in the previous quarter.

36.    Defendants had listed their stores as their primary asset in their 2007 Annual Report. Now that they have sold almost three quarters of their stores they are without significant assets to pay off their remaining debts including those owed to plaintiff.

37.    On November 19, 2007, I sent a letter to Stacy Kruse, Wilsons' Chief Financial Officer and Treasurer, seeking to recover the value of the racks Wilsons took from PCI. This letter is attached as **Exhibit 8**.

38.    On November 28, 2007 Corrine Lapinsky, Wilsons' director of legal services, responded claiming only one defense: that the racks were settled as part of the settlement agreement attached to the Affidavit of Martin Terzian as Exhibit D. Ms. Lapinsky's letter is attached as **Exhibit 9**.

39.    As explained more fully in Mr. Terzian's affidavit, both the plain language of the contract and the intention of the parties makes it obvious that the Settlement Agreement was not intended to include the racks.

40.    I am neither aware of any counterclaims that Wilsons could assert against PCI, nor did Wilsons's response letter make any counterclaims against PCI and therefore PCI's claims exceed all known counterclaims.

41.    No previous application for the relief herein prayed for has been made.

Dated: July 22, 2008
       New York, NY

                              BALLON STOLL BADER & NADLER, P.C.


                              By_____
                                 Vano I. Haroutunian (VH-1010)
                                 *Attorneys for Plaintiff*
                                 729 7th Ave., 17th Floor
                                 New York, New York, 10019
                                 (212) 575-7900

# Exhibit 1-A



# FORM 8-K

## PreVu, INC - WLSN

**Filed: July 14, 2008 (period: July 08, 2008)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K - CURRENT REPORT

Item 1.01      Entry into a Material Definitive Agreement.

Item 2.01      Completion of Acquisition or Disposition of Assets.

Item 2.05      Costs Associated with Exit or Disposal Activities.

Item 2.06      Material Impairments.

Item 3.02      Unregistered Sales of Equity Securities.

Item 5.03      Amendments to Articles of Incorporation or Bylaws; Change in Fiscal
               Year.

Item 9.01      Financial Statements and Exhibits.

SIGNATURES
Index to Exhibits
EX-2.1 (ASSET PURCHASE AGREEMENT)

EX-99.1 (PRESS RELEASE)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 8-K

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) <u>July 8, 2008</u>

# PreVu, Incorporated
(Exact name of registrant as specified in its charter)

| **Minnesota** | **000-21543** | **41-1839933** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **7401 Boone Ave. N.** | |
|---|---|
| **Brooklyn Park, Minnesota** | **55428** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code <u>(763) 391-4000</u>

### Wilsons The Leather Experts Inc.
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

**Item 1.01 Entry into a Material Definitive Agreement.**

On July 8, 2008, Wilsons The Leather Experts Inc. (the "Company") entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") with AM Retail Group, Inc. ("AM Retail Group"), a wholly owned subsidiary of G-III Apparel Group, Ltd., a New York based apparel company. The Asset Purchase Agreement, which is filed herewith as Exhibit 2.1, provides for the Company's sale to AM Retail Group of its outlet assets and e-commerce division. See Item 2.01 below for additional information.

Also on July 8, 2008, the Company and AM Retail Group entered into two Transition Services Agreements. Under the Transition Services Agreement for Services to Seller, AM Retail Group agreed to provide certain services to the Company on a transitional basis, including certain distribution services and information technology services related to contracts or other assets that were transferred to AM Retail Group under the Asset Purchase Agreement. AM Retail Group also provided the Company the right to occupy certain office space being subleased to AM Retail Group by the Company in connection with the transactions contemplated by the Asset Purchase Agreement. The Company will pay AM Retail Group for these services on the terms set forth in the Transition Services Agreement for Services to Seller.

Under the Transition Services Agreement for Services to Buyer, the Company agreed to provide certain services to AM Retail Group on a transitional basis with respect to the operation by AM Retail Group of the outlet assets and e-commerce business purchased by AM Retail Group, including certain finance, import-related and telecommunications services. AM Retail Group will pay the Company for these services on the terms set forth in the Transition Services Agreement for Services to Buyer.

On July 8, 2008, the Company also entered into a Fifth Amendment to Fifth Amended and Restated Credit Agreement with General Electric Capital Corporation ("GECC") and the credit parties and lenders signatory thereto (the "Amendment"). The Amendment permitted the sale of the outlet assets and e-commerce division to AM Retail Group and made several changes in connection with such sale, including reducing the lenders' revolving loan commitments from $115.0 million to $30.0 million, reducing the letter of credit sublimit from $75.0 million to $20.0 million, extending the notice period for informing the lenders of corporate name changes and adjusting the borrowing base. The changes to the borrowing base limit the Company's revolving credit borrowings to:

- 100% of the book value of credit card receivables;

- plus the lesser of $1.0 million or 100% of the book value of eligible wholesale accounts receivable;

- plus 102.5% of the then applicable discount rate applied in appraising eligible retail inventories times the appraised eligible retail inventories, plus 102.5% of such discount rate times the Company's future retail inventories subject to trade letters of credit;

- plus the lesser of $1.0 million or 60% of the book value of the Company's wholesale inventory, including in-transit inventory but minus the book value of in-transit inventory in excess of $1.0 million;

- plus 60% of the book value of the Company's future wholesale inventories related to trade letters of credit;

- minus a reserve equal to 10% of the lesser of $30.0 million and the maximum amount calculated under the formula described above, plus $7.5 million, plus other reserves as set forth by GECC;

- plus the amount of cash deposited in certain banks under the control of GECC;

- minus the aggregate of letter of credit obligations and certain other advances.

The Amendment also deferred a prepayment fee that otherwise would have been due upon the Company's commitment reduction, however the full prepayment fee of $212,750 will be due upon any further reduction or termination of the revolving loan commitment.

### Item 2.01 Completion of Acquisition or Disposition of Assets.

On July 8, 2008, the Company completed the sale of its outlet assets and e-commerce division to AM Retail Group as contemplated by the Asset Purchase Agreement. Pursuant to the terms of the Asset Purchase Agreement, AM Retail Group purchased all inventory, fixed assets and intellectual property principally related to the Company's outlet store and e-commerce divisions. The leases associated with the Company's 116 outlet stores were assigned to AM Retail Group. AM Retail Group acquired the assets for a total purchase price of approximately $22.3 million. On July 8, 2008, the Company issued the press release attached hereto as Exhibit 99.1 announcing the completion of the sale of the outlet assets and e-commerce division to AM Retail Group.

### Item 2.05 Costs Associated with Exit or Disposal Activities.

In connection with the sale of the outlet assets and e-commerce division to AM Retail Group, the Company anticipates incurring a charge for write-offs of certain prepaid assets. The Company is in the process of determining the amount of these write-offs and will disclose the amount of the charge in an amendment to this Form 8-K to the extent it is material.

### Item 2.06 Material Impairments.

In connection with the sale of the outlet assets and e-commerce division to AM Retail Group, the Company anticipates incurring a charge related to the impairment of certain fixed assets. The Company is in the process of determining the amount of the impairment and will disclose the amount of the impairment in an amendment to this Form 8-K to the extent it is material.

**Item 3.02 Unregistered Sales of Equity Securities.**

In connection with the transactions described above, the Company has negotiated agreements with certain landlords to terminate leases for the mall stores that the Company previously liquidated. In connection with certain of the lease termination agreements, the Company agreed to issue cash consideration and an aggregate of 2,289,284 shares of its common stock, which represents approximately 5.7% of the total shares of the Company's common stock that were outstanding immediately prior to such issuance (or, approximately 2.4% of the Company's common stock on a fully-diluted basis). The value the Company received in reduced payments under the lease termination agreements was substantially in excess of the market price of the shares issued. The offers and sales of the common stock were made to accredited investors pursuant to Rule 506 of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and therefore are exempt from the registration requirements of the Securities Act.

**Item 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

On July 8, 2008, the Company filed Articles of Amendment of Amended and Restated Articles of Incorporation to amend Article I to change the Company's corporate name to PreVu, Incorporated.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| | |
|---|---|
| 2.1 | Asset Purchase Agreement by and among AM Retail Group, Inc., the Company and certain subsidiaries of the Company dated as of July 8, 2008 (excluding schedules and exhibits, which the Company agrees to furnish supplementally to the Securities and Exchange Commission upon request) |
| 99.1 | Press Release, dated July 8, 2008 |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

PREVU, INCORPORATED

Date: July 14, 2008                              By    /s/ Stacy A. Kruse
                                                       Stacy A. Kruse
                                                       Chief Financial Officer and Treasurer

**Index to Exhibits**

| Exhibit No. | Description | Method of Filing |
|---|---|---|
| 2.1 | Asset Purchase Agreement by and among AM Retail Group, Inc., the Company and certain subsidiaries of the Company dated as of July 8, 2008 (excluding schedules and exhibits, which the Company agrees to furnish supplementally to the Securities and Exchange Commission upon request) | Electronic Transmission |
| 99.1 | Press Release, dated July 8, 2008 | Electronic Transmission |

Source: PreVu, INC, 8-K, July 14, 2008

Exhibit 2.1

## ASSET PURCHASE AGREEMENT

### BY AND AMONG

### AM RETAIL GROUP, INC.

### AND

WILSONS THE LEATHER EXPERTS, INC.
ROSEDALE WILSONS, INC.
WILSONS LEATHER OF DELAWARE INC.
RIVER HILLS WILSONS, INC.
WILSONS LEATHER OF FLORIDA INC.
WILSONS LEATHER DIRECT INC.
WILSONS LEATHER OF GEORGIA INC.
WILSONS LEATHER OF ALABAMA INC.
WILSONS LEATHER OF INDIANA INC.
WILSONS LEATHER OF CONNECTICUT INC.
WILSONS LEATHER OF IOWA INC.
WILSONS LEATHER OF LOUISIANA INC.
WILSONS LEATHER OF NEW JERSEY INC.
WILSONS LEATHER OF MARYLAND INC.
WILSONS LEATHER OF NEW YORK INC.
WILSONS LEATHER OF MASSACHUSETTS INC.
WILSONS LEATHER OF NORTH CAROLINA INC.
WILSONS LEATHER OF MICHIGAN INC.
WILSONS LEATHER OF OHIO INC.
WILSONS LEATHER OF MISSISSIPPI INC.
WILSONS LEATHER OF PENNSYLVANIA INC.
WILSONS LEATHER OF MISSOURI INC.
WILSONS LEATHER OF SOUTH CAROLINA INC.
WILSONS LEATHER OF TENNESSEE INC.
WILSONS LEATHER OF WISCONSIN INC.
WILSONS LEATHER OF TEXAS INC.
WILSONS LEATHER OF VIRGINIA INC.
WILSONS LEATHER HOLDINGS INC.
BERMANS THE LEATHER EXPERTS INC.

Source: PreVu, INC, 8-K, July 14, 2008

**TABLE OF CONTENTS**

ARTICLE 1 PURCHASE OF ACQUIRED ASSETS AND RELATED TERMS ........ 1
  1.1    Certain Definitions Relating to Transactions ........ 1
  1.2    Sale and Purchase of Acquired Assets ........ 6
  1.3    Unassignable Contracts and Related Matters ........ 6

ARTICLE 2 PURCHASE PRICE AND ADJUSTMENT ........ 7
  2.1    Purchase Price ........ 7
  2.2    Calculation of Estimated Purchase Price for Closing ........ 7
  2.3    Payment of Estimated Purchase Price at Closing and Related Payments ........ 7
  2.4    Purchase Price Adjustment ........ 8

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF EACH SELLER ........ 11
  3.1    Organization and Good Standing. ........ 11
  3.2    Authority and Authorization. ........ 11
  3.3    Organizational Documents ........ 11
  3.4    Ownership of Sellers ........ 12
  3.5    Conflicts and Consents. ........ 12
  3.6    Financial Information and Undisclosed Liabilities. ........ 12
  3.7    Taxes ........ 13
  3.8    Litigation and Orders ........ 14
  3.9    Compliance with Law ........ 14
  3.10  Contracts ........ 14
  3.11  Certain Assets ........ 17
  3.12  Certain Business Relationships ........ 17
  3.13  Certain Payments ........ 17
  3.14  Real Property ........ 18
  3.15  Environmental Matters ........ 18
  3.16  Intellectual Property ........ 19
  3.17  Treatment of Acquired Assets and Source Code ........ 20
  3.18  Privacy and Data Security Matters ........ 21
  3.19  Insurance ........ 22
  3.20  Absence of Certain Events ........ 22
  3.21  Employee Benefits ........ 23
  3.22  Employees and Labor Relations ........ 24
  3.23  Suppliers ........ 25
  3.24  Brokers ........ 25
  3.25  Projections ........ 25
  3.26  Disclosure ........ 26
  3.27  Certain General Exceptions ........ 26

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ........ 26
  4.1    Organization and Good Standing ........ 26
  4.2    Authority and Authorization ........ 26
  4.3    Conflicts and Consents. ........ 26
  4.4    Litigation and Orders ........ 27
  4.5    Availability of Funds ........ 27
  4.6    Forward-Looking Statements ........ 27

i

Source: PreVu, INC, 8-K, July 14, 2008

| | | |
|---|---|---|
| 4.7 | Brokers | 27 |
| 4.8 | Capitalization | 27 |
| **ARTICLE 5 CERTAIN COVENANTS** | | 27 |
| 5.1 | No Liability for Unobtained Consents and Governmental Permits | 27 |
| 5.2 | Access to Information | 28 |
| 5.3 | Further Assurances | 29 |
| 5.4 | Confidentiality and Publicity | 29 |
| 5.5 | Employee Matters | 30 |
| 5.6 | Mail, Receivables and Other Items to be Given to Proper Party | 34 |
| 5.7 | Transfer Taxes | 34 |
| 5.8 | Covenant Not to Compete and Related Covenants | 34 |
| 5.9 | Intercompany Accounts | 35 |
| 5.10 | Bulk Sales Laws | 35 |
| 5.11 | License Back and Name Changes | 35 |
| 5.12 | Transition Services | 36 |
| 5.13 | Insurance and Insurance Proceeds | 37 |
| 5.14 | Substitution of Seller Collateral | 37 |
| 5.15 | Customer Data | 38 |
| 5.16 | Transaction Confidentiality Agreements | 38 |
| 5.17 | Post-Closing Releases of Sellers | 38 |
| 5.18 | Certain Obligations Regarding Customers | 38 |
| 5.19 | Closing Date Financial Statements | 40 |
| 5.20 | SEC and National Securities Exchange Requirements | 40 |
| 5.21 | Tax Proceedings | 40 |
| 5.22 | Cooperation Regarding Certain Intellectual Property | 41 |
| 5.23 | License Back of Certain Software | 41 |
| 5.24 | Filing of Releases of Security Interests | 41 |
| 5.25 | Certain Undelivered Inventory | 41 |
| 5.26 | Vendor Matters | 42 |
| 5.27 | Credit Card and Bank Account Matters | 43 |
| 5.28 | Liens | 43 |
| 5.29 | Racking in Sellers Distribution Facility | 44 |
| 5.30 | Landlord Retention Amount | 44 |
| 5.31 | Certain Lease Matters | 44 |
| **ARTICLE 6 CLOSING, AND CLOSING DELIVERIES** | | 45 |
| 6.1 | Closing | 45 |
| 6.2 | Closing Deliveries by Sellers. | 45 |
| 6.3 | Closing Deliveries by Buyer | 46 |
| **ARTICLE 7 CONDITIONS TO OBLIGATIONS TO CLOSE** | | 47 |
| 7.1 | Conditions to Obligation of Buyer to Close | 47 |
| 7.2 | Conditions to Obligation of Sellers to Close | 48 |
| **ARTICLE 8 INDEMNIFICATION AND RESOLUTION OF CERTAIN DISPUTES** | | 48 |
| 8.1 | General | 48 |
| 8.2 | Indemnification | 48 |
| 8.3 | Certain Limitations and Other Matters Regarding Claims | 49 |
| 8.4 | Certain Survival Periods | 51 |

ii

| 8.5 | Notice of Claims and Procedures | 51 |
| 8.6 | Reduction for Insurance, Taxes and Other Offsets | 53 |
| 8.7 | Subrogation | 53 |
| 8.8 | Effect of Purchase Price Adjustment | 53 |
| 8.9 | Indemnification Adjusts Purchase Price for Tax Purposes | 54 |
| 8.10 | Effect of Officer's Certificates | 54 |

ARTICLE 9 CERTAIN GENERAL TERMS AND OTHER AGREEMENTS — 54

| 9.1 | Notices | 54 |
| 9.2 | Expenses | 54 |
| 9.3 | Interpretation; Construction | 55 |
| 9.4 | Parties in Interest; No Third-Party Beneficiaries | 56 |
| 9.5 | Governing Law | 56 |
| 9.6 | Jurisdiction, Venue and Waiver of Jury Trial | 56 |
| 9.7 | Entire Agreement; Amendment; Waiver | 56 |
| 9.8 | Assignment; Binding Effect | 56 |
| 9.9 | Severability; Blue-Pencil | 57 |
| 9.10 | Counterparts | 57 |
| 9.11 | Disclosure Schedules | 57 |

ARTICLE 10 CERTAIN DEFINITIONS — 57

**Exhibits**

| Exhibit 1.1(a)(1) | Assumed Contracts |
| Exhibit 1.1(a)(6) | Intellectual Property in Acquired Assets |
| Exhibit 1.1(b)(1) | Certain Excluded Contracts |
| Exhibit 1.1(b)(15) | Certain Excluded Assets |
| Exhibit 2.2 | Sellers' Calculation of Estimated Purchase Price and Other Payments |
| Exhibit 2.3 | Landlord Payment Schedule |
| Exhibit 2.4(j) | Allocation of Purchase Price |
| Exhibit 5.5(a) | Certain Eligible Employees and Non-Eligible Employees |
| Exhibit 5.12-1 | Transition Services Agreement for Services to Seller |
| Exhibit 5.12-2 | Transition Services Agreement for Services to Buyer |
| Exhibit 5.14 | Letters of Credit |
| Exhibit 6.2(a) | Bill of Sale, Assignment and Assumption Agreement |
| Exhibit 6.2(b)(1) | Trademark Assignment |
| Exhibit 6.2(b)(2) | Domain Name Assignment |
| Exhibit 6.2(g) | Assignment and Assumption Agreement for Leases |
| Exhibit 7.1(b) | Encumbrances to be Released |
| Exhibit 10 | Outlet Stores |

iii

Source: PreVu, INC, 8-K, July 14, 2008

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into effective as of July 8, 2008, by and among AM Retail Group, Inc., a Delaware corporation ("Buyer"), Wilsons The Leather Experts Inc., a Minnesota corporation ("Parent"), Rosedale Wilsons, Inc., a Minnesota corporation, Wilsons Leather of Delaware Inc., a Delaware corporation, River Hills Wilsons, Inc., a Minnesota corporation, Wilsons Leather of Florida Inc., a Florida corporation, Wilsons Leather Direct Inc., a Delaware corporation, Wilsons Leather of Georgia Inc., a Georgia corporation, Wilsons Leather of Alabama Inc., an Alabama corporation, Wilsons Leather of Indiana Inc., an Indiana corporation, Wilsons Leather of Connecticut Inc., a Connecticut corporation, Wilsons Leather of Iowa Inc., an Iowa corporation, Wilsons Leather of Louisiana Inc., a Louisiana corporation, Wilsons Leather of New Jersey Inc., a New Jersey corporation, Wilsons Leather of Maryland Inc., a Maryland corporation, Wilsons Leather of New York Inc., a New York corporation, Wilsons Leather of Massachusetts Inc., a Massachusetts corporation, Wilsons Leather of North Carolina Inc., a North Carolina corporation, Wilsons Leather of Michigan Inc., a Michigan corporation, Wilsons Leather of Ohio Inc., an Ohio corporation, Wilsons Leather of Mississippi Inc., a Mississippi corporation, Wilsons Leather of Pennsylvania Inc., a Pennsylvania corporation, Wilsons Leather of Missouri Inc., a Missouri corporation, Wilsons Leather of South Carolina Inc., a South Carolina corporation, Wilsons Leather of Tennessee Inc., a Tennessee corporation, Wilsons Leather of Wisconsin Inc., a Wisconsin corporation, Wilsons Leather of Texas Inc., a Texas corporation, Wilsons Leather of Virginia Inc., a Virginia corporation, Wilsons Leather Holdings Inc., a Minnesota corporation, and Bermans The Leather Experts Inc., a Delaware corporation (each such Person, other than Buyer, is a "Seller", and collectively, such Persons are "Sellers"). Certain capitalized terms used in this Agreement are defined in Article 10.

### Recitals

A. Sellers, collectively, are engaged in the business of selling leather outerwear, accessories and apparel through mall stores, airport stores and outlet stores and on the internet.

B. Sellers, collectively, desire to sell, convey, transfer and assign to Buyer, and Buyer desires to purchase from Sellers, certain assets of the Outlet Business (which includes Sellers' e-commerce business as described herein), upon and subject to the terms herein.

### Agreement

In consideration of the foregoing and the representations, warranties, covenants and agreements in this Agreement, each Party hereby agrees as follows:

### ARTICLE 1
### PURCHASE OF ACQUIRED ASSETS AND RELATED TERMS

1.1 **Certain Definitions Relating to Transactions**. For purposes of this Agreement, the following definitions apply:

(a) **Acquired Assets Defined**. "Acquired Assets" means, under and subject to the terms herein, all right, title and interest of each Seller, in each case as of the Effective Time, in and to each item listed below in this Section 1.1(a), except that no Excluded Asset is an

Source: PreVu, INC, 8-K, July 14, 2008

Acquired Asset. The Acquired Assets include the following (to the extent not expressly listed as an Excluded Asset):

(1) each Assumed Contract (with "Assumed Contract" meaning, other than any Excluded Contract, each Contract to which any Seller is a party that is (i) listed or referred to on Exhibit 1.1(a)(1), (ii) Principally Related to the Outlet Business that is terminable at will or upon not more than 90 days' notice by the applicable Seller without any Liability or other obligation of such Seller (other than with respect to actions before the termination thereof), (iii) Principally Related to the Outlet Business that involves aggregate future payments of less than $10,000 or (iv) orders for merchandise inventory, materials or supplies with respect to the Outlet Business for which the associated value is not included in the calculation of Final Transferred Inventory, other than orders for any Undelivered Inventory (it being acknowledged that (A) any such item that Buyer pays for under such an order in this clause (iv) is an asset of Buyer and (B) if such associated value was included in the calculation of Final Transferred Inventory, then the applicable Seller would retain the associated payment obligation to the applicable third party under such order);

(2) all furniture, fixtures, improvements and equipment (including computer equipment, but excluding any related software or information except to the extent any right, title or interest in or to any such software or information is an Acquired Asset pursuant to another clause in this Section 1.1(a)) (A) physically located in any Outlet Store, Sellers Distribution Facility or, except as stated in Section 1.1(b)(12) and 1.1(b)(15), Seller's Headquarters at the Effective Time or (B) wherever physically located that are Principally Related to the Outlet Business;

(3) all merchandise inventory that, at the Effective Time, is (A) located in any Outlet Store (or in such Outlet Store's storage space), (B) located in Sellers Distribution Facility (or in transit from Sellers Distribution Facility to an Outlet Store) that has a SKU and location identifier designating such inventory for sale in any Outlet Store, (C) located at (or in transit from Sellers Distribution Facility to) the third party fulfillment center engaged by Sellers that is designated for sale in Sellers' e-commerce business or (D) located in Sellers Distribution Facility that has a SKU and location identifier designating such inventory for sale in Sellers e-commerce business (provided, however, that the merchandise inventory (x) in such clauses (a)(3)(C) and (a)(3)(D) does not include any merchandise inventory with respect to which, at the Effective Time, a customer of a Seller has ordered such inventory and such inventory has not yet shipped to such customer and (y) does not include any inventory on order (or in transit) for sale in any Outlet Store or in Sellers e-commerce business, in each case which, at the Effective Time, has not been previously delivered to Sellers Distribution Facility or a third party fulfillment center engaged by Sellers that is designated for sale in Sellers' e-commerce business (collectively, the "Undelivered Inventory"), which Undelivered Inventory will be subject to Section 5.25));

(4) all office materials or supplies (other than inventory defined as an Acquired Asset pursuant to clause (a)(3) above) located in, or on order for, any Outlet Store (or in such Outlet Store's storage space) at the Effective Time, including routine office supplies, bags, boxes and similar items Principally Related to the Outlet Business

2

(except for office materials and supplies that are located in Sellers Distribution Facility and are not "Wilsons Leather" branded, which office materials and supplies are not Acquired Assets);

(5) all Register Cash (with "Register Cash" meaning any currency or coin, but not checks, money orders or similar draft instruments, in each case to the extent physically located at any Outlet Store at the Effective Time that is held at such Outlet Store for actual use in transactions with customers in such Outlet Store's operations during the next day after the Cut-Off Date that such Outlet Store is open in the Ordinary Course of Business of the applicable Seller);

(6) all Intellectual Property listed in Exhibit 1.1(a)(6);

(7) all leasehold improvements in any Outlet Store (subject to the terms hereof and any applicable Real Property Lease);

(8) all rights Principally Related to the Outlet Business under any representation, warranty or guarantee by any manufacturer or supplier to the Outlet Business to the extent with respect to any of the Acquired Assets or Assumed Liabilities;

(9) all goodwill, going concern value and enterprise value Principally Related to the Outlet Business;

(10) all of the following, to the extent Principally Related to the Outlet Business and in existence: (A) sales records, accounting records, records of purchases by any Seller and supplier lists and correspondence with supplier and potential suppliers; (B) customer lists and related records and correspondence with customers and potential customers and all related documents, to the extent permitted by Applicable Law and to the extent contemplated in, and subject to, Section 5.15; (C) advertising and promotional materials; (D) records regarding any examination by a Governmental Authority; (E) personnel and payroll records of Transferred Employees, to the extent permitted by Applicable Law; and (F) general correspondence and any similar document or record;

(11) all of the following that is with respect to any Outlet Store, Sellers Headquarters or Sellers Distribution Facility: (A) telephone numbers, including cellular telephone numbers (but only to the extent such cellular telephone number is issued to any Transferred Employee); (B) facsimile numbers; (C) postal addresses; and (D) postal boxes;

(12) subject to Section 2.4(i), all of the following: (A) security deposits given to any landlord under any Real Property Lease; and (B) Prepaid Items;

(13) all Permits and rights and privileges associated with such Permits, in each case to the extent both transferable and solely used with respect to Sellers Distribution Facility or any Outlet Store;

(14) a pro rata portion (as contemplated in Section 2.4(i)) of all claims and rights of any Seller with respect to Tax refunds, Tax credits and Tax deposits, in each case only with respect to Real Property Lease Taxes; and

3

Source: PreVu, INC, 8-K, July 14, 2008

(15) all other assets (other than any asset that is excluded pursuant to any of the preceding clauses in this <u>Section 1.1(a)</u> or any other Excluded Asset) that are, at the Effective Time, Principally Related to the Outlet Business, whether or not located in any Outlet Store.

(b) **Excluded Assets Defined.** "<u>Excluded Assets</u>" means, under and subject to the terms herein, all assets in or to which any Seller has any right, title or interest that are not described in <u>Section 1.1(a)</u> or are otherwise excluded from the Acquired Assets by any other term herein. The Excluded Assets include each item listed below in this <u>Section 1.1(b)</u> (and all right title and interest of any Seller, or any Affiliate of any Seller, in or to any such item listed below):

(1) each Contract to which any Seller is a party that is not an Assumed Contract (each such Contract, including any Contract for any Intercompany Service and each Contract listed in <u>Exhibit 1.1(b)(1)</u>, is an "<u>Excluded Contract</u>");

(2) all minute books, ownership records and seals of any Seller and all other documents relating to the organization, maintenance or existence of any Seller;

(3) all bank accounts, cash accounts, investment accounts, deposit accounts, lockboxes and similar accounts of Sellers;

(4) all cash, cash equivalents, checks and similar instruments (whether or not cleared) and short-term securities of Sellers, in each case other than any Register Cash;

(5) all accounts receivable, including credit card-related receivables for sales of Sellers before the Effective Time;

(6) (A) all Taxpayer and other identification numbers of Sellers; (B) all Tax Returns and Tax records of Sellers; and (C) duplicate copies of all books and records that are an Acquired Asset (including any such item that any Seller or any Affiliate of any Seller is required to retain in its possession by any Governmental Authority);

(7) all claims and rights of any Seller with respect to: (A) Tax refunds, Tax credits and Tax deposits, in each case other than with respect to Real Property Lease Taxes to the extent stated in <u>Section 1.1(a)(14)</u>; and (B) Tax loss carry forwards;

(8) all insurance policies and insurance coverage and all rights in connection therewith;

(9) all Seller Plans and all rights in connection with and assets of any Seller Plan;

(10) all rights of any Seller under this Agreement or any other Contract or item executed or delivered by or on behalf of any Party in connection with the transactions contemplated under this Agreement;

(11) any equity interest or other security of any kind (or right to receive any equity interest or other security) in or of any Person (including any Seller);

4

Source: PreVu, INC, 8-K, July 14, 2008

(12) any asset physically located at Sellers Headquarters that is not Principally Related to the Outlet Business or physically located at any store of any Seller that is not an Outlet Store (for the avoidance of doubt, for each employee who is not an Eligible Employee, any asset issued to such employee or any asset that is primarily used by such employee in the performance of such employee's employment duties for a Seller is an Excluded Asset, including any personal desktop or laptop computer, pager, cellular telephone, BlackBerry or other telephone, desk or other office furniture or equipment);

(13) all of the following that is not with respect to any Outlet Store, Sellers Headquarters or Sellers Distribution Facility: (A) telephone numbers, including cellular telephone numbers issued to employees that are not a Transferred Employee; (B) facsimile numbers; (C) postal addresses; and (D) postal boxes;

(14) all inventory, materials or supplies not defined as an Acquired Asset pursuant to Section 1.1(a)(3) or 1.1(a)(4), including all leather or any, if any, other production materials or sub-materials that, at the Effective Time, is in the possession of any Seller that has not yet been manufactured into a product for sale (provided that Undelivered Inventory will be subject to Section 5.25);

(15) any other asset listed in Exhibit 1.1(b)(15); or

(16) all leasehold improvements, other than leasehold improvements in any Outlet Store.

(c) **Assumed Liabilities Defined**. "Assumed Liabilities" means, under and subject to the terms herein, only those Liabilities and other obligations of any Seller arising out of, relating to or resulting from any Assumed Contract (including any Real Property Lease) that is, by the terms of such Assumed Contract, to be paid, performed, satisfied or observed after the Effective Time.

(d) **Assumption of Assumed Liabilities; Non-Assumption of Other Liabilities**. Under and subject to the terms of this Agreement, Buyer hereby assumes, effective as of the Effective Time, and agrees to pay, perform and satisfy when due, and observe fully and timely, all Assumed Liabilities (as defined above). Except as specifically set forth in this Section 1.1(d) or to the extent expressly stated in this Agreement or any Ancillary Document, Buyer expressly does not, and shall not, assume or be deemed to have assumed under this Agreement or by reason of any transaction contemplated hereunder, any debts, liabilities (contingent or otherwise) or obligations of any of the Sellers of any nature whatsoever. The Assumed Liabilities shall not include (i) subject to Section 2.4(i), any debts, liabilities (contingent or otherwise) or obligations of any of the Sellers (including, without limitation, trade accounts payable and liabilities that should be accrued in accordance with GAAP up to and including the Effective Time) arising out of any Contract that is not an Assumed Contract (with the Parties acknowledging that that any Contract Principally Related to the Outlet Business that is required to be listed on Exhibit 1.1(a)(1) to avoid a breach of the first sentence of Section 3.10(b), but is not listed on Exhibit 1.1(a)(1) (regardless of any Knowledge thereof on the part of Buyer), is not an Assumed Contract and no right, title or interest therein is an Acquired Asset), (ii) any liabilities of Sellers arising from customer complaints or any related customer chargebacks (including all deductions of any kind) relating to the Outlet Business prior to the Effective Time

5

# Exhibit 1-B

(except to the extent provided in <u>Section 5.18</u>), (iii) except as otherwise specified in this Agreement, any liability or obligation for Taxes of Sellers, whether or not accrued, assessed or currently due and payable, including without limitation any liability for Taxes (A) of Sellers, whether or not it relates to the operation of Sellers' businesses, (B) of Sellers arising from the operation of Sellers' business or the ownership of the Acquired Assets prior to the Effective Time, or (C) of Sellers arising out of the consummation of the transactions contemplated hereby (for purposes of this <u>Section 1.1(d)</u>, all real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Acquired Assets for a Tax period that includes (but does not end on) the Cut-Off Date shall be apportioned between Sellers and Buyer based upon the number of days of such period included in the Tax period before (and including) the Cut-Off Date and the number of days of such Tax period after the Cut-Off Date), (iv) any Liability or other obligation of any Seller (A) under any Seller Plan or (B) to or with respect to any current or former employee of any Seller, or (v) other than under <u>Section 2.4(i)</u> and any related payment hereunder, any Liability or other obligation of any Seller under any Assumed Contract (including any Real Property Lease) that is, by the terms of such Assumed Contract, to be paid, performed, satisfied or observed on or prior to the Effective Time.

1.2 <u>**Sale and Purchase of Acquired Assets**</u>. Under and subject to the terms of this Agreement, effective as of the Effective Time, each Seller hereby sells, conveys, transfers and assigns to Buyer, and Buyer hereby purchases from each Seller, all of such Seller's right, title and interest in and to the Acquired Assets. None of the Excluded Assets are sold, conveyed, transferred or assigned to Buyer.

1.3 <u>**Unassignable Contracts and Related Matters**</u>. Notwithstanding anything herein to the contrary other than <u>Section 5.1</u> (and subject to <u>Section 5.1</u>), if (a) any Assumed Contract is not capable of being sold, conveyed, transferred or assigned hereunder, or (whether or not in connection with an Assumed Contract) if Buyer is not permitted to provide or Parent and its applicable Affiliates are not permitted to receive any license, sublicense or related service under section 3.1 of the Transition Services Agreement under which Parent is the service recipient, in each case in the absence of the approval, consent or waiver of any other Person (without breaching, violating, defaulting under, conflicting with, giving rise to or creating any right to accelerate, increase, terminate, modify or cancel any material right or obligation or creating any Encumbrance, other than a Permitted Encumbrance, under, such Assumed Contract, or without otherwise violating any right of such other Person) and (b) all necessary approvals, consents or waivers of any such other Person (including any party to such Assumed Contract) have not been obtained at or before the Closing, then the applicable Seller and Buyer will cooperate to obtain such approvals, consents, or waivers as soon as reasonably possible and shall act with respect to each such Assumed Contract, and with respect to section 3.1 of such Transition Services Agreement (as applicable), such that Buyer shall obtain the rights and benefits of such Assumed Contract and assume the corresponding Assumed Liabilities, and Parent and its Affiliates will obtain the rights and benefits under section 3.1 of such Transition Services Agreement (and related rights and benefits under such Transition Services Agreement) and pay the amounts owed to Buyer with respect thereto, so that the Parties are, to the greatest extent possible, put in the same position they would have been had such approval, consent or waiver been obtained unconditionally. Such actions by Buyer or such Seller may be in the form of a subcontract, sublicense or sublease appointing Buyer as agent to the applicable Seller to perform such Assumed Contract, or any other arrangement under which Buyer could enforce for the benefit of Buyer any and all rights and benefits of the applicable Seller against the third party thereto. For

6

Source: PreVu, INC, 8-K, July 14, 2008

the avoidance of doubt, the foregoing actions will be performed on an Assumed Contract by Assumed Contract basis, and in accordance with Applicable Law.

## ARTICLE 2
## PURCHASE PRICE AND ADJUSTMENT

2.1 **Purchase Price**. Upon and subject to the terms herein, Buyer will pay to Sellers the aggregate amount of $20,646,575 (the "Initial Purchase Price"), as such amount is adjusted pursuant to the terms herein (such amount, as adjusted pursuant to any term herein, is the final purchase price for the Acquired Assets and is referred to herein as the "Purchase Price").

2.2 **Calculation of Estimated Purchase Price for Closing**. On or before the Closing Date, Sellers have delivered to Buyer a statement in form acceptable to Buyer (including supporting documentation therefor acceptable to Buyer), attached hereto as Exhibit 2.2, containing Sellers' reasonable estimate of (a) Transferred Inventory and (b) the Purchase Price (which, for Closing, is (1) the Initial Purchase Price *plus* any amount by which such estimated Transferred Inventory contained in such statement exceeds the sum of Target Transferred Inventory plus $6,500, (2) the Initial Purchase Price *minus* any amount by which such estimated Transferred Inventory contained in such statement is less than the sum of Target Transferred Inventory plus $6,500 or (3) the Initial Purchase Price in the instance where such estimated Transferred Inventory contained in such statement equals the sum of Target Transferred Inventory plus $6,500 (as applicable), *plus* in the applicable case under such clause (1), (2) or (3), as the case may be, the amount of Sellers' good faith estimate of the amount of Register Cash, which amount shall be included in the Estimated Purchase Price). The amount of such estimated Purchase Price from Sellers is the "Estimated Purchase Price".

2.3 **Payment of Estimated Purchase Price at Closing and Related Payments**. Upon and subject to the terms herein, Buyer will pay the Estimated Purchase Price to Sellers (to be allocated among Sellers, as determined by Sellers consistent with the terms herein) as described in this Section 2.3. Buyer will pay to Sellers, in cash, by wire transfer of immediately available funds, the amount of $16,943,809 (which includes amounts paid pursuant to Section 2.4(i) and the sentence of this Section 2.3 below that describes certain reimbursements regarding Transferred Employees) at the Closing and on the Closing Date to the account designated by Sellers on or before the Closing Date. Buyer will withhold from the Estimated Purchase Price the amount of $3,773,502 (the "Landlord Retention Amount") at the Closing and on the Closing Date, which is so withheld with respect matters contemplated herein regarding the landlords identified on Exhibit 2.3 (the "Landlord Payment Schedule") and which will be held and paid pursuant to Section 5.30. The Buyer will withhold, and shall not pay to Sellers at Closing, the following components of the Estimated Purchase Price (however, the amount of such components will be paid or withheld pursuant and subject to the terms of this Agreement): (1) the sum of $1,000,000 (the "Gift Card Holdback Amount"), which amount shall be held by Buyer to secure certain Gift Card Item Reimbursable Amounts, as further provided in Section 5.18; and (2) the sum of $500,000 (the "Vendor Loss Holdback Amount"), which amount shall be held by Buyer to secure Vendor Losses, as further provided in Section 5.26. Additionally, at Closing and on the Closing Date, Buyer will pay to Sellers (to be allocated by Sellers based on Sellers' determination of the amount owing to the applicable Sellers) the amount stated in Exhibit 2.2 for reimbursement for such Sellers in connection with such Sellers agreeing not to obtain reimbursement from certain Transferred Employees for excess used (but unearned)

7

vacation time, sick leave or other time off by such Transferred Employees as of the Effective Time. For each such amount so withheld by Buyer from the Estimated Purchase Price as the Landlord Retention Amount or under any of clause (1) or (2) of this Section 2.3, in each case that is subsequently required to be paid to any Seller after Closing (including as contemplated in Section 5.18, 5.26 or 5.30), Buyer will pay to such Seller interest on each such portion of such withheld amount that is so subsequently required to be paid to such Seller. Buyer will pay such interest at the time Buyer is required to pay such portion of such withheld amount to such Seller. Such interest will be calculated at an annual rate equal to 3.0% and based on the number of actual days elapsed from (but not including) the Closing Date to (and including) the date of such payment, *divided by* 365.

2.4 Purchase Price Adjustment.

(a) **Sellers' Preparation of the Statement**. Within 60 days after the Closing Date, Sellers will prepare and deliver to Buyer a statement (the "Statement") setting forth, in reasonable detail, Sellers' determination of Transferred Inventory and of the amount of Register Cash at the Effective Time. Buyer will assist Sellers and their representatives in all reasonable respects in preparing the Statement and will give Sellers and their representatives reasonable access, upon reasonable prior request, to the personnel, properties, books and records regarding the Outlet Business for such purpose and the other matters in this Section 2.4. The final determination of Transferred Inventory pursuant to this Section 2.4 is "Final Transferred Inventory" and the final determination of Register Cash pursuant to this Section 2.4 is "Final Register Cash."

(b) **Buyer's Response to the Statement**. The Transferred Inventory and Register Cash in the Statement will become final and binding upon the Parties (and become Final Transferred Inventory and Final Register Cash, respectively) 60 days after Sellers give the Statement to Buyer, unless Buyer gives written notice, in reasonable detail, of its disagreement (a "Notice of Disagreement") to Sellers before the end of such 60-day period. If Buyer gives Notice of Disagreement before the end of such 60-day period stated above, then Final Transferred Inventory and Final Register Cash (as finally determined in accordance with clause (b)(1) or (b)(2) below) will become final and binding on the Parties upon the earlier of (1) the date the Parties resolve in writing any differences they have with respect to the amount of the Transferred Inventory or Register Cash or (2) the date any disputed items are finally resolved in writing by the Arbitrator pursuant to Section 2.4(c). Sellers will not modify the Statement in any manner adverse to Buyer. Buyer will not modify the Notice of Disagreement in any manner adverse to Sellers. Any item or amount in, or omitted from, the Statement that Buyer does not disagree with in the Notice of Disagreement will be final and binding on the Parties in the manner stated in, or omitted from, the Statement.

(c) **Resolving Matters in Notice of Disagreement**. During the 30-day period after a Notice of Disagreement is given, Sellers and Buyer will attempt to resolve in writing any differences that they have regarding any item in such Notice of Disagreement. If, at the end of such 30-day period, Sellers and Buyer have not reached agreement on all such items, then any Party may require that the items that remain in dispute be promptly submitted to an arbitrator (the "Arbitrator") for review and resolution. The Arbitrator will be a nationally recognized public accounting firm agreed upon by the Parties in writing; provided that the Arbitrator will not be an accounting firm used by any Seller or Buyer (or any Affiliate of any of them) within

8

Source: PreVu, INC, 8-K, July 14, 2008

the three years preceding the Closing Date for any purpose. The Arbitrator will determine procedures for such arbitration, subject to the terms hereof. The Arbitrator will only consider the items that remain in dispute. The Arbitrator will render a decision resolving such items in dispute within 30 days after completion of submissions to the Arbitrator. The Arbitrator will determine Final Transferred Inventory and Final Register Cash solely based on submissions made by Sellers and Buyer consistent with the terms hereof (and not by independent review). The Arbitrator will not assign a value to any item that is greater than the greater value for such item claimed by any Party or less than the lesser value for such item claimed by any Party.

(d) **Allocation of Fees and Expenses**. Each Party shall pay its own and its Affiliates' fees and expenses incurred with respect to such Arbitration; provided, however, that the Non-Prevailing Party in such arbitration will also pay the fees and expenses of the Arbitrator. A Party is the "Prevailing Party" if the Arbitrator's determination of the items in dispute is closer to such Party's determination of such items than it is to the other Party's determination of such items (in each case in the aggregate and as submitted to the Arbitrator). A Party is the "Non-Prevailing Party" if the other Party is the Prevailing Party.

(e) **Adjustment to Purchase Price Based on Final Transferred Inventory and Final Register Cash**. The Purchase Price will be, and automatically will be adjusted to be, equal to the sum of the Initial Purchase Price *plus* Final Register Cash, and then as such sum is (1) increased by the amount, if any, by which Final Transferred Inventory exceeds Target Transferred Inventory or (2) decreased by the amount, if any, by which Final Transferred Inventory is less than Target Transferred Inventory. However, if no such adjustment is required pursuant to clause (1) or (2) of this Section 2.4(e), then the Purchase Price will equal the sum of the Initial Purchase Price *plus* Final Register Cash.

(f) **Reconciliation Payment**. Within five Business Days after Final Transferred Inventory and Final Register Cash become final and binding on the Parties, the following will occur:

(1) if the Estimated Purchase Price (as paid at Closing but excluding components not paid at the Closing on the Closing Date as described in Section 2.3) is less than the Purchase Price (excluding components not paid at the Closing on the Closing Date as described in Section 2.3 and as adjusted, if at all, under Section 2.4(e)), then Buyer will pay to Sellers, in the aggregate, the amount of such difference, without interest, in cash, by wire transfer of immediately available funds; and

(2) if the Estimated Purchase Price (as paid at Closing but excluding components not paid at the Closing on the Closing Date as described in Section 2.3) is more than the Purchase Price (excluding components not paid at the Closing on the Closing Date as described in Section 2.3 and as adjusted, if at all, under Section 2.4(e)), then Sellers, in the aggregate, will pay to Buyer the amount of such excess, without interest, in cash, by wire transfer of immediately available funds.

(g) **Target Transferred Inventory Defined**. "Target Transferred Inventory" means the amount of $18,552,575.

(h) **Transferred Inventory Defined**. "Transferred Inventory" means an amount equal to the amount of inventory, materials and supplies that are an Acquired Asset

9

pursuant to Section 1.1(a)(3) or 1.1(a)(4). Transferred Inventory described in Section 1.1(a)(3) will be calculated at average cost, in a manner consistent with Sellers' past practices and stock ledger, including with respect to the calculation of any reserve for shrinkage (which reserve for shrinkage would be a reduction to the total amount of Transferred Inventory, consistent with such past practices and stock ledger). With respect to office materials and supplies described in Section 1.1(a)(4), the applicable amount shall be fixed at $65,000.

(i) **Proration.** In addition to the foregoing matters in this Article 2, Sellers, on the one hand, and Buyer, on the other hand, will pro rate, as of the Effective Time, based on the number of days elapsed in the applicable period, all Prepaid Items. "Prepaid Item" means, to the extent with respect to any Acquired Asset or Assumed Liability, any: (1) rent, utility (unless and to the extent that Buyer shall be billed directly for post-Closing usage), Real Property Lease Tax, common area maintenance, marketing or advertising allocation or other similar amount paid or payable with respect to any Real Property Lease; (2) prepaid cost or expense, advance payment or similar prepayment; (3) charge or payment based on performance or possession under any lease (other than any Real Property Lease), service Contract, maintenance Contract, marketing or advertising Contract or similar Contract, in each case that is included within or under any Assumed Contract; or (4) other similar prepaid amount that is or was an obligation to any third party. In connection with the foregoing, Sellers will be given full credit for all amounts paid or otherwise satisfied by any Seller for which Buyer receives the benefit (including any such amount that is an Acquired Asset). The Parties will use their commercially reasonable efforts to cause all providers of utility services to bill the applicable Seller for all costs owed by such Seller hereunder and to bill Buyer for all costs owed by Buyer hereunder (to the extent the Parties would be billed directly). At Closing, Buyer will pay to Sellers or Sellers will pay to Buyer (as applicable) an amount equal to 90% of Sellers' good faith estimate of the Prepaid Items (other than the Prepaid Items described in clause (i)(1) above, as to which 100% shall be paid), as set forth on Exhibit 2.2. Thirty (30) days after Closing, Buyer will pay to Sellers or Sellers will pay to Buyer (as applicable) an amount to properly allocate such pro rated Prepaid Items under this Section 2.4(i) (net of the payment made pursuant to the preceding sentence), without interest, in cash, by wire transfer of immediately available funds.

(j) **Allocation of Purchase Price.** Each Party will allocate the Purchase Price among the Acquired Assets and the covenant described in Section 5.8 in accordance with Exhibit 2.4(j) and Applicable Law. After Closing, the Parties will make consistent use of such allocation, as adjusted to reflect any adjustments needed to remain consistent with Final Transferred Inventory, Final Register Cash and the Prepaid Items under Section 2.4(i) and the resulting adjustment to the Purchase Price, for all Tax and financial reporting purposes. With respect to such allocation, as so adjusted, each Party will (1) be bound by such allocation, (2) act in accordance with such allocation in the preparation and the filing of all Tax Returns and in the course of any Tax audit, Tax review or other Tax Proceeding relating thereto, (3) take no position, and cause its Affiliates to take no position, inconsistent with such allocation for Tax or financial reporting purposes (including in connection with any Proceeding), unless in each case otherwise required pursuant to a "determination" within the meaning of section 1313(a) of the Code, and (4) not later than 30 days before any filing of any IRS Form 8594 by or on behalf of such Party (whether initial or supplemental) relating to the transactions contemplated herein, deliver to each other Party a copy of such IRS Form. In furtherance of the foregoing, if any Governmental Authority, on its own initiative, makes or proposes an allocation of the Purchase Price among the Acquired Assets and the covenant described in Section 5.8 hereof which differs

10

---

Source: PreVu, INC, 8-K, July 14, 2008

materially from the allocation contemplated by this <u>Section 2.4(j)</u>, each of Buyer, on the one hand, and Sellers, on the other hand, shall have the right, at its or their election and expense, to contest such Governmental Authority's determination. In the event of such a contest, the other Party or Parties hereto shall cooperate reasonably with the contesting Party, but shall have the right to file such protective claims or Tax Returns as may be reasonably required to protect its or their interests.

(k) **Actions of Sellers in Unison**. Each Seller will act in unison and in agreement with each other Seller with respect to all matters in this <u>Section 2.4</u>. Additionally, for purposes of <u>Section 2.4(c)</u> and <u>2.4(d)</u>, all Sellers are treated as a single Party.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF EACH SELLER

Except as disclosed in the Disclosure Schedule and subject to <u>Section 9.11</u>, each Seller, jointly and severally, hereby represents and warrants to Buyer as follows:

3.1 <u>**Organization and Good Standing**</u>. Each Seller is a duly organized and validly existing corporation in good standing under the laws of the jurisdiction in which it was organized, each as listed in Section 3.1 of the Disclosure Schedule. Each Seller is duly qualified and in good standing to do business as a foreign corporation in each jurisdiction in which the ownership or leasing of its properties or assets or the conduct of its business requires such qualification, except where the failure to be so qualified or in good standing either individually or in the aggregate has not had and is not reasonably likely to have a Material Adverse Effect and will not materially and adversely affect such Seller's ability to consummate the transactions contemplated herein, with each such jurisdiction being listed in Section 3.1 of the Disclosure Schedule. Each Seller has full corporate power and authority to own and lease its properties and assets and conduct its business as now conducted.

3.2 <u>**Authority and Authorization**</u>. The execution, delivery and performance of this Agreement and each Ancillary Document of each Seller have been duly authorized and approved by all necessary corporate action with respect to such Seller, and each such authorization and approval remains in full force and effect. This Agreement and each Ancillary Document of each Seller has been duly executed by such Seller. Assuming due authorization, execution and delivery by Buyer of this Agreement and each Ancillary Document of Buyer, this Agreement is, and each Ancillary Document of each Seller is, the legal, valid and binding obligation of each Seller, enforceable against such Seller in accordance with its terms, except to the extent enforceability may be limited by any Enforceability Limitation. Each Seller and has all requisite corporate power and authority to enter into this Agreement and each Ancillary Document to be executed and delivered by such Seller and to consummate the transactions contemplated herein and therein to be consummated by such Seller.

3.3 <u>**Organizational Documents**</u>. A copy of the articles or certificate of incorporation as amended to the date hereof (certified by the Secretary or Department of State of the applicable State) and the bylaws of each Seller has been delivered to Buyer and such documents are complete and correct and represent the presently effective articles or certificate of incorporation and bylaws of Sellers. The minutes of the meetings (or proper written consents) of the boards of directors of Sellers authorizing the execution and delivery of this Agreement and the

11

Source: PreVu, INC, 8-K, July 14, 2008

consummation of the transactions contemplated hereby (certified by a duly authorized officer of the applicable Seller), copies of which have been delivered to Buyer, are true, accurate and complete as of the Closing Date.

3.4 **Ownership of Sellers**. Section 3.4 of the Disclosure Schedule lists the names of the owners of all capital stock of each Seller, other than Parent, as of the date hereof.

3.5 **Conflicts and Consents.**

(a) **Conflicts.** Neither the execution or delivery by any Seller of this Agreement or by any Seller of any Ancillary Document nor consummation by any Seller of the transactions contemplated herein or therein does or will (with or without the passage of time or giving of notice): (1) constitute a breach of, violate, conflict with or give rise to or create any right or obligation under any Organizational Document of any Seller; (2) violate any Applicable Law material to such Seller or violate in any material respect any Order applicable to such Seller; or (3) constitute a material breach or violation of or a material default under, conflict with or give rise to or create any right of any Person other than any Seller to accelerate, increase, terminate, modify or cancel any material right or obligation or result in the creation of any Encumbrance, other than a Permitted Encumbrance, under, any Major Contract that is an Assumed Contract.

(b) **Consents.** Section 3.5(b) of the Disclosure Schedule sets forth each approval by, notification to or filing with any Person required in connection with any Seller's execution, delivery or performance of this Agreement or any Ancillary Document of such Seller or such Seller's consummation of the transactions contemplated herein or therein, except (1) with respect to any Contract not required to be disclosed in the Disclosure Schedule to avoid a breach of Section 3.10 or (2) for any consent, approval, notice or filing, the absence of which will not materially and adversely affect such Seller's ability to consummate the transactions contemplated herein. "Consent" means the consents, approvals, notices or filings listed in Section 3.5(b) of the Disclosure Schedule.

3.6 **Financial Information and Undisclosed Liabilities.**

(a) **Financial Information Defined.** Section 3.6(a) of the Disclosure Schedule contains the following: (1) unaudited statements, as of May 3, 2008 (the "Financial Information Date"), of inventory, furniture, fixtures and equipment of the Outlet Business; (2) unaudited profit and loss statements of the Outlet Business for Parent's fiscal years ended February 3, 2007 and February 2, 2008 and for the three-month period ended on the Financial Information Date; (3) unaudited profit and loss statements of the Outlet Business for each fiscal quarter in Parent's fiscal years ended February 3, 2007 and February 2, 2008; and (4) a schedule reflecting the allocations of shared direct and indirect expenses among Parent's divisions for the three-month period ending on the Financial Information Date (such statements are, collectively, the "Financial Information").

(b) **Financial Information.** The Financial Information is true, correct and complete, in all material respects, and fairly presents, in all material respects, at their respective dates and for the respective periods covered thereby, the assets of the Outlet Business with respect to the specific items presented in the Financial Information and results of operations of the Outlet Business. The Financial Information is consistent in all material respects with the

12

Source: PreVu, INC, 8-K, July 14, 2008

books and records of Parent, which books and records of Parent are in all material respects correct and complete. Except as set forth in Section 3.6(b) of the Disclosure Schedule, each statement included in the Financial Information has been prepared on a consistent basis throughout the periods involved. Sellers acknowledge and agree that Buyer is relying on the accuracy and completeness of the Financial Information in making its determination as to whether it must file the Financial Information, or any portion thereof, with the SEC.

(c) **Undisclosed Liabilities.** No Seller has any Liability with respect to the Outlet Business that at the Effective Time would be an Assumed Liability, except for Liabilities (1) under any Major Contract that is an Assumed Contract (or a Contract not required to be disclosed in the Disclosure Schedule to avoid a breach of <u>Section 3.10</u>) or that is otherwise disclosed in or contemplated by this Agreement, including the Disclosure Schedule, (2) that have arisen in the Ordinary Course of Business of such Seller since the Financial Information Date, or (3) under this Agreement or any Ancillary Document or otherwise in connection with the transactions contemplated herein or therein.

3.7 <u>Taxes</u>.

(a) Such Seller has timely filed all Tax Returns that it has been required to file, and all such Tax Returns were correct and complete in all material respects and were prepared in substantial compliance with Applicable Law. None of such Tax Returns has been examined or audited by any Governmental Authority or is currently the subject of a Proceeding. Such Seller has paid, or made provisions in accordance with GAAP for the payment of, all Taxes due (whether or not shown or required to be shown on any Tax Return) through and including the Closing Date, including, but not limited to, with respect to 2008. Sufficient reserves have been established on the books and records of such Seller and are reflected in the Financial Information of such Seller to cover any unpaid Taxes of such Seller. There are no Encumbrances with respect to any of the Acquired Assets owned by such Seller that arose in connection with any failure (or alleged failure) to pay any Tax, other than Permitted Encumbrances. There is not currently pending any Proceeding or any dispute or claim by a Governmental Authority concerning the Tax liability of such Seller with respect to the income, business, operations or property of such Seller. No claim has been made by a Governmental Authority in a jurisdiction where such Seller does not file Tax Returns that it is or may be subject to Tax in that jurisdiction.

(b) All Taxes which such Seller was required by law to withhold, deposit or collect in connection with any amount paid or owing to any employee, independent contractor, creditor, partner or other third party have been duly withheld, deposited and collected and, to the extent required, have been paid to the relevant Governmental Authority, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(c) None of the directors, officers or other Person responsible for Taxes of such Seller has Knowledge, based upon personal contact with any agent of any Governmental Authority, that such Governmental Authority intends to assess any additional Taxes for any period for which Tax Returns have been filed by such Seller.

13

Source: PreVu, INC, 8-K, July 14, 2008

(d) None of the Acquired Assets owned by such Seller is (i) "tax-exempt use property" within the meaning of section 168(h)(1) of the Code, or (ii) "tax-exempt bond financed property" within the meaning of section 168(g) of the Code.

(e) None of the Acquired Assets owned by such Seller is an interest in any Person that is treated as a partnership for U.S. federal income Tax purposes or would be treated as a pass-through or disregarded entity for any Tax purpose.

(f) None of the Assumed Liabilities is an obligation to make a payment that is not deductible under section 280G of the Code. Such Seller has no liability for the Taxes of any Person under §1.1502-6 of the United States Income Tax Regulations (or any similar provision of state, local or foreign law), other than another Seller or any other member of the affiliated group of corporations of which Parent is the common parent, or as a transferee or successor, by contract or otherwise.

3.8 **Litigation and Orders**. Except as set forth in Section 3.8 of the Disclosure Schedule, there is no Proceeding pending or, to any Seller's Knowledge, Threatened against any Seller, as of the date of this Agreement, that (a) relates to the Outlet Business or any of the Acquired Assets (other than (1) workers' compensation claims or (2) challenges by governmental Intellectual Property office examiners as part of the related application process) that, if decided adversely to such Seller, is reasonably likely to result in an adverse effect upon the business or operations or condition, financial or otherwise, of the Outlet Business or the Acquired Assets or (b) seeks to enjoin, prohibit or otherwise challenge the transactions contemplated hereby. As of the date of this Agreement, no Seller is subject to any material restriction or limitation on the Outlet Business under any Order and no unsatisfied Order rendered against or affecting Sellers or any of the Acquired Assets might reasonably result in an adverse effect upon the business or operations or condition, financial or otherwise, of the Outlet Business or any of the Acquired Assets or adversely affect the validity or enforceability of any of the Assumed Contracts.

3.9 **Compliance with Law**. At all times since January 28, 2006, each Seller has been operated in compliance with all Applicable Laws (including those relating to maintaining Permits required of such Seller to conduct its business), except as does not relate to the Outlet Business or as set forth on Section 3.9 of the Disclosure Schedule and except for any non-compliance that has not had and is not reasonably likely to have a Material Adverse Effect.

3.10 **Contracts**.

(a) Section 3.10(a) of the Disclosure Schedule lists the following Contracts, in effect as of the date of this Agreement, to which any Seller is a party that is Principally Related to the Outlet Business (each Contract so listed and each Real Property Lease is a "Major Contract"):

(1) each employment agreement (other than those that are terminable at will by any Seller without any Liability or other obligation to any Seller, except any Liability or other obligation with respect to services rendered before the termination thereof);

14

Source: PreVu, INC, 8-K, July 14, 2008

(2) each covenant not to compete that restricts the Outlet Business as presently conducted;

(3) each operating lease (as lessor or lessee) of tangible personal property (other than any such lease calling for payments of less than $10,000 per 12-month period);

(4) each Contract to pay or receive any royalty or license fee or to license (either as licensor or licensee) any Intellectual Property (other than any (A) license with any Seller or any Affiliate of any Seller, but no other Person, that terminates at the Effective Time, (B) license for Intellectual Property embedded in any equipment or fixture, (C) non-exclusive implied license of Intellectual Property or (D) non-exclusive license for the use of any commercially available off-the-shelf software);

(5) each Contract regarding any management, personal service or consulting or other similar type of Contract under which there exists aggregate future payments in excess of $10,000 per Contract (other than those (A) that are terminable at will or upon not more than 90 days' notice by any Seller without any Liability or other obligation to any Seller, except any Liability or other obligation with respect to services rendered before the termination thereof, or (B) entered into in connection with a license);

(6) each Contract for the purchase by any Seller of any supply or product that calls for performance over a period of more than 12 months (other than those that are terminable at will or upon not more than 90 days' notice by any Seller without any Liability or other obligation to any Seller, except any Liability or other obligation with respect to any supply or product purchased before the termination thereof);

(7) each mortgage agreement, deed of trust, security agreement, purchase money agreement, conditional sales contract or capital lease created or assumed by, or permitted to be created by written document made or accepted by, any Seller (other than any (A) purchase money agreement, conditional sales contract or capital lease evidencing any Encumbrance only on tangible personal property under which there exists aggregate future payments less than $10,000 per Contract or (B) protective filing of any financing statement under the Uniform Commercial Code);

(8) each Contract under which any Seller is obligated to repay or has guaranteed any outstanding indebtedness for borrowed money or remains obligated to lend to or make any investment in (in the form of a loan, capital contribution or otherwise) any other Person, other than any other Seller;

(9) each Contract under which any Seller has advanced or loaned any other Person, other than any other Seller, outstanding amounts in the aggregate for such Person exceeding $10,000;

(10) each outstanding power of attorney with respect to any Seller (other than those entered into in its Ordinary Course of Business in connection with any Intellectual Property or Tax matter);

15

Source: PreVu, INC, 8-K, July 14, 2008

(11) each Contract with any distributor or broker of any product or service offered by any Seller;

(12) each Contract for any advertising or promotional service or website design or hosting;

(13) each Contract for the sale of any product or service offered by any Seller that calls for performance over a period of more than six months (other than those that are terminable at will or upon not more than 90 days' notice by any Seller without any Liability or other obligation to any Seller except any Liability or other obligation with respect to products or services ordered before the termination thereof);

(14) agreements of any Seller for mergers, consolidations or reorganizations or for the purchase or sale of material assets (other than in its Ordinary Course of Business) or all or substantially all of a Person's business and assets;

(15) each Contract with finders, brokers or underwriters (other than under which Buyer will have no obligation); and

(16) each other Contract not entered into in the Ordinary Course of Business of the applicable Seller (other than any Contract calling for payments by or to any Seller of less than $10,000 per 12-month period).

(b) Exhibit 1.1(a)(1) sets forth a true and complete list of all Contracts to which any Seller is a party that is Principally Related to the Outlet Business, other than Excluded Contracts and Contracts that are terminable at will or upon not more than 90 days' notice by the applicable Seller without any Liability or other obligation of such Seller (other than with respect to actions before the termination thereof) or which involve aggregate future payments of less than $10,000 (and other than any (A) license with any Seller or any Affiliate of any Seller, but no other Person, that terminates at the Effective Time, (B) license for Intellectual Property embedded in any equipment or fixture, (C) non-exclusive implied license of Intellectual Property (D) non-exclusive license for the use of any commercially available off-the-shelf software or (E) order described in Section 1.1(a)(1)(iv)). Sellers have made available to Buyer a true, correct and complete copy of each such Contract required to be so listed (or, to the extent that such an Assumed Contract is oral, an accurate summary thereof). With respect to each Major Contract (and with the following assuming that each Consent has been obtained, which, for any Consent that is a filing or notice, means the making of such filing or notice), (1) such Major Contract is legal, valid and binding, in full force and effect and enforceable (except to the extent enforceability may be limited by any Enforceability Limitation) in accordance with its terms against the Seller that is a party thereto and, to such Seller's Knowledge, against each other party thereto, (2) such Seller is not and, to such Seller's Knowledge, no other party thereto is in material breach of or default under such Major Contract, (3) no event, occurrence or condition exists or has occurred that (with or without the passage of time or giving of notice) would constitute a material breach or default of, or permit termination, modification, acceleration or cancellation of, such Major Contract or of any material right, Liability or other obligation thereunder, (4) such Seller has not waived any material right under such Major Contract and (5) no party to such Major Contract has terminated, modified, accelerated or canceled such Major Contract or any material right, Liability or other obligation thereunder or communicated in writing such party's

16

Source: PreVu, INC, 8-K, July 14, 2008

intent to do so. Seller has not granted any release or waiver in writing or that is otherwise material under or with respect to any of the Major Contracts. Seller has not assigned or otherwise transferred any of its rights under any of the Major Contracts.

3.11 **Certain Assets**.

(a) **Title**. Each Seller has good and marketable title to, or a valid leasehold interest in or valid license for, the tangible Acquired Assets to be conveyed by it pursuant to this Agreement, free and clear of any Encumbrance other than any Permitted Encumbrance.

(b) **Condition**. The tangible Acquired Assets, other than supplies and inventory, have been maintained in accordance with normal applicable industry practice, are in good operating condition and repair (except normal wear and tear) and is sufficient in all material respects for the purposes for which they are used.

(c) **Inventory**. Subject to the applicable reserves in the determination of Final Transferred Inventory and other than inventory for liquidation located at, held for or in transit to the Outlet Store at 3117 West Magnolia Boulevard, Burbank, California, substantially all of the On-Hand Inventory is merchantable. None of the On-Hand Inventory is on consignment (other than from one Seller to another). "On-Hand Inventory" means the finished goods inventory that is an Acquired Asset pursuant to Section 1.1(a)(3)(A), 1.1(a)(3)(B) or 1.1(a)(3)(D). Except as set forth on Section 3.11 of the Disclosure Schedule and except for such inventory for liquidation and subject to reserves consistent with Sellers' past practices, On-Hand Inventory does not include any items below standard quality, damaged or spoiled, or of a quality or quantity not usable or saleable in the normal course of the Outlet Business.

3.12 **Certain Business Relationships**. No Seller is a party to any Contract that is an Assumed Contract with any of its Affiliates (other than any other Seller). None of Sellers' officers owns, directly or indirectly, individually or collectively, an interest in any entity which is a competitor or supplier of the Outlet Business, other than owning or holding less than 2% of the outstanding shares of any class of stock that is regularly traded on a recognized domestic or foreign securities exchange or over-the-counter market. Since January 30, 2005, except as set forth in Section 3.12 of the Disclosure Schedule, no officer of any Seller, while such an officer, received income from any source other than a Seller that should have properly been paid to the Outlet Business.

3.13 **Certain Payments**. No Seller nor any director, officer, agent, or employee of any Seller, or, to the Knowledge of the Sellers, any other Person associated with our acting for or on behalf of any Seller, has directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business for the Outlet Business, (ii) to pay for favorable treatment for business secured for the Outlet Business or (iii) to obtain special concessions, or for special concessions already obtained, for or in respect of the Outlet Business, in each case in violation of Applicable Law, or (b) established or maintained any fund or asset for any purpose described in clause (a) above that has not been recorded in the books and records of Sellers.

17

Source: PreVu, INC, 8-K, July 14, 2008

3.14 **Real Property**. Other than the leased or occupied real property listed in Section 3.14 of the Disclosure Schedule (the "Leased Real Property," and each Contract under which any Leased Real Property is leased or occupied by any Seller is a "Real Property Lease"), no Seller owns any right, title or interest in any real property that is used in any manner in connection with the Outlet Business or that will become an Acquired Asset. Sellers, considered collectively, have a valid leasehold interest in each Leased Real Property, free and clear of any Encumbrance other than any Permitted Encumbrance. There are no parties in possession of the Leased Real Property other than the applicable Seller. No Leased Real Property has suffered any material damage by fire or other casualty that has not been repaired and restored in all material respects. As of the date hereof, no party to any Real Property Lease has exercised any termination right with respect thereto. All rent and other sums and charges payable by the applicable Seller as tenant thereunder are current. No Seller has received written notice from any insurance company that such insurance company will require any alteration to any Leased Real Property for continuance of a policy insuring such property (other than any notice of alteration that has been completed), to the extent that such alteration is the responsibility of the applicable Seller. No Seller is contesting any operating cost, real estate Tax or assessment or other charge payable by such Seller under any Real Property Lease. No Seller has exercised any (if any) option under any Real Property Lease to purchase the real property subject to such Real Property Lease. There are no material capital expenditures, to any Sellers' Knowledge, required to be made by Buyer in connection with the Leased Real Property in order to comply with any Real Property Lease or Applicable Laws or any insurance requirements of any Seller or any landlord under any Real Property Lease. All buildings, structures, facilities, and other improvements (collectively, "Improvements") are in good operating condition and repair, subject to normal wear and maintenance given their relative ages. To any Seller's Knowledge, all Permits that are required or appropriate to use or occupy the Leased Real Property as currently conducted thereon have been issued and are in full force and effect.

3.15 **Environmental Matters**.

(a) Sellers have made available to Buyer a true, correct and complete copy of all Phase I and Phase II environmental site assessments (if any) related to any of the Leased Real Property that are in any Seller's possession or control.

(b) One or more of the Sellers has obtained all material Permits that are required under any Environmental Law, except as does not relate to the Outlet Business or any Acquired Asset. Each Seller is in compliance with all material Environmental Laws and the terms of all material Permits issued pursuant to any Environmental Law, except as does not relate to the Outlet Business or any Acquired Asset.

(c) Except as does not relate to the Outlet Business or any Acquired Asset, there is no Environmental Claim pending or, to any Seller's Knowledge, Threatened as of the date of this Agreement against any Seller.

(d) In connection with the Outlet Business or any Acquired Asset, no Seller has installed, used, generated, treated, disposed of or arranged for the disposal of any Hazardous Substance in a manner reasonably likely to create any material Liability or other obligation for such Seller under any Environmental Law with respect to any Leased Real Property.

18

3.16 **Intellectual Property**.

(a) Section 3.16(a) of the Disclosure Schedule lists all (i) Intellectual Property owned by any Seller (including, as applicable for each item listed, the record owner, the jurisdiction, the application and registration numbers, the filing date, the issuance or registration date, the registrar and the expiration date) that constitutes an Acquired Asset and is registered with any Governmental Authority (or with any Person that maintains domain name registrations) and all applications for any such registration; (ii) common law trademarks owned by any Seller that are Principally Related to the Outlet Business and material to the conduct of the Outlet Business; and (iii) common law copyrights owned by any Seller that are Principally Related to the Outlet Business and material to the conduct of the Outlet Business. Each such registration or application has been maintained effective by all requisite filings, renewals and payments, and remains in full force and effect. Except as indicated therein, none of the Intellectual Property identified in Section 3.16(a) of the Disclosure Schedule has been abandoned or cancelled.

(b) One or more of the Sellers owns all right, title and interest in and to, free and clear of all Encumbrances, other than any Permitted Encumbrance, or has the right to use without payment of any royalty, license fee or similar fee (other than pursuant to a Major Contract or a Contract not required to be disclosed in the Disclosure Schedule to avoid a breach under Section 3.10), the Intellectual Property identified in Section 3.16(a) of the Disclosure Schedule that has not been abandoned or cancelled. Except as disclosed in Section 3.16(b) of the Disclosure Schedule, (i) no Seller has granted to any Person (other than any other Seller), and no other Person (other than any other Seller) has, any license, option or other rights in or to such Intellectual Property; (ii) since February 3, 2002, no Seller has received notice of any pending or, to any Seller's Knowledge, Threatened action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand that challenges the legality, validity, enforceability, registrations, use or ownership of such Intellectual Property, other than office actions in connection with the prosecution of applications for the registration or issuance of such Intellectual Property; (iii) other than any Major Contract (if applicable), no Seller is a party to any co-existence, consent, settlement or similar agreements limiting or modifying the rights of any Seller in such Intellectual Property anywhere in the world; (iv) no Seller has brought any Proceeding that is now pending against any Person, nor provided notice to any Person (including by cease and desist letter), that such Person is infringing such Intellectual Property, and to the Sellers' Knowledge, no Person is infringing such Intellectual Property; and (v) no Seller has received written notice, as of the date hereof, that any of such Intellectual Property has been declared unenforceable or otherwise invalid by any Governmental Authority.

(c) To each Seller's Knowledge, no Seller has received any charge, complaint, claim, demand or notice since February 3, 2002, whether written or oral, alleging that any use, sale or offer to sell any good or service of any Seller with respect to the Outlet Business infringes upon, misappropriates or violates any Intellectual Property right of any other Person (including any claim that any Seller must license or refrain from using any Intellectual Property right of any other Person in connection therewith or any offer by any other Person to license any Intellectual Property right of any other Person in connection therewith). To each Seller's Knowledge, no Seller is, with respect to the Outlet Business, infringing upon, misappropriating or violating the Intellectual Property of any other Person. To each Seller's Knowledge, no other Person is infringing upon, misappropriating or violating the Intellectual Property of any Seller constituting an Acquired Asset.

19

Source: PreVu, INC, 8-K, July 14, 2008

(d) Notwithstanding the foregoing, no representation or warranty is made in this Agreement regarding any infringement, misappropriation or violation with, upon, of, by or otherwise relating to any (1) license for Intellectual Property embedded in any equipment or fixture, (2) non-exclusive implied license of Intellectual Property or (3) non-exclusive license for the use of any commercially available off-the-shelf software.

3.17 **Treatment of Acquired Assets and Source Code.**

(a) Sellers have not knowingly permitted (including but not limited to actions by its employees and contractors) Sellers' rights in any Acquired Asset that is material to the conduct of the Outlet Business, the value of which to any Seller is dependent on it being maintained as a trade secret, to enter into the public domain or otherwise to become publicly available without cost.

(b) Sellers have obtained from all of their consultants and other third parties who have independently or jointly contributed to the conception, reduction to practice, creation or development of the Intellectual Property that is an Acquired Asset unencumbered and unrestricted exclusive ownership (subject to any Permitted Encumbrance) of, or a license sufficient for Sellers' current use for, all such third party's intellectual property rights in such contribution, excluding moral rights that are not assignable.

(c) Except as does not relate to the Outlet Business, Sellers have obtained from all current and former employees agreements requiring disclosure and assignment of inventions, and non-disclosure agreements. Except as does not relate to the Outlet Business, to Sellers' Knowledge, no current or former employee is in violation of such agreement.

(d) To the Knowledge of Sellers, no current or former employee, consultant or other third party has developed any material technology, software or other intellectual property that is an Acquired Asset for Sellers that is subject to any agreement under which such individual has assigned or otherwise granted to any third party (other than any Seller) any material rights in or to such technology, software or other intellectual property.

(e) To the extent that the Acquired Assets that are software owned by any Seller incorporate, integrate with, dynamically or statically link to, or use any third party intellectual property in the development, testing, pre-production, production, support or disaster recovery of the Acquired Assets, Sellers have (subject to any Permitted Encumbrance) (i) obtained all right, title and interest in and to such third party intellectual property by operation of law or by valid assignment or (ii) obtained perpetual (except in the event of breach) rights to use, modify, reproduce, display, prepare derivative works upon, perform, and distribute such third party intellectual property.

(f) Except as does not relate to the Outlet Business, Sellers use no software that is distributed by Sellers as open source software (including but not limited to software distributed under the GNU General Public License (GPL) (all versions), the GNU Lesser General Public License (LGPL) (all versions) or the Artistic License, Apache 2.0).

(g) To the Knowledge of Sellers, no current or former employee, consultant or other third party has contributed any Intellectual Property that is an Acquired Asset to any open source project.

20

(h) Neither Sellers nor any current or former employee acting on Sellers' behalf has contributed to any standards organization or similar entity that requires Sellers to grant or offer to grant third parties any rights in the Acquired Assets.

(i) Except as does not relate to the Outlet Business, to the Knowledge of Sellers, the software owned or used by Sellers accurately recognizes, calculates, processes and stores all same century and multi-century formulas, dates, date notations (including leap years), time zones and any "day-light savings" formulas and resolves ambiguities in date and time input and output.

(j) Except as does not relate to the Outlet Business, the software owned or used by Sellers accurately recognizes, calculates, processes and stores all numbers, whether expressed in decimal form, fraction form or both, in each case to the extent and in the manner sufficient for Sellers' current use thereof.

(k) No Seller or any of its employees has intentionally introduced into any software that is an Acquired Asset any code, device, criteria, mechanism or function for the purpose of adversely restricting, disabling, damaging, destroying or otherwise shutting down, or adversely altering the functionality of, specifications for, or access to, all or any portion of the software that is an Acquired Asset (including any computer code, programs or programming devices that are designed to, or which disrupt, modify, delete, deactivate, harm or otherwise impede any portion of such software in any material manner), all of the foregoing excluding documented access control functions. Sellers use the virus-scanning software listed on Section 3.17(k) of the Disclosure Schedule as well as security measures listed thereon.

3.18 **Privacy and Data Security Matters**.

(a) Except as does not relate to the Outlet Business, Sellers have not been required under Applicable Law to issue, and have not issued, any notifications under any Applicable Law relating to the actual or suspected unauthorized access or acquisition of personally identifiable information.

(b) Except as does not relate to the Outlet Business, Sellers have not undergone any audit or regulatory inquiry from any Governmental Authority with respect to privacy or data security of personally identifiable information and, to Sellers' Knowledge, no inquiry from any Governmental Authority (including as a result of complaints from any individuals provided to such Governmental Authority) is Threatened regarding same.

(c) Except as does not relate to the Outlet Business, Sellers are in compliance in all material respects with all requirements under Applicable Law and applicable industry standards (including but not limited to Payment Card Industry standards and including regulatory requirements of Governmental Authorities) governing personally identifiable information and data security.

(d) Except as does not relate to the Outlet Business, Sellers have obtained all consents required by Applicable Law with respect to current uses of individually identifiable data.

21

Source: PreVu, INC, 8-K, July 14, 2008

3.19 **Insurance**. Sellers have made available to Buyer a true, correct and complete copy of all insurance policies (or, when not reasonably available, the corresponding insurance binders) in force on the date hereof that are maintained by or cover any material aspect of the Outlet Business. Such policies are in full force and effect, and no Seller is in default under any of them. No Seller has received any notice of non-renewal, cancellation or intent to cancel, not renew or increase premiums or deductibles with respect to such insurance policies, nor, to the Knowledge of Sellers, is there any basis for such action.

3.20 **Absence of Certain Events**. From the Financial Information Date through the date hereof, there has not been any Material Adverse Effect. Since the Financial Information Date, the Outlet Business, taken has a whole, has been operated in all material respects in the Ordinary Course of Business of each Seller. From the Financial Information Date to the date of this Agreement, no Seller has done any of the following:

(a) except in its Ordinary Course of Business, (1) except for cash distributions to any Seller, made any sale, lease to any other Person, license to any other Person or other disposition of any asset that relates to the Outlet Business or any Acquired Asset, (2) failed to use its commercially reasonable efforts to preserve and maintain the Leased Real Property in substantially the same condition as existed on the Financial Information Date, ordinary wear and tear excepted, (3) made any capital expenditure or purchase or otherwise acquired any material asset that relates to the Outlet Business or any Acquired Asset (other than purchases of inventory in its Ordinary Course of Business and capital expenditures that did not exceed $10,000 (individually or in the aggregate)), licensed any intangible asset that relates to the Outlet Business or any Acquired Asset from any other Person (other than any (A) license for Intellectual Property embedded in any equipment or fixture, (B) non-exclusive implied license of Intellectual Property or (c) non-exclusive license for the use of any commercially available off-the-shelf software), leased any real property from any other Person that relates to the Outlet Business or any Acquired Asset or leased any tangible personal property from any other Person that relates to the Outlet Business or any Acquired Asset (other than leases of tangible personal property in its Ordinary Course of Business under which the payments do not exceed $10,000 (individually or in the aggregate)) or (4) disclosed any material confidential, proprietary or non-public information that relates to the Outlet Business or any Acquired Asset (other than as is reasonably protected under a customary non-disclosure Contract);

(b) granted any Encumbrance on any asset that relates to the Outlet Business or any Acquired Asset, other than (1) pursuant to a Major Contract (or a Contract not required to be disclosed in the Disclosure Schedule to avoid a breach under Section 3.10) or (2) any Permitted Encumbrance;

(c) became a guarantor with respect to any obligation of any other Person, other than any other Seller, or assumed any obligation of any such Person for borrowed money, in each case other than guarantees or obligations that will not become Assumed Liabilities;

(d) incurred any indebtedness for borrowed money that will become an Assumed Liability and cannot be prepaid at any time without penalty;

(e) except in its Ordinary Course of Business, amended or terminated in any respect that is adverse to the Outlet Business, taken as a whole, any Major Contract;

22

(f) (1) adopted or changed any material accounting method or principle used by such Seller, except as required under GAAP, the Code or any rule or regulation of the SEC or (2) changed any annual accounting period;

(g) failed to use its commercially reasonable efforts to preserve, and prevent any material degradation in, such Seller's relationship with its material suppliers and others having material business relations with such Seller relating to the Outlet Business;

(h) entered into any employment agreement with any individual who is an Eligible Employee (other than oral arrangements for employment at will), or, except in its Ordinary Course of Business granted any bonus or otherwise increased the compensation or benefits payable or to become payable to any individual who is an Eligible Employee;

(i) (1) paid, discharged, settled or satisfied any material claim that would have become an Acquired Asset, except (A) in its Ordinary Course of Business or (B) the payment, discharge, settlement or satisfaction of any claim to the extent reflected or reserved for on the Financial Information or (2) otherwise waived, released, assigned or transferred any right of material value that will be or would have become an Acquired Asset; or

(j) agreed, by entering into a Contract or legally binding commitment, to do any of the foregoing.

3.21 **Employee Benefits**.

(a) Section 3.21 of the Disclosure Schedule lists all Seller Plans. Sellers have delivered to Buyer an accurate summary of each Seller Plan.

(b) Each Seller Plan is in compliance in all material respects with its terms and with all applicable requirements of Applicable Law, including the Code and ERISA. As of the Closing Date, all contributions (including all premiums, employer contributions and employee salary reduction contributions) required to be made to, under or with respect to each Seller Plan with respect to individuals who may become Eligible Employees (and their dependents and beneficiaries) will have been made, other than immaterial amounts that will be made after Closing by a Seller without adverse effect on Buyer. There are no pending or threatened claims or proceedings against or relating to any Seller Plan (other than routine claims for benefits). No Seller or any ERISA Affiliate nor any director, officer or employee of any Seller or of any ERISA Affiliate has engaged in any unresolved Prohibited Transaction or committed any breach of fiduciary responsibility under ERISA, except for any Prohibited Transaction for which a specific exemption is provided under or pursuant to ERISA or the Code.

(c) Each Seller Plan that is intended to be qualified under section 401 of the Code has been determined by the IRS to be so qualified.

(d) No Seller has incurred or may incur, whether directly or indirectly, any liability or obligation under Title IV of ERISA with respect to any "employee pension plan" (within the meaning of Section 3(2) of ERISA), including, without limitation, any multiemployer plan described in Section 3(37) of ERISA. No Encumbrance has been imposed on the Acquired Assets pursuant to Section 302, 303 or Title IV of ERISA or Section 412 or 430 of the Code and no fact exists that would reasonably be expected to give rise to such Encumbrance. No Seller

23

has contributed to or has had an obligation to contribute to a multiemployer plan as described in Section 3(37) of ERISA.

(e) No Seller Plan provides for continuing benefits or coverage for any participant or any beneficiary of a participant after such participant's termination of employment, except as may be required by COBRA at such participant's or such beneficiary's expense. The requirements of section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA relating to COBRA continuation of health coverage have been satisfied with respect to each Seller Plan that is subject to such requirements.

(f) No Seller is bound by any collective bargaining agreement to maintain any Plan. No Seller Plan is subject to the laws of, or maintained primarily for the benefit of employees whose principal employment is located in, a country other than the United States.

3.22 **Employees and Labor Relations**.

(a) As of the date hereof, no Seller is a party to or is bound by any collective bargaining agreement or other similar Contract with any labor union representing any employee of any Seller who would be an Eligible Employee. No labor strike, lockout or material labor dispute or work stoppage has occurred or, to any Seller's Knowledge, has been Threatened, in each case from January 28, 2006 through the date of this Agreement with respect to any employee of any Seller who would be an Eligible Employee. To each Seller's Knowledge, no union organizing campaign exists or has occurred from January 28, 2006 through the date of this Agreement with respect to any employee of any Seller who would be an Eligible Employee. Section 3.22(a) of the Disclosure Schedule contains, as of the date stated in Section 3.22(a) of the Disclosure Schedule, a true, correct and complete list of each Eligible Employee and with respect to each such Eligible Employee the following information: (a) the employer of such Eligible Employee, (b) the amount of salary currently being paid on a gross annualized basis (if applicable), the hourly pay rate (if applicable) of such Eligible Employee and the amount of compensation paid in the fiscal year ended February 2, 2008; and (c) the nature and amount of any material perquisites or employee benefits currently being provided to or for the account of such Eligible Employee, other than the Seller Plans described herein. Set forth in Section 3.22(a) of the Disclosure Schedule is a list of individuals, whose duties are Principally Related to the Outlet Business, who are (A) "leased employees" within the meaning of Section 414(n) of the Code or (B) "independent contractors" within the meaning of the Code and the rules and regulations promulgated thereunder.

(b) To the Knowledge of the Sellers, no Eligible Employee is a party to any confidential information or other agreement that in any way restricts the ability of such Eligible Employee to perform his or her duties for the Sellers.

(c) Each of the Sellers has complied in all material respects with all Applicable Laws relating to the employment of labor in connection with the conduct of the Outlet Business, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, nondiscrimination, harassment, and the payment of social security and other Taxes. All persons who have performed services for the Sellers in connection with the conduct of the Outlet Business and have been classified as independent contractors have satisfied the requirements of all Applicable Laws to be so classified, and as applicable the Sellers have

24

Source: PreVu, INC, 8-K, July 14, 2008

fully and accurately reported their compensation on IRS Forms 1099 or other applicable tax forms for independent contractors when required to do so.

(d) Except as set forth in Section 3.22(d) of the Disclosure Schedule, there are no proceedings pending or, to the Knowledge of the Sellers, Threatened, between the Sellers, on the one hand, and any current or former employees thereof who were employed in connection with the conduct of the Outlet Business, on the other hand, including any claims for actual or alleged harassment or discrimination based on race, national origin, age, sex, sexual orientation, religion, disability, or similar tortuous conduct, wage and hour claims, breach of contract, wrongful termination, defamation, intentional or negligent infliction of emotional distress, interference with contract or interference with actual or prospective economic advantage. There are no claims pending or, to the Knowledge of the Sellers, Threatened, against any of the Sellers under any workers' compensation plan applicable to any individual who is an Eligible Employee.

(e) Sellers have provided all of their employees who would be an Eligible Employee with all wages, benefits, relocation benefits, stock options, bonuses and incentives and all other compensation which became due and payable through the date of this Agreement. No Seller has instituted any "freeze" of, or delayed or deferred the grant of, any cost-of-living or other salary adjustments for any of its employees who would be an Eligible Employee.

(f) Set forth on Section 3.22(f) of the Disclosure Schedule is a list of all employees terminated by any Seller within 60 days before the Closing Date, the dates of the terminations, and the location in which all such employees worked. At all times prior to Closing, each Seller has complied in all material respects with the WARN Act and all similar state Applicable Laws, and other than the termination of the employees listed on Section 3.22(f) of the Disclosure Schedule, no Seller has taken any action which could affect the Parties' obligations under the WARN Act.

3.23 **Suppliers**.

(a) Section 3.23(a) of the Disclosure Schedule sets forth, for the years ended February 2, 2008 and February 3, 2007 and for the quarter ended May 3, 2008, the names of each supplier that accounted for more than $100,000 of the operating expenses of the Outlet Business during any such period.

(b) No supplier identified on Section 3.23(a) of the Disclosure Schedule with respect to the quarter ended May 3, 2008, has, since the start of such quarter, canceled or otherwise terminated, or threatened in writing to a Seller to cancel or terminate, its relationship with Sellers, or its business done with Sellers.

3.24 **Brokers**. No Seller has any Liability or other obligation to any broker, finder or similar intermediary in connection with the purchase or sale of Acquired Assets hereunder that would cause Buyer to become liable for payment of any fee or expense with respect thereto.

3.25 **Projections**. Sellers have provided Buyer with the projections for the Outlet Business included in the Greene Holcomb & Fisher "Confidential Executive Summary—Wilsons Leather Outlet" (the "Projections"). The Projections were prepared in good faith and are based upon assumptions and estimates that the Sellers believed to be reasonable at the time of preparation; it being understood by the Buyer that projections such as the Projections are

25

Source: PreVu, INC, 8-K, July 14, 2008

inherently subject to risks, uncertainties and other factors that may cause actual results to differ from those stated in such Projections.

3.26 **Disclosure**. To Sellers' Knowledge, no information furnished by or on behalf of Sellers to Buyer in connection with this Agreement (including the Disclosure Schedule) contains any untrue statement of a material fact or omits to state a material fact necessary to make such statement, in the light of the circumstances under which it was made, not misleading.

3.27 **Certain General Exceptions**. Notwithstanding any term of this Agreement, no representation or warranty is made by any Seller in this Agreement regarding any product (including with respect to the non-infringement of any Intellectual Property of any third party relating to such product) purchased from or through, or otherwise supplied by or through, G-III Apparel Group, Ltd., an Affiliate of Buyer ("G-III"), or any Affiliate of G-III.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to each Seller as follows:

4.1 **Organization and Good Standing**. Buyer is a duly organized and validly existing corporation in good standing under the laws of the State of Delaware. Buyer is duly qualified and in good standing to do business as a foreign corporation in each jurisdiction in which the ownership and leasing of its properties or assets or the conduct of its business requires such qualification, except where the failure to be so qualified or in good standing will not materially and adversely affect Buyer's ability to consummate the transactions contemplated herein. Buyer has full corporate power and authority to own and lease its properties and assets and conduct its business as now conducted.

4.2 **Authority and Authorization**. The execution, delivery and performance of this Agreement and each Ancillary Document of Buyer have been duly authorized and approved by all necessary corporate action with respect to Buyer, and each such authorization and approval remains in full force and effect. This Agreement and each Ancillary Document of Buyer has been duly executed by Buyer. Assuming due authorization, execution and delivery by each Seller of this Agreement and each Ancillary Document of any Seller, this Agreement is, and each Ancillary Document of Buyer is, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except to the extent enforceability may be limited by any Enforceability Limitation. Buyer has all requisite corporate power and authority to enter into this Agreement and each Ancillary Document to be executed and delivered by Buyer and to consummate the transactions contemplated herein and therein to be consummated by Buyer.

4.3 **Conflicts and Consents**.

(a) **Conflicts**. Neither the execution or delivery by Buyer of this Agreement or by Buyer of any Ancillary Document nor consummation by Buyer of the transactions contemplated herein or therein does or will (with or without the passage of time or giving of notice): (1) constitute a breach of, violate, conflict with or give rise to or create any right or obligation under any Organizational Document of Buyer; (2) violate any Applicable Law or Order; or (3) constitute a breach or violation of or a default under, conflict with or give rise to or create any right of any Person other than Buyer to accelerate, increase, terminate, modify or

26

cancel any right or obligation under, any Contract to which Buyer is a party, except where such a breach, violation, default, conflict or right described in clause (a)(2) or (a)(3) above will not materially and adversely affect Buyer's ability to consummate the transactions contemplated herein.

(b) **Consents**. No consent or approval by, notification to or filing with any Person is required in connection with Buyer's execution, delivery or performance of this Agreement or any Ancillary Document of Buyer or Buyer's consummation of the transactions contemplated herein or therein, except for any consent, approval, notice or filing, the absence of which will not materially and adversely affect Buyer's ability to consummate the transactions contemplated herein.

4.4 **Litigation and Orders**. There is no Proceeding pending or, to Buyer's Knowledge, Threatened against Buyer, as of the date of this Agreement, that, if decided adversely to Buyer, will materially and adversely affect Buyer's ability to consummate the transactions contemplated herein. As of the date of this Agreement, Buyer is not subject to any Order that will materially and adversely affect Buyer's ability to consummate the transactions contemplated herein.

4.5 **Availability of Funds**. Buyer has available cash or existing available borrowing capacity under committed borrowing facilities on the date hereof, and Buyer will have available cash at Closing, in each case that is sufficient to enable Buyer to consummate the transactions contemplated herein. Buyer's obligations hereunder are not contingent upon procuring any financing.

4.6 **Forward-Looking Statements**. Buyer and its representatives have received certain estimates, budgets, forecasts, plans and financial projections (collectively, "Forward-Looking Statements"). There are uncertainties inherent in the Forward-Looking Statements, and Buyer is familiar with such uncertainties.

4.7 **Brokers**. Buyer has no Liability or other obligation to any broker, finder or similar intermediary in connection with the purchase or sale of the Acquired Assets hereunder that would cause any Seller to become liable for payment of any fee or expense with respect thereto.

4.8 **Capitalization**. Buyer's capitalization consists of equity of $15,000,000 and long-term debt of $10,000,000.

**ARTICLE 5**
**CERTAIN COVENANTS**

5.1 **No Liability for Unobtained Consents and Governmental Permits**. Buyer acknowledges and agrees that (1) certain Consents may be necessary from parties to Contracts in connection with the transactions contemplated herein in order to not constitute at Closing a breach or violation of or a default under, conflict with or give rise to or create any right or obligation under or create any Encumbrance (other than a Permitted Encumbrance) under, such Contracts, which Consents have not been obtained, (2) certain Permits may be required as a result of the transactions contemplated herein for Buyer to conduct the Outlet Business after Closing in the manner in which the Outlet Business was conducted before Closing and (3) except

27

Source: PreVu, INC, 8-K, July 14, 2008

to the extent expressly stated in <u>Article 3</u>, no Seller has made (and no Person on behalf of any Seller has made) any representation or warranty or similar assurance regarding the need for or desirability of any consent or approval by, notification to or filing with any Person, nor regarding the need for or desirability of any Permit. Buyer agrees that, except as otherwise expressly provided in this <u>Section 5.1</u> (or as a result of any representation or warranty in <u>Article 3</u>), no Seller will have any Liability or other obligation whatsoever to Buyer or any of Buyer's Other Indemnified Persons arising out of, relating to or resulting from the failure to obtain any such Consent or Permit (provided that each Seller has performed its related obligations hereunder). Buyer further agrees that no term herein will be breached as a result of (a) failure to obtain any such Consent or Permit or (b) any claim or Proceeding commenced or Threatened by or on behalf of any Person arising out of, relating to or resulting from the failure to obtain any such Consent or Permit.

5.2 <u>Access to Information</u>.

(a) **Certain Removals of Certain Information and Other Assets**. After Closing, if any information or other asset of any Seller (or any Affiliate of any Seller) that is not an Acquired Asset was included in the Acquired Assets, or if Buyer (or any of its Affiliates) otherwise retains access to or use of any such information or other asset in connection with its acquisition of the Outlet Business hereunder, then Buyer will cooperate with Sellers in all reasonable respects, at Sellers' expense, to maintain the confidentiality of such information or other asset (if applicable), not use such information or other asset and redact or otherwise remove such information or other asset from such Acquired Asset (or to otherwise cause Buyer and its Affiliates to no longer have access thereto or use thereof).

(b) **Post-Closing Access for Sellers**. Throughout the seven-year period after Closing, subject to Buyer's reasonable confidentiality precautions, Buyer will, during normal business hours and upon reasonable notice from any Seller: (1) cause any Seller and any Seller's representatives to have reasonable access to the books and records (including financial and Tax records, Tax Returns, files, papers and related items) relating to the Outlet Business and to the personnel responsible for preparing and maintaining such books and records, in each case to the extent necessary or reasonably desirable to (A) defend or pursue any Proceeding, (B) defend or pursue indemnification matters hereunder, (C) prepare or audit financial statements, (D) prepare or file Tax Returns or (E) address other Tax, accounting, financial or legal matters or respond to any investigation or other inquiry by or under the control of any Governmental Authority; and (2) permit any Seller and any Seller's representatives to make copies of such books and records for the foregoing purposes, at such Seller's expense.

(c) **Post-Closing Access for Buyer**. Throughout the seven-year period after Closing, subject to any Seller's reasonable confidentiality precautions, each Seller will, during normal business hours and upon reasonable notice from Buyer: (1) cause Buyer and Buyer's representatives to have reasonable access to any (if any) portion of the books and records (including financial and Tax records, Tax Returns, files, papers and related items) of any Seller relating to the Outlet Business that were not an Acquired Asset and to the personnel responsible for preparing and maintaining such books and records, in each case to the extent necessary or reasonably desirable for Buyer to take any action of the type contemplated in any of clauses (c)(1)(A) through (c)(1)(E) of <u>Section 5.2(b)</u>; and (2) permit Buyer and Buyer's

28

Source: PreVu, INC, 8-K, July 14, 2008

representatives to make copies of such portion of such books and records for the foregoing purposes, at Buyer's expense.

(d) **Post-Closing Retention of Information by Sellers.** At and after Closing, without limiting the definition of Excluded Assets, each Seller may retain in such Seller's (or any of its Affiliates') possession, subject to Buyer's reasonable confidentiality precautions, any copies of any books or records of such types described in Section 5.2(b)(1) that are in any Seller's possession or control (or the possession or control of any of its Affiliates), including for any purpose described in Section 5.2(b)(1).

5.3 **Further Assurances.** If after Closing any further action is necessary, proper or desirable to carry out any purpose of this Agreement, then each Party will take such further action (including, without limitation, the execution and delivery of further documents to effect the transfer of Intellectual Property or other Acquired Assets to Buyer) as any other Party reasonably requests to carry out such purpose. The foregoing will be at the expense of such requesting Party, except to the extent such requesting Party is entitled to indemnification therefor or to the extent this Agreement otherwise allocates such expense to any other Party. Sellers will provide to Buyer applicable copies of employee benefits records to the extent permitted by Applicable Law, without cost to Buyer.

5.4 **Confidentiality and Publicity.**

(a) **Confidentiality Agreement.** Subject to the other terms of this Section 5.4, the Confidentiality Agreement, dated March 31, 2008, to which G-III and Parent are a party (the "Confidentiality Agreement"), will remain in full force and effect pursuant to its terms, except that, after the Closing Date, information that G-III is required to keep confidential under the Confidentiality Agreement, for purposes of the obligations of G-III under the Confidentiality Agreement, will be deemed not to refer to any information then Principally Relating to the Outlet Business.

(b) **Publicity.** Except as stated in this Section 5.4(b) or 5.4(c), each Party will not, and each Party will cause each of its Affiliates not to, make any public release or announcement regarding this Agreement or any of the transactions contemplated herein without the prior written approval thereof of each other Party (which will not be unreasonably withheld). Each Party will cooperate with each other Party in issuing, promptly after entering into this Agreement, its press release (with mutually agreed upon text) that announces the Parties' entry into this Agreement and the transactions contemplated herein generally.

(c) **Certain Permitted Disclosures.** Notwithstanding the foregoing, nothing in this Section 5.4 will prevent any of the following at any time:

(1) a Party or any of its Affiliates disclosing any information to the extent required under Applicable Law (other than due to any requirement of the SEC or the rules and regulations of any national securities exchange, which is addressed in one or more clauses below); provided, however, that if a Party or any of such Party's Affiliates is so required to so disclose any information that otherwise would be prohibited in the absence of this Section 5.4(c), then (A) such Party will provide to each other Party prompt written notice thereof and cooperate (and cause such Affiliate, as applicable, to

29

cooperate) with each other Party, to the extent any other Party reasonably requests, so that such other Party may seek a protective order or other remedy or waive compliance with the terms of this Agreement (subject, in each case, to legal requirements to the contrary) and (B) if such protective order or other remedy is not obtained, or if each such applicable other Party waives compliance with the terms of this Agreement, then such Party will (and will cause such Affiliate, as applicable, to) disclose only the portion of such information that is so required to be disclosed, and such Party will (and will cause such Affiliate, as applicable, to) use its commercially reasonable efforts, at the expense of such other Party, to obtain reasonable assurance that confidential treatment will be accorded such information;

(2) a Party or any of its Affiliates making any release or announcement that is required by the SEC or the rules or regulations of any national securities exchange, in which case such Party will (or will cause such Affiliate to), if practicable under the circumstances, allow each other Party reasonable time to comment on such release or announcement in advance;

(3) any Seller communicating with any of its suppliers on a need to know basis regarding the transactions contemplated herein, including regarding any change to any document, requirement or process relating to any product or service of any Seller;

(4) a Party or any of its Affiliates making a statement or disclosure (A) as part of its or any of its Affiliate's financial statements or, notwithstanding clause (c)(1) above, Tax Returns or filing with the SEC or any national securities exchange or (B) to the extent reasonably necessary to enforce or comply with this Agreement; or

(5) a Party making a statement or disclosure to (A) such Party's (or any of its Affiliate's) paid legal, accounting and financial advisers to the extent reasonably necessary for any such adviser to perform its paid legal, accounting and financial services, respectively, for such Party (or such Affiliate) or (B) any lender or prospective lender of such Party (or such Affiliate) to the extent reasonably required as part of such lending relationship.

5.5 **Employee Matters**.

(a) **Definitions**.

(1) "Eligible Employee" means, as of immediately before the Effective Time, any employee of any Seller who is: (A) primarily rendering services in one or more Outlet Stores; (B) a district or regional manager dedicated primarily to the Outlet Business; or (C) listed as such in Exhibit 5.5(a). Notwithstanding the foregoing, the definition of Eligible Employee excludes any employee of any Seller who is listed as not being Eligible Employee in Exhibit 5.5(a), who are individuals that Sellers may determine to retain.

(2) "Transferred Employee" means each Eligible Employee who accepts Buyer's offer of employment as contemplated in Section 5.5(b). Notwithstanding the foregoing, an Eligible Employee will become a "Transferred Employee," if at all, on or as of: (1) immediately after the Effective Time on the Cut-Off Date, if such Eligible

30

Source: PreVu, INC, 8-K, July 14, 2008

Employee is then actively a worker; (2) immediately after the Effective Time on the Cut-Off Date, if such Eligible Employee is absent from work on such date due to authorized vacation or jury duty and returns to active employment following the end of the vacation or the completion of jury duty, as the case may be; or (3) the date such Eligible Employee returns to active employment, in the case of an Eligible Employee who, on the Cut-Off Date, is absent from work due to sick leave, short term disability, maternity leave, military leave or other authorized leave of absence with a right to return to his or her job, and who returns to active employment within the time required under the original terms and conditions applicable to such absence.

(b) **Offers of Employment with Buyer**. Prior to the Closing, to be effective immediately after the Effective Time, Buyer has made or will have made bona fide offers of employment to all Eligible Employees, including each Eligible Employee on medical, disability, family, military or other leave of absence as of the Effective Time (but not any employment offer to, or hiring of, any employee of any Seller that is not an Eligible Employee), and Buyer will hire each Eligible Employee that accepts such offer of employment. Such offered employment will have been, in each case, on terms (other than regarding employee benefits, which are the subject of other terms of this <u>Section 5.5</u>) that are comparable, as a whole for each individual, to the terms of employment provided to each such Eligible Employee immediately before the Effective Time by the applicable Seller. Not later than the Closing Date, Sellers notified or will notify each Eligible Employee to be hired by Buyer, in writing, that his/her employment with Sellers is terminated as of the Effective Time.

(c) **Employee Retention**. Subject to the other obligations of Buyer in this <u>Section 5.5</u>, nothing in this <u>Section 5.5</u> otherwise obligates Buyer to continue the employment of any Transferred Employee for any specific period after the Effective Time.

(d) **Statutory Notices**. At all times after the Effective Time, Buyer will comply in all material respects with the WARN Act and all similar state Applicable Laws. Buyer and Sellers acknowledge and agree that they are relying on the foregoing for purposes of assessing any obligations to give notice to employees of the transactions contemplated herein or to take any other action under Applicable Law.

(e) **COBRA and Other Obligations**. The "selling group" (within the meaning of paragraph (a) of Q&A-3 of Treasury Regulation §54.4980B-9) will continue to maintain group health plan coverage available to its employees after the Closing such that Buyer will not become a "successor employer," as that term is defined in paragraph (c) of Q&A-8 of Treasury Regulation §54.4980B-9. Except as specifically provided in this subsection (but without limiting Buyer's express obligations under <u>Section 5.5(h)</u>), Buyer does not and will not assume the sponsorship of, the responsibility for contributions to, or any liability under or in connection with, any Seller Plan. Without limiting the foregoing, Buyer shall have no obligation whatsoever to pay all or any part of, and Sellers shall remain responsible for, (i) any severance benefits that a Seller is or may be obligated to pay in connection with the termination of employment by Seller of any of its employees, (ii) accrued but unpaid salaries, wages, bonuses, incentive compensation or other compensation owing by any Seller or (iii) any bonuses or other amounts due to employees of any Seller with respect to their employment by any Seller arising from or related to the transactions contemplated herein or any other types of stay or change in control bonus payments. After Closing, Buyer will make available group medical, dental and vision coverage to Transferred

31

Source: PreVu, INC, 8-K, July 14, 2008

Employees and their eligible dependents. Seller will be responsible for offering and, if elected, providing COBRA health coverage continuation to all individuals who are "M&A qualified beneficiaries" with respect to the transactions contemplated herein (within the meaning of Treasury Regulation section 54.4980B-9, Q&A-4). For the avoidance of doubt, Seller shall not be responsible for satisfying COBRA continuation coverage obligations arising after the Closing with respect to Transferred Employees and their dependents who have become covered by Buyer's group health plan. Sellers shall remain solely responsible for all liabilities relating to or arising in connection with (1) claims for welfare benefits incurred by Transferred Employees and their qualified beneficiaries and dependents before the date they become Transferred Employees, and (2) claims by Transferred Employees for workers' compensation benefits arising in connection with any occupational injury or disease occurring on or prior to the Effective Time. At the Effective Time for any employee that becomes a Transferred Employee on the Cut-Off Date, and at the close of Business on the date any other employee becomes a Transferred Employee, such employee and his or her dependents shall cease participation in all Seller Plans, except with respect to benefits accrued as of, or claims incurred and payable as of, such time or as contemplated in <u>Section 5.5(h)</u>.

(f) **No Transfer of Plan Assets**. No portion of the assets of any trust or other fund maintained by any Seller or any Affiliate of any Seller for the purpose of paying benefits under any Seller Plan will be transferred to Buyer or any Plan of Buyer or any of Buyer's Affiliates.

(g) **No Amendment of Benefits nor Third-Party Beneficiary**. Without limiting <u>Section 9.4</u>, (1) no Plan or other employee benefit is, or will be deemed to be, amended by any term hereof and (2) no Person, including any employee (or dependent thereof) of any Party or any Affiliate of any Party, is a third party beneficiary of any term of this <u>Section 5.5</u>.

(h) **Employee Benefits Transition**. The Parties agree to the following arrangements for the provision of certain welfare benefits to Transferred Employees and their dependents during the period from the Effective Time until 11:59 p.m. on July 31, 2008 (the "<u>Transition Period</u>"):

(1) **Insured Plans**. The Seller Plans that are fully insured and that will continue to provide coverage for Transferred Employees and their dependents during the Transition Period are medical insurance for Sellers Headquarters and Sellers Distribution Facility employees, and life insurance. To the extent that Buyer deducts employee contributions for the employee share of such coverages with respect to coverage provided during the Transition Period, Buyer will pay the amounts so deducted to Sellers within three Business Days following each payroll date on which such amounts are deducted. Sellers will be responsible for the employer share of the premiums for such coverages during the portion of the month of July 2008 from July 1 until the Effective Time. Buyer will be responsible for the employer share of the premiums for such coverages during the Transition Period. Within three Business Days following the payroll date on which the employee share of said premiums are deducted (or would have been so deducted, it being Buyer's option as to whether so deducted) with respect to coverage provided for a portion of the Transition Period, Buyer will pay to Sellers an amount equal to the employer share of the premium for the coverage provided during that portion of the Transition Period. Sellers will transmit to the respective insurance carriers

32

Source: PreVu, INC, 8-K, July 14, 2008

all premium amounts received from Buyer pursuant to this clause (1), which payments will occur not later than the payment date for each such premium under the historical practices of Sellers.

(2) **Self-Insured Plans.** The Seller Plans that are self-insured and that will continue to provide coverage for Transferred Employees and their dependents during the Transition Period are medical coverage for field employees, dental coverage and vision coverage. To the extent that Buyer deducts employee contributions for the employee share of such coverages with respect to coverage provided during the Transition Period, Buyer will pay the amounts so deducted to Sellers within three Business Days following each payroll date on which such amounts are deducted. In addition, within three Business Days following July 31, 2008, Buyer will pay to Sellers an amount equal to the pro rata share of the July 2008 premium paid to Sellers' stop-loss carrier attributable to such coverage provided during the Transition Period. Sellers will be responsible for the costs covered by said Seller Plans with respect to claims of Transferred Employees and their dependents that are incurred due to the provision of services during the portion of the month of July 2008 from July 1 until the Effective Time. Buyer will be responsible for the costs covered by said Seller Plans with respect to claims of Transferred Employees and their dependents that are incurred due to the provision of services during the Transition Period. As soon as administratively feasible following the end of each month during the period from July through December of 2008, Sellers will provide to Buyer a statement showing (A) the aggregate amount of claims paid by Sellers (disregarding any such claims to the extent reimbursed to Sellers by Sellers' stop-loss carrier) under such self-insured plans with respect to coverage provided to Transferred Employees and their dependents during the Transition Period, (B) the aggregate amount of employee contributions received by Sellers (through payroll deduction or by payment from Buyer under the foregoing provisions of this clause (2)) with respect to such self-insured coverage provided to Transferred Employees and their dependents during the Transition Period and (C) for months following July 2008, the aggregate amount of reimbursements received from Buyer under the next sentence of this clause (2) with respect to months preceding the month to which the statement relates. Within three Business Days following its receipt of the statement for a month, Buyer will pay to Sellers the amount, if any, by which the amount in clause (A) of the previous sentence exceeds the sum of the amounts in clauses (B) and (C) of such sentence.

(3) **Proration.** To the extent that it is necessary to prorate premiums or contributions under the preceding provisions of this Section 5.5(h) with respect to a particular period (such as a month or a payroll period), proration will be based on the number of calendar days in each portion of the period divided by the total number of calendar days in the applicable period.

(i) **Seller Plans.** Within 30 days after the Closing, Sellers shall deliver to Buyer true, correct and complete copies of (a) the governing documents of each Seller Plan, (b) where applicable, the most recent summary plan description of each Seller Plan, and (c) any employee handbook or similar materials furnished to Seller employees who are Eligible Employees.

33

Source: PreVu, INC, 8-K, July 14, 2008

5.6 **Mail, Receivables and Other Items to be Given to Proper Party**. After Closing, (a) each Party will promptly deliver to the proper Party the original of any mail or other communication received by such Party that is or should properly be the property of such other Party and (b) at least monthly, each Party will deliver to the proper Party any monies, checks or other instruments of payment received by such Party to which such other Party is entitled.

5.7 **Transfer Taxes**. Buyer will, on the one hand, and Sellers, on the other hand, will each pay when due 50% of all Transfer Taxes. Each Seller and Buyer will cooperate in all reasonable respects in timely making all filings, returns, reports and forms as may be required to comply with the provisions of Applicable Law relating to any Transfer Tax and in executing and delivering certificates that accurately set forth relevant facts to entitle any Seller or Buyer to exemptions from the payment of Transfer Taxes (if applicable). "Transfer Tax" means any sales, use, value-added, business, goods and services, transfer (including any stamp duty or other similar tax chargeable in respect of any instrument transferring property), documentary, conveyancing or similar tax or expense or any recording fee, in each case that is imposed as a result of any transaction contemplated herein, together with any penalty, interest and addition to any such item with respect to such item.

5.8 **Covenant Not to Compete and Related Covenants**.

(a) To further ensure that Buyer receives the expected benefits of acquiring the Acquired Assets, each Seller agrees that (subject to the other terms of this Section 5.8), throughout the period that begins at the Effective Time and ends on the second anniversary of the Closing Date (but excluding any period between the Effective Time and the occurrence of Closing, in the case where the Effective Time precedes Closing), such Seller will not, and such Seller will cause each of its Subsidiaries not to, directly or indirectly,

(1) own or hold any equity interest in or manage or otherwise operate any Person that owns or operates any Restricted Business in the Restricted Area, where

(A) "Restricted Business" means any outlet store, or group of outlet stores owned by the same Person or by Persons that are Affiliates, in each case with respect to which greater than 50% of the revenue from such outlet store, or group of outlet stores, is directly derived from the retail sale of leather outerwear, and

(B) "Restricted Area" means the geographical area of the United States; or

(2) employ in the Restricted Area any individual who, immediately before the Effective Time, was an Eligible Employee who was (at such time) an officer or management-level employee of any Seller or any Affiliate of any Seller.

(b) Notwithstanding Section 5.8(a), nothing in this Agreement prohibits or otherwise restricts any Seller or any of its Subsidiaries from performing, permitting or otherwise being involved in, any of the following:

(1) any Permitted Investment, where "Permitted Investment" means: (A) owning or holding less than 2% of the outstanding shares of any class of stock that is

34

Source: PreVu, INC, 8-K, July 14, 2008

regularly traded on a recognized domestic or foreign securities exchange or over-the-counter market; or (B) an acquisition after Closing of any of a Person's assets or equity interests or any of such Person's or its Affiliates' businesses (such Person or businesses so acquired being the "Permitted Acquired Business") if the portion of the Permitted Acquired Business that is engaged in the Restricted Business generated less than 20% of the total revenue of such Permitted Acquired Business during the most recently completed fiscal year of such Permitted Acquired Business preceding the date of such acquisition; or

(2) (A) general solicitation for employment (including in any newspaper or magazine, over the internet or by any search or employment agency) if not specifically directed towards any employee of Buyer of any of its Affiliates, (B) hiring an individual (x) where the initial contact with such individual regarding such hiring primarily arose from any such general solicitation or (y) whose employment with Buyer or any Affiliate or Buyer ceased under circumstances that did not involve any solicitation (other than any solicitation contemplated under clause (b)(2)(A) above) by any Seller or any Affiliate of any Seller or (C) hiring or retaining any individual that Buyer did not offer to hire as of the Cut-Off Date or the following day or involuntarily terminated on or after the Cut-Off Date.

(c) Each Seller specifically acknowledges and agrees that (1) this Section 5.8 is reasonable and necessary to ensure that Buyer receives the expected benefits of acquiring the Acquired Assets, (2) Buyer has refused to enter into this Agreement in the absence of this Section 5.8 and (3) breach of this Section 5.8 will harm Buyer to such an extent that monetary damages alone may be an inadequate remedy. Therefore, in the event of a breach by any Seller of this Section 5.8, Buyer (in addition to all other remedies Buyer may have) will be entitled to seek a temporary restraining order, injunction and other equitable relief (and seek that it be without posting any bond or other security) restraining such Seller from committing or continuing such breach.

5.9 **Intercompany Accounts**. Each Seller will cause all intercompany accounts in effect immediately before the Effective Time between or among any of the Sellers with respect to the Outlet Business that relate to any Acquired Asset or Assumed Liability, to be paid in full or otherwise fully satisfied, effective at or before the Effective Time.

5.10 **Bulk Sales Laws**. Without limiting any right of Buyer under Article 8, Buyer (a) acknowledges that the Parties or any of them may not comply with the provisions of any bulk transfer law or Tax law relating to bulk sales or bulk transfers of any jurisdiction in connection with any Acquired Asset or the transactions contemplated by this Agreement and (b) hereby waives any requirement of compliance with such laws; *provided, however,* that no such waiver shall relieve Parent and Sellers or liability for any pre-Closing Taxes.

5.11 **License Back and Name Changes**.

(a) **License Back of Names**. Upon and subject to the terms of this Section 5.11, effective as of the Effective Time, Buyer hereby grants to each Seller the non-transferable (except to any Affiliate of such Seller, which is permitted), royalty-free, non-exclusive license and right to use, during the License Period, each Mark in any location.

35

Source: PreVu, INC, 8-K, July 14, 2008

(b) **Additional Terms Regarding License Back**. Each Seller agrees that, during the License Period, (1) the nature and quality of all products and services sold by such Seller (or Affiliate of such Seller) under any Mark will conform in all material respects to such Seller's (or Affiliate's) past practices, standards and specifications followed prior to Closing, (2) the use of any Mark by any Seller (or any such Affiliate) will conform in all material respects to such Seller's (or Affiliate's) past practices, standards and specifications followed prior to Closing, (3) it will not do anything to materially and negatively impact the value of any Mark or the reputation and goodwill associated therewith and (4) such Seller will (and will cause each such Affiliate to) diligently pursue a process that gradually decreases the use of any Mark. Should Buyer believe that any Seller is not complying with <u>Section 5.11(b)</u>, Buyer shall notify such Seller in writing of its concerns. Such Seller will then have 10 Business Days to cure its defect in all material respects. If such Seller acknowledges and agrees that it is in default, but refuses to cure its defect, the License Period shall immediately terminate and Sellers shall immediately cease use of the Marks. If, however, there is a good faith dispute as to whether such Seller is in default or whether such a default has been cured, nothing in this Section limits Buyer's right to seek indemnification for such non-compliance or to seek (including before the end of such period) injunctive relief to stop such non-compliance.

(c) **Definitions**. The following definitions apply:

(1) "<u>License Period</u>" means the period that begins at the Effective Time and ends on the 180th day after the Closing Date.

(2) "<u>Mark</u>" means each trademark, service mark, trade name, trade dress, design, logo or other similar Intellectual Property used by any Seller in the conduct of the Outlet Business that is an Acquired Asset.

(d) **Name Changes**. Within 10 Business Days after Closing (or, for any Seller or Affiliate of any Seller that is not incorporated in any state of the United States or with respect to Parent's ticker symbol on the NASDAQ stock market, as soon as practicable after such 10th Business Day), each applicable Seller will, and cause each of its applicable Affiliates to, take the corporate action necessary to change such Seller's, or such Affiliate's, name to a name that does not contain the word "Wilsons" or any term confusingly similar thereto by making all required filing with the applicable Governmental Authority of an amendment to such Seller's, or Affiliate's, charter, certificate of incorporation or other applicable document reflecting such name change. Promptly thereafter, each applicable Seller will, and will cause each of its applicable Affiliates to, file with the applicable Governmental Authorities in each jurisdiction in which it is qualified to do business as a foreign corporation appropriate forms reflecting such name change.

5.12 <u>Transition Services</u>. At Closing, Parent and Buyer will enter into agreements substantially in the form of <u>Exhibit 5.12-1</u> and <u>5.12-2</u>, each dated the Closing Date, and each providing for certain transition services after the Effective Time under and subject to the terms thereof (each a "<u>Transition Services Agreement</u>").

36

Source: PreVu, INC, 8-K, July 14, 2008

5.13 <u>Insurance and Insurance Proceeds</u>.

(a) **Post-Closing and Assumed Liabilities**. To the extent existing and permitted by their terms, Sellers shall maintain in full force and effect their general liability and product liability insurance policies relating to the pre-Closing operation of the Outlet Business for one year after the Closing. Without limiting the foregoing, if after Closing Buyer reasonably determines that any Liability or other obligation that is an Assumed Liability is then covered by any insurance policy relating to the Outlet Business of any Seller (or any Affiliate of any Seller) and such Liability or other obligation is not covered by any insurance policy of Buyer (or any Affiliate of Buyer), then Buyer may give a notice to Sellers that states such determination and describes such Liability or other obligation in reasonable detail. If Buyer gives such a notice, then the following will apply:

(1) The applicable Parties will cooperate in all reasonable respects, at Buyer's expense, to determine if the following conditions are satisfied: (A) such Liability or other obligation is covered by any such insurance policy of any Seller (or Affiliate of any Seller), (B) any Seller (or Affiliate of any Seller) has the right to obtain any insurance proceeds with respect thereto and (C) such Liability or other obligation is not covered by any insurance policy of Buyer (or any Affiliate of Buyer).

(2) If all of the conditions in the preceding clause (b)(1) are satisfied or there is a reasonable likelihood that all of such conditions are satisfied, then, at Buyer's expense, the applicable Sellers will use commercially reasonable efforts to obtain such proceeds from the provider of such insurance of such Sellers (or their applicable Affiliates).

(3) To the extent any Seller (or any Affiliate of any Seller) actually recovers any such insurance proceeds (which, for the avoidance of doubt, would be the amount in excess of any deductible, retention or self-insurance amount), then such Seller will pay (or cause such Affiliate to pay) to Buyer an amount equal to the difference of (1) such amount of such recovered proceeds (but not to exceed the amount of such associated Liability or other obligation that is an Assumed Liability) *minus* (2) the costs and expenses of any Seller (or Affiliate of any Seller) incurred in connection with the foregoing (to the extent not already reimbursed by Buyer), including with respect to any Tax.

5.14 <u>Substitution of Seller Collateral</u>. For and at Closing, and to the extent not accomplished at Closing then as soon thereafter as is reasonably possible after any Seller's request, Buyer will use its commercially reasonable efforts to secure the unconditional release and, as appropriate, return to the applicable Seller, of any Seller Collateral (with "<u>Seller Collateral</u>" meaning any letter of credit and any collateral given to the issuer thereof, escrowed funds, guarantee, bond or other collateral given by or on behalf of any Seller, in each case to the extent pertaining to any of the Acquired Assets, but not meaning any such collateral that is an Acquired Asset). <u>Exhibit 5.14</u> identifies such letters of credit as of the date hereof. Until any such release is secured, all costs of any Seller for the continuation of any Seller Collateral relating thereto after the Effective Time will be paid by Buyer within three Business Days after such Seller informs Buyer thereof. Nothing in this <u>Section 5.14</u> will limit or otherwise affect the assumption by Buyer of any Liability or other obligation that is an Assumed Liability.

37

Source: PreVu, INC, 8-K, July 14, 2008

5.15 **Customer Data**. No information in any customer list or related record will be an Acquired Asset, to the extent the Person to which such information pertains has requested or required that such information not be shared with or provided to any Person in a manner that would preclude giving such information to Buyer hereunder, including by making (whether by act or omission) such request or requirement via any Contract, applicable privacy policy or other means of communication with any Seller or any Affiliate of any Seller. At all times after Closing, Buyer will (a) cause all customer lists and related records that are an Acquired Asset to only be used in compliance with Applicable Law and (b) act in a manner consistent with, and cause to be honored, all applicable Contracts, privacy policies and other means of communication in connection with which any Seller (or any Affiliate of any Seller) collected such information, including all customer opt out requests, flags and similar items existing in connection with any such customer list or record that are identifiable to Buyer in connection therewith.

5.16 **Transaction Confidentiality Agreements**. After the Closing Date, to the extent reasonably requested by Buyer, Parent will use its commercially reasonable efforts to enforce the terms of each Transaction Confidentiality Agreement for Buyer's benefit; provided that, within three Business Days after Parent informs Buyer thereof, Buyer will reimburse Parent for all costs (including reasonable attorneys' fees and expenses) of Parent or any of its Affiliates arising out of, relating to or resulting from such requested enforcement. "Transaction Confidentiality Agreement" means a confidentiality agreement that Parent entered into after January 1, 2008 with any prospective purchaser (other than Buyer) of the Outlet Business.

5.17 **Post-Closing Releases of Sellers**. After Closing, with respect to any Real Property Lease under which any Seller has any obligation after Closing, Buyer will cooperate with the applicable Seller in all reasonable respects, at such Sellers' expense, to obtain the full release, in writing and in a form reasonably satisfactory to the applicable Seller, of all of the obligations (of every kind and nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent and whenever arising) of such Seller (and to the extent applicable, of each Affiliate of such Seller) first arising after the Effective Time under or in connection with such Real Property Lease.

5.18 **Certain Obligations Regarding Customers**.

(a) **Gift Card Items**. Buyer will have no obligation to honor any Gift Card Item; however, if there is honored, in a transaction with a customer at an Outlet Store after the Effective Time but on or before May 31, 2009, any gift certificate, gift card, voucher or similar item giving such customer, as the holder of such item, the right to apply the monetary value of such item to any purchased product from any Seller (or any Affiliate of any Seller), in each case that was sold or issued by any Seller (or any Affiliate of any Seller) prior to the Effective Time (each such item being a "Gift Card Item"), then (i) Buyer shall use commercially reasonable efforts to prevent duplicate charges and (ii) Sellers will reimburse Buyer for the dollar amount properly applied (as determined under this Section 5.18(a)) by Buyer to such customer's purchase from Buyer of such purchased product pursuant to such Gift Card Item (the "Reimbursable Amount") as and to the extent provided in Section 5.18(a)(2).

(1) Within 30 days after May 31, 2009, Buyer will deliver to Parent a

38

Source: PreVu, INC, 8-K, July 14, 2008

statement (the "Gift Card Statement") setting forth (A) the aggregate Reimbursable Amount with respect to the period commencing at the Effective Time and ending on May 31, 2009 (the "Total Reimbursable Amount") and (B) information Sellers reasonably require to confirm Buyer's calculations of the amounts owed under this Section (which may include the serial numbers or other identifying information establishing that a Gift Card Item was sold or issued by a Seller or an Affiliate of a Seller prior to the Effective Time, the date such Gift Card Item was used by Buyer's customer, the amount remaining on such Gift Card Item before and after such transaction, and the Reimbursable Amount with respect to each transaction).

(2) (A) If the Total Reimbursable Amount equals or exceeds the sum of the Gift Card Holdback Amount *plus* any amounts paid by any Seller or any Affiliate of any Seller to Buyer with respect to any Reimbursable Amounts, Sellers shall not be entitled to the return of any portion of the Gift Card Holdback Amount. If the Total Reimbursable Amount is less than the sum of the Gift Card Holdback Amount *plus* any amounts paid by any Seller or any Affiliate of any Seller to Buyer with respect to any Reimbursable Amounts, Buyer shall, along with the Gift Card Statement, deliver to Parent, by check or by wire transfer of immediately available funds to an account designated by Parent in writing, the amount by which the Total Reimbursable Amount is less than the sum of the Gift Card Holdback Amount *plus* any amounts paid by any Seller or any Affiliate of any Seller to Buyer with respect to any Reimbursable Amounts.

(B) If, in connection with any of the actions contemplated in this Section 5.18(a)(2), the Parties determine that a payment is owed to Sellers, but the amount of such payment is in dispute, then the portion of such amount not in dispute will be paid when required under clause 2(A) above (without limiting any Party's rights or obligations). The Parties will resolve any dispute in connection with this Section 5.18 as contemplated in Section 5.18(a)(3).

(3) For a period of one year after Parent's receipt of the Gift Card Statement, Sellers and their designated representatives will have the right, upon reasonable notice and during business hours, to review the books and records of Buyer and its Affiliates with respect to all information reasonably related to Gift Card Items under such Gift Card Statement and any other matter reasonably relating to this Section 5.18(a) and to reasonably consult with employees and agents of Buyer and its Affiliates having knowledge or responsibility with respect to such matters, and Buyer will cooperate with Sellers in all reasonable respects in connection therewith. In the event that Buyer and Sellers have a dispute with respect to any Reimbursable Amount claimed by Buyer, they will attempt to resolve the dispute in good faith. If it is finally determined that a greater or lesser amount was owed by Sellers than the amount to be paid or already paid by Sellers (including if withheld by Buyer), then Sellers will promptly pay to Buyer, or Buyer will promptly pay to Sellers (as applicable and in each case without interest), the amount of such underpayment or overpayment (as applicable). If Buyer and Sellers are unable to resolve any such dispute within 60 days, they shall submit such dispute to an Arbitrator using substantially the same procedures described in Sections 2.4(c) and 2.4(d).

39

Source: PreVu, INC, 8-K, July 14, 2008

(4) Notwithstanding the foregoing provisions of this Section 5.18(a), in no event will any Seller have any Liability or other obligation under this Section 5.18(a) with respect to any Gift Card Item honored by Buyer (A) to the extent in excess of the dollar amount remaining on such Gift Card Item as of the Effective Time or otherwise validly remaining on such Gift Card Item at any other time or (B) in a manner otherwise inconsistent with the terms and conditions of such Gift Card Item established by the applicable Seller or Affiliate of a Seller prior to the Effective Time. Notwithstanding any other term of this Agreement, in no event will any Party (or any of its Affiliates) have any Liability or other obligation to any other Party (or any of its Affiliates) relating to honoring or satisfying any coupon or similar item (including that Buyer will have no obligation to honor or satisfy any coupon or similar item issued by any Seller, and Sellers will have no obligation to reimburse or otherwise pay Buyer if Buyer honors or satisfies any such coupon or similar item).

(b) **Returns, Refunds and Exchanges**. Buyer will pay, perform and satisfy (as applicable) all obligations (if any) of each Seller, pursuant to such Seller's return, refund and exchange policies or Applicable Law (as applicable), regarding the return or exchange of, or the granting of a refund with respect to, any product that is of a type sold at an Outlet Store as of the Effective Time. Each Seller will be deemed to assign and transfer to Buyer, without any further action by any Seller, any rights of such Seller (1) in and to any such product with respect to which Buyer or any of its Affiliates grants a refund or permits a return or exchange and (2) against the manufacturer or supplier of such product to the extent of and relating to such refund, return or exchange. In no event will any Seller or any Affiliate of any Seller have any Liability or other obligation to Buyer or any of its Affiliates regarding any such refund, return or exchange.

5.19 **Closing Date Financial Statements**. Within 60 days after the Closing, Sellers will cooperate with Buyer, at Buyer's expense, for Buyer to prepare, in accordance with general accepted accounting principles and consistent with past practices, unaudited financial statements, including balance sheets and income statements, of the Outlet Business as of the Effective Time.

5.20 **SEC and National Securities Exchange Requirements**. Each Seller and Buyer will cooperate with each other in all reasonable respects to fulfill any applicable requirement of the SEC or any national securities exchange in connection with the transactions contemplated herein, including to perform in sufficient time to meet any applicable filing deadline that any of them may have. Sellers shall, if requested by Buyer, cooperate with Buyer in the preparation, at Buyer's cost and expense, of audited financial statements concerning the Outlet Business with respect to such periods as Buyer may be required to file or make available pursuant to any applicable requirement of the SEC or any national securities exchange, and shall furnish Buyer and its representatives reasonable access to their books, records and work papers in connection with the foregoing.

5.21 **Tax Proceedings**. Each Seller and Buyer shall provide each other with such assistance as may reasonably be requested by the other in connection with the preparation of any Tax Return, any Tax audit or other examination by any Governmental Authority or any judicial or administrative Proceeding relating to Taxes, and each shall provide the other with any records or information that are relevant to such Tax Return, Tax audit, examination or Proceeding. Such assistance shall include making employees reasonably available on a mutually convenient basis

40

Source: PreVu, INC, 8-K, July 14, 2008

to provide additional information and explanation of material provided hereunder and shall include providing copies of any relevant Tax Returns and supporting work schedules. The Party requesting assistance hereunder shall reimburse the other for reasonable expenses incurred in providing such assistance.

5.22 **Cooperation Regarding Certain Intellectual Property**. After Closing, Buyer will cooperate with Sellers, at Sellers' reasonable request and expense, in Sellers' efforts to obtain from JDA Software, Inc. or its applicable Affiliates (collectively, "JDA") a separate, non-exclusive license directly from JDA for Sellers and their Affiliates with respect to the software (and any related Intellectual Property) that is among the Acquired Assets (in each case only to the extent such software and Intellectual Property relates to JDA).

5.23 **License Back of Certain Software**. Upon and subject to the terms of this Section 5.23, effective as of the Effective Time, Buyer hereby grants back to each Seller a non-exclusive, perpetual, irrevocable, paid-up worldwide right and license to use the Licensed Software for Sellers', and any Seller's Affiliate's, internal use only with the right and license to create derivative works based upon the Licensed Software for Sellers', and any Seller's Affiliate's, internal use only the Licensed Software and such derivative works, including all intellectual property rights related thereto, including both source code and object code versions of any computer software included among the Licensed Software or to allow a third party to do any of the foregoing for any Seller or any such Affiliate. Without limiting the foregoing, each Seller or any such Affiliate has the right to reproduce, improve, revise, change, adapt, modify, make, merge into other software, enhance, deliver, install, composite with other products and support, distribute and otherwise use the Licensed Software solely for Sellers', and any Seller's Affiliate's, internal use only. This Section 5.23 does not grant any Party or any of its Affiliates, sublicensees or customers any right to any improvement, revision, change, derivative work, adaptation or other modification (collectively, "Licensed Software Improvements") made by or on behalf of any other Party (including any of its Affiliates, successors, assigns, agents or other licensees) to the Licensed Software and all right, title and interest in and to Licensed Software Improvements will be owned by the Party responsible for creating such Licensed Software Improvement. This Section 5.23 does not impose any obligation on any Party to maintain or support the Licensed Software. "Licensed Software" means all software developed by or specifically for any Seller or any of its Affiliates in which any Seller or any of its Affiliates owns, subject to any Permitted Encumbrance, all right, title and interest, that is an Acquired Asset (collectively, along with all source code, object code, documentation, programmer notes and the like related thereto).

5.24 **Filing of Releases of Security Interests**. Sellers shall, within 10 Business Days after the Closing, cause to be filed Form UCC-3s with respect to the termination of the security interest of General Electric Capital Corporation in the Acquired Assets, in each jurisdiction in which a UCC-1 Financing Statement was filed with respect thereto, and shall furnish written evidence thereof to Buyer. In addition, Sellers shall, within 10 Business Days after the Closing, cause to be filed all necessary releases with any Governmental Authority with respect to the termination of the security interests relating to any Intellectual Property.

5.25 **Certain Undelivered Inventory**. This Section 5.25 refers only to any merchandise inventory that, at the Effective Time, is Undelivered Inventory. If, after the Closing, any Undelivered Inventory is delivered to Sellers Distribution Facility or a third party

41

Source: PreVu, INC, 8-K, July 14, 2008

# Exhibit 1-C

fulfillment center engaged by Sellers prior to the Effective Time (which Undelivered Inventory delivered to such fulfillment center was designated for sale in Sellers' e-commerce business), then (1) Buyer will notify Parent thereof, (2) Buyer will pay to the applicable Seller (as designated by Parent), within two Business Days after such notification, an amount equal to (without duplication) all of any Sellers' purchase price for, and additional freight and other costs and expenses with respect to the purchase and delivery of, such Undelivered Inventory, in cash, by wire transfer of immediately available funds to an account designated by Parent, and (3) subject to the foregoing, effective at the time such wire transfer is received by such Seller, such Seller will, and hereby does, sell, convey, transfer and assign to Buyer, and Buyer will, and hereby does, purchase from such Seller, all of such Seller's right, title and interest in and to such Undelivered Inventory, free and clear of Encumbrances, other than Permitted Encumbrances or Encumbrances arising from any act or omission by Buyer.

5.26 **Vendor Matters**. (a) Within 60 days after the Closing Date, Buyer shall furnish to Sellers a statement (the "Vendor Loss Statement") setting forth (A) the aggregate amount of any Losses incurred by Buyer arising from (but without solicitation or encouragement or initial contact relating thereto from or on behalf of Buyer or any of Buyer's Affiliates) Sellers' payment defaults or other disputes of Sellers with vendors in the 30 day period after the Closing (the "Vendor Losses") and (B) information Sellers reasonably require to confirm Buyer's calculation of the Vendor Losses.

(b) If the Vendor Losses are less than the Vendor Loss Holdback Amount, Buyer shall, along with the Vendor Loss Statement, deliver to Parent, by check or by wire transfer of immediately available funds to an account designated by Parent in writing, the amount by which the Vendor Losses are less than the Vendor Loss Holdback Amount. If the Vendor Losses are greater than or equal to the Vendor Loss Holdback Amount, Sellers shall not be entitled to the return of any portion of the Vendor Loss Holdback Amount, and Buyer shall be entitled to recover, in accordance with Article 8, Vendor Losses in excess of the Vendor Loss Holdback Amount.

(c) Notwithstanding the other terms of this Section 5.26 (and in addition to the terms of Section 5.26(d)), before Buyer incurs any Loss contemplated under Section 5.26(a), (1) Buyer will give notice (with reasonable detail) to Sellers, as early as practicable under the circumstances, that such Loss is Threatened or otherwise reasonably expected, (2) the Parties will cooperate in all reasonable respects to determine the amount owed to such vendor (if any) and to mitigate such Loss (if any). Thereafter, either (A) Buyer will not incur such Loss, except to the extent (x) mutually agreed upon by the Parties (such agreement not to be unreasonably withheld), (y) Buyer is required to pay such Loss pursuant to any Order or (z) determined by an Arbitrator under Section 5.26(d) or (B) Buyer may incur such Loss voluntarily; provided that Sellers' obligation to Buyer hereunder will not be established unless (and only to the extent) established under the preceding clauses (A)(x), (A)(y) or (A)(z).

(d) For a period of 90 days after Sellers' receipt of the Vendor Loss Statement, Sellers and their designated representatives will have the right, upon reasonable notice and during business hours, to review the books and records of Buyer with respect to all information reasonably related to the Vendor Losses and any other matter reasonably relating to this Section 5.26 and to reasonably consult with employees and agents of Buyer having knowledge or responsibility with respect to such matters, and Buyer will cooperate with Sellers

42

Source: PreVu, INC, 8-K, July 14, 2008

in all reasonable respects in connection therewith. In the event that Buyer and Sellers have a dispute with respect to the Vendor Losses claimed by Buyer, they will attempt to resolve the dispute in good faith. If it is finally determined that a greater or lesser amount was owed to Buyer than the amount to be paid or already paid by Sellers, then Sellers will promptly pay to Buyer, or Buyer will promptly pay to Sellers (as applicable), the amount of such underpayment or overpayment (as applicable). If Buyer and Sellers are unable to resolve any such dispute within 60 days, they shall submit such dispute to an Arbitrator using substantially the same procedures described in Sections 2.4(c) and 2.4(d).

5.27 **Credit Card and Bank Account Matters**.

(a) Buyer shall open credit card processing accounts and bank accounts for the use in the Outlet Business as soon as practicable after the Effective Time, but in no event later than 30 days after Closing. Sellers will receive cash and credit card receivables in their existing accounts with respect to sales occurring in the Outlet Business after the Effective Time (to the extent Buyer causes such amounts to be so deposited, which Sellers will facilitate) until a date, to be specified by Buyer in writing, but in no event later than 30 days after Closing, as of which date Buyer shall transition to the use its own accounts (such period, the "Collection Period"). Within 30 days after such transition date, Sellers shall furnish to Buyer a statement (the "Reconciliation") setting forth (A) the aggregate amount of cash and credit card receivables of the Outlet Business in the Collection Period so received by Sellers (the "Collected Amount") and (B) information Buyer reasonably requires to confirm Sellers' calculation of the Collected Amount.

(b) Each Business Day from the day after the Closing Date through the Business Day after the end of the Collection Period (and thereafter, if necessary, to pay any Collected Amount owed to Buyer as contemplated herein), Sellers will give written direction to their lender (which sweeps such accounts) to remit to Buyer all Collected Amounts so received through the day prior to each such direction (without duplication), such that the Collected Amounts are paid to Buyer.

(c) For a period of one year after Buyer's receipt of the Reconciliation, Buyer and its designated representatives will have the right, upon reasonable notice and during business hours, to review the books and records of Sellers with respect to all information reasonably related to the Collected Amount and any other matter reasonably relating to this Section 5.27 and to reasonably consult with employees and agents of Sellers having knowledge or responsibility with respect to such matters, and Sellers will cooperate with Buyer in all reasonable respects in connection therewith. In the event that Buyer and Sellers have a dispute with respect to the Collected Amount claimed by Sellers, they will attempt to resolve the dispute in good faith. If it is finally determined that a greater or lesser amount was owed by Sellers than the amount to be paid or already paid by Sellers, then Sellers will promptly pay to Buyer, or Buyer will promptly pay to Sellers (as applicable and in each case without interest), the amount of such underpayment or overpayment (as applicable). If Buyer and Sellers are unable to resolve any dispute within 60 days, they shall submit such dispute to an Arbitrator using substantially the same procedures described in Sections 2.4(c) and 2.4(d).

5.28 **Liens**. Within 30 days after the Closing, Sellers shall furnish to Buyer written documentation evidencing the satisfaction and release of all tax or judgment liens identified in

43

the Disclosure Schedule.

5.29 **Racking in Sellers Distribution Facility**. During the period from the Effective Time until May 31, 2009, Buyer will have the right to use the racking in the Sellers Distribution Facility (which is an Excluded Asset) as part of Buyer's normal operations at the Sellers Distribution Facility. Buyer will maintain such racking during such period and cause such racking to be in the same general condition at the end of such period as exists on the Effective Date (including with respect to normal wear and tear). Notwithstanding the foregoing, if Buyer enters into a new lease with the landlord of the Sellers Distribution Facility to extend Buyer's occupancy of the Sellers Distribution Facility beyond May 31, 2009, Sellers will transfer to Buyer all right, title and interest in and to such racking (on an "AS IS, WHERE IS" basis), without additional consideration, free and clear of any liens or encumbrances of any lender to Sellers, including, without limitation, General Electric Capital Corporation, as lender and as agent for other lenders..

5.30 **Landlord Retention Amount**. This Section 5.30 will govern the retention and payment of the Landlord Retention Amount. From and after the Effective Time, Sellers will use commercially reasonable efforts to negotiate and enter into written settlement agreements with the landlords listed on Exhibit 2.3 (the "Subject Landlords") with respect to the closing of certain of Sellers' mall stores. Promptly after entering into any such settlement agreement with any Subject Landlord (but while Buyer still holds any portion of the Landlord Retention Amount), Sellers will (a) provide written notice to Buyer of the execution of such settlement agreement, the aggregate amount payable by any Seller or Affiliate of any Seller pursuant to such settlement agreement, net of any amount otherwise paid by or on behalf of any Seller or such an Affiliate (each, a "Settlement Payment Amount"), the name of the recipient to whom such payment will be made and wire transfer instructions for payment to such recipient (if available to Sellers) or the address where a check is to be sent to such recipient for the amount of such Settlement Payment Amount and (b) direct Buyer to pay such Settlement Payment Amount to such recipient on behalf of the applicable Seller or such an Affiliate (provided that such payment obligation of Buyer will not exceed the portion of the Landlord Retention Amount then held by Buyer). Within one Business Day after Sellers give any such notice and direction to Buyer, Buyer will pay to the recipient named in such notice and direction (in the manner stated above and in such notice and direction) the applicable Settlement Payment Amount on behalf of the applicable Seller or such an Affiliate. Notwithstanding any other term of this Agreement, in no event will any portion of the Landlord Retention Amount (or any interest thereon) be available to Buyer or any of its Affiliates to satisfy any Liability or other obligation of any Seller or any Affiliate of any Seller under this Agreement or any Ancillary Document (including pursuant to Section 8.3(h)), nor will Buyer retain any of the Landlord Retention Amount except to the extent permitted in this Section 5.30.

5.31 **Certain Lease Matters**. After Closing, Buyer will give to Parent written notice if Buyer is actually evicted from an Outlet Store by the landlord with respect thereto because of the Parties' failure to obtain such landlord's consent to the assignment of the Real Property Lease covering such Outlet Store to Buyer pursuant to this Agreement, such notice to be given within five Business Days after such actual eviction occurs (each, if any, an "Outlet Store Eviction"). If, but only if, more than six Outlet Store Evictions occur, Sellers will pay to Buyer an amount equal to $17,241.00 (which amount equals 1/116 multiplied by $2,000,000) with respect to each such Outlet Store Eviction (including the first six Outlet Store Evictions), such

44

Source: PreVu, INC, 8-K, July 14, 2008

payment to be made by wire transfer of immediately available funds to the account designated in writing by Buyer within ten Business Days after the seventh Outlet Store Eviction (in the case of payments owed by Sellers with respect to the first seven Outlet Store Evictions) or, as and if applicable, within ten Business Days after each Outlet Store Eviction to occur after the seventh Outlet Store Eviction. For the avoidance of doubt, in no event will Sellers (or any of them) have any Liability or other obligation under this Section 5.31 if six or fewer Outlet Store Evictions occur. In addition, after Closing, in the event that one or more landlords contest the assignment of any Real Property Lease covering an Outlet Store to Buyer pursuant to this Agreement or litigate or threaten to litigate such assignment, the assignment of such Real Property Lease by such Seller to Buyer hereunder shall be deemed not to have occurred, at Buyer's option, but without limiting and subject to Section 1.3, and such Seller and Buyer shall negotiate an operating agreement, on mutually agreeable terms, with respect to the applicable Real Property Lease.

**ARTICLE 6**
**CLOSING, AND CLOSING DELIVERIES**

6.1 **Closing**. Closing of the transactions contemplated herein ("Closing") will take place at the offices of Fulbright & Jaworski L.L.P., New York, New York, beginning at 9:00 a.m. local time on date hereof (the "Closing Date"). The sale, conveyance, transfer, assignment and purchase of the Acquired Assets, and the assumption of the Assumed Liabilities, will be effective as of 11:59 p.m. Minneapolis time (the "Effective Time") on July 5, 2008 (the "Cut-Off Date"). To the extent the Parties agree, documents may be delivered at Closing by facsimile or other electronic means.

6.2 **Closing Deliveries by Sellers**. At Closing, each Seller will deliver, or cause to be delivered, to Buyer (or as Buyer or this Agreement otherwise directs), the following:

(a) a Bill of Sale, Assignment and Assumption Agreement in the form attached hereto as Exhibit 6.2(a), dated the Closing Date (the "Bill of Sale"), executed by each Seller;

(b) a (1) Trademark Assignment in the form attached hereto as Exhibit 6.2(b)(1), dated the Closing Date (the "Trademark Assignment"), and (2) Domain Name Assignment in the form attached hereto as Exhibit 6.2(b)(2), dated the Closing Date (the "Domain Name Assignment"), each executed by the applicable Sellers;

(c) each Transition Services Agreement, each executed by Parent, pursuant to Section 5.12;

(d) an officer's certificate of a duly authorized officer of each Seller, each in a form approved by Buyer (such approval not to be unreasonably withheld), dated the Closing Date, executed by such officer, each certifying (1) that attached thereto are true, correct and complete copies of the certificate or articles of incorporation (including all amendments thereto) of each Seller, and that the same are in full force and effect; (2) that attached thereto are true, correct and complete copies of the bylaws of each Seller, and that the same are full force and effect and were in full force and effect on the date of the resolutions described below; (3) that attached thereto is a true, correct and complete copy of the requisite resolutions of the Board of Directors and of the requisite (if any are required) shareholders of such Seller approving and

45

Source: PreVu, INC, 8-K, July 14, 2008

authorizing the execution, delivery and performance by such Seller of this Agreement and each Ancillary Document of such Seller and the transactions contemplated herein and therein, and that such resolutions are the only resolutions of such Board of Directors or shareholders with respect to such matters and have not been modified, rescinded or amended and remain in full force and effect; and (4) that each person who, as an officer of such Seller, signed and delivered this Agreement or any Ancillary Document was at the time of such signing and delivery duly elected and appointed, qualified and acting as such officer;

(e) a certificate of good standing of each Seller, issued by the Secretary of State (or equivalent) of its state of incorporation or organization on a recent date;

(f) a FIRPTA Certificate complying in all respects with section 1445(b)(2) of the Code;

(g) the Assignment and Assumption Agreements with respect to the Real Property Leases in the form attached hereto as Exhibit 6.2(g), dated the Closing Date (the "Assignments of Leases"), each executed by the applicable Seller;

(h) all keys of any Seller to all locks to the Leased Real Property, together with all security codes for any Leased Real Property or space therein (which will be considered delivered if in the possession of the Persons reasonably designated by Buyer);

(i) a consent, executed by Lawson Software, Inc., to the assignment of Sellers' contracts with Lawson Software, Inc. to Buyer, in form and substance satisfactory to Buyer (however, if Buyer effects the Closing without the delivery of such item, then the requirement to make such delivery is deemed to be fully waived);

(j) a consent, executed by JDA Software, Inc., to the assignment of Sellers' contracts that are Assumed Contracts with JDA Software, Inc. to Buyer, in form and substance satisfactory to Buyer (however, if Buyer effects the Closing without the delivery of such item, then the requirement to make such delivery is deemed to be fully waived);

(k) a Sublease Agreement, dated the Closing Date (the "Sublease Agreement"), executed by Bermans The Leather Experts Inc., in form and substance satisfactory to Buyer; and

(l) all other documents and items required by this Agreement to be delivered, or caused to be delivered, by any Seller at Closing.

6.3 **Closing Deliveries by Buyer.** At Closing, Buyer will deliver, or cause to be delivered, to the applicable Seller (or as the applicable Seller or this Agreement otherwise directs), the following:

(a) payment of the Estimated Purchase Price, pursuant to Section 2.3;

(b) the Bill of Sale and Assignments of Leases, each executed by Buyer;

(c) the Trademark Assignment and the Domain Name Assignment, each executed by Buyer;

46

Source: PreVu, INC, 8-K, July 14, 2008

(d) each Transition Services Agreement, each executed by Buyer, pursuant to Section 5.12;

(e) an officer's certificate of a duly authorized officer of Buyer, in a form approved by Parent (such approval not to be unreasonably withheld), dated the Closing Date, executed by such officer, each certifying (1) that attached thereto are true, correct and complete copies of the certificate or articles of incorporation (including all amendments thereto) of Buyer, and that the same are in full force and effect; (2) that attached thereto are true, correct and complete copies of the bylaws of Buyer, and that the same are full force and effect and were in full force and effect on the date of the resolutions described below; (3) that attached thereto is a true, correct and complete copy of the requisite resolutions of the Board of Directors of Buyer approving and authorizing the execution, delivery and performance by Buyer of this Agreement and each Ancillary Document of Buyer and the transactions contemplated herein and therein, and that such resolutions are the only resolutions of such Board of Directors with respect to such matters and have not been modified, rescinded or amended and remain in full force and effect; and (4) that each person who, as an officer of Buyer, signed and delivered this Agreement or any Ancillary Document was at the time of such signing and delivery duly elected and appointed, qualified and acting as such officer;

(f) the Sublease Agreement, executed by Buyer, in form and substance satisfactory to Sellers; and

(g) all other documents and items required by this Agreement to be delivered, or caused to be delivered, by Buyer at Closing.

**ARTICLE 7**
**CONDITIONS TO OBLIGATIONS TO CLOSE**

7.1 **Conditions to Obligation of Buyer to Close**. The obligation of Buyer to effect the closing of the transactions contemplated herein is subject to the satisfaction at or before Closing of all of the following conditions, any one or more of which may be waived by Buyer, in Buyer's sole discretion (and, for any such condition not satisfied, if Buyer effects the Closing, then Buyer will be deemed to have waived such condition, with no associated Liability or other obligation resulting therefrom for any Seller):

(a) **Releases.** Sellers will have delivered to Buyer a written document in a form reasonably acceptable to each Party, each dated on or before the Closing Date and executed by each Person to whom, at Closing, any Seller owes any indebtedness for borrowed money or with whom Seller has a contractual right to borrow money, even if Seller does not owe any indebtedness for borrowed money to such Person at Closing (or, if applicable, executed by such Person's agent or similar representative), in each case under which such Person (or such agent or representative on such Person's behalf) (1) consents to the transactions contemplated herein (to the extent required) and (2) agrees to release each Encumbrance of such Person on any Acquired Asset upon the satisfaction of the conditions in such document (each such document being a "Lender Release").

(b) **Other Releases.** Sellers shall have delivered to Buyer written evidence of the release of the Encumbrances set forth on Exhibit 7.1(b).

47

Source: PreVu, INC, 8-K, July 14, 2008

(c) **Other Documents**. Sellers shall have delivered to Buyer the documents described in Section 6.2.

7.2 <u>Conditions to Obligation of Sellers to Close</u>. The obligation of each Seller to effect the closing of the transactions contemplated herein is subject to the satisfaction at or before Closing of all of the following conditions, any one or more of which may be waived by all Sellers, in each Seller's sole discretion (and, for any such condition not satisfied, if Sellers effect the Closing, then Sellers will be deemed to have waived such condition, with no associated Liability or other obligation resulting therefrom for Buyer):

(a) **Lender Release**. Sellers will have obtained each Lender Release.

(b) **Letters of Credit or Other Seller Collateral**. Buyer will have put in place and caused to be fully effective replacement, standby or substitute letters of credit that replace, backstop or substitute for letters of credit of any Seller (or Affiliate of any Seller) or other Seller Collateral regarding which all Sellers (and all Affiliates of any Seller), as applicable, have not been released, in each case to the extent required to cause, at all times at and after the Effective Time, any Liability or other obligation with respect to any such letter of credit of any Seller (or Affiliate of any Seller) or other Seller Collateral arising out of, relating to or resulting from any Assumed Liability or activity or operation of Buyer (or any Affiliate of Buyer) to be automatically fully satisfied by such a replacement, standby or substitute letter of credit put in place by Buyer.

(c) **Other Documents**. Buyer shall have delivered to Sellers the documents described in Section 6.3.

## ARTICLE 8
## INDEMNIFICATION AND RESOLUTION OF CERTAIN DISPUTES

8.1 <u>General</u>. Except as otherwise provided herein, the several representations, warranties, covenants, and agreements of the Parties contained in this Agreement (or in any document delivered at Closing in connection herewith, except to the extent stated therein) shall be deemed to have been made on the Closing Date and shall be deemed to be material and to have been relied upon by Buyer and Sellers notwithstanding any investigation made by Buyer or Sellers.

8.2 <u>Indemnification</u>.

(a) Each of the Sellers shall, jointly and severally, indemnify and hold Buyer and its Other Indemnified Persons harmless from and against: (i) any and all loss, cost, liability, damage and expense (including reasonable legal fees, expert costs and other expenses incident thereto) (each a "Loss" and, collectively, "Losses") arising out of or resulting from any inaccuracy, misrepresentation or breach of any representation or warranty of any Seller under this Agreement; (ii) any and all Losses arising out of any breach or non-fulfillment of any covenant or agreement of any Seller under this Agreement; (iii) any and all liabilities and obligations of Sellers (other than Assumed Liabilities or any other liability or obligation of Buyer hereunder) of any nature whatsoever, whether accrued, absolute, fixed, contingent, or otherwise known or unknown to Sellers, whether arising before or after the Closing, including, but not limited to, Losses with respect to any liability of Sellers deemed to have been assumed by Buyer by virtue of common law, statute or regulation or failure to comply therewith, which liability or

48

Source: PreVu, INC, 8-K, July 14, 2008

obligation Buyer has not expressly agreed to assume or pay hereunder, including without limitation, bulk transfer laws in effect in any State; (iv) except to the extent expressly stated herein, any liability or obligation for Taxes of any Seller, whether or not accrued, assessed or currently due and payable (including without limitation any such liability for Taxes of Sellers, (a) whether or not it relates to the operation of the Outlet Business, (b) arising from the operation of the Outlet Business or the ownership of the Acquired Assets on or prior to the Effective Time or (c) arising out of the consummation of the transactions contemplated hereby (for purposes of this Section 8.2(a)(iv), all real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Acquired Assets for a Tax period that includes (but does not end on) the Cut-Off Date shall be apportioned between Sellers and Buyer in the manner stated in this Agreement)); (v) any and all liabilities and obligations of any Seller or any Affiliate of any Seller regarding any product sold by any Seller or any Affiliate of any Seller before the Effective Time, except to the extent any of the foregoing is an Assumed Liability or an obligation of Buyer pursuant to any other term hereof; and (vi) all claims, actions, suits, proceedings, demands, assessments, judgments, costs and expenses, including, without limitation, any reasonable legal fees and expenses, incident to any of the foregoing.

(b) Buyer shall indemnify and hold each Seller and its Other Indemnified Persons harmless from and against: (i) any and all Losses arising out of or resulting from any inaccuracy, misrepresentation or breach of any representation or warranty of Buyer under this Agreement; (ii) any and all Losses arising out of any breach or non-fulfillment of any covenant or agreement of Buyer under this Agreement; (iii) any and all Losses arising out of or in connection with the ownership or operation of the Acquired Assets or the Assumed Liabilities, in each case with respect to periods after the Effective Time; (iv) any and all liabilities and obligations of Buyer or any Affiliate of Buyer regarding any product sold by Buyer or any Affiliate of Buyer after the Effective Time, except to the extent any Seller has any indemnification obligation therefor pursuant to Section 8.2(a)(i) or 8.2(a)(ii); (v) any and all Losses arising out of any failure to secure the unconditional release or, as appropriate, return to the applicable Seller, of any letter of credit or any other Seller Collateral, including any amount that any Seller is obligated to pay with respect to any letter of credit that pertains to any Acquired Asset, Assumed Liability or operation or activity of Buyer (or any of its Affiliates) after the Effective Time; and (vi) all claims, actions, suits, proceedings, demands, assessments, judgments, costs and expenses, including, without limitation, any reasonable legal fees and expenses, incident to any of the foregoing.

8.3 <u>Certain Limitations and Other Matters Regarding Claims</u>.

(a) **Deductible on Sellers' Obligations**. No Seller will have any obligation under Section 8.2(a)(i) (or 8.2(a)(vi) to the extent incident to 8.2(a)(i)), unless and until the aggregate amount of Losses for which all Sellers are obligated thereunder exceeds $200,000 (the "Deductible"), and then only for the amount of such Losses in excess of the Deductible, subject to the other terms of this Article 8.

(b) **Cap on Sellers' Obligations**. The obligations of all Sellers under Section 8.2(a)(i) (or 8.2(a)(vi) to the extent incident to 8.2(a)(i)), in the aggregate, will not exceed an amount equal to $3,500,000 (the "Cap"), subject to the other terms of this Article 8.

49

Source: PreVu, INC, 8-K, July 14, 2008

(c) **Deductible on Buyer's Obligations**. Buyer will not have any obligation under Section 8.2(b)(i) (or 8.2(b)(vi) to the extent incident to 8.2(b)(vi)) unless and until the aggregate amount of Losses for which Buyer is obligated thereunder exceeds the Deductible, and then only for the amount of such Losses in excess of the Deductible, subject to the other terms of this Article 8.

(d) **Cap on Buyer's Obligations**. The obligations of Buyer under Section 8.2(b)(i) (or 8.2(b)(vi) to the extent incident to 8.2(b)(vi)), in the aggregate, will not exceed an amount equal to the Cap, subject to the other terms of this Article 8.

(e) **Certain Treatment of Special Representations**. Notwithstanding the foregoing terms of this Section, (1) Section 8.3(a), 8.3(b), 8.3(c) or 8.3(d) will not limit any Liability or other obligation with respect to any Special Representation or Critical Representation and (2) the amount of Losses hereunder with respect to any Special Representation or Critical Representation will not be used in determining if the Deductible or Cap has been reached or exceeded. "Special Representation" means any representation or warranty in Section 3.7 or 3.21. "Critical Representation" means any representation or warranty (A) in Section 3.2, 3.11(a), 3.24, 4.2 or 4.7 or (B) that is made with fraud (of which intent is an element).

(f) **Sole and Exclusive Remedies**. The sole and exclusive remedy of the Parties for money damages in the event of any inaccuracy, misrepresentation or breach of any representation or warranty of a Party under this Agreement or any Ancillary Document delivered to another Party in connection herewith will be strictly limited to indemnification pursuant to this Article 8; provided, however, that this Section 8.3(f) will not restrict the right of a party hereto to bring an action for fraud (of which intent is an element) or to seek recovery with respect to Losses arising out of or resulting from the breach of any covenant or agreement contained in this Agreement or any Ancillary Document (but not from any inaccuracy, misrepresentation or breach of any representation or warranty of a Party under this Agreement or any Ancillary Document).

(g) **Specific Performance**. Each Party acknowledges and agrees that each other Party may be damaged irreparably if this Agreement is not performed in accordance with its terms or otherwise is breached and that a Party will be entitled to seek injunctive relief to prevent breaches hereof and to enforce specifically this Agreement and its terms (including Section 5.8) in addition to any other remedy to which such Party may be entitled hereunder.

(h) **Buyer's Setoff Right**. To the extent that Buyer is entitled to indemnification for Losses, Buyer may satisfy any portion of such Losses by offsetting against any amount payable by Buyer to any Seller or any Affiliate thereof pursuant to this Agreement or the Transition Services Agreements, in each case subject to the following:

(1) With respect to each such Loss which Buyer intends to satisfy under this Section 8.3(h), Buyer must first make a bona fide claim for indemnification pursuant to Section 8.5(a) on or before the date that such amount is otherwise payable by Buyer pursuant to this Agreement or the Transition Services Agreements.

(2) If Buyer and Sellers have a dispute with respect to such claim by Buyer, then they will attempt to resolve such dispute in good faith. If Buyer and Sellers

50

are unable to resolve any such dispute within 60 days, then they will submit such dispute to an Arbitrator using substantially the same procedures described in Sections 2.4(c) and 2.4(d) in which event the date on which any such amount otherwise payable by Buyer to any Seller or any Affiliate thereof shall be required to be paid shall be extended to the third business day after the later of the agreement of Buyer and Sellers with respect to such dispute or the resolution of such dispute through arbitration and shall then be payable only to the extent not reduced by such resolution of such indemnification claim.

(i) **Exclusion of Vendor Losses**. The limitations and restrictions on indemnification set forth in Sections 8.3(a) and 8.3(b) shall be inapplicable to the first portion of Vendor Losses which are up to the amount of the Vendor Loss Holdback Amount that are payable by Sellers pursuant to Section 5.26.

8.4 **Certain Survival Periods**.

(a) **Survival of Representations and Warranties**. Subject to Section 8.4(b), each representation or warranty herein will survive the execution and delivery of this Agreement and remain in full force and effect until the date that is 18 months after the Closing Date, at which time such representation or warranty will expire and terminate and no indemnification obligation will be associated therewith or based thereon, except that each Special Representation will survive until 90 days after all Liabilities and other obligations hereunder relating thereto are barred by all applicable statutes of limitation (including periods of extension, whether automatic or permissive) and each Critical Representation will survive indefinitely.

(b) **Survival of Representations and Warranties Until Final Determination**. For each claim for indemnification hereunder regarding a representation or warranty that is validly made before expiration of such representation or warranty, such claim and associated right to indemnification will not terminate before final determination and satisfaction of such claim.

(c) **Survival of Covenants and Agreements**. Each covenant and agreement (other than representations and warranties) herein, and all associated rights to indemnification, will survive Closing and will continue in full force thereafter until all Liabilities and other obligations hereunder relating thereto are barred by all applicable statutes of limitation, subject to any applicable limitation stated herein.

8.5 **Notice of Claims and Procedures**.

(a) **Notice of Claims**. A Party entitled to indemnification hereunder (the "Claiming Party") will give the Party obligated to provide such indemnification (the "Indemnifying Party") prompt notice of any claim, for which such Claiming Party proposes to demand indemnification, (1) by a Person that is not a Party nor an Other Indemnified Person (such a claim being a "Third Party Claim" and such notice of such Third Party Claim being the "Initial Claim Notice") or (2) that does not involve a Third Party Claim, in each case specifying the amount and nature of such claim (to the extent known). Thereafter, the Claiming Party will give the Indemnifying Party, promptly after the Claiming Party's (or any of its applicable Other Indemnified Person's) receipt or delivery thereof copies of all documents (including court papers) received or delivered by the Claiming Party (or any such Other Indemnified Person)

51

Source: PreVu, INC, 8-K, July 14, 2008

relating to any such Third Party Claim. The failure to promptly give such notice or to promptly give such copies will not relieve the Indemnifying Party of any Liability or other obligation hereunder, except if the Indemnifying Party was prejudiced thereby, but only to the extent of such prejudice.

(b) **Access and Cooperation**. Each Party will, and will cause its Other Indemnified Persons to, cooperate and assist in all reasonable respects regarding such Third Party Claim, including by promptly making available to such other Party (and its legal counsel and other professional advisers with a reasonable need to know) all books and records of such Person relating to such Third Party Claim, subject to reasonable confidentiality precautions.

(c) **Defense and Participation Regarding Third Party Claims**. This <u>Section 8.5(c)</u> relates only to Third Party Claims.

(1) **Election to Conduct Defense**. Promptly after receiving an Initial Claim Notice under <u>Section 8.5(a)</u>, the Indemnifying Party will have the option to conduct the Defense of such Third Party Claim, at the expense of the Indemnifying Party. To elect to conduct such Defense, the Indemnifying Party must give written notice of such election to the Claiming Party within 10 days (or within the shorter period, if any, during which a Defense must be commenced for the preservation of rights) after the Claiming Party gives the corresponding Initial Claim Notice to the Indemnifying Party.

(2) **Conduct of Defense, Participation and Settlement**. If the Indemnifying Party conducts the Defense of such Third Party Claim, then (A) the Claiming Party may participate (including by retaining separate counsel), at its own expense, in such Defense (including any Proceeding regarding such Third Party Claim) and will have the right to receive copies of all notices, pleadings or other similar submissions regarding such Defense, (B) each Party will keep each other Party reasonably informed of all matters material to such Defense and Third Party Claim at all stages thereof, (C) the Claiming Party will not (and will cause its Other Indemnified Persons not to) admit Liability or other obligation with respect to, or compromise or settle, such Third Party Claim without the Indemnifying Party's prior written consent (which consent will not be unreasonably withheld) and (D) the Indemnifying Party will not compromise or settle such Third Party Claim, without the consent of the Claiming Party (which consent will not be unreasonably withheld), if such compromise or settlement (x) involves any material limitation on any future operations of the Claiming Party (or any of its Other Indemnified Persons), (y) affects in a manner materially adverse to the Claiming Party (or any of its Other Indemnified Persons) any other existing Third Party Claim or (z) does not release the Claiming Party (and any applicable Other Indemnified Person) from all Liabilities and other obligations regarding such Third Party Claim, other than any Liability or other obligation being satisfied by the Indemnifying Party hereunder.

(3) **Indemnifying Party Does Not Conduct Defense**. If the Indemnifying Party does not elect to conduct the Defense of such Third Party Claim, then the Claiming Party may conduct the Defense of such Third Party Claim in any manner that the Claiming Party reasonably deems appropriate, at the expense of the Indemnifying Party, which expenses shall be reasonable and documented (subject to the other

52

Source: PreVu, INC, 8-K, July 14, 2008

limitations of this Article 8), and the Claiming Party will have the right to compromise or settle such Third Party Claim after receiving the consent of the Indemnifying Party (which consent will not be unreasonably withheld).

8.6 **Reduction for Insurance, Taxes and Other Offsets**.

(a) The obligations of each Indemnifying Party hereunder regarding any Loss will be reduced, including retroactively, by the amount of any insurance proceeds, benefit regarding Taxes (a "Tax Benefit") or other amount or benefit received, directly or indirectly, by the Claiming Party (or any of its Other Indemnified Persons) regarding such Loss. Without limiting the generality of the foregoing, if (1) the Claiming Party (or such Other Indemnified Person) receives from or on behalf of an Indemnifying Party, or an Indemnifying Party pays on behalf of the Claiming Party (or such Other Indemnified Person), a payment regarding a Loss and (2) the Claiming Party (or such Other Indemnified Person) subsequently receives, directly or indirectly, any insurance proceeds, Tax Benefit or other amount or benefit regarding such Loss, then such Claiming Party (for itself or on behalf of such Other Indemnified Person, as applicable) will promptly pay to the Indemnifying Party the amount of such insurance proceeds, Tax Benefit or other amount or benefit, or, if less, the amount of such payment. The amount of such insurance proceeds, Tax Benefit or other amount or benefit received will be net of any costs and expenses incurred or that would be incurred by the Claiming Party (or such Other Indemnified Person) in procuring the same.

(b) In computing the amount of any such Tax Benefit, the Claiming Party (or such Other Indemnified Person) will be deemed to have received only the Tax Benefit actually realized by the Claiming Party (or such Other Indemnified Person) as a result of the Tax items arising from the incurrence or payment of any indemnified Losses.

8.7 **Subrogation**. Each Party hereby waives (and agrees to cause its applicable Other Indemnified Persons to waive), to the extent permitted under its (and their) insurance policies, any subrogation rights that its (or their) insurer may have against the Indemnifying Party with respect to any Loss. If an Indemnifying Party makes an indemnification payment to a Claiming Party (or to any of its Other Indemnified Persons) with respect to any Loss, then such Indemnifying Party will be subrogated, to the extent of such payment, to all related rights and remedies of such Claiming Party (or, if applicable, of such Other Indemnified Person) under any insurance policy or otherwise against or with respect to such Loss, except with respect to amounts not yet recovered by such Claiming Party (or such Other Indemnified Person) under any such insurance policy or otherwise that already have been netted against such Loss for purposes of determining the indemnifiable amount of such Loss. Promptly following such Indemnifying Party's request, such Claiming Party will (and such Claiming Party will cause each such Other Indemnified Person to) take all reasonably necessary, proper or desirable actions (including the execution and delivery of any document reasonably requested) to accomplish the foregoing.

8.8 **Effect of Purchase Price Adjustment**. Any Loss for which a Party would otherwise be obligated to provide indemnification hereunder will be offset to the extent (but only to the extent) such Loss is reflected in the adjustments to the Purchase Price under Article 2.

53

8.9 **Indemnification Adjusts Purchase Price for Tax Purposes**. Each Party will, including retroactively, treat indemnification payments under this Agreement as adjustments to the Purchase Price for Tax purposes to the extent permitted under Applicable Law.

8.10 **Effect of Officer's Certificates**. For the avoidance of doubt, any written certification by a Person (or any officer thereof) of the accuracy of any representation or warranty in this Agreement (or of the accuracy, occurrence or non-occurrence of any other matter), including any certification contemplated in Section 7.1 or 7.2, will be deemed to constitute the making or re-making of such representation or warranty by such Person (or a representation or warranty hereunder regarding such other matter) at the time of such certification in the manner and to the extent stated in such certification, including for purposes of Section 8.2(a)(i) and 8.2(b)(i). Any written certification by such an officer is made in such capacity, and no Person will have any recourse against such officer in any personal capacity in connection therewith, other than for fraud (of which intent is an element).

## ARTICLE 9
## CERTAIN GENERAL TERMS AND OTHER AGREEMENTS

9.1 **Notices**. All notices or other communications required or permitted to be given hereunder will be in writing and will be (a) delivered by hand, (b) sent by United States registered or certified mail or (c) sent by nationally recognized overnight delivery service for next Business Day delivery, in each case as stated below in this Section. Such notices or communications will be deemed given (1) if so delivered by hand, when so delivered, (2) if sent by such mail, three Business Days after mailing, or (3) if sent by such nationally recognized overnight courier service, one Business Day after delivery to such service. A Party may change the address to which such notices and other communications are to be given by giving the other Party notice in the foregoing manner.

|     |     |     |
| --- | --- | --- |
| (A) | If to any Seller, to: | with a copy to: |
|  | Wilsons The Leather Experts Inc.<br>7401 Boone Ave. N.<br>Brooklyn Park, Minnesota 55428<br>Attn: Chief Financial Officer | Faegre & Benson LLP<br>2200 Wells Fargo Center<br>90 S. 7th Street<br>Minneapolis, Minnesota 55402<br>Attn: Philip S. Garon, Esq.<br>    Chris E. Hofstad, Esq. |
| (B) | If to Buyer, to: | with a copy to: |
|  | G-III Apparel Group, Ltd.<br>512 Seventh Avenue<br>New York, New York 10018<br>Attn: Wayne S. Miller | Fulbright & Jaworski, L.L.P.<br>666 Fifth Avenue<br>New York, New York 10103<br>Attn: Neil Gold, Esq. |

9.2 **Expenses**. Except as is expressly stated otherwise herein, each Party will bear its own costs and expenses incurred in connection with the transactions contemplated herein.

54

Source: PreVu, INC, 8-K, July 14, 2008

9.3 **Interpretation; Construction**. In this Agreement:

(a) the table of contents and headings are for convenience of reference only and will not affect the meaning or interpretation of this Agreement;

(b) the words "herein," "hereunder," "hereby" and similar words refer to this Agreement as a whole (and not to the particular sentence, paragraph or Section where they appear);

(c) terms used in the plural include the singular, and vice versa, unless the context clearly requires otherwise;

(d) unless expressly stated herein to the contrary, reference to any document means such document as amended or modified and as in effect from time to time in accordance with the terms thereof;

(e) unless expressly stated herein to the contrary, reference to any Applicable Law means such Applicable Law as amended, modified, codified, replaced or reenacted, in whole or in part, and as in effect from time to time, including any rule or regulation promulgated thereunder;

(f) the words "including," "include" and variations thereof are deemed to be followed by the words "without limitation";

(g) "or" is used in the sense of "and/or"; and "any" is used in the sense of "any or all";

(h) unless expressly stated herein to the contrary, reference to a document, including this Agreement, will be deemed to also refer to each annex, addendum, exhibit, schedule or other attachment thereto;

(i) unless expressly stated herein to the contrary, reference to an Article, Section or Exhibit is to an article, section or exhibit, respectively, of this Agreement;

(j) all dollar amounts are expressed in United States dollars and will be paid in cash (unless expressly stated herein to the contrary) in United States currency;

(k) when calculating a period of time, the day that is the initial reference day in calculating such period will be excluded and, if the last day of such period is not a Business Day, such period will end on the next day that is a Business Day;

(l) with respect to all dates and time periods in or referred to in this Agreement, time is of the essence;

(m) the phrase "the date hereof" means the date of this Agreement, as stated in the first paragraph hereof; and

(n) the Parties participated jointly in the negotiation and drafting of this Agreement and the documents relating hereto, and each Party was represented by legal counsel

Source: PreVu, INC, 8-K, July 14, 2008

in connection with this Agreement and such other documents and each Party and each Party's counsel has reviewed and revised (or had ample opportunity to review and revise) this Agreement and such other documents; therefore, if an ambiguity or question of intent or interpretation arises, then this Agreement and such other documents will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the terms hereof or thereof.

9.4 **Parties in Interest; No Third-Party Beneficiaries**. Nothing in this Agreement (whether express or implied, including Section 5.5) will or is intended to confer any right or remedy under or by reason of this Agreement on any Person (including any Other Indemnified Person or any employee), except each Party and their respective permitted successors and assigns.

9.5 **Governing Law**. This Agreement will be construed and enforced in accordance with the substantive laws of the State of New York without reference to principles of conflicts of law.

9.6 **Jurisdiction, Venue and Waiver of Jury Trial**. EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN MINNEAPOLIS, MINNESOTA, OR NEW YORK, NEW YORK, IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY DOCUMENT AND TO THE RESPECTIVE COURT TO WHICH AN APPEAL OF THE DECISIONS OF ANY SUCH COURT MAY BE TAKEN. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE THEREIN OF SUCH A PROCEEDING. EACH PARTY HEREBY AGREES THAT A FINAL JUDGMENT IN ANY SUCH PROCEEDING WILL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY JURISDICTION BY SUIT ON THE JUDGMENT OR BY ANY OTHER MANNER PROVIDED BY APPLICABLE LAW. EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL IN ANY SUCH PROCEEDING.

9.7 **Entire Agreement; Amendment; Waiver**. This Agreement, including the Disclosure Schedule, constitutes the entire Agreement among the Parties pertaining to the subject matter herein and supersedes any prior representations, warranties, covenants, agreements and understandings of any of the Parties regarding such subject matter. No supplement, modification or amendment hereof will be binding unless expressed as such and executed in writing by each Party (except as contemplated in Section 9.9). No waiver of any term hereof will be binding unless expressed as such in a document executed by the Party making such waiver. No waiver of any term hereof will be a waiver of any other term hereof, whether or not similar, nor will any such waiver be a continuing waiver beyond its stated terms. Failure to enforce strict compliance with any term hereof will not be a waiver of, or estoppel with respect to, any existing or subsequent failure to comply.

9.8 **Assignment; Binding Effect**. Neither this Agreement nor any right or obligation hereunder will be assigned, delegated or otherwise transferred by any Party without the prior written consent of each other Party (which consent will not be unreasonably withheld), except that each Party will have the right to assign or otherwise transfer this Agreement or any right hereunder or delegate any obligation hereunder to: (a) a Person that does all of the following:

56

Source: PreVu, INC, 8-K, July 14, 2008

(1) acquires or otherwise succeeds to all or substantially all of such Party's business and assets; (2) assumes all of such Party's obligations hereunder; and (3) agrees to perform or cause performance of all such assumed obligations when due; (b) any of its Affiliates; or (c) any source of financing for such Party or any of its Affiliates; provided that no such assignment, delegation or transfer under clause (a), (b) or (c) above will relieve the assigning, delegating or transferring Party of any obligation hereunder. This Agreement will be binding on and inure to the benefit of the respective permitted successors and assigns of the Parties. Any purported assignment, delegation or other transfer not permitted by this Section is void.

9.9 **Severability; Blue-Pencil**. The terms of this Agreement will, where possible, be interpreted and enforced so as to sustain their legality and enforceability, read as if they cover only the specific situation to which they are being applied and enforced to the fullest extent permissible under Applicable Law. If any term of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced, then all other terms of this Agreement will nevertheless remain in full force and effect, and such term automatically will be amended so that it is valid, legal and enforceable to the maximum extent permitted by Applicable Law, but as close to the Parties' original intent as is permissible.

9.10 **Counterparts**. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

9.11 **Disclosure Schedules**. Each matter disclosed in any section of the Disclosure Schedule, representation or warranty in a manner that makes its relevance to one or more other sections of the Disclosure Schedule, representations or warranties reasonably apparent on the face of such disclosure will be deemed to have been appropriately included in each such other section of the Disclosure Schedule, representation or warranty (notwithstanding the presence or absence of any reference in or to any section of the Disclosure Schedule, representation or warranty).

**ARTICLE 10**
**CERTAIN DEFINITIONS**

"Acquired Assets" is defined in Section 1.1(a).

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such Person. For purposes of this definition, "control," "controlled by" and "under common control with," as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by Contract or otherwise. Notwithstanding the foregoing, no shareholder of Parent is an Affiliate of any Seller.

"Agreement" is defined in the first paragraph of this Agreement.

"Ancillary Document" means, with respect to a Person, any document executed and delivered by or on behalf of such Person or any Affiliate of such Person, in connection with the execution and delivery of this Agreement or Closing, pursuant to the terms of this Agreement (but not including this Agreement).

57

Source: PreVu, INC, 8-K, July 14, 2008

"Applicable Law" means any applicable provision of any constitution, treaty, statute, law (including the common law), rule, regulation, ordinance, code or order enacted, adopted, issued or promulgated by any Governmental Authority.

"Arbitrator" is defined in Section 2.4(c).

"Assignments of Leases" is defined in Section 6.2(g).

"Assumed Contract" is defined in Section 1.1(a)(1).

"Assumed Liabilities" is defined in Section 1.1(c).

"Bill of Sale" is defined in Section 6.2(a).

"Business Day" means any day, other than a Saturday or Sunday and other than a day that banks in the State of New York are generally authorized or required by Applicable Law to be closed.

"Buyer" is defined in the first paragraph of this Agreement.

"Buyer DC Plan" is defined in Section 5.5(h).

"Cap" is defined in Section 8.3(b).

"Claiming Party" is defined in Section 8.5(a).

"Closing" is defined in Section 6.1.

"Closing Date" is defined in Section 6.1.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collected Amount" is defined in Section 5.27(a).

"Collection Period" is defined in Section 5.27(a).

"Confidentiality Agreement" is defined in Section 5.4(a).

"Consent" is defined in Section 3.5(b).

"Contract" means any contract, agreement, purchase order, warranty or guarantee, license, use agreement, lease (whether for real estate, a capital lease, an operating lease or other), sublease, instrument or note, in each case that creates a legally binding obligation, and in each case whether oral or written, and all amendments, supplements and modifications thereof.

"Critical Representation" is defined in Section 8.3(e).

"Cut-Off Date" is defined in Section 6.1.

58

Source: PreVu, INC, 8-K, July 14, 2008

"Deductible" is defined in Section 8.3(a).

"Defense" means legal defense (which may include related counterclaims) reasonably conducted by reputable legal counsel of good standing selected with the consent of the Claiming Party (which consent will not be unreasonably withheld).

"Disclosure Schedule" means the disclosure schedule delivered and made a part of this Agreement on the date hereof.

"Domain Name Assignment" is defined in Section 6.2(b).

"Effective Time" is defined in Section 6.1.

"Eligible Employee" is defined in Section 5.5(a)(1).

"Encumbrance" means any mortgage, pledge, security interest, charge, lien, lease, license, occupancy, option or other right to purchase, easement, restriction or reservation or any other encumbrance whatsoever.

"Enforceability Limitation" means any applicable bankruptcy, reorganization, insolvency, moratorium or other similar Applicable Law affecting creditors' rights generally and principles governing the availability of equitable remedies.

"Environmental Claim" means any written notice by a Governmental Authority alleging potential Liability or other obligation (including potential Liability or other obligation for investigatory cost, cleanup cost, governmental response cost, natural resources damage, property damage, personal injury or penalty) arising out of, relating to or resulting from (a) the presence, or release into the environment, of any material or form of energy at any location, whether or not owned by any Seller or (b) any violation, or alleged violation, of any Environmental Law.

"Environmental Law" means any applicable federal, state or local law or other legal requirement relating to pollution or protection of the environment, including any law relating to any emission, discharge, release or possible release of any pollutant, contaminant, hazardous or toxic material, substance or waste into air, surface water, groundwater or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any pollutant, contaminant or hazardous or toxic material, substance or waste.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any (if any) corporation, trade or business (whether or not incorporated) that is under common control with any Seller pursuant to section 414(b) or (c) of the Code.

"Estimated Purchase Price" is defined in Section 2.2.

"Excluded Assets" is defined in Section 1.1(b).

"Excluded Contract" is defined in Section 1.1(b)(1).

59

Source: PreVu, INC, 8-K, July 14, 2008

"Final Transferred Inventory" is defined in Section 2.4(a).

"Final Register Cash" is defined in Section 2.4(a).

"Financial Information" is defined in Section 3.6(a).

"Financial Information Date" is defined in Section 3.6(a).

"Forward-Looking Statements" is defined in Section 4.6.

"GAAP" means generally accepted United States accounting principles as have been consistently applied by Sellers.

"G-III" is defined in Section 3.27.

"Gift Card Holdback Amount" is defined in Section 2.3.

"Gift Card Item" is defined in Section 5.18(a).

"Gift Card Statement" is defined in Section 5.18(a).

"Governmental Authority" means any: (a) nation, state, county, city, district or other similar jurisdiction of any nature; (b) federal, state, local or foreign government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, commission, bureau, instrumentality, department, official, entity, court or tribunal); (d) multi-national organization or body; or (e) body or other Person directed by Applicable Law to exercise any arbitrative, administrative, executive, judicial, legislative, police, regulatory or Taxing authority or power.

"Hazardous Substance" means any pollutant, contaminant, hazardous substance, hazardous waste or petroleum or fraction thereof, and any other chemical, waste, substance or material regulated by any Environmental Law.

"Improvements" is defined in Section 3.14.

"Indemnifying Party" is defined in Section 8.5(a).

"Initial Claim Notice" is defined in Section 8.5(a).

"Initial Purchase Price" is defined in Section 2.1.

"Intellectual Property" means any trademark, service mark, trade name, trade dress, goodwill, patent, copyright, design, logo, formula, invention (whether or not patentable or reduced to practice), concept, domain name, website, trade secret, know-how, confidential information, mask work, product right, software, technology or other intangible asset of any nature, whether in use, under development or design or inactive (including any registration, application or renewal regarding any of the foregoing).

"Intercompany Service" means any service provided or received by any Seller or any of its Affiliates to or from any Seller or any of its Affiliates that are consistent with the types of

60

Source: PreVu, INC, 8-K, July 14, 2008

services customarily provided or received between a company and its Affiliates, including human resources, Tax, accounting, legal, risk management and similar administrative services.

"IRS" means the United States' Internal Revenue Service.

"JDA" is defined in Section 5.22.

"Knowledge" has the following meaning: (a) an individual will have "Knowledge" of a particular fact or other matter if such individual is actually consciously aware of such fact or matter; and (b) a Person, other than an individual, will have "Knowledge" of a particular fact or other matter if any individual who is serving as a director or officer (or similar executive) of such Person currently has Knowledge, as stated in clause (a) above, of such fact or other matter.

"Landlord Payment Schedule" is defined in Section 2.3.

"Landlord Retention Amount" is defined in Section 2.3.

"Leased Real Property" is defined in Section 3.14.

"Lender Release" is defined in Section 7.1(a).

"Liability" means any existing liability or obligation of any nature, whether accrued, absolute, contingent, direct or indirect, perfected, inchoate, unliquidated or otherwise (including any obligation under any Contract).

"License Period" is defined in Section 5.11(c)(1).

"Licensed Software" is defined in Section 5.23.

"Licensed Software Improvements" is defined in Section 5.23.

"Loss" and "Losses" are defined in Section 8.2(a).

"Major Contract" is defined in Section 3.10(a).

"Mark" is defined in Section 5.11(c)(2).

"Material Adverse Effect" means any event or condition that, individually or in the aggregate, has had or is reasonably likely to have a materially adverse effect on the Outlet Business, taken as a whole, or the ability of the Sellers to perform their obligations under this Agreement, except that none of the following will be deemed to constitute, and none of the following will be taken into account in determining the occurrence (or possible occurrence) of a Material Adverse Effect: (a) the reaction (including subsequent actions) of any Person not a Party to any transaction contemplated herein; (b) any event or condition generally affecting any of the industries in which Sellers operate, the United States economy as a whole or any foreign economy in any location that materially affects the Outlet Business, provided that such events or conditions in this clause do not have a materially disproportionate effect on the Outlet Business (relative to other participants in the Sellers' industry); (c) any national or international political or social event or condition, including the engagement by the United States in hostilities, whether

61

Source: PreVu, INC, 8-K, July 14, 2008

or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, provided that such events or conditions in this clause do not have a materially disproportionate effect on the Outlet Business (relative to other participants in the Sellers' industry); (d) any financial, banking or securities market (including any disruption thereof or any decline in the price of any security or any market index); or (e) any compliance with any term of, or the taking of any action required by, this Agreement.

"Multiemployer Plan" has the meaning given in section 3(37) of ERISA.

"Non-Prevailing Party" is defined in Section 2.4(d).

"Notice of Disagreement" is defined in Section 2.4(b).

"On-Hand Inventory" is defined in Section 3.11(c).

"Order" means any order, writ, injunction, decree, judgment, award or determination, whether or not exclusive to the applicable Person, of or from any Governmental Authority.

"Ordinary Course of Business" means any action (which includes, for this definition, any failure to take action), condition, circumstance or status of or regarding a Person that is: (a) consistent with the past practices of such Person and is taken or exists in the ordinary course of the normal operations of such Person; or (b) similar in nature and magnitude to actions customarily taken (or not taken) without any specific authorization by the board of directors (or by any Person or group of Persons exercising similar authority) of such Person.

"Organizational Document" means, for any Person: (a) the articles or certificate of incorporation, formation or organization (as applicable) and the by-laws or similar governing document of such Person; (b) any limited liability company agreement, partnership agreement, operating agreement, shareholder agreement, voting agreement, voting trust agreement or similar document of or regarding such Person; (c) any other charter or similar document adopted or filed in connection with the incorporation, formation, organization or governance of such Person; (d) any Contract regarding the governance of such Person or the relations among any of its equity holders with respect to such Person; or (e) any amendment to any of the foregoing.

"Other Indemnified Person" means, for any Person, such Person's Affiliates and each of such Person's and each of such Affiliate's stockholders, officers, directors, partners, members, governors, managers, employees, agents and successors and assigns.

"Outlet Business" means Sellers' business of selling leather outerwear, accessories and apparel through the outlet stores listed in Exhibit 10 which, as used in this Agreement, includes Sellers' e-commerce business for the sale of leather outerwear, accessories and apparel.

"Outlet Store" means an outlet store listed on Exhibit 10.

"Parent" is defined in the first paragraph of this Agreement.

"Party" means any Seller or Buyer.

62

"Permit" means any license or permit from a Governmental Authority.

"Permitted Acquired Business" is defined in Section 5.8(b)(1).

"Permitted Encumbrance" means any: (a) Encumbrance listed in the Disclosure Schedule or reflected or disclosed in any of the Financial Information; (b) Encumbrance for any Tax, assessment or other governmental charge that is not yet due and payable or that may thereafter be paid without interest or penalty; (c) Encumbrance arising under any original purchase price conditional sales contract or equipment lease; (d) easement, covenant, condition or restriction of public record identified in the Disclosure Schedule; (e) pledge or deposit to secure any obligation under any workers or unemployment compensation law or to secure any other public or statutory obligation; (f) mechanic's, materialmen's, landlord's, carrier's, supplier's or vendor's lien or similar Encumbrance arising or incurred in the Ordinary Course of Business of the applicable Person that secures any amount that is not overdue for a period of more than 90 days; or (g) other imperfection of title or license or other Encumbrance, if any, that does not materially impair the use or operation of any asset to which it relates in the conduct of the business of the applicable Person as presently conducted.

"Permitted Investment" is defined in Section 5.8(b)(1).

"Person" means any individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or any other business entity or association or any Government Authority.

"Plan" means an "employee benefit plan" (as such term is defined in section 3(3) of ERISA) and any employment, severance, retention, change in control, incentive (equity or otherwise), deferred compensation, vacation, holiday, sick leave, fringe benefit, educational assistance, flexible spending or other compensatory agreement, plan, program or arrangement that is not an "employee benefit plan" as so defined.

"Prepaid Item" is defined in Section 2.4(i).

"Prevailing Party" is defined in Section 2.4(d).

"Principally Related to the Outlet Business" means, with respect to any item (whether tangible, intangible or mixed), event or condition, that such item, event or condition is primarily (other than any immaterial or minor occasional exception) used, possessed, derived or in existence with respect to the Outlet Business, which includes certain operations at Sellers Headquarters and Sellers Distribution Facility.

"Proceeding" means any action, arbitration, audit, demand, hearing, inquiry, investigation, litigation, proceeding or suit in each case (other than arbitration) that is or is to be commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority.

"Prohibited Transaction" has the meaning given in section 406 of ERISA and 4975 of the Code.

"Projections" is defined in Section 3.25.

63

Source: PreVu, INC, 8-K, July 14, 2008

"Purchase Price" is defined in Section 2.1.

"Real Property Lease" is defined in Section 3.14.

"Real Property Lease Tax" means any ad valorem Tax regarding real estate that is a direct or indirect obligation pursuant to the terms of a Real Property Lease.

"Reconciliation" is defined in Section 5.27(a).

"Register Cash" is defined in Section 1.1(a)(5).

"Reimbursable Amount" is defined in Section 5.18(a).

"Restricted Area" is defined in Section 5.8(a)(1)(B).

"Restricted Business" is defined in Section 5.8(a)(1)(A).

"SEC" means the Securities and Exchange Commission.

"Seller" is defined in the first paragraph of this Agreement.

"Seller Collateral" is defined in Section 5.14.

"Seller Plan" means a Plan that is made or maintained with or for the benefit of or otherwise covers one, or more than one, individual who may become a Transferred Employee (or any beneficiary or dependent of any such individual).

"Sellers Distribution Facility" means the distribution facility of Parent and its Affiliates located at 7401 Boone Ave. N., Brooklyn Park, Minnesota.

"Sellers Headquarters" means the headquarters and office facility of Parent and its Affiliates located at 7401 Boone Ave. N., Brooklyn Park, Minnesota.

"Settlement Payment Amount" is defined in Section 5.30.

"Special Representation" is defined in Section 8.3(e).

"Statement" is defined in Section 2.4(a).

"Subject Landlords" is defined in Section 5.30.

"Sublease Agreement" is defined in Section 6.2(k).

"Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or other interests, having by their terms ordinary voting power to elect a majority of the board of directors of such other Person (or others performing similar functions with respect to such other Person), is directly or indirectly owned or controlled by such first Person or by any one or more of such first Person's Subsidiaries.

"Target Transferred Inventory" is defined in Section 2.4(g).

64

Source: PreVu, INC, 8-K, July 14, 2008

"Tax" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, including any interest, fine, penalty or similar addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Tax Benefit" is defined in Section 8.6(a).

"Tax Return" means any return, declaration, report, filing, claim for refund or information return or statement relating to any Tax, including any schedule or attachment thereto and including any amendment thereof.

"Third Party Claim" is defined in Section 8.5(a).

"Threatened" means, with respect to any matter, that a demand, notice or statement has been made or given, in writing or otherwise, that states that such matter is being or will be asserted, commenced, taken or otherwise pursued.

"Total Reimbursable Amount" is defined in Section 5.18(a).

"Trademark Assignment" is defined in Section 6.2(b).

"Transaction Confidentiality Agreement" is defined in Section 5.16.

"Transfer Tax" is defined in Section 5.7.

"Transferred Employee" is defined in Section 5.5(a)(2).

"Transferred Employee Leave Obligation" is defined in Section 1.1(c)(2).

"Transferred Inventory" is defined in Section 2.4(h).

"Transition Period" is defined in Section 5.5(h).

"Transition Services Agreement" is defined in Section 5.12.

"Undelivered Inventory" is defined in Section 1.1(a)(3).

"Vendor Loss Holdback Amount" is defined in Section 2.3.

"Vendor Loss Statement" is defined in Section 5.26(a).

"Vendor Losses" is defined in Section 5.26(a).

65

Source: PreVu, INC, 8-K, July 14, 2008

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988.

\* \* \* \* \*

*[Signature Pages Follow]*

66

Source: PreVu, INC, 8-K, July 14, 2008

IN WITNESS WHEREOF, each Party has executed this Asset Purchase Agreement effective as of the date first written above.

Wilsons The Leather Experts Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Rosedale Wilsons, Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

River Hills Wilsons, Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather Direct Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Alabama Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

AM Retail Group, Inc.

By:   /s/ Michael Brady
Name: Michael Brady
Title: VP Corporate Controller

Wilsons Leather of Delaware Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Florida Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Georgia Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Indiana Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

[*Signature Page to Asset Purchase Agreement*]

Source: PreVu, INC, 8-K, July 14, 2008

Wilsons Leather of Connecticut Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Louisiana Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Maryland Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Massachusetts Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Michigan Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Iowa Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of New Jersey Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of New York Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of North Carolina Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Ohio Inc.

By:   /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

*[Signature Page to Asset Purchase Agreement]*

Source: PreVu, INC, 8-K, July 14, 2008

Wilsons Leather of Mississippi Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Missouri Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Tennessee Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Texas Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather Holdings Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Pennsylvania Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of South Carolina Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Wisconsin Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Leather of Virginia Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Bermans The Leather Experts Inc.

By:     /s/ Stacy A. Kruse
Name: Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

*[Signature Page to Asset Purchase Agreement]*

Source: PreVu, INC, 8-K, July 14, 2008

Exhibit 99.1



**Contact:**

Stacy A. Kruse
Chief Financial Officer and Treasurer
Wilsons The Leather Experts Inc.
(763) 391-4000

**For Immediate Release**

**Wilsons The Leather Experts Inc. Announces
The Sale of Outlet Store and E-Commerce Assets;
Wilsons Leather to Change Corporate Name**

   MINNEAPOLIS – (BUSINESS WIRE) – July 8, 2008 – Wilsons The Leather Experts Inc. (NASDAQ: WLSN) today announced the sale of its outlet store and e-commerce assets to AM Retail Group, Inc., a wholly owned subsidiary of G-III Apparel Group, Ltd. (NasdaqGSM: GIII), a New York based apparel company. Under the terms of the agreement, AM Retail Group, Inc. purchased all inventory, fixed assets and intellectual property principally related to Wilsons Leather's outlet store and e-commerce divisions. The leases associated with Wilsons Leather's 116 outlet stores were assigned to AM Retail Group, Inc. AM Retail Group, Inc. acquired the assets for a total purchase price of approximately $22.3 million. The sale is part of Wilsons Leather's previously announced strategy to obtain capital to be used in the launch of its new mall accessories store concept.

   In connection with these actions, Wilsons Leather will change its name to PreVu, Incorporated.

**About Wilsons Leather**

   Wilsons Leather is a leading specialty retailer of leather outerwear, accessories and apparel in the United States.

*Except for historical information, matters discussed in this press release are forward-looking statements that involve risks and uncertainties, and actual results may be materially different. Such statements are based on information available to management as of the time of such statements and include statements related to future comparable store sales results, business strategies, changes to merchandise mix, and future sales results. Factors that could cause actual results to differ include: potential delisting of our common stock if we are unable to satisfy the Nasdaq listing requirements; our ability to utilize our tax net operating loss carryforwards; our ability to expand our accessories business and acquire suitable accessories brands, including our ability to finance any expansion; risks associated with our ability to strengthen our existing store base and develop our accessories concept; continued declines in comparable store sales; dependence on our key suppliers to implement our designer brand merchandise strategy; changes in customer shopping patterns; the potential for additional impairment losses if our operating performance does not improve; competition in our markets; uncertainty in general economic conditions; unseasonably warm weather; our ability to effectively respond to changes in fashion trends and consumer demands; decreased availability and increased cost of leather; risks associated with foreign sourcing and international business; seasonality of our business; the public sale into the market of common stock issued pursuant to options granted under our employee benefit plans or shares issued in our 2004 equity financing or issuable*

**Wilsons Leather**

Source: PreVu, INC, 8-K, July 14, 2008

7401 Boone Avenue North
Brooklyn Park, Minnesota 55428
763.391.4000
www.wilsonsleather.com

Source: PreVu, INC, 8-K, July 14, 2008



*upon exercise of warrants delivered in connection with our 2004 equity financing, as well as shares issuable upon conversion and exercise of the preferred stock and warrants issued in connection with the financing that was completed on June 15, 2007; risks associated with estimates made by management based on our critical accounting policies; changes to financial accounting standards that may affect our results of operations; loss of key members of our senior management team; concentration of ownership of our common stock; volatility of the market price of our common stock; reliance on third parties for upgrading and maintaining our management information systems; war, acts of terrorism or the threat of either; and interruption in the operation of our corporate offices and distribution center.*

*The information included in this press release is operative as of this date only. Wilsons Leather does not undertake any obligation to update its forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. In order to ensure that all investors continue to have equal access to the same information, Wilsons Leather will refrain from updating forward-looking statements made in this press release unless it does so through means designed to provide broad distribution of the information to the public.*

###

**Wilsons Leather**

7401 Boone Avenue North
Brooklyn Park, Minnesota 55428
763.391.4000
www.wilsonsleather.com

---

Created by 10KWizard    www.10KWizard.com

# Exhibit 2

# Earthtimes.org (Press Release)

| Print this Page | | Close Window |

## Wilsons The Leather Experts Inc. Announces The Sale of Outlet Store and E-Commerce Assets

Posted on : 2008-07-08 | Author : MN-WILSONS
News Category : PressRelease

MINNEAPOLIS - (Business Wire) Wilsons The Leather Experts Inc. (NASDAQ: WLSN) today announced the sale of its outlet store and e-commerce assets to AM Retail Group, Inc., a wholly owned subsidiary of G-III Apparel Group, Ltd. (NasdaqGSM: GIII), a New York based apparel company. Under the terms of the agreement, AM Retail Group, Inc. purchased all inventory, fixed assets and intellectual property principally related to Wilsons Leather's outlet store and e-commerce divisions. The leases associated with Wilsons Leather's 116 outlet stores were assigned to AM Retail Group, Inc. AM Retail Group, Inc. acquired the assets for a total purchase price of approximately $22.3 million. The sale is part of Wilsons Leather's previously announced strategy to obtain capital to be used in the launch of its new mall accessories store concept.

In connection with these actions, Wilsons Leather will change its name to PreVu, Incorporated.

## About Wilsons Leather

Wilsons Leather is a leading specialty retailer of leather outerwear, accessories and apparel in the United States.

*Except for historical information, matters discussed in this press release are forward-looking statements that involve risks and uncertainties, and actual results may be materially different. Such statements are based on information available to management as of the time of such statements and include statements related to future comparable store sales results, business strategies, changes to merchandise mix, and future sales results. Factors that could cause actual results to differ include: potential delisting of our common stock if we are unable to satisfy the Nasdaq listing requirements; our ability to utilize our tax net operating loss carryforwards; our ability to expand our accessories business and acquire suitable accessories brands, including our ability to finance any expansion; risks associated with our ability to strengthen our existing store base and develop our accessories concept; continued declines in comparable store sales; dependence on our key suppliers to implement our designer brand merchandise strategy; changes in customer shopping patterns; the potential for additional impairment losses if our operating performance does not improve; competition in our markets; uncertainty in general economic conditions; unseasonably warm weather; our ability to effectively respond to changes in fashion trends and consumer demands; decreased availability and increased cost of leather; risks associated with foreign sourcing and international business; seasonality of our business; the public sale into the market of common stock issued pursuant to options granted under our employee benefit plans or shares issued in our 2004 equity financing or issuable upon exercise of warrants delivered in connection with our 2004 equity financing, as well as shares issuable upon conversion and*

exercise of the preferred stock and warrants issued in connection with the financing that was completed on June 15, 2007; risks associated with estimates made by management based on our critical accounting policies; changes to financial accounting standards that may affect our results of operations; loss of key members of our senior management team; concentration of ownership of our common stock; volatility of the market price of our common stock; reliance on third parties for upgrading and maintaining our management information systems; war, acts of terrorism or the threat of either; and interruption in the operation of our corporate offices and distribution center.

The information included in this press release is operative as of this date only. Wilsons Leather does not undertake any obligation to update its forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. In order to ensure that all investors continue to have equal access to the same information, Wilsons Leather will refrain from updating forward-looking statements made in this press release unless it does so through means designed to provide broad distribution of the information to the public.

Wilsons The Leather Experts Inc.
Stacy A. Kruse, 763-391-4000
Chief Financial Officer and Treasurer

Print this Page        Close Window

**Press Release Print Source :**
http://www.earthtimes.org/articles/show/wilsons-the-leather-experts-inc,460381.shtml
© 2008 earthtimes.org. All Rights Reserved.
This material may not be published, broadcast, rewritten, or redistributed.

# Exhibit 3

Case 1:08-cv-06627-PAC    Document 6-6    Filed 08/04/2008    Page 2 of 4



# Department of State

## Division of Corporations

### Search Our Corporation and Business Entity Database

The Corporation and Business Entity Database includes business and not for profit corporations, limited partnerships, limited liability companies and limited liability partnerships, as well as other miscellaneous businesses. This information is best viewed with Netscape Navigator 7.0 and above or Internet Explorer 6.0 and above. Please note that the database does not include corporate or other business entity assumed names filed pursuant to General Business Law, §130. Assumed name filings are filed and maintained by the Division of Corporations for corporations, limited liability companies and limited partnerships. Although maintained by the Division of Corporations, searches of records of assumed names used by corporations, limited liability companies and limited partnerships must be made by a written, faxed or e-mail request to the Division. All other entities such as general partnerships, sole proprietorships and limited liability partnerships file an assumed name certificate directly with the county clerk in each county in which the entity conducts or transacts business.

Every effort has been made to ensure that the information contained on this site is up to date and accurate. As the Department relies upon information provided to it, the information's completeness or accuracy cannot be guaranteed. If you have any questions about performing a search or the results you receive, please contact the NYS Department of State, Division of Corporations at (518) 473-2492, Monday - Friday, 8:30 a.m. - 4:30 p.m.

The information contained in this database is current through July 17, 2008.

**Search Criteria**

| | |
|---|---|
| Entity Name * | prevu incorporated |
| Name Type * | All |
| Search Type * | Contains |

The items marked with * are required.

[ Search the Database ]

To search the database do the following:

1. Enter the Corporation or Business Entity Name being searched for.

NYS Department of State Corporation and Business Entity Database
Case 08-cv-06627-PAC    Document 6-6    Filed 08/04/2008    Page 3 of 4
Page 2 of 2

2. Select a Name Type.
3. Select a Search Type.
4. Tab to Search the Database and press the enter key or click Search the Database.

Additional Search Instructions

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# NYS Department of State

## Division of Corporations

### Informational Message

No business entities were found.

Please refine your search criteria.

To continue please do the following:

Tab to Ok and press the Enter key or Click Ok.

Ok

Division of Corporations, State Records and UCC Home Page     NYS Department of State Home Page

# Exhibit 4

  

# Department of State

## Division of Corporations

### Search Our Corporation and Business Entity Database

The Corporation and Business Entity Database includes business and not for profit corporations, limited partnerships, limited liability companies and limited liability partnerships, as well as other miscellaneous businesses. This information is best viewed with Netscape Navigator 7.0 and above or Internet Explorer 6.0 and above. Please note that the database does not include corporate or other business entity assumed names filed pursuant to General Business Law, §130. Assumed name filings are filed and maintained by the Division of Corporations for corporations, limited liability companies and limited partnerships. Although maintained by the Division of Corporations, searches of records of assumed names used by corporations, limited liability companies and limited partnerships must be made by a written, faxed or e-mail request to the Division. All other entities such as general partnerships, sole proprietorships and limited liability partnerships file an assumed name certificate directly with the county clerk in each county in which the entity conducts or transacts business.

Every effort has been made to ensure that the information contained on this site is up to date and accurate. As the Department relies upon information provided to it, the information's completeness or accuracy cannot be guaranteed. If you have any questions about performing a search or the results you receive, please contact the NYS Department of State, Division of Corporations at (518) 473-2492, Monday - Friday, 8:30 a.m. - 4:30 p.m.

The information contained in this database is current through July 17, 2008.

**Search Criteria**

| | |
|---|---|
| Entity Name * | wilsons the leather experts inc. |
| Name Type * | All |
| Search Type * | Contains |

The items marked with * are required.

[ Search the Database ]

To search the database do the following:

1. Enter the Corporation or Business Entity Name being searched for.

Case 1:08-cv-06627-PAC    Document 6-7    Filed 08/04/2008    Page 3 of 4
NYS Department of State Corporation and Business Entity Database
Page 2 of 2

2. Select a Name Type.
3. Select a Search Type.
4. Tab to Search the Database and press the
   enter key or click Search the Database.

<u>Additional Search Instructions</u>

<u>Division of Corporations, State Records and UCC Home Page</u>    <u>NYS Department of State Home Page</u>

# NYS Department of State

## Division of Corporations

### Informational Message

No business entities were found.

Please refine your search criteria.

To continue please do the following:

Tab to Ok and press the Enter key or Click Ok.

Ok

Division of Corporations, State Records and UCC Home Page     NYS Department of State Home Page

# Exhibit 5-A

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549
## FORM 10-K

(Mark one)

☑  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended February 2, 2008**

OR

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from            to

Commission file number 000-21543

# Wilsons The Leather Experts Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Minnesota** | **41-1839933** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **7401 Boone Ave. N., Brooklyn Park, MN** | **55428** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(763) 391-4000**

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common stock, $.01 par value** | **Nasdaq Global Market** |
| (Title of Class) | (Name of Exchange on Which Registered) |

Securities registered pursuant to Section 12(g) of the Act:    None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☐    No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark if the disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☑

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☑

The aggregate market value of the common equity held by non-affiliates of the registrant was $44,153,181 based on the closing sale price for the common stock on the last business day of the registrant's most recently completed second fiscal quarter as reported by the Nasdaq Global Market℠. For purposes of determining such aggregate market value, all executive officers and directors of the registrant are considered to be affiliates of the registrant. This number is provided only for the purpose of this Annual Report on Form 10-K and does not represent an admission by either the registrant or any such person as to the status of such person.

The number of shares outstanding of the registrant's common stock, $.01 par value, was 39,372,209 at April 4, 2008.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the definitive Proxy Statement of Wilsons The Leather Experts Inc. for the 2008 Annual Meeting of Shareholders (the "Proxy Statement"), which will be filed within 120 days after the registrant's fiscal year ended February 2, 2008, are incorporated by reference into Part III of this Annual Report on Form 10-K ("Form 10-K"). The Audit Committee Report is expressly not incorporated by reference in this Form 10-K.

WILSONS THE LEATHER EXPERTS INC.

FORM 10-K

For the fiscal year ended February 2, 2008

TABLE OF CONTENTS

| | DESCRIPTION | PAGE |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 18 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 18 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 19 |
| Item 4A. | Executive Officers of the Registrant | 19 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 20 |
| Item 6. | Selected Financial Data | 20 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| Item 7A. | Quantitative and Qualitative Disclosure About Market Risk | 31 |
| Item 8. | Financial Statements and Supplementary Data | 31 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 31 |
| Item 9A(T). | Controls and Procedures | 32 |
| Item 9B. | Other Information | 33 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 33 |
| Item 11. | Executive Compensation | 33 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 33 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 33 |
| Item 14. | Principal Accountant Fees and Services | 33 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 34 |
| Signatures | | 35 |

# PART I

*When we refer to "we," "our," "us," or "Wilsons Leather," we mean Wilsons The Leather Experts Inc. and its subsidiaries, including its predecessor companies. Unless otherwise indicated, references to our fiscal year mean the year ended on the Saturday closest to January 31. The periods that will end or have ended on January 31, 2009, February 2, 2008, February 3, 2007, and January 28, 2006 are referred to herein as 2008, 2007, 2006, and 2005, respectively. The results of operations for fiscal year 2006 consisted of 53 weeks. All other fiscal years referenced consist of 52 weeks.*

## Item 1.    Business

### Disclosure Regarding Forward-Looking Statements

The information presented in this Form 10-K under the headings Item 1. "Business" and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" contains certain forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Such forward-looking statements are based on the beliefs of our management as well as on assumptions made by and information currently available to us at the time such statements were made and relate to, among other things, future comparable store sales results, business strategies, changes to merchandise mix, future sales results, expected demand for our products, financing requirements, capital expenditures, store operations, store openings and closings, and competition. Although we believe these statements are reasonable, readers of this Form 10-K should be aware that actual results could differ materially from those projected by such forward-looking statements as a result of a number of factors, many of which are outside of our control, including those set forth under Item 1A. "Risk Factors," beginning on page 10 of this Form 10-K. Readers of this Form 10-K should consider carefully the factors listed under Item 1A. "Risk Factors," as well as the other information and data contained in this Form 10-K. All forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements set forth under Item 1A. "Risk Factors" in this section. The words "anticipate," "believe," "estimate," "expect," "intend," "plan," "target," "may," "will," "project," "should," "continue," and similar expressions or the negative thereof, as they relate to us, are intended to identify such forward-looking statements. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

### Overview

We are a specialty retailer of quality leather outerwear, accessories and apparel in the United States. Our multi-channel store locations are designed to target a broad customer base with a superior level of customer service. Through our international leather sourcing network and relationships with vendors of nationally recognized designer brands, we are able to consistently provide our customers with quality, fashionable merchandise at attractive prices. Our business structure results in shorter lead times, allowing us to react quickly to popular and emerging fashion trends and customer preferences, rapidly replenish fast-selling merchandise and minimize fashion risk.

As of February 2, 2008, we operated a total of 391 stores (including 158 stores that we are liquidating — see "Reorganization and Partial Store Liquidation") located in 42 states, including 259 mall stores, 118 outlet stores and 14 airport locations. We have historically supplemented our permanent stores with temporary seasonal stores during our peak selling season. However, operation of our temporary seasonal stores was suspended in 2006. We do not intend to operate any temporary seasonal stores in the foreseeable future. Our mall stores average approximately 2,560 total leased square feet and as of February 2, 2008, featured a large assortment of classic and contemporary leather outerwear, accessories and apparel. Our outlet stores operate primarily under the Wilsons Leather Outlet[SM] name, average approximately 3,900 total leased square feet and offer a combination of clearance merchandise from our mall stores, special outlet-only merchandise and key in-season goods. Our airport stores average approximately 630 total leased square feet, feature travel-related products as well as leather accessories and provide us the opportunity to showcase our products and the *Wilsons Leather* brand to millions of potential customers each year in some of the busiest airports in the United States.

**Financial Strategy**

In 2007, our goal was to build on the "reinvented" Wilsons Leather we worked to create in 2006 to appeal to a more contemporary and upscale target customer and not revert to the promotional "price only" environment of crowded stores and unattractive presentations that was our past. Our fiscal 2007 results reflect the fact that the transition of our customer base is taking more time than anticipated, as our traditional price only customer has opted out of the "reinvented" Wilsons Leather. We have yet to reach our new target customer in satisfactory numbers. Over the past few years, mall traffic has been trending downward, off-mall retail venues have gained popularity and competition has continued to increase from non-specialty discounters and mass merchandisers. Compounding these issues for us was an extremely challenging retail environment for outerwear in 2007.

During 2007, our primary initiatives to build on the "reinvented" Wilsons Leather were:

*Increase Accessories Penetration.* To mitigate the continuing seasonality we face in the outerwear business, we continued to expand our accessories categories. Outerwear comparable store sales continue to decline year over year, which further supports our shift in strategic focus toward accessories. Our accessories penetration increased to 44.9% of net sales in 2007 as compared to 41.4% and 38.3% in 2006 and 2005, respectively. We will continue to increase our accessories profile in 2008 by offering nationally recognized designer brands in our 100 remaining mall stores. We plan to make accessories our primary product offering.

*Emphasis on Designer Brands.* We significantly increased the number of nationally recognized designer brands in our accessories and outerwear offerings during the 2007 holiday season, primarily in our mall stores. Designer brand product performed better than our private label offerings for both accessories and outerwear and we plan to significantly increase our designer brand offerings in 2008. Sell-throughs of designer brands, at higher average unit retails, are significantly higher than our own private label offerings.

*New Store Environment Test.* We tested a new store environment in four locations during the fourth quarter of 2007. These stores featured primarily designer brands for both accessories and outerwear, with an emphasis on accessories. Designer brand handbags were featured using updated display fixtures and presentations. In addition, two of these stores operated under the name "Studio" as part of the test. Initial test results for the accessories business in these stores was promising and we look forward to rolling out an improved version of this store concept to our 100 remaining mall stores in 2008.

*Develop a Wholesale Business.* In 2006, we laid the foundation for a wholesale business to sell proprietary licensed and branded leather products in geographic and product categories outside our current markets and product mix. During 2007, we continued to focus on building a wholesale business and we established relationships with certain major retailers. However, we have decided to focus our limited capital resources on our new go-forward accessories mall concept and revitalization/enhancement of our outlet and airport channels. As such, we will discontinue our wholesale business during the first quarter of 2008.

Our financial strategy for 2008 is to aggressively reduce costs and working capital needs, launch a new mall accessory store concept and revitalize/enhance our outlet and airport channels.

*Reorganization and Partial Store Liquidation.* On February 15, 2008, we announced that we would liquidate up to 160 mall stores (subsequently revised to 154 mall stores and four outlet stores — the "liquidation stores") and eliminate approximately 938 store-related positions. We retained a third party liquidator and real estate firm to assist in this process. The liquidation is part of a strategy aimed at reducing our mall store base, aggressive cost cutting measures and the launch of a new mall accessories store concept. Concurrent with these store closures and using the liquidation sale proceeds, our 100 remaining mall stores will be remodeled to a new mall accessories store concept that has been tested in four different regions of the country, as mentioned above. As part of the launch of our new mall accessories concept stores and ongoing cost reduction efforts, we have also realigned our organization to reflect the reduced store base and decreased overseas sourcing needs. As a result, we eliminated 64 positions at our corporate headquarters, overseas offices and distribution center. During the fourth quarter of 2007, we recorded a $9.3 million impairment loss related to the assets located at the liquidation stores as well as $10.4 million in other asset impairment charges that were primarily related to the mall-based stores that will be converted to the new accessories concept.

2

*New Mall Accessories Store Concept.*    During the 2007 holiday season, as mentioned above, we began testing a new mall accessories store concept in four stores to address our customer traffic issues and elevate our brand positioning. With that test, we identified an accessories centered offering that appeals to an important buying demographic.

This new concept will be a designer brand driven store for women, focusing on fashion accessories with a limited selection of outerwear. We have kept only our best mall stores in the best locations for this concept. Our plan is to remodel every remaining mall store to this new concept during 2008. With handbags generally priced from $100 — $400, this new concept will provide an upscale boutique feel for customers in the emerging or mass luxury category and will be an alternative to the department store homogenization that has occurred in this category.

*Revitalize/Enhance Our Outlet and Airport Channels.*    Our outlet and airport channels have historically been profitable and cash flow positive. The reorganization and partial store liquidation included the closing of only four outlet stores. These channels are the foundation for our new mall accessories store concept to provide stability and cash flow as our new accessories concept is developed. We plan to introduce new product offerings in both accessories and outerwear in our outlet channel. In addition, we will strive to implement new marketing packages and improved display presentations in our outlet channel.

**Merchandising Strategy and Product Design**

During the 2007 holiday season, we shifted the emphasis of product mix in our mall stores to designer brand product in outerwear. It is clear that designer brand product outperforms our private label offerings in our stores and as a result, we will significantly increase the mix of designer brand offerings in both accessories and outerwear in our mall stores and we eventually intend to eliminate private label offerings in those stores. This represents a change in strategy from our past, when the majority of our product was designed and sourced directly by us, working with our overseas partners. As a result, we will close the majority of our overseas sourcing office locations in the first quarter of 2008 and will have a minimal direct presence in China, Hong Kong and India going forward to support a significantly reduced amount of private label offerings.

The elements of our merchandise strategy combine to create an assortment of products that appeal to consumers from a broad range of socio-economic, demographic and cultural profiles and are designed to generate demand and increase comparable store sales. We perform internal market research at least annually and we will continue to survey our current and potential customers each year to update our customer demographics.

In 2007, we continued to update the merchandising of accessories within our mall stores to increase the size of our accessories business. The emphasis was primarily on handbags. As a result, accessories penetration increased to 44.9% from 41.4% of net sales in 2006. In 2008, we plan to continue to expand our accessories offerings with a goal of 70% penetration in our 100 remaining mall stores. The overwhelming majority of these accessories will be designer brand offerings. Our accessories business has proven to be less seasonal and has grown into the largest merchandise category of our business. We believe that further increasing our accessories business will offer us an opportunity to limit the risks inherent in and reduce the seasonality of our business.

*New Mall Accessories Store Concept.*    We decided to close the majority of our mall stores and remodel the 100 remaining mall stores to a new accessories concept. The cash proceeds from the liquidation of inventory at the closed stores will be used to help fund the transformation of the 100 remaining mall stores. This new concept will be a designer brand driven store for women, focusing on fashion accessories with a limited selection of outerwear. All of the product we plan to offer in our mall stores will be designer brand product. We will no longer offer any of our private label merchandise at these stores. Our store fixtures and signage will be updated to better display and highlight the various designer brands we will sell. We plan to complete the remodel of all 100 mall stores during 2008.

*Target Core Customer Base.*    In 2008, we intend to continue to appeal to a more classic and contemporary target customer. In our stores, we target high potential, high-volume customers ages 25 to 55, and we work to ensure that our stores are assorted with the products they want. In our new accessories mall concept, we will focus on women by offering fashionable designer brand handbags and accessories. In our outlets, we will continue to deliver

fashion-right leather merchandise for men and women that fits the lifestyle needs of our target customers at prices they find attractive.

*Pursue Multiple Selling Channels.*   We operate our stores in malls, outlet centers and airports. We also sell through our e-commerce site. Our new accessories concept in our mall stores focuses on designer brand handbags for women and we plan new merchandise offerings in our outlet channel as well. It is our hope that these new product offerings will generate the increased traffic we need to improve our sales and operating performance.

The following table sets forth the percentages of net sales by major merchandise category for 2007 and 2006:

| Merchandise Category | 2007 | 2006 |
|---|---|---|
| Accessories | 44.9% | 41.4% |
| Women's apparel | 27.0% | 28.0% |
| Men's apparel | 28.1% | 30.6% |
| Total | 100.0% | 100.0% |

## Sourcing and Quality Assurance

With our shift toward designer brand merchandise mentioned above, we will significantly reduce the volume of private label product we directly design and source. The majority of our product will be purchased from third party domestic vendors. Specifically, our mall stores will carry 100% designer brand product. As a result, we have decided to close the majority of our overseas sourcing office locations in the first quarter of 2008 and will have a minimal direct presence in China, Hong Kong and India going forward.

During 2007, and throughout our past, our sourcing infrastructure and strong relationships with our overseas suppliers allowed us to effectively control merchandise production without owning manufacturing facilities. Our designers and buyers worked closely with our sourcing team to identify and develop leather styles, colors and finishes. During 2007, we maintained a staff of approximately 33 professionals located in China, Hong Kong and India who were primarily responsible for overseeing the production and quality assurance process in overseas factories and were supervised by the sourcing team at our corporate headquarters. Their responsibilities included inspecting leather at the tanneries, coordinating the production capacity, matching product samples to our technical specifications, and providing technical assistance and quality assurance through inspection in the factories. In 2007, approximately 65% of our outerwear and accessories were manufactured by approximately 60 independently owned manufacturing facilities located primarily in China and India. Going forward, our merchandising department will be working primarily with third party domestic vendors to choose the right mix of designer brand merchandise. However, we will maintain a minimal presence in China, Hong Kong and India working from a single office location, with only three full-time professionals in Hong Kong, who will work closely with the merchandising team at our corporate headquarters performing primarily merchandising and quality assurance functions.

## Store Formats and Locations

As of February 2, 2008, we operated 391 retail stores (including the 158 liquidation stores) located in 42 states, including 259 mall stores, 118 outlet stores and 14 airport locations. While we had historically supplemented our permanent stores with temporary seasonal stores during our peak selling season, operation of our temporary seasonal stores was suspended in 2006. We do not intend to operate any temporary seasonal stores in the foreseeable future.

In addition, our e-commerce site at www.wilsonsleather.com offers leather outerwear, accessories and apparel, as well as company background and financial information.

4

*Store Locations as of February 2, 2008:*

| State | Mall | Outlet | Airport | Total | Liquidation Stores Mall | Liquidation Stores Outlet | State | Mall | Outlet | Airport | Total | Liquidation Stores Mall | Liquidation Stores Outlet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | — | 1 | — | 1 | — | — | North Carolina | 7 | 3 | — | 10 | 3 | — |
| Arizona | 2 | 1 | — | 3 | 1 | — | North Dakota | 3 | — | — | 3 | 1 | — |
| California | 24 | 14 | 1 | 39 | 15 | — | Nebraska | 1 | — | — | 1 | — | — |
| Colorado | 4 | 4 | — | 8 | 2 | — | New Hampshire | 4 | 2 | — | 6 | 2 | — |
| Connecticut | 6 | 1 | — | 7 | 3 | — | New Jersey | 7 | 3 | — | 10 | 2 | — |
| Delaware | 2 | 1 | — | 3 | 1 | — | New Mexico | 2 | 1 | — | 3 | 2 | — |
| Florida | 8 | 8 | 1 | 17 | 5 | — | Nevada | 1 | 3 | — | 4 | — | — |
| Georgia | 8 | 5 | 3 | 16 | 5 | — | New York | 15 | 4 | — | 19 | 9 | 1 |
| Iowa | 4 | 1 | — | 5 | 3 | — | Ohio | 14 | 4 | — | 18 | 11 | 1 |
| Idaho | 1 | — | — | 1 | 1 | — | Oklahoma | 2 | — | — | 2 | — | — |
| Illinois | 22 | 4 | 5 | 31 | 19 | — | Oregon | 5 | 1 | — | 6 | 2 | — |
| Indiana | 6 | 2 | — | 8 | 5 | — | Pennsylvania | 14 | 5 | 1 | 20 | 8 | — |
| Kansas | 2 | 1 | — | 3 | 1 | — | South Carolina | — | 5 | — | 5 | — | 1 |
| Kentucky | 2 | — | — | 2 | 2 | — | South Dakota | 2 | — | — | 2 | 2 | — |
| Louisiana | — | 2 | — | 2 | — | — | Tennessee | 6 | 4 | — | 10 | 3 | — |
| Massachusetts | 8 | 2 | — | 10 | 5 | — | Texas | 10 | 8 | — | 18 | 4 | — |
| Maryland | 8 | 4 | — | 12 | 3 | — | Utah | 1 | 1 | 1 | 3 | — | — |
| Maine | 1 | 2 | — | 3 | 1 | — | Virginia | 7 | 3 | 1 | 11 | 5 | — |
| Michigan | 16 | 3 | — | 19 | 11 | 1 | Washington | 9 | 3 | — | 12 | 3 | — |
| Minnesota | 11 | 3 | 1 | 15 | 5 | — | Wisconsin | 11 | 4 | — | 15 | 7 | — |
| Missouri | 3 | 3 | — | 6 | 2 | — | **GRAND TOTAL** | 259 | 118 | 14 | 391 | 154 | 4 |
| Mississippi | — | 2 | — | 2 | — | — | | | | | | | |

*Site Selection for Store Openings and Closings.* We use a detailed process to identify favorable store locations in existing or new markets. Within each targeted market, we identify potential sites for new and replacement stores by evaluating market dynamics. Our site selection criteria include:

* customer segment and demographic data derived from our point-of-sale network and outside sources;

* information relating to population density in concentric circles surrounding the center;

* the performance of past temporary seasonal stores within the center;

* the proposed location within the center; and

* projected profitability, cost, return on investment, and cash-flow objectives.

Our cross-functional review committee approves proposed store projects, including new sites and lease renewals. We periodically evaluate our stores to assess the needs for remodeling or the timing of possible closure based on economic factors. Our real estate, store planning and executive management teams analyze the performance and profitability of our stores and markets to assess the potential for new and replacement stores and to identify underperforming stores. In 2008, we plan to open two outlet stores and close five mall stores (primarily related to natural lease terminations) in addition to the 158 liquidation stores.

5

The following chart highlights the number of stores, by format, opened or closed in each of the last three years:

| | Mall | Outlet | Airport | Total |
|---|---|---|---|---|
| Store count as of January 28, 2006 . . . . . . . . . . . . . . . . . | 298 | 110 | 14 | 422 |
| **Fiscal year ended February 3, 2007** | | | | |
| Stores opened . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 6 | — | 9 |
| Stores closed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (14) | — | — | (14) |
| End of year count . . . . . . . . . . . . . . . . . . . . . . . . . . | 287 | 116 | 14 | 417 |
| **Fiscal year ended February 2, 2008** | | | | |
| Stores opened . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 4 | — | 5 |
| Stores closed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (29) | (2) | — | (31) |
| End of year count . . . . . . . . . . . . . . . . . . . . . . . . . . | 259 | 118 | 14 | 391 |
| **Liquidation stores February 15, 2008** . . . . . . . . . . . . | 154 | 4 | — | 158 |

*Mall Stores.* As of February 2, 2008, we operated 259 mall stores in 38 states. This includes the 154 mall stores we are closing through liquidation in the first half of 2008. Our mall stores have historically showcased a full range of leather outerwear, accessories and apparel primarily under our proprietary labels. Our new accessories store concept in the 100 remaining mall stores will be a designer brand driven store for women, focusing on fashion accessories, primarily handbags, with a limited selection of outerwear. See "Financial strategy — new mall accessories store concept" above for further discussion of the new concept. These stores average approximately 2,560 total leased square feet and are located in all types of shopping malls, serving diverse demographics.

We had historically supplemented our mall stores with temporary seasonal stores during our peak selling season. We did not operate any temporary seasonal stores in 2006. We do not intend to operate any temporary seasonal mall stores in the foreseeable future.

*Outlet Stores.* As of February 2, 2008, we operated 118 outlet stores in 36 states under the name Wilsons Leather Outlet℠. One of these stores operates under the name The Wallet Works®. To maintain brand image, we generally locate outlet stores in larger outlet centers in areas away from our mall stores. Our Wilsons Leather Outlet℠ stores offer clearance items and special outlet-only merchandise as well as certain key in-season products for both men and women. Wilsons Leather Outlet℠ stores average approximately 3,900 total leased square feet. We did not operate any temporary seasonal outlet stores in 2006. We do not intend to operate any temporary seasonal outlet stores in the foreseeable future.

*Airport Stores.* As of February 2, 2008, we operated 14 airport stores in eight states. Our airport stores play a key role in growing awareness of the *Wilsons Leather* name and showcasing our products to millions of travelers who pass by our airport stores each year. These stores average approximately 630 total leased square feet and carry many of our best-selling accessories styles.

*e-commerce.* Our e-commerce site, www.wilsonsleather.com, offers an extension of our store experience and is intended to increase brand awareness, strengthen the relationship with our customers, make our merchandise more accessible to our customers and facilitate cross-marketing with our stores. We are also using e-mail as a means of reaching out to our customers. Our e-commerce site features key in-season merchandise as well as promotional merchandise. In 2007, our on-line net sales grew 11.1% to $7.4 million as compared to $6.7 million in 2006. We plan to continue to invest prudently in the development and maintenance of our on-line presence, with the Internet serving as an additional shopping format for our customers, as well as a vehicle for building brand awareness. The administration and marketing of our e-commerce site is outsourced to a third party vendor who performs similar services for other specialty retailers.

*Store Operations.* Our store operations are organized by region. During 2007, our mall and airport stores were divided into two regions, and our outlet stores comprised a third region, with each region subdivided into districts. During 2008, as a result of the closing of the liquidation stores and significantly lower store base, our mall stores will comprise one region and our outlet and airport stores will comprise a second region, with each of these

6

regions subdivided into districts. Each district manager is responsible for anywhere from nine to 14 stores. Individual stores are staffed by a manager, an assistant manager and a complement of full- and part-time sales associates whose numbers fluctuate based upon expected and actual sales. A typical store manager has on average over four years experience with our company. Store managers are responsible for hiring and associate training, operations including, among other things, visual display and inventory control and sales. All other aspects of store operations are administered centrally by our corporate offices.

A core aspect of our corporate culture is to focus on employee training and customer service. We emphasize sales associate training to ensure each associate has knowledge of our merchandise and our target customer. Our associates receive ongoing training in the unique properties of leather, the appropriate methods of care for the various leather finishes and the product specifications and details of our merchandise. In addition, we train associates to perform minor repairs in our stores for customers free of charge.

We regularly evaluate our customer service performance through on-line customer satisfaction surveys, direct surveys of customers who return merchandise and mall intercept surveys. Issues relating to policy, procedure or merchandise are frequently reviewed to improve service and quality.

## Distribution

Merchandise for our stores was shipped directly from domestic merchandise vendors or overseas manufacturers to our distribution center located in Brooklyn Park, Minnesota or to a third-party distribution facility in Kent, Washington. We discontinued use of the distribution facility in Kent, Washington late in the fourth quarter of 2007. With the significantly decreased store base as a result of the liquidation, we no longer have the merchandise volume to justify use of two distribution centers. We are party to a 15-year operating lease, with a five-year option to extend, for our 289,000 square-foot distribution center in Brooklyn Park, Minnesota that is equipped with automated garment-sorting equipment, automated accessory packing equipment, and hand-held radio frequency scanners for rapid bar code scanning and enhanced merchandise control. During 2007, approximately 20% of the merchandise received was immediately sent to our stores through cross-docking via the Kent, Washington distribution center, which allowed for reduced logistics expense and improved speed to market. Merchandise is shipped to our Brooklyn Park, Minnesota distribution center to replenish stores weekly with key styles and to build inventory for the peak holiday selling season. Through the integration of merchant and distribution systems, we are able to frequently replenish goods to ensure that our stores maintain an appropriate level of inventory.

## Marketing and Advertising

Our marketing strategy in 2008 will focus on developing our new accessories store concept in our mall stores and revitalizing/enhancing our existing outlet and airport channels. As mentioned earlier in "Financial strategy — new mall accessories store concept," we will be remodeling our 100 remaining mall stores to a new accessories store concept. This new concept will be a designer brand driven store for women, focusing on fashion accessories with a limited selection of outerwear. Our new concept will provide great design and innovative products from both known and emerging designers. The stores will be dramatic, with a sophisticated, contemporary, feminine design that highlights products in the style of high-end boutiques. These stores will have new wall graphics, signage, ticketing, and store display fixtures that will highlight the designer brands we offer.

Our outlet stores will also offer new merchandise in both accessories and apparel. We will update our wall graphics and signage in the outlets as well to highlight the increased mix of designer brand product.

Our airport stores showcase the *Wilsons Leather* name and some of our best selling accessories travel brands to millions of travelers annually in some of the busiest airports in the United States. Our e-commerce site makes our merchandise more accessible to customers, increases brand awareness and facilitates cross-marketing efforts with our brick and mortar stores.

We market to specific lifestyles and offer outerwear, accessories and apparel in styles ranging from classic, to contemporary, to high fashion. We target high potential, high-volume customers between the ages of 25 and 55. In the case of our new accessories mall store concept, we will be focusing entirely on fashion conscious women. We

7

are in the process of evaluating several different forms of media promotion to better reach our target customer in 2008.

## Licensing

Our sales of licensed products were an important part of our business. Licensed product net sales were $4.3 million, $10.9 million and $13.3 million in 2007, 2006 and 2005, respectively. However, with the shift in strategy to the new mall accessories store concept and our decision to exit the wholesale business, we have decided to discontinue our current licensing relationships. We may, in the future, seek new licensing strategies as our new accessories store concept evolves.

Our primary licensed merchandise had been with some of the top NASCAR® drivers for a line of products including men's and women's fashion leather jackets, handbags and other accessories bearing the marks of these popular drivers. Under these licensing agreements, we were generally required to achieve a minimum level of net sales, pay specified royalties and receive prior approval from the licensor as to all elements of the licensed merchandise we offered. We were also limited as to the selling channels we could use and were precluded from competing with certain licensor channels. The licensor generally maintained the right to terminate our license agreement if we failed to satisfy the specified requirements. Certain of our license agreements have provisions requiring minimum sales and related royalty commitments be met. All required royalty commitments had either been met or were accrued for as of the end of 2007. However, subsequent to year end, we have stopped making these payments as part of our cost reduction initiatives.

## Information Systems

We continually assess and upgrade our information systems in an effort to better support our stores' operations and home office administrative functions. Over the past several years, we have made considerable investments in improving our information systems and completing the replacement of major operating platforms in the functional areas of merchandising, finance, human resources, manufacturing, and store point-of-sale and back-office systems. Most recently, in 2006 we completed a significant upgrade to our financial systems, replaced the core components of our store point-of-sale systems hardware, installed traffic counters in certain stores on a pilot basis, and implemented a data warehouse to provide more timely and detailed information. During 2007, we commenced work on a new point-of-sale system that we plan to roll out to our stores in 2008. These systems provide all levels of our organization access to information, powerful analytical tools to improve our understanding of sales and operating trends and the flexibility needed to anticipate future business needs. We believe that our current systems, along with planned upgrades, are adequate to meet our operational plans over the next several years.

Our point-of-sale and back-office systems have been designed to, among other things, free store associates' time so that they can focus on serving our customers. Our point-of-sale system automates store operations and gives each store the ability to view inventory at other store locations, access human resource and inventory management documentation and enables customer information collection. On a daily basis, we obtain sales and inventory data from our stores, facilitating merchandising decisions regarding the allocation of inventory, pricing and inventory levels.

## Competition

The retail leather outerwear, accessories and apparel industry is both highly competitive and fragmented. We believe that the principal bases upon which we compete are selection, style, quality, price, value, store location, and service. We compete with a broad range of other retailers, including specialty retailers, department stores, mass merchandisers and discounters, and other retailers of leather outerwear, accessories and apparel. Over the past few years, mall traffic has been trending downward, off-mall retail venues have gained popularity and competition has continued to increase from non-specialty discounters and mass merchandisers, as they have significantly expanded into leather outerwear at promotional price points. We have found that we have different competitors during different times of the year. For example, our competition with department stores increases during the holiday gift giving season. While our prices are competitive and we believe our quality is superior, we lack the marketing leverage these parties can bring to bear during the fourth quarter when they promote leather outerwear.

8

**Trademarks**

We conduct our business under various trade names, brand names, trademarks, and service marks in the United States, including M. Julian®, Maxima®, Pelle Studio®, Wilsons The Leather Experts™, Tannery West®, Georgetown Leather Design™, The Wallet Works®, Wilsons Leather™, Wilsons Leather Outlet℠, Handcrafted by Wilsons The Leather Experts™, and Vintage by Wilsons The Leather Experts™. However, our *Wilsons Leather* branded items are becoming a significantly smaller percentage of our business and eventually will be sold only in our outlet stores and through our e-commerce Website.

**Employees**

As of February 2, 2008, we had 2,998 associates working for our company. Of these, 232 were corporate office and distribution center associates, 949 were full-time and 1,784 were part-time associates in our stores and 33 were located in our far east sourcing offices. In 2007, during our peak selling season from October through January, we employed approximately 49 additional seasonal associates in our distribution center and approximately 1,632 additional seasonal associates in our stores. On February 15, 2008, we announced the liquidation of 158 stores (see "Financial Strategy — Reorganization and Partial Store Liquidation"). As a result, approximately 938 store-related positions were eliminated, as well as 64 positions at our corporate headquarters, overseas offices and distribution center. We consider our relationships with our associates to be good. None of our associates are governed by collective bargaining agreements.

**Available Information**

Our Internet address is www.wilsonsleather.com. We make available free of charge through our Internet Web site our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) of the Exchange Act, as amended, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission. Our Code of Business Ethics and Conduct and our Board of Directors Committee charters are also available via our Web site.

**Item 1A.    Risk Factors**

The risks and uncertainties described below are not the only ones facing our company. Additional risks and uncertainties also may impair our business operations. If any of the following risks actually occur, our business, financial condition and results of operations would likely suffer.

*We will need funding during the second quarter of fiscal 2008, and there is no assurance that funding will be available.*

We have had recurring losses from operations and negative cash flows from operating activities in 2007 and 2006. Our senior credit facility was amended on February 14, 2008. The amendment, among other things, allowed for the liquidation of 158 stores, revised our borrowing base by adding a $10.0 million reserve, prohibits borrowing under our revolving line of credit until we provide projections and a business plan that are acceptable to our lender, and requires a monthly appraisal of our inventory. In order to execute our go forward plans, we will need to amend some of the restrictions in our current credit facility, or find alternative sources of credit, and raise additional capital during the second quarter. Without additional capital, we may run out of cash in the second quarter of 2008. These conditions led our independent registered public accounting firm to include an explanatory paragraph in its report expressing substantial doubt about our ability to continue as a going concern. We are pursuing possible sources of funding, including possible sales of existing assets. However, there can be no assurance that additional funding will be available or can be obtained on terms that are favorable to us, or at all. We have not received an indication from the lender in our current credit facility that the lender will agree to amend the terms of the facility. If we are not able to obtain additional capital in the second quarter, we will not be able to continue our operations outside of bankruptcy. Under certain bankruptcy events, the Company may be required to redeem shares of its Preferred Stock at their liquidation value, which is the $45 million purchase price for those shares plus any accrued but unpaid dividends. However, the redemption would not be permitted by law, unless the Company is able to pay its debts as they come due, and would be prohibited by the terms of its existing credit facility. The Company's financial statements do not include any adjustments that might result from the outcome of this uncertainty. If we raise capital through the issuance of additional equity securities, the holdings of existing shareholders will be diluted.

*We may not be able to maintain our listing on the Nasdaq Global Market if we are unable to satisfy the minimum bid price requirements and, if we fail to do so, the price and liquidity of our common stock may decline.*

On February 15, 2008, we received notice from The Nasdaq Stock Market stating that for 30 consecutive business days our common stock had closed below the minimum $1.00 per share requirement for continued inclusion under Nasdaq Marketplace Rule 4450(a)(5). The notice had no effect on the listing of our securities at that time, and our common stock continues to trade on the Nasdaq Global Market under the symbol "WLSN".

In accordance with Nasdaq Marketplace Rule 4450(e)(2), we have 180 calendar days, or until August 13, 2008, to regain compliance. The notice states that if, at any time before August 13, 2008, the bid price of our common stock closes at $1.00 per share or more for a minimum of 10 consecutive business days, Nasdaq staff will provide written notification that we have achieved compliance with the minimum bid price requirement. No assurance can be given that we will regain compliance during that period. As of April 7, 2008, our closing bid price was $0.19.

If we do not regain compliance with the minimum bid price requirement by August 13, 2008, Nasdaq staff will provide us with written notification that our securities will be delisted. At that time, we may appeal the delisting determination to a Listing Qualifications Panel. Alternatively, we may apply to transfer our securities to The Nasdaq Capital Market if we satisfy the requirements for initial inclusion set forth in Nasdaq Marketplace Rule 4310(c), other than the minimum bid price requirement of Nasdaq Marketplace Rule 4310(c)(4). In such event, we will be afforded an additional 180 calendar days to comply with the minimum bid price requirement while listed on The Nasdaq Capital Market. No assurance can be given that we will be eligible for the additional 180-day compliance period, or, if applicable, that we will regain compliance during any additional compliance period. Delisting of our common stock would have a negative effect on the market price for our shares and could limit our ability to raise additional capital.

We have not yet determined what action, if any, we will take in response to this notice, although we intend to monitor the closing bid price of our common stock between now and August 13, 2008, and to consider available options if our common stock does not trade at a level likely to result in our regaining compliance with the Nasdaq minimum closing bid price requirement.

### We may not be able to exit store leases for the 158 liquidation stores on terms that are acceptable to us and to our lender.

A key component of our restructuring efforts, and our ability to finance the conversion of our mall-based stores to the new accessories concept, relates to lease terminations and store liquidations for our 158 liquidation stores. Currently, we have not reached agreement with landlords with respect to any of the leases for our 158 liquidation stores. In addition, our lender has limited the aggregate amount that we may pay to exit such leases. We can make no assurances that we will be able to exit such leases on terms that are acceptable to us and our lender.

### We may not be able to utilize our tax net operating loss carryforwards.

Our ability to utilize net operating loss carryforwards is limited under various provisions of the Internal Revenue Code, including Section 382. We have determined that changes in ownership under this section have occurred on June 4, 2003 and May 30, 2006. These ownership changes result in $37.0 million of the total $136.1 million net operating loss carryforward being limited. On an annual basis, approximately $4.1 million of the Section 382 limited net operating loss will become available for utilization. If we raise capital through the issuance of additional equity securities, the loss carryforwards as of February 2, 2008 may be subject to annual limitations that could significantly reduce the aggregate amount of carryforwards available to offset future taxable income, if any.

### We may not be able to expand our accessories business or acquire suitable accessories brands.

In June 2007, we completed a $45.0 million Preferred Stock and Warrant financing. In addition to the influx of capital, this private placement brought us a large new investor, Goldner Hawn Private Equity, to assist in setting our long-term strategic direction. We expect that our future business strategy will build on our previously established initiative of expanding our accessories business. Analysis of our strategic alternatives related to our accessories business includes the potential acquisition of a small, established brand, the potential acquisition, joint venture or licensing agreement surrounding a larger, more well known brand and the offering of popular accessory designer brands. However, our ability to implement these strategies may be limited by our financial resources. As mentioned in "Financial Strategy — New Mall Accessories Store Concept," we tested a new accessories concept in four of our stores during the 2007 holiday season. On February 15, 2008, we announced that we would liquidate up to 160 mall stores and use the proceeds of the liquidation sales to remodel our 100 remaining mall stores to this new accessories concept (see "Financial Strategy — Reorganization and Partial Store Liquidation"). This new accessories concept will be a designer brand driven store for women, focusing on fashion accessories with a limited selection of outerwear. We have kept only our best mall stores in the best locations for this new concept. Our plan is to remodel all 100 remaining mall stores this year into this new accessories concept, if we have sufficient capital. We believe that expansion of our accessories business through the new concept would attract new customers and improve comparable store sales. However, this strategy is in the early stages of development. There can be no assurance that we will be able to expand our accessories business through either greater acceptance of our new designer brand offerings or acquisition of a suitable accessories brand. If we are not able to successfully develop this new concept, we may not be able to obtain products from desirable designer brands. In addition, certain of our leases contain restrictions on the name we use and the products we sell that may be incompatible with our go forward plans. If we are not able to execute this strategy and attract additional customers, our comparable store sales, operating margins and cash flow will be adversely affected, which would materially and adversely affect our business, financial condition and results of operations.

*Our growth is dependent on strengthening the operating performance of our existing stores and development of our accessories concept.*

Our ability to grow our existing business depends in part on our ability to appropriately identify, develop and effectively execute strategies and initiatives related to strengthening our stores' operations and increasing brand acceptance. Our growth over the next several years depends on our ability to successfully and effectively manage our existing business by continuing to revitalize our mall and outlet stores, increase acceptance of our brand and the designer brands we offer and open new stores on a limited basis as opportunities arise. Our ability to grow our business will be limited, however, if we are unable to improve the sales performance and productivity of our existing stores. Failure to effectively identify, develop and execute strategies and initiatives may lead to increased operating costs without offsetting benefits and could have a material adverse effect on our results of operations. Our new mall accessories store strategy will be a designer brand driven store for women, focusing on fashion accessories with a limited selection of outerwear. These stores will feature popular designer brands and appeal to fashion conscious women. In our outlet stores, we are also going to offer new merchandise in both accessories and apparel. However, our ability to implement these strategies may be limited by our financial resources. If we are not able to develop our new strategies, attract customers through our new strategies and gain acceptance of our new accessories store concept, our comparable store sales, operating margins and cash flow will be adversely affected, which would have a material adverse effect on our business, financial condition and results of operations.

*Our comparable store sales declined during each of the last three years.*

Our comparable store sales decreased by 10.4%, 17.2% and 2.9% in 2007, 2006 and 2005, respectively. Our comparable store sales are affected by a variety of factors, including:

- general economic conditions and, in particular, the retail sales environment;
- consumer shopping preferences;
- transition of our target customer base;
- level of acceptance of our designer brand merchandise offerings;
- level of acceptance of the *Wilsons Leather* brand;
- actions by competitors or mall anchor tenants;
- weather conditions;
- fashion trends;
- changes in our merchandise mix;
- the timing of new store openings and the relative proportion of new stores to mature stores;
- maintaining appropriate inventory levels;
- calendar shifts of seasonal periods; and
- timing of promotional events.

A continued inability to generate comparable store sales increases in the future would erode operating margins if we were unable to implement additional cost reductions and could have a material adverse effect on our business, financial condition and results of operations.

*We are dependent upon our key suppliers to implement our merchandising strategy to offer designer brands in our stores' accessories and outerwear product mix.*

Our new accessories concept will be a 100% designer brand driven store for women, focusing on fashion accessories with a limited selection of outerwear. These stores will feature popular designer brands and appeal to fashion conscious women. We believe that in offering these designer brands, we will generate additional traffic in our stores. The successful implementation of this designer brand strategy will depend on our relationships with our

12

key suppliers. Our inability to successfully integrate additional designer brands into our accessories and outerwear merchandise mix may limit acceptance of our new accessories concept, which may have a material adverse effect on our business, financial condition and results of operations.

### Changes in customer shopping patterns could harm our sales.

Most of our stores are located in enclosed shopping malls and regional outlet centers. Our ability to sustain or increase the level of sales depends in part on the continued popularity of malls and outlet centers as shopping destinations and the ability of malls and outlet centers, tenants and other attractions to generate a high volume of customer traffic. Many factors beyond our control may decrease mall traffic, including, among other things, economic downturns, rising energy prices, the closing of anchor department stores, weather, concerns of terrorist attacks, construction and accessibility to strip malls, or alternative shopping formats (such as catalogs, e-commerce or discount stores). Any changes in consumer preferences and shopping patterns could adversely affect our financial condition and operating results.

### We may need to record additional impairment losses in the future if our stores' operating performance does not improve.

We continually review our stores' operating performance and evaluate the carrying value of their assets in relation to their expected future cash flows. In those cases where circumstances indicate that the carrying value of the applicable assets may not be recoverable, we record an impairment loss related to the long-lived assets. In the fourth quarter of 2007, we recorded an impairment loss of $19.7 million. This impairment loss was comprised of: 1) all of the assets located at the liquidation stores, 2) all of the non-inventory assets located at our 100 remaining mall stores and 3) all of the non-inventory assets at four of our outlet stores. In the fourth quarter of 2006, we recorded an impairment loss of $0.7 million related to certain of our mall store assets. These impairment losses are described in greater detail in Note 1, "Summary of significant accounting policies — store closing and impairment of long-lived assets," contained in our consolidated financial statements beginning on page F-8 of this report. If our stores' operating performance does not improve in the future, the carrying value of our stores' assets may not be recoverable in light of future expected cash flows. This may result in our need to record additional impairment losses in certain markets where our stores operate that could have a materially adverse effect on our business, financial condition and results of operation.

### The high level of competition in our markets may lead to reduced sales and profits.

The retail leather outerwear, accessories and apparel markets are highly competitive and fragmented. We compete with a broad range of other retailers, including other specialty retailers, department stores, mass merchandisers and discounters, many of which have greater financial and other resources. Increased competition may reduce sales, increase operating expenses, decrease profit margins, and negatively affect our ability to obtain site locations, sales associates and other employees. Over the past few years, mall traffic has been trending downward, off-mall retail venues have gained popularity and competition has continued to increase from non-specialty discounters and mass merchandisers as they have significantly expanded into the leather outerwear category at promotional price points. There can be no assurance that we will be able to compete successfully in the future and, if we are unable to do so, our business, financial condition and operating results could be adversely affected.

### Uncertainty in general economic conditions may lead to reduced consumer demand for our outerwear, accessories and apparel and could adversely affect our business and liquidity.

Meeting our future capital requirements depends on the sustained demand for our products. Many factors affect the level of consumer spending on our products, including, among others:

- general economic conditions, including recessionary periods;
- rising energy prices;
- interest rates;

13

- the availability of consumer credit;
- continued hostilities in the Middle East and other significant national and international events; and
- taxation and consumer confidence in future economic conditions.

Consumer purchases of discretionary items, such as our products, tend to decline during recessionary periods when disposable income is lower. Any uncertainties in the United States' economic outlook can adversely affect consumer spending habits and mall traffic and result in lower than expected net sales on a quarterly and annual basis.

Increased energy prices put additional pressure on consumer purchases of discretionary items, which could adversely affect our net sales. In addition, these higher energy costs may have the potential to increase our shipping and delivery costs and could adversely affect our merchandise margins if we are unable to pass these costs on to our customers.

### *Unseasonably warm weather, particularly during the fall and winter, has in the past and may in the future negatively effect our sales performance.*

Unseasonably warm weather during the fall and winter season has negatively impacted our comparable store sales and total net sales performance in the past. While we are striving to mitigate our dependence on outerwear, as evidenced by our new mall accessories store concept, we will continue to sell a limited selection of outerwear in our mall stores and a larger selection in our outlet stores. Continued warm weather trends in the future may have a material adverse effect on our business, financial condition and results of operations.

### *Our inability to effectively respond to changes in fashion trends and consumer demands could adversely affect our sales.*

Our success, including acceptance of our new mall accessories store strategy, depends on our ability to identify fashion and product trends as well as our ability to anticipate, gauge and react swiftly to changes in consumer demand. Our products must remain appealing for a broad range of consumers with diverse and changing preferences; however, our orders for products must be placed in advance of customer purchases. We cannot be certain that we will be able to identify new fashion trends and adjust our product mix in a timely manner. If we misjudge market preferences, we may be faced with significant excess inventories for some products and missed opportunities for other products. In response, we may be forced to rely on additional markdowns or promotional sales to dispose of excess, slow-moving inventories. In addition, consumer sentiment toward and demand for leather and designer brand offerings may change and we may not be able to react to any such changes effectively, or at all. There can be no assurance that demand for our products and designer brand offerings will not decline as a result of negative publicity regarding certain diseases that may affect the supply of hides used to make leather products such as mad cow and hoof-and-mouth disease. If we are unable to anticipate, gauge and respond to changes in demand or if we misjudge fashion trends, it could have a material adverse effect on our business, financial condition and results of operations.

### *A decrease in the availability of leather or an increase in its price could harm our business.*

The cost of leather comprises a significant portion of our overall merchandise cost. A number of factors affect the price of leather, including the demand for leather in the shoe, furniture and automobile upholstery industries. In addition, leather supply is influenced by worldwide meat consumption and the availability of hides. Fluctuations in leather supply and pricing, which can be significant, may have a material adverse effect on our business, financial condition and results of operations. Our transition to our new accessories concept will reduce our reliance on leather.

### *We could have difficulty obtaining merchandise from our foreign suppliers.*

We import our outerwear and accessories from independent foreign contract manufacturers located primarily in China and India. We do not have long-term contracts or formal supply arrangements with our contract manufacturers. In 2007, approximately 65% of our outerwear and accessories contracted for manufacture were

14

# Exhibit 5-B

purchased from foreign suppliers, with approximately 56% purchased from China and 7% purchased from India. With our shift toward designer brand merchandise going forward, we will significantly reduce the volume of private label merchandise we source from overseas vendors. The majority of our product will be purchased from third party, domestic vendors. However, the majority of this product will still be manufactured overseas in places like China and India. Trade relations with China and India have, in the past, been contentious. If trade relations with these countries or any other country from which we purchase goods, either directly or indirectly, deteriorate, or if any new or additional duties, quotas or taxes are imposed on imports from these countries, leather purchase and production costs could increase significantly, negatively impacting our sales prices, profitability or the demand for leather merchandise and designer brand offerings. Further, we cannot predict whether any of the countries in which our products are currently manufactured or may be manufactured in the future will be subject to trade restrictions imposed by the United States government, including the likelihood, type or effect of any such restrictions, or whether any other conditions having an adverse effect on our ability to purchase products will occur. Certain other risks related to foreign sourcing and purchasing include:

- transportation delays and interruptions, including delays relating to labor disputes;

- economic and political instability;

- restrictive actions by foreign governments;

- trade and foreign tax laws;

- fluctuations in currency exchange rates and restrictions on the transfer of funds; and

- the possibility of boycotts or other actions prompted by domestic concerns regarding foreign labor practices or other conditions beyond our control.

Any event causing a sudden disruption of imports from China, India or other foreign countries, including a disruption due to financial difficulties of a supplier or a catastrophic event (such as, but not limited to, a fire, tornado, flood, or act of terrorism) could have a material adverse effect on our business, financial condition and results of operations. In the event that commercial transportation is curtailed or substantially delayed due to a dockworkers' strike or other similar work action, our business may be adversely impacted, as we may have difficulty shipping merchandise to our distribution center and stores.

### *The seasonality of our business could affect our profitability.*

Since our leather outerwear and apparel products are most often purchased during the holiday season, we experience substantial fluctuations in our sales and profitability. We generate a significant portion of our net sales from October through January, which includes the holiday selling season. We generated 50.4% of our annual net sales during that time period in 2007, and 23.5% in December alone. While we are striving to mitigate our dependence on outerwear, as evidenced by our new mall accessories store concept, we will continue to sell a limited selection of outerwear in our mall stores and a larger selection in our outlet stores. Because our profitability, if any, is historically derived in the fourth quarter, our annual results of operations have been, and will continue to be, heavily dependent on the results of operations from October through January.

Given the seasonality of our business, misjudgments in fashion trends, the effects of war and other significant national and international events or unseasonably warm or severe weather during our peak selling season could have a material adverse effect on our financial condition and results of operations. Our results of operations may also fluctuate significantly as a result of a variety of other factors, including:

- merchandise mix offered during the peak selling season;

- the timing and level of markdowns and promotions by us during the peak selling season;

- the timing and level of markdowns and promotions by our competitors during the peak selling season;

- consumer shopping patterns and preferences;

- the timing of certain holidays; and

15

• the number of shopping days and weekends between Thanksgiving and Christmas.

*The public sale of our common stock issued pursuant to our employee benefit plans or the sale into the market of the shares issued in our equity financing in April 2004 or issuable upon exercise of the warrants delivered in connection with our April 2004 equity financing, as well as shares issuable upon conversion of the Preferred Stock and exercise of the Warrants issued in connection with the June 2007 preferred stock financing described in this report, could decrease the price of our common stock or make it more difficult to obtain additional financing in the future.*

As of February 2, 2008, 1,471,660 shares were subject to issuance upon the exercise of vested stock options previously granted by us, all of which would be freely tradable if issued, subject to compliance with Rule 144 in the case of our affiliates. In addition, 1,054,516 shares of our common stock have been reserved for issuance pursuant to our employee benefit plans. In connection with the April 2004 equity financing which was completed on July 2, 2004, we issued 17,948,718 shares of our common stock and warrants to purchase four million shares of our common stock, subject to certain adjustments, to three institutional investors. With the June 15, 2007 Preferred Stock and Warrant financing described in this report, we issued shares of Preferred Stock that are initially convertible into 30 million shares of common stock and warrants to purchase 15 million shares of common stock, which Preferred Stock and Warrants are subject to certain anti-dilution adjustments. The Preferred Stock is entitled to payment-in-kind cumulative dividends of 8.0% per year, issuable semi-annually, payable in shares of preferred stock, that will increase the number of common shares upon conversion. As of February 2, 2008, there were 46,667 shares of preferred stock outstanding that were convertible into 31.1 million shares of common stock. Our Preferred Stock is convertible into shares of common stock at a conversion price of $1.50 per share and the warrants have an exercise price of $2.00 per share; however, these conversion and exercise prices are subject to anti-dilution adjustments in the event of stock issuances below either the market price or the conversion or exercise price. In addition, in connection with such financing, the number of shares of common stock issuable upon exercise of the warrants issued in the April 2004 equity financing increased by approximately one million shares to approximately five million. If we raise capital through the sale of equity, which due to the current market price of our common stock would likely occur at a price below the conversion price and exercise price of our Preferred Stock and warrants, our current shareholders will face further dilution, and this dilution may make it difficult for us to raise additional capital by selling equity. The market price of our common stock could decline as a result of market sales of such shares of common stock or the perception that such sales will occur. Such sales or the perception that such sales might occur also might make it difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

*Our accounting policies and methods are key to how we report our financial condition and results of operations and they may require management to make estimates about matters that are inherently uncertain.*

Our management must select and apply many of these accounting policies and methods so that they not only comply with U.S. generally accepted accounting principles, but they also reflect management's judgment as to the most appropriate manner in which to record and report our financial condition and results of operations. In some cases, management must select the accounting policy or method to apply from two or more alternatives, any of which might be reasonable under the circumstances, yet might result in our reporting materially different amounts than would have been reported under a different alternative. Note 1, "Summary of significant accounting policies," to our consolidated financial statements describes our significant accounting policies.

We have identified two accounting policies as being "critical" to the presentation of our financial condition and results of operations because they require management to make particularly subjective and/or complex judgments about matters that are inherently uncertain and because of the likelihood that materially different amounts would be reported under different conditions or using different assumptions. These critical accounting policies relate to the valuation of inventory and the valuation of property and equipment for impairment. Because of the uncertainty of estimates about these matters, we cannot provide any assurance that we will not:

• significantly increase our lower of cost or market allowance for slow moving or obsolete inventory; or

- recognize a significant fixed asset impairment charge.

For more information, refer to Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations — Critical Accounting Policies."

### *Changes to financial accounting standards may affect our results of operations and cause us to change our business practices.*

We prepare our financial statements to conform with U.S. generally accepted accounting principles. These accounting principles are subject to interpretation by the American Institute of Certified Public Accountants, the Securities and Exchange Commission and various bodies formed to interpret and create appropriate accounting principles. A change in those principles could have a significant effect on our reported results and may affect our reporting of transactions completed before a change is announced. Changes to those rules or the questioning of current practices may adversely affect our reported financial results or the way we conduct our business.

### *Loss of key members of our senior management team could adversely affect our business.*

Our success depends largely on the efforts and abilities of our current senior management team. The loss of service of any of these persons could adversely affect our business. Our Chief Executive Officer resigned effective April 3, 2008, and we do not currently have a President or Chief Executive Officer. We do not maintain key-man life insurance on any members of our senior management team.

### *Ownership of our common stock is concentrated.*

Four of our investors beneficially owned, in the aggregate, 81.0% of our common stock as of April 1, 2008. These investors include: Marathon Fund Limited Partnership V ("Marathon," owned and managed by Goldner Hawn Private Equity), Peninsula Investment Partners, L.P. ("Peninsula"), Quaker Capital Partners I, L. P., and Quaker Capital Partners II, L. P. (collectively "Quaker"). All of these investors are represented on our board and a support agreement exists among the investors that requires Peninsula and Quaker to vote with Marathon on various matters including election of two members to our board and certain defined transactions including the sale of the Company. These investors voting together would be able to exert significant influence over our business and affairs, including:

- the election of individuals to our board of directors;

- the adoption of amendments to our Amended and Restated Articles of Incorporation; and

- the approval of certain mergers, additional financing, sales of assets, and other business acquisitions or dispositions.

In addition, the ownership concentration of our stock may limit liquidity and cause shareholders to experience fluctuations when selling large blocks of our stock.

### *The market price for our common stock may be volatile.*

Our stock price has been, and is expected to continue to be, highly volatile. There could be an immediate adverse impact on our stock price as a result of:

- any future sales of our common stock or other securities;

- a decline in any quarter of our net sales or earnings;

- a decline in any quarter of comparable store sales;

- a deviation in our net sales, earnings or comparable store sales from levels expected by securities analysts;

- changes in financial estimates by securities analysts;

- changes in market valuations of other companies in the same or similar markets;

17

- our inability to develop our new mall accessories store concept and the market perception of this new concept; or

- difficulty obtaining alternative funding sources or other limitations on our liquidity.

In addition, the Nasdaq Global Market<sup>SM</sup> has experienced extreme volatility that has often been unrelated to the performance of particular companies. Future market fluctuations may cause our stock price to fall regardless of our performance. Such volatility may limit our future ability to raise additional capital.

### We rely on third parties for upgrading and maintaining our information systems.

The efficient operation of our business is heavily dependent on our information systems. In particular, we rely heavily on the automated sortation system used in our Brooklyn Park, Minnesota distribution center and the merchandise management system used to track sales and inventory. We also rely on a third-party package for our accounting, financial reporting and human resource functions. We depend on our vendors to maintain and periodically upgrade these systems so that these systems continue to support our business. The software programs supporting our automated sorting equipment and processing our inventory management information are licensed to us by independent software developers. The inability of these developers to continue to maintain and upgrade these software programs would disrupt our operations if we were unable to convert to alternate systems in an efficient and timely manner.

### War, acts of terrorism or the threat of either may negatively impact the availability of merchandise and otherwise adversely impact our business.

In the event of war or acts of terrorism, or if either is threatened, our ability to obtain merchandise available for sale in our stores may be negatively affected. We import a substantial portion of our merchandise from other countries. If imported goods become difficult or impossible to bring into the United States, and if we cannot obtain such merchandise from other sources at similar costs, our sales and profit margins may be adversely affected.

The majority of our stores are located in enclosed shopping malls and regional outlet centers. In response to the terrorist attacks of September 11, 2001, security has been heightened in public areas. Any further threat of terrorist attacks or actual terrorist events, particularly in public areas, could lead to lower customer traffic in shopping malls and outlet centers. In addition, local authorities or mall management could close shopping malls and outlet centers in response to any immediate security concern. Mall closures, as well as lower customer traffic due to security concerns, could result in decreased sales that would have a material adverse effect on our business, financial condition and results of operations.

### Any significant interruption in the operation of our corporate offices and distribution center could have a material adverse effect on our business.

Our corporate offices and our Brooklyn Park, Minnesota distribution center are in one location. Our operations could be materially and adversely affected if a catastrophic event (such as, but not limited to, a fire, tornado, flood, or act of terrorism) impacts the use of these facilities. There can be no assurance that we would be successful in obtaining alternative facilities in a timely manner if such a catastrophic event were to occur.

### Item 1B.    Unresolved Staff Comments

None.

### Item 2.    Properties

As of February 2, 2008, we operated 391 leased store locations. All of our stores were located in shopping malls, outlet centers or airport retail locations. New store leases with third parties are typically 10 years in duration. Most leases require us to pay annual minimum rent plus a contingent rent dependent on the store's annual sales in excess of a specified threshold. In addition, the leases generally require us to pay costs such as real estate taxes and common area maintenance costs. On February 15, 2008, we announced that we would liquidate and close 154 mall

stores and four outlet stores. As a result of our cost reduction strategies implemented since year end, we have stopped making payments under certain of our leases.

We are also party to a 15-year operating lease, with a five-year option to extend, for a 289,000 square-foot distribution center and 69,000 square-foot corporate office space located in Brooklyn Park, Minnesota.

**Item 3.    Legal Proceedings**

We are involved in various legal actions arising in the ordinary course of business. In the opinion of our management, the ultimate disposition of these matters will not have a material adverse effect on our consolidated financial position and results of operations.

**Item 4.    Submission of Matters to a Vote of Security Holders**

None.

**Item 4A.    Executive Officers of the Registrant**

The following table sets forth certain information concerning our executive officers as of April 7, 2008:

| Name | Age | Position |
|---|---|---|
| Stacy A. Kruse | 48 | Chief Financial Officer and Treasurer |
| M. Adam Boucher | 47 | Chief Operating Officer |
| William S. Hutchison | 34 | Chief Merchandising and Sourcing Officer |
| Michael J. Tripp | 39 | Vice President, Global Logistics and e-Commerce |

*Stacy A. Kruse* has served as our Chief Financial Officer and Treasurer since January 2006, prior to which she served as our Vice President Finance and Treasurer from August 2004 to January 2006, our Director of Finance and Treasurer from April 2003 to August 2004, and Director of Business Planning & Analysis and Treasurer from June 2001 to March 2003. Prior to joining Wilsons Leather, Ms. Kruse was Director of Finance (Information Services and Business Operations) at US Bancorp, a financial services company, from 1999 to 2001 and held various positions at Carlson Marketing Group, a marketing services company, from 1995 to 1999, most recently as Director of Operations (Loyalty Division) from 1996 to 1999.

*M. Adam Boucher* has served as our Chief Operating Officer since February 2008, prior to which he was our Vice President, Store Sales and Real Estate from January 2006 to February 2008 and our Vice President, Store Sales from August 2005 to January 2006. Prior to joining Wilsons Leather, Mr. Boucher held various retail stores and corporate development positions at Payless ShoeSource, a specialty family footwear retailer, from 1988 to 2005, most recently as Vice President, Retail Operations Eastern Zone from 2004 to 2005.

*William S. Hutchison* has served as our Chief Merchandising and Sourcing Officer since February 2007, prior to which he served as our Vice President, Sourcing and Wholesale from January 2006 to February 2007, our Vice President, Sourcing from September 2005 to January 2006 and our Divisional Merchandise Manager — Men's from February 2001 to September 2005. Prior to joining Wilsons Leather, Mr. Hutchison held various merchandising positions with Dillard's Department Stores, Inc. from 1995 to 2001, most recently as Product Development, Brand Manager from 1999 to 2001.

*Michael J. Tripp* has served as our Vice President Global Logistics and e-Commerce since February 2008, prior to which he served as our Vice President, Global Logistics and Customs Compliance from February 2007 to February 2008, our Vice President, Logistics from June 2006 to February 2007, our Director of Distribution and Transportation from April 2004 to June 2006, and our General Manager Distribution from February 2000 to April 2004. Prior to joining Wilsons Leather, Mr. Tripp held various distribution center leadership positions with Kmart, a mass merchandise retailer, from 1997 to February 2000, most recently as Assistant General Manager from 1999 to 2000 and as an Operations Supervisor with Target, an upscale discounter, from 1995 to 1997.

## PART II

**Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock, $.01 par value, trades on the Nasdaq Global Market$^{SM}$ under the symbol WLSN. The closing price of our common stock on April 7, 2008 was $0.19. The following table presents the high and low market prices from January 30, 2005 through February 2, 2008.

| Quarterly Common Stock Price Ranges | | |
|---|---|---|
| Fiscal quarter ended | High | Low |
| April 29, 2006 | $3.98 | $3.14 |
| July 29, 2006 | $4.12 | $3.25 |
| October 28, 2006 | $3.70 | $2.46 |
| February 3, 2007 | $2.84 | $1.68 |
| May 5, 2007 | $2.10 | $1.30 |
| August 4, 2007 | $2.36 | $1.01 |
| November 3, 2007 | $1.97 | $1.16 |
| February 2, 2008 | $1.39 | $0.65 |

There were 70 record holders of our common stock as of April 7, 2008.

**Cash Dividends**

We have not declared any cash dividends since our inception in May 1996. In addition, our loan agreements contain certain restrictions limiting, among other things, our ability to pay cash dividends or make other distributions. See Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources."

**Purchases of Equity Securities**

We did not purchase any shares of our common stock during the fourth quarter of 2007.

**Item 6.    Selected Financial Data**

Not applicable.

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following discussion of our financial condition and results of operations should be read in conjunction with our selected historical consolidated financial data and consolidated financial statements and notes thereto appearing elsewhere in this Form 10-K.

**Executive Overview**

We measure performance using such key operating statistics as comparable store sales, sales per square foot, gross margin percentage, and store operating expenses, with a focus on labor, as a percentage of sales. These results translate into store operating contribution and store cash flow, which we use to evaluate overall performance on an individual store basis. Store operating contribution is calculated by deducting a store's operating expenses from its gross margin and is measured as a percentage of sales. Store operating contribution gives us an overall measure as to whether or not individual locations and markets are meeting our financial objectives.

In addition, general and administrative expenses are monitored in absolute amount, as well as on a percentage of net sales basis. We continue to monitor product costing and promotional activity and their impact on margin

levels. In 2007 and 2006, our inventory markdowns were higher than in the past as we aggressively liquidated certain merchandise and repositioned our inventory mix pursuant to our strategic initiatives of offering designer brand merchandise and a greater mix of accessories. Our gross margins are influenced by the mix of merchandise between accessories and outerwear in our total sales.

We also measure and evaluate investments in our retail locations, including inventory and property and equipment. Inventory performance is primarily measured by inventory turns, or the number of times store inventory turns over in a given period, and amounts of owned inventory at various times based on payment terms from our vendors. The most significant investments in property and equipment are made at the time we open a store.

As of February 2, 2008, we operated a total of 391 stores located in 42 states, including 259 mall stores, 118 outlet stores and 14 airport locations, including 158 stores that we are liquidating (described in greater detail below). We had historically supplemented our permanent stores with temporary seasonal stores during our peak selling season. However, operation of our temporary seasonal stores was suspended in 2006. We do not intend to operate any temporary seasonal stores in the foreseeable future.

We generate a significant portion of our net sales from October through January, which includes the holiday selling season. We generated 50.4% of our annual net sales in that time period in 2007, and 23.5% in December alone. As part of our strategy to improve operating margins, maximize revenue and minimize losses during non-peak selling seasons, we have increased the number of outlet locations since 2000, which are less seasonal, and modified our product mix to emphasize accessories. In addition, our continued focus on accessory penetration has resulted in accessory sales growth as a percentage of our total net sales to 44.9% in 2007 from 41.4% in 2006 and 38.3% in 2005.

Comparable store sales decreased 10.4% and 17.2% in 2007 and 2006, respectively. A store is included in the comparable store sales calculation after it has been open and operated by us for more than 52 weeks. The percentage change is computed by comparing total net sales for comparable stores as thus defined at the end of the applicable reporting period with total net sales from comparable stores for the comparable period in the prior year.

The following table contains selected information for each of our store formats for 2007.

| | Sales (in millions) | Comparable Store Sales | Average Size (in selling square feet) | Sales per Selling Square Foot[1] |
|---|---|---|---|---|
| Mall stores | $145.2 | (10.5)% | 2,000 | $ 248 |
| Outlet stores | 115.6 | (11.0)% | 3,250 | 297 |
| Airport stores | 10.4 | (4.0)% | 600 | 1,197 |
| e-commerce | 7.4 | — | — | — |
| Wholesale | 1.8 | — | — | — |
| Total | $280.4 | | | |

The following table contains selected information for each of our store formats for 2006.

| | Sales (in millions) | Comparable Store Sales | Average Size (in selling square feet) | Sales per Selling Square Foot[1] |
|---|---|---|---|---|
| Mall stores | $173.1 | (22.7)% | 2,000 | $ 296 |
| Outlet stores | 128.7 | (8.9)% | 3,250 | 347 |
| Airport stores | 10.7 | (12.7)% | 600 | 1,289 |
| e-commerce | 6.7 | — | — | — |
| Wholesale | 1.5 | — | — | — |
| Seasonal | 0.6 | — | — | — |
| Total | $321.3 | | | |

(1)     Sales per square foot is defined as net sales for stores open a full 12 months divided by total selling square feet for stores open a full 12 months.

21

During 2007, our primary initiatives to build on the "reinvented" Wilsons Leather were:

*Increase Accessories Penetration.*   To mitigate the continuing seasonality we face in the outerwear business, we continued to expand our accessories categories. Our accessories penetration increased to 44.9% of net sales in 2007 as compared to 41.4% and 38.3% in 2006 and 2005, respectively. We will continue to increase our accessories profile in 2008 by offering nationally recognized designer brands in our 100 remaining mall stores.

*Emphasis on Designer Brands.*   We significantly increased the number of nationally recognized designer brands in our accessories and outerwear offerings during the 2007 holiday season in our mall stores. Designer brand product performed better than our private label offerings for both accessories and outerwear and we plan to significantly increase our designer brand offerings in 2008. Sell-throughs of designer brands, at higher average unit retails, are significantly higher than our own private label offerings.

*New Store Environment Test.*   We tested a new store environment in four locations during the fourth quarter of 2007. These stores featured primarily designer brands for both accessories and outerwear, with an emphasis on accessories. Designer brand handbags were featured using updated display fixtures and presentations. Initial test results for the accessories business in these stores were promising and we look forward to rolling out an improved version of this new accessories concept to our 100 remaining mall stores in 2008.

*Develop a Wholesale Business.*   In 2006, we laid the foundation for a wholesale business to sell proprietary licensed and branded leather products in geographic and product categories outside our current markets and product mix. During 2007, we continued to focus on building a wholesale business and we established relationships with certain major retailers. However, we have decided to focus our limited capital resources on our new go-forward accessories mall concept and revitalization/enhancement of our outlet and airport channels. As such, we will discontinue our wholesale business during the first quarter of 2008.

The results of these initiatives were disappointing from a financial perspective. While we did make improvements and discoveries that we believe will have a long-term positive impact on our operating results, the bottom line is that we did not turn the business around and we disappointed our shareholders. The challenges we faced in 2007 were not new. Over the past few years, mall traffic has been trending downward, off-mall retail venues have gained popularity and competition has continued to increase from non-specialty discounters and mass merchandisers. Compounding these issues for us was an extremely challenging retail environment for outerwear in 2007. We anticipated that designer brand outerwear would drive more traffic in our stores than our own private label offerings and it did. Sell-throughs of designer brands, at higher average unit retails, were significantly higher than our own private label offerings. However, this was not enough to offset the erosion in traffic we have continued to experience.

Our financial strategy for 2008 is to aggressively reduce costs and working capital needs, launch a new mall accessories store concept and revitalize/enhance our outlet and airport channels.

*Reorganization and Partial Store Liquidation.*   On February 15, 2008, we announced that we would liquidate up to 160 mall stores (subsequently revised to 154 mall stores and four outlet stores — the "liquidation stores") and eliminate approximately 938 store-related positions. We retained a third party liquidator and real estate firm to assist in this process. The liquidation is part of a strategy aimed at reducing our mall store base, aggressive cost cutting measures and the launch of a new mall accessories store concept. Concurrent with these store closures and using the liquidation sale proceeds, our 100 remaining mall stores will be remodeled to a new mall accessories store concept that has been tested in four different regions of the country. As part of the launch of the mall accessories store concept and ongoing cost reduction efforts, we have also realigned our organization to reflect the reduced store base and decreased overseas sourcing needs. As a result, we eliminated 64 positions at our corporate headquarters, overseas offices and distribution center. The liquidation will be presented as discontinued operations commencing in the first quarter of 2008. Our net sales and expenses will be significantly reduced going forward as a result of the liquidation. During the fourth quarter of 2007, we recorded a $9.3 million impairment loss related to the non-inventory assets located at the liquidation stores, as well as $10.4 million in other asset impairment charges that were primarily related to the mall-based stores that will be converted to the new accessories concept.

*New Mall Accessories Store Concept.*   During the 2007 holiday season, we began testing a new mall accessories store concept in four stores to address our customer traffic issues and elevate our designer brand

22

positioning. With that test, we identified an accessories centered offering that appeals to an important buying demographic.

This new accessories concept will be a designer brand driven store for women, focusing on fashion accessories with a limited selection of outerwear. We have kept only our best mall stores in the best locations for this concept. Our plan is to remodel every remaining mall store to this new concept during 2008. With handbags generally priced from $100 — $400, this new concept will provide an upscale boutique feel for customers in the emerging or mass luxury category and will be an alternative to the department store homogenization that has occurred in this category.

*Revitalize/Enhance Our Outlet and Airport Channels.*    Our outlet and airport channels have historically been profitable and cash flow positive. The reorganization and partial store liquidation included the closing of only four outlet stores. These channels are the foundation for our new mall accessories store concept to provide stability and cash flow as our new accessories concept is developed. We plan to introduce new product offerings in both accessories and outerwear in our outlet channel. In addition, we will strive to implement new marketing packages and improved display presentations in our outlet channel.

In June 2007, we completed a $45.0 million private placement of a newly created series of convertible preferred stock and warrants to purchase our common stock (the "Preferred Stock and Warrant financing"). The proceeds of the Preferred Stock and Warrant financing were used to repay our outstanding $20.0 million Term B promissory note and to fund general working capital requirements going forward, including the rollout of our designer brand merchandise initiative. This transaction is described in greater detail below in "Liquidity and capital resources." In addition to the influx of capital, the private placement brought us a large new investor, Goldner Hawn Private Equity, to assist in setting our long-term strategic direction.

We intend the discussion of our financial condition and results of operations that follows to provide information that will assist in understanding our current liquidity, consolidated financial statements, the changes in certain key items in those consolidated financial statements from year to year and the primary factors that accounted for those changes, as well as how certain accounting principles, policies and estimates affect our consolidated financial statements.

## Critical Accounting Policies

Our significant accounting policies are described in Note 1, "Summary of significant accounting policies," contained in our consolidated financial statements beginning on page F-7 of this report. We believe that the following discussion addresses our critical accounting policies, which are those that are most important to the portrayal of our financial condition and results of operations and require management's most difficult, subjective and complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain.

*Inventories*

We value our inventories, which consist primarily of finished goods held for sale purchased from domestic and foreign vendors, at the lower of cost or market value, determined by the retail inventory method using the last-in, first-out ("LIFO") basis. As of February 2, 2008 and February 3, 2007, the LIFO cost of inventories approximated the first-in, first-out cost of inventories. The inventory cost includes the cost of merchandise, freight, duty, sourcing overhead, and other merchandise-specific charges. A periodic review of inventory quantities on hand is performed to determine if inventory is properly stated at the lower of cost or market. Management evaluates several factors related to valuing inventories at the lower of cost or market such as anticipated consumer demand, fashion trends, expected permanent retail markdowns, the aging of inventories, and class or type of inventories. A provision is recorded to reduce the cost of inventories to the estimated net realizable values, if required.

Permanent markdowns designated for clearance activity are recorded at the point of decision, when utility of inventory has diminished, versus the point of sale. Factors considered in the determination of permanent markdowns include current and anticipated demand, customer preferences, age of the merchandise, and style trends. The corresponding reduction to gross margin is also recorded in the period that the decision is made.

23

Shrinkage is estimated as a percentage of sales for the period from the last inventory date to the end of the fiscal year. Physical inventories are taken at least biannually for all stores and our distribution center and inventory records are adjusted accordingly. The shrink rate for the most recent physical inventory, in combination with current events and historical experience, is used as the accrual rate to record shrink for the next inventory cycle.

Any significant unanticipated changes in the factors noted above could have a significant impact on the value of our inventories and our reported operating results.

*Property and Equipment Impairment*

Our property and equipment consists principally of store leasehold improvements and store fixtures and are included in the "Property and equipment" line item in our consolidated balance sheets in our consolidated financial statements. These long-lived assets are recorded at cost and are amortized using the straight-line method over the lesser of the applicable store lease term or the estimated useful life of the leasehold improvements. The typical initial lease term for our stores is 10 years. Computer hardware and software and distribution center equipment are amortized over three to five years and 10 years, respectively. We review long-lived assets for impairment whenever events, such as decisions to close a store or changes in circumstances, indicate that the carrying value of an asset may not be recoverable. In the fourth quarter of 2007, we recorded an impairment loss of $19.7 million. This impairment loss was comprised of: 1) all of the assets located at the liquidation stores, 2) all of the non-inventory assets located at our 100 remaining mall stores and 3) all of the non-inventory assets at four of our outlet stores. In the fourth quarter of 2006, we recorded an impairment loss of $0.7 million related to certain of our mall store assets. We had determined, based on the sales projections at the time for 2007 and 2008, that the estimated future undiscounted cash flows for these stores would not be sufficient to recover the carrying value of the underlying store assets. These impairment losses are recorded on a separate line item entitled "Asset impairments" in the accompanying consolidated statements of operations. Such assets were written down to fair value less the expected disposal value, if any, of such furniture, fixtures and equipment. We determined that these assets had no fair value, as the majority of such assets relate to leasehold improvements and other store-specific fixtures and equipment.

## Results of Operations

*Overview*

The following table contains selected information from our historical consolidated statements of operations, expressed as a percentage of net sales:

|  | For the years ended | |
| --- | --- | --- |
|  | February 2, 2008 | February 3, 2007 |
| NET SALES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.0% | 100.0% |
| COST OF GOODS SOLD, BUYING AND OCCUPANCY COSTS . . . . . . . . . . . . | 80.4 | 72.9 |
| Gross margin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19.6 | 27.1 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES . . . . . . . . . . . . . . . | 35.6 | 34.1 |
| DEPRECIATION AND AMORTIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.0 | 3.9 |
| ASSET IMPAIRMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.0 | 0.2 |
| Operating loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (27.0) | (11.1) |
| INTEREST EXPENSE, NET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.5 | 0.6 |
| Loss before income taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (27.5) | (11.7) |
| INCOME TAX PROVISION (BENEFIT) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.2 | (1.4) |
| Net loss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (27.7) | (10.3) |

24

*2007 Compared to 2006*

*Net Sales.*    2007 net sales decreased 12.7% to $280.4 million from $321.3 million in 2006. This decrease in net sales was primarily the result of a decrease in 2007 comparable store sales of 10.4% compared to a decrease of 17.2% in 2006. The decrease in comparable store sales was experienced in all our merchandise lines, with men's down 17.0%, women's down 13.2% and accessories down 3.9%. Mall and outlet channels were down 10.5% and 11.0%, respectively.

We also had a 2.6% reduction in the average store count year-over-year. We opened five stores and closed 31 during 2007 compared to opening nine stores and closing 14 during 2006. As of February 2, 2008, we operated 391 stores (including the 158 liquidation stores) compared to 417 as of February 3, 2007.

The significant transition we have undertaken in our mall stores during 2007 and 2006 continued to have a negative impact on our comparable store sales in both 2007 and 2006. Our goal of transitioning our customer base has taken more time than anticipated, while our traditional price only customer has opted out of the "reinvented" Wilsons Leather. Designer brand product introduced in our mall stores during the 2007 holiday season outperformed our own private label offerings. However, this was not effective in offsetting the erosion in traffic we have continued to experience.

Net sales for the liquidation stores were $73.4 million and $85.8 million in 2007 and 2006, respectively.

*Cost of Goods Sold, Buying and Occupancy Costs.*    Cost of goods sold, buying and occupancy costs decreased $8.7 million, or 3.7%, to $225.5 million in 2007, compared to $234.3 million in 2006. This decrease was driven by: (1) a $7.7 million decrease in product costs due to the significantly lower sales volume in 2007, (2) a $3.3 million decrease in buying and occupancy costs as a result of our decreased receipt volume and reduction in average store count in 2007 and (3) a $1.3 million reduction in delivery and other costs of sales, again, due to the lower receipt volume. These decreases were somewhat offset by a $3.6 million increase in temporary and permanent markdowns. The increase in markdowns was primarily due to markdowns taken in the third quarter of 2007 as we aggressively moved our non-go-forward merchandise to make room for our designer brand offerings in our mall stores.

The $7.7 million decrease in product costs includes $1.6 million related to a lawsuit settlement in the fourth quarter of 2007. We brought a civil lawsuit in U.S. District Court against the former General Manager — Asia and our theft coverage insurance carrier in May 2007 related to a kickback scheme discovered in September 2005 involving the former General Manager — Asia. In December 2007, the lawsuit was settled for payments to us in the aggregate amount of $1.6 million. This was recorded as a reduction of cost of sales in the fourth quarter of 2007.

Gross margin dollars decreased $32.1 million, or 36.9%, to $54.9 million in 2007 compared to $87.0 million in 2006 primarily related to the lower sales volume in 2006. Gross margin as a percentage of net sales decreased by 750 basis points to 19.6% in 2007 compared to 27.1% in 2006 primarily due to: (1) a 560 basis point decrease in merchandise margins resulting from a 180 basis point decrease in initial markup and a 380 basis point increase in markdowns as a percentage of net sales (resulting from the aggressive third quarter markdown activity mentioned above) and (2) the de-leveraging resulting from our comparable store sales, which resulted in a 210 basis point increase in buying and occupancy costs as a percentage of sales.

Cost of goods sold, buying and occupancy costs for the liquidation stores were $66.2 million and $69.6 million in 2007 and 2006, respectively.

*Selling, General and Administrative Expenses.*    Selling, general and administrative ("SG&A") expenses decreased $9.8 million, or 8.9%, to $99.7 million in 2007 as compared to $109.4 million in 2006. As a percentage of net sales, 2007 SG&A expenses increased to 35.6% as compared to 34.1% in 2006. The increase in percentage rate is the result of our lower sales volume, which more than offset the $9.8 million decrease in total spending.

The $9.8 million decrease in 2007 SG&A spending was primarily due to: (1) a $3.6 million decrease in store-related expenses in line with our lower sales volume and reduced store count relating to reduced payroll hours, benefits spending, supply usage, communication charges, as well as lower shrink expense, (2) a $3.4 million decrease in promotional spending primarily related to reduced media spending and (3) a $2.8 million decrease in

25

administrative costs due primarily to reduced spending on payroll and benefits as a result of lower headcount, a $0.7 million decrease in stock-based compensation charges and decreased spending on travel and relocation.

**Depreciation and Amortization.**  For the year ended February 2, 2008, depreciation and amortization decreased $1.1 million to $11.3 million from $12.5 million in 2006. Depreciation and amortization as a percentage of net sales increased slightly to 4.0% in 2007 as compared to 3.9% in 2006. The $1.1 million decrease was primarily the result of prior year depreciation on assets that are now fully depreciated and our lower store count, as we had on average 11 fewer stores open in 2007 as compared to 2006.

**Asset Impairments.**  During 2007, we recorded an impairment charge of $19.7 million comprised of: (1) all of the assets located at the liquidation stores, (2) all of the assets located at our 100 remaining mall stores and (3) all of the assets at four of our outlet stores. This compares to a $0.7 million impairment loss recorded during 2006 related to certain of our mall stores. We had determined, based on the sales projections at the time for 2007 and 2008, that the estimated future undiscounted cash flows for these stores would not be sufficient to recover the carrying value of the underlying store assets. Such assets were written down to fair value less the expected disposal value, if any, of such furniture, fixtures and equipment. We determined that these assets had no fair value, as the majority of such assets related to leasehold improvements and other store-specific furniture and equipment.

**Operating Loss.**  The operating loss of 2007 was $75.8 million as compared to $35.6 million in 2006, or 27.0% of net sales in 2007 as compared to 11.1% of net sales in 2006. The $40.2 million decline in operating performance was due to: (1) a $32.1 million decrease in gross margin performance and (2) $19.0 million of additional asset impairments recorded in 2007, somewhat offset by: (1) a $9.8 million decrease in SG&A spending and (2) a $1.1 million decrease in depreciation and amortization.

**Interest Expense, Net.**  Interest expense, net, for 2007 decreased by $0.5 million to $1.3 million as compared to $1.9 million in 2006. This decrease was primarily attributable to the repayment of our $20.0 million Term B promissory note in the second quarter of 2007.

**Income Tax Provision (Benefit).**  The income tax provision of $0.4 million in 2007 relates primarily to estimated federal alternative minimum tax as a result of an increase in our LIFO inventory deferred tax liability. This compares to an income tax benefit of $4.4 million recorded in 2006 related to the reduction of the income tax provision we recorded in the fourth quarter of 2005 due to our July tax year end at the time. Subsequent to our July 2006 tax year end, we elected to conform our tax year end to our fiscal year end as of February 3, 2007. Therefore, fluctuations created by different book and tax year ends were eliminated going forward.

Due to cumulative losses sustained over the past five fiscal years, we believe that it is more likely than not that our deferred tax assets will not be realized. Accordingly, a full valuation allowance has been recorded against the net deferred tax assets, including potentially unrealizable net operating losses. The ability to utilize net operating loss carryforwards is limited under various provisions of the Internal Revenue Code (see Note 8, "Income taxes," in our consolidated financial statements).

**Net Loss.**  The net loss for 2007 was $77.5 million as compared to $33.1 million in 2006, or a loss of $2.46 per basic and diluted share available to common shareholders in 2007 as compared to a loss of $0.85 per basic and diluted share in 2006.

**Net Loss Available to Common Shareholders.**  The 2007 net loss per common share available to common shareholders of $2.46 reflects adjustments required to be made to our net loss in order to measure net loss available to common shareholders. These adjustments related to our June 2007 Preferred Stock and Warrant financing. For 2007, these adjustments include: (1) a $3.4 million accrued paid-in-kind dividend payable related to the Preferred Stock, (2) a $14.9 million beneficial conversion feature associated with the Preferred Stock, and (3) a $1.0 million deemed dividend to certain warrant holders related to anti-dilution provisions of the applicable warrants. See Note 9, "Preferred stock and warrant financing," to our consolidated financial statements. There are no comparable adjustments reflected in the 2006 per common share figures.

26

## Liquidity and Capital Resources

*Liquidity.* We have incurred net losses of $77.5 million and $33.1 million and used $28.2 million and $14.6 million in cash for operating activities during 2007 and 2006, respectively. In addition, our $45.6 million cash balance at the beginning of 2006 has decreased to $7.4 million at the end of 2007. Subsequent to year end, as part of our cost reduction initiatives, we stopped making payments under certain of our licensing and lease agreements. Our senior credit facility was amended on February 14, 2008. The amendment, among other things, allowed for the liquidation of 158 stores, revised our borrowing base by adding a $10.0 million reserve, prohibits borrowing under our revolving line of credit until we provide projections and a business plan that are acceptable to our lender, and requires a monthly appraisal of our inventory. Our financial statements do not include any adjustments that might result from the outcome of this uncertainty. In order to execute our go forward plans, we will need to amend some of the restrictions in our current credit facility, or find alternative sources of credit, and raise additional capital during the second quarter of 2008. We are pursuing possible sources of funding, including possible sales of existing assets. However, there can be no assurance that additional funding will be available or can be obtained on terms that are favorable to us, or at all. We have not received an indication from the lender in our current credit facility that the lender will agree to amend the terms of the facility. If we are not able to obtain additional capital in the second quarter of 2008, we will not be able to continue our operations outside of bankruptcy. Under certain bankruptcy events, we may be required to redeem shares of our Preferred Stock at their liquidation value, which is the $45 million purchase price for those shares plus any accrued but unpaid dividends. However, the redemption would not be permitted by law, unless we are able to pay our debts as they come due, and would be prohibited by the terms of our existing credit facility. Our financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*Capital resources.* Our capital requirements are primarily driven by our seasonal working capital needs, investments in new stores, remodeling existing stores, enhancing information systems, and increasing efficiency for our distribution centers. In addition, implementation of our key initiatives relating to our new mall accessories store concept will require significant resources, including capital dollars. We plan to largely fund the remodel of our 100 remaining mall stores to the new accessories store concept with proceeds from the liquidation sale; however, we will need additional capital in order to complete this project. Our peak working capital needs typically occur during the period from August through early December as inventory levels are increased in advance of our peak selling season from October through January.

Our future capital requirements depend on the sustained demand for our leather and accessories products. Many factors affect the level of consumer spending on our products, including, among others, general economic conditions, including rising energy prices, customer shopping patterns, interest rates, the availability of consumer credit, weather, the outbreak of war, acts of terrorism or the threat of either, other significant national and international events, taxation, and consumer confidence in future economic conditions. Consumer purchases of discretionary items such as our products tend to decline during periods when disposable income is lower. Consumer spending habits have shifted toward large discount retailers, which has decreased mall traffic, resulting in lower net sales on a quarterly and annual basis.

General Electric Capital Corporation ("GECC") has provided us with a senior credit facility, as amended, that provides for borrowings of up to $115.0 million in aggregate principal amount, including a $75.0 million letter of credit subfacility. The maximum amount available under the revolving credit portion of our senior credit facility as amended is limited to:

- 100% of the book value of credit card receivables;

- plus the lesser of $10 million or 100% of the book value of eligible wholesale accounts receivable;

- plus 102.5% of the then applicable discount rate applied in appraising eligible retail inventories times the appraised eligible retail inventories, plus 102.5% of such discount rate times our future retail inventories subject to trade letters of credit;

- plus the lesser of $10 million, or 60% of the book value of our wholesale inventory, including in-transit inventory but minus the book value of in-transit inventory in excess of $5 million;

- plus 60% of the book value of our future wholesale inventories related to trade letters of credit;

- minus a reserve equal to 10% of the lesser of $115.0 million and the maximum amount calculated under the formula described above, plus $10.0 million, plus other reserves as set forth by GECC.

At February 2, 2008, we had no borrowings under the revolving portion of the senior credit facility and $12.2 million in outstanding letters of credit. At February 2, 2008, based on the formula described above, the Company had $21.0 million available under the revolving portion of the senior credit facility.

Interest is currently payable on revolving credit borrowings at variable rates determined by the applicable LIBOR plus 1.25% to 1.75%, or the prime rate plus 0.0% to 0.5% (commercial paper rate plus 1.25% to 1.75% if the loan is made under the "swing line" portion of the revolver). The applicable margins will be adjusted quarterly on a prospective basis as determined by the previous quarters' ratio of borrowings to borrowing availability. In addition, GECC has the right to appraise our inventory monthly to determine the value of our eligible inventory as if sold in an orderly liquidation, which is then used to establish borrowing limits under our senior credit facility. Reductions in the appraised value of our inventory, which have transpired in the past, would reduce our borrowing capacity.

We pay monthly fees of 0.25% per annum on the unused portion of the senior credit facility, as defined, and per annum fees on the average daily amount of letters of credit outstanding during each month ranging from .625% to .875% in the case of trade letters of credit and from 1.25% to 1.75% in the case of standby letters of credit. Such fees are subject to quarterly adjustment in the same manner as our interest rate margins. The senior credit facility expiration is June 30, 2010, at which time all borrowings become due and payable. Any reduction of the revolving credit portion of the senior credit facility is subject to prepayment fees under most circumstances. Any such reduction would be subject to a 0.37% prepayment fee if the reduction is made on or prior to June 30, 2008, and 0.185% prepayment fee if prepayment is made after June 30, 2008 but on or prior to December 31, 2008. After December 31, 2008, the revolving credit portion of the senior credit facility is prepayable without penalty.

Prior to an amendment dated June 15, 2007, the senior credit facility provided for borrowings of up to $135.0 million in aggregate principal amount that included a $20.0 million Term B promissory note. The Term B promissory note was collateralized by our equipment and was due and payable upon the expiration of the senior credit facility on June 30, 2010. Interest was payable on the Term B promissory note at a variable rate equal to the LIBOR plus 4.0%. We repaid the $20.0 million balance on June 15, 2007, without a prepayment fee per the consent of the senior lenders, with proceeds from our Preferred Stock equity financing discussed below.

The senior credit facility contains certain restrictions and covenants, which, among other things, restrict our ability to acquire or merge with another entity; make investments, loans or guarantees; incur additional indebtedness; create liens or other encumbrances; or pay cash dividends or make other distributions. The June 15, 2007 amendment specifically allowed for the Preferred Stock equity financing discussed below. At February 2, 2008, we were in compliance with all covenants related to the senior credit facility. The senior credit facility was amended on February 14, 2008. The Amendment added further borrowing restrictions and requires more frequent appraisals of our inventory. Specifically, the borrowing base definition has been amended to exclude the value of the liquidation inventory after a guaranteed amount of liquidation proceeds is received from the third party liquidator, and to exclude the value of all store display fixtures. Also, a minimum $10.0 million reserve has been added to the borrowing base. However, the amendment permits us to include the amount of cash deposited in certain banks in determining how much we can borrow. The amendment also requires us to provide a daily borrowing base certificate and a monthly appraisal of the inventory value.

We are dependent on the senior credit facility to fund working capital and letter of credit needs. As described above, we will need to amend some of the restrictions in our current credit facility, or find alternative sources of credit, and raise additional capital during the second quarter in order to fund our working capital needs and continue our operations outside of bankruptcy. Under certain bankruptcy events, we may be required to redeem shares of our Preferred Stock at their liquidation value, which is the $45 million purchase price for those shares plus any accrued but unpaid dividends. However, the redemption would not be permitted by law, unless we are able to pay our debts as they come due, and would be prohibited by the terms of our existing credit facility.

On June 1, 2007, we entered into a Securities Purchase Agreement (the "Purchase Agreement") that provided for the sale of shares of Series A Convertible Preferred Stock (the "Preferred Stock") and warrants to purchase

28

common stock (the "Warrants") for a total purchase price of $45.0 million to four institutional investors. The Purchase Agreement required that we shall have filed the Certificate of Designations for the Series A Convertible Preferred Shares (the "Certificate of Designations") to establish this new class of securities. This new class of securities was established and the Preferred Stock and Warrant financing closed on June 15, 2007. We used the proceeds from this transaction to repay the $20.0 million Term B promissory note, for general working capital purposes, as well as to pay fees related to the transaction.

The Preferred Stock is initially convertible into shares of common stock at a conversion price of $1.50 per share, or 30 million total shares of common stock. Going forward, the number of shares of common stock issuable upon conversion of the Preferred Stock at any time is equal to the stated value of each share of Preferred Stock ($1,000) divided by the conversion price then in effect. The Preferred Stock is entitled to payment-in-kind cumulative dividends of 8.0% per year, issuable semi-annually, payable in shares of Preferred Stock. As of February 2, 2008, there were 46,667 shares of Preferred Stock outstanding that were convertible into 31.1 million shares of common stock. The Preferred Stock also requires us to redeem shares of the Preferred Stock upon certain defined triggering events, including: conversion defaults, indebtedness defaults, events of bankruptcy, certain judgments against us, and uncured breaches of any representations, covenants or other conditions of the documents related to the Preferred Stock and Warrant financing. In addition, we have the option to redeem the Preferred Stock beginning on June 1, 2010 if our common stock is trading above a specified price and we have an effective registration statement for the resale of the common stock issuable upon conversion of the Preferred Stock.

The Warrants to purchase an aggregate of 15 million shares of our common stock are exercisable at a price of $2.00 per share and are exercisable for five years from the date of issuance, June 15, 2007.

The Preferred Stock and the Warrants are subject to certain anti-dilution adjustments as defined in the Certificate of Designations and the form of Warrant. These anti-dilution adjustments relate to certain events including consolidations, mergers, stock dividends, stock splits, reclassifications or other changes in the corporate structure of our Company. The Preferred Stock and the Warrants also provide for anti-dilution adjustments if we issue stock below either the market price or the applicable conversion price or exercise price. The holders of the Preferred Stock and the Warrants have certain demand and incidental registration rights with respect to the shares of common stock issuable upon conversion of the Preferred Stock and exercise of the Warrants.

In connection with the issuance of the Preferred Stock and the Warrants, the number of shares of common stock and exercise price per share of common stock of the warrants issued by us in April and July of 2004 have been adjusted pursuant to the anti-dilution provisions of those warrants. The exercise price per share was reduced from $3.00 to $2.39 and the aggregate number of shares of common stock issuable upon exercise of such warrants increased by approximately 1.0 million shares to approximately 5.0 million shares.

Pursuant to the terms of the Purchase Agreement, we paid a transaction fee to the lead investor equal to 1.0% of its purchase price and reimbursed the investors $0.5 million for their expenses incurred in connection with the transaction. With the issuance of the Preferred Stock and the Warrants through the Purchase Agreement, the holdings of existing shareholders were diluted.

**Cash Flow Analysis**

The following table summarizes our cash flow activity for 2007 and 2006:

|  | For the years ended | |
| --- | --- | --- |
|  | February 2, 2008 | February 3, 2007 |
|  | (in thousands) | (in thousands) |
| Net cash used in operating activities | $(28,213) | $(14,550) |
| Net cash used in investing activities | (5,686) | (11,033) |
| Net cash provided by (used in) financing activities | 21,352 | (60) |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | $(12,547) | $(25,643) |

29

*Operating Activities.*    2007 operating activities utilized cash of $28.2 million compared to utilizing cash of $14.6 million in 2006.

Net cash utilized by operating activities in 2007 of $28.2 million was comprised primarily of: (1) our net loss of $77.5 million, (2) a $0.3 million increase in net accounts receivable and (3) a $0.9 million decrease in income taxes payable and other long-term liabilities (a $0.5 million increase in income taxes payable offset by decreased long-term liabilities of $1.4 million primarily related to deferred rent.)

These uses of cash were somewhat offset by the following sources of cash and non-cash charges: (1) $11.8 million in non-cash adjustments for depreciation and amortization, (2) a $19.7 million non-cash asset impairment charge, (3) $1.6 million in non-cash charges related to stock-based compensation costs, (4) a $0.5 million increase in deferred income taxes, (5) a $16.6 million conscious decision to reduce our inventory and, (6) a $0.3 million decrease in prepaid expenses.

Net cash utilized by operating activities in 2006 of $14.6 million was comprised of: (1) our net loss of $33.1 million, (2) a $5.4 million net decrease in income taxes payable and other liabilities primarily resulting from a decrease of $4.8 million in taxes payable due to the income tax benefit recorded in 2006 and a $0.6 million decrease in our deferred rent liability and (3) a $4.8 million increase in prepaid expenses primarily related to the timing of rent payments.

These were somewhat offset by the following sources of cash: (1) $13.2 million in non-cash adjustments for depreciation and amortization, (2) a $10.7 million decrease in inventories resulting from our aggressive management of inventory levels in 2006, (3) $2.3 million in non-cash charges related to stock-based compensation costs, (4) a $0.9 million decrease in net accounts receivable primarily relating to outstanding insurance claims for damages caused by Hurricane Katrina in 2005 and paid in 2006, as well as decreased credit card and construction allowance receivables, (5) a $0.7 million increase in accounts payable and accrued expenses primarily due to increased customer payables related to outstanding gift cards, and (6) a $0.7 million non-cash charge related to the asset impairment loss we recorded for certain of our mall stores in 2006.

*Investing Activities.*    Investing activities for 2007 totaled $5.7 million comprised primarily of $4.0 million in capital expenditures related to the renovation and improvement of existing stores and leasehold improvements for new mall and outlet stores and $1.7 million for certain information systems projects, primarily new point-of-sale software.

In 2006, investing activities were a net $11.0 million with capital expenditures of $11.1 million being somewhat offset by $0.1 million of proceeds on the disposition of property and equipment. Capital expenditures in 2006 included: (1) $6.0 million for the construction of new stores and the renovation of and improvements to existing stores, (2) $2.2 million in new fixtures for our mall stores, (3) $2.0 million in information systems projects including new cash register CPUs and printers for our stores, (4) a $0.5 million automated conveyor system in our distribution center, and (5) $0.4 million in other administrative fixed assets.

*Financing Activities.*    Financing activities for 2007 provided $21.4 million primarily related to the June 2007 Preferred Stock and Warrant financing, which included the issuance of 45,000 shares of preferred stock and warrants to purchase 15 million shares of common stock, for net proceeds of $36.0 million and $5.3 million, respectively. Issuances of common stock from our employee stock purchase plan and non-employee directors' stock retainer totaling $0.2 million were partially offset by $0.1 million in costs incurred related to amending our senior credit facility. In addition, we repaid the $20.0 million balance of our Term B promissory note with the equity financing proceeds during the second quarter of 2007.

In 2006, financing activities utilized net cash of $0.1 million, with $0.4 million in debt acquisition costs relating to our restated credit agreement offsetting $0.3 million in proceeds from the issuance of common stock from the exercise of stock options, share grants to our non-employee directors and from our employee stock purchase plan.

**Commercial Commitments**

### Amount of Commitment by Period (in thousands)

| | Total Obligations | 2008 | 2009-2010 | 2011-2012 | After Five Years |
|---|---|---|---|---|---|
| Documentary letters of credit .............. | $ 8,604 | $ 8,604 | $— | $— | $— |
| Standby letters of credit .................. | 3,580 | 3,580 | — | — | — |
| Total commercial commitments ............. | $12,184 | $12,184 | $— | $— | $— |

In addition to the commitments reflected in the table above, we have future operating lease commitments of $154.9 million, including $44.4 million related to the liquidation stores.

**Off-Balance Sheet Arrangements**

We have operating lease commitments as noted above. There are no other off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in our financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors.

**Seasonality and Inflation**

A majority of our net sales and operating profit is generated in the peak selling period from October through January, which includes the holiday selling season. As a result, our annual operating results have been, and will continue to be, heavily dependent on the results of our peak selling period. Net sales are generally lowest during the period from April through July, and we typically do not become profitable, if at all, until the fourth quarter of a given year. Most of our stores are unprofitable during the first three quarters. Conversely, in a typical year nearly all of our stores are profitable during the fourth quarter, even those that may be unprofitable for the full year. During the fourth quarter of 2007, most of our mall stores were not profitable due to poor operating performance and the $19.7 million of impairment charges. Historically, we have opened most of our stores during the last half of the year. As a result, new mall stores opened just prior to the fourth quarter produce profits in excess of their annualized profits since the stores typically generate losses in the first nine months of the year.

We do not believe that inflation has had a material effect on the results of operations during the past three years; however, there can be no assurance that our business will not be affected by inflation in the future.

**Recently Issued Accounting Pronouncements**

See Note 1, "Summary of significant accounting policies," contained in our consolidated financial statements, for a full description of recent accounting pronouncements, including the respective expected dates of adoption and effects on results of operations and financial condition.

**Item 7A.    Quantitative and Qualitative Disclosure About Market Risk**

Not applicable.

**Item 8.    Financial Statements and Supplementary Data**

Consolidated financial statements required pursuant to this Item begin on page F-1 of this Form 10-K. Pursuant to the applicable accounting regulations of the Securities and Exchange Commission, we are not required to provide supplementary data.

**Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

31

**Item 9A(T).    Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We have established and maintain disclosure controls and procedures that are designed to ensure that material information relating to us and to our subsidiaries required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including the chairman of our board, who is acting as our principal executive officer, and our chief financial officer as appropriate to allow timely decisions regarding required disclosure. We carried out an evaluation, under the supervision and with the participation of our management, including our chairman of the board, who is acting as our principal executive officer, and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the chairman of the board and chief financial officer concluded that our disclosure controls and procedures were effective as of the date of such evaluation.

**Management's Report on Internal Controls and Procedures**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed by, or under the supervision of, our principal executive, which position is currently served by the chairman of our board, and our chief financial officer and effected by our board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles and includes those policies and procedures that:

(i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;

(ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with the authorizations of our management and directors; and

(iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Because of inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of February 2, 2008. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework. Based on this assessment, our management concluded that our internal control over financial reporting was effective as of February 2, 2008.

This annual report does not include an attestation report of the company's registered public accounting firm regarding internal control over financing reporting. Management's report was not subject to attestation by the company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the company to provide only management's report in this annual report.

**Change in Internal Control Over Financial Reporting**

There were no changes in the our internal control over financial reporting that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

32

**Item 9B.   Other Information**

None.

## PART III

Certain information required by Part III is incorporated by reference from our definitive Proxy Statement for the 2008 Annual Meeting of Shareholders (the "Proxy Statement"), which will be filed with the Securities and Exchange Commission pursuant to Regulation 14A within 120 days after February 2, 2008.

Except for those portions specifically incorporated in this Form 10-K by reference to our Proxy Statement, no other portions of the Proxy Statement are deemed to be filed as part of this Form 10-K.

**Item 10.   Directors, Executive Officers and Corporate Governance**

Incorporated by reference in this Form 10-K is the information appearing under the headings "Proposal Number One — Election of Directors" and "Section 16(a) Beneficial Ownership Reporting Compliance" in our Proxy Statement. For information concerning executive officers and family relationships between any director or executive officer, see Item 4A. "Executive Officers of the Registrant" in this Form 10-K.

In March 2004, we adopted a Code of Business Ethics and Conduct applicable to all associates and directors of our company, including our chief executive officer, chief operating officer, chief financial officer, controller, treasurer, and other employees performing similar functions. A copy of the Code of Business Ethics and Conduct was filed as Exhibit 14.1 incorporated by reference to our 2004 Form 10-K. We intend to file on our Web site any amendments to, or waivers from, our Code of Business Ethics and Conduct within four business days of any such amendment or waiver. We intend to post on our Web site any amendments to, or waivers from, our Code of Business Ethics and Conduct that apply to our principal executive officer, principal financial officer, principal accounting officer, controller, and other persons performing similar functions promptly following the date of such amendment or waiver. A copy of our Code of Business Ethics and Conduct is also available on our Web site (www.wilsonsleather.com).

**Item 11.   Executive Compensation**

Incorporated by reference in this Form 10-K is the information appearing under the heading "Executive Compensation" in our Proxy Statement.

**Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Incorporated by reference in this Form 10-K is the information appearing under the headings "Security Ownership of Principal Shareholders and Management" and "Equity Compensation Plan Information" in our Proxy Statement.

**Item 13.   Certain Relationships and Related Transactions, and Director Independence**

Incorporated by reference in this Form 10-K is the information appearing under the headings "Certain Relationships and Related Transactions" and "Proposal Number One — Election of Directors — Board Matters and Meeting Attendance" in our Proxy Statement.

**Item 14.   Principal Accountant Fees and Services**

Incorporated by reference in this Form 10-K is the information under the heading "Fees Paid to Independent Registered Public Accounting Firm" in our Proxy Statement.

## PART IV

**Item 15.    Exhibits and Financial Statement Schedules**

**(a) Documents filed as part of this report:**

1. Financial Statements:

   Report of Independent Registered Public Accounting Firm

   Consolidated Balance Sheets

   Consolidated Statements of Operations

   Consolidated Statements of Shareholders' Equity

   Consolidated Statements of Cash Flows

   Notes to Consolidated Financial Statements

2. Financial Statement Schedule

3. Exhibits

   The exhibit index attached to this report is incorporated by reference herein.

34

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on April 11, 2008:

WILSONS THE LEATHER EXPERTS INC.
(registrant)

By: _____ /s/ STACY A. KRUSE _____

Stacy A. Kruse
Chief Financial Officer and Treasurer
(principal financial and accounting officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on April 11, 2008 by the following persons on behalf of the registrant and in the capacities indicated:

| /s/ MICHAEL T. SWEENEY | Chairman of the Board of Directors |
|---|---|
| MICHAEL T. SWEENEY | (acting principal executive officer) |
| /s/ STACY A. KRUSE | Chief Financial Officer and Treasurer |
| STACY A. KRUSE | (principal financial and accounting officer) |
| /s/ DARREN L. ACHESON | Director |
| DARREN L. ACHESON | |
| /s/ GAIL A. COTTLE | Director |
| GAIL A. COTTLE | |
| /s/ WILLIAM F. FARLEY | Director |
| WILLIAM F. FARLEY | |
| /s/ PETER V. HANDAL | Director |
| PETER V. HANDAL | |
| /s/ BRADLEY K. JOHNSON | Director |
| BRADLEY K. JOHNSON | |
| /s/ DAVID L. ROGERS | Director |
| DAVID L. ROGERS | |
| /s/ MARK G. SCHOEPPNER | Director |
| MARK G. SCHOEPPNER | |
| /s/ R. TED WESCHLER | Director |
| R. TED WESCHLER | |

35

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

### Index to Consolidated Financial Statements and Financial Statement Schedule

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of February 2, 2008 and February 3, 2007 | F-3 |
| Consolidated Statements of Operations for the years ended February 2, 2008 and February 3, 2007 | F-4 |
| Consolidated Statements of Shareholders' Equity for the years ended February 2, 2008 and February 3, 2007 | F-5 |
| Consolidated Statements of Cash Flows for the years ended February 2, 2008 and February 3, 2007 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
| Financial Statement Schedule: | |
| Schedule II — Valuation and Qualifying Accounts | F-29 |

## Report of Independent Registered Public Accounting Firm

The Board of Directors and Shareholders,
Wilsons The Leather Experts Inc.:

We have audited the accompanying consolidated balance sheets of Wilsons The Leather Experts Inc. and subsidiaries as of February 2, 2008 and February 3, 2007, and the related consolidated statements of operations, shareholders' equity and cash flows for the fiscal years then ended. In connection with our audits of the consolidated financial statements, we also have audited the financial statement schedule as listed in the accompanying index. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Wilsons The Leather Experts Inc. and subsidiaries as of February 2, 2008 and February 3, 2007, and the results of their operations and their cash flows for the fiscal years then ended, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has suffered recurring losses from operations and negative cash flows from operating activities that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As discussed in Note 1 to the consolidated financial statements, the Company adopted the provisions of Financial Accounting Standards Board Interpretation No. 48 "Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109" on February 4, 2007.

/s/   KPMG LLP

Minneapolis, Minnesota
April 11, 2008

F-2

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

### (In thousands, except share and per share amounts)

| | February 2, 2008 | February 3, 2007 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $ 7,362 | $ 19,909 |
| Accounts receivable, net of allowance of $48 and $71 in 2007 and 2006, respectively | 3,462 | 3,132 |
| Inventories | 58,307 | 74,897 |
| Prepaid expenses | 6,821 | 7,267 |
| Income taxes receivable | 141 | — |
| TOTAL CURRENT ASSETS | 76,093 | 105,205 |
| Property and equipment, net | 13,681 | 38,890 |
| Other assets, net | 815 | 1,250 |
| TOTAL ASSETS | $ 90,589 | $145,345 |
| **LIABILITIES, PREFERRED STOCK AND COMMON SHAREHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES: | | |
| Accounts payable | $ 16,288 | $ 14,337 |
| Accrued expenses | 12,718 | 14,534 |
| Income taxes payable | — | 921 |
| Deferred income taxes | 723 | 220 |
| TOTAL CURRENT LIABILITIES | 29,729 | 30,012 |
| Long-term debt | — | 20,000 |
| Income taxes payable | 1,367 | — |
| Other long-term liabilities | 15,441 | 16,832 |
| TOTAL LIABILITIES | 46,537 | 66,844 |
| COMMITMENTS AND CONTINGENCIES | | |
| Preferred stock, $.01 par value; 200,000 shares authorized; 46,667 and no shares issued and outstanding on February 2, 2008 and February 3, 2007, respectively (liquidation preference of $47,309) | 39,033 | — |
| COMMON SHAREHOLDERS' EQUITY: | | |
| Common stock, $.01 par value; 150,000,000 shares authorized; 39,336,903 and 39,204,299 shares issued and outstanding on February 2, 2008 and February 3, 2007, respectively | 393 | 392 |
| Additional paid-in capital | 140,500 | 136,441 |
| Accumulated deficit | (135,876) | (58,334) |
| Accumulated other comprehensive income | 2 | 2 |
| TOTAL COMMON SHAREHOLDERS' EQUITY | 5,019 | 78,501 |
| TOTAL LIABILITIES, PREFERRED STOCK AND COMMON SHAREHOLDERS' EQUITY | $ 90,589 | $145,345 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

**(In thousands, except per share amounts)**

| | For the years ended | |
| --- | --- | --- |
| | February 2, 2008 | February 3, 2007 |
| NET SALES | $280,438 | $321,262 |
| COST OF GOODS SOLD, BUYING AND OCCUPANCY COSTS | 225,523 | 234,251 |
| Gross margin | 54,915 | 87,011 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 99,657 | 109,423 |
| DEPRECIATION AND AMORTIZATION | 11,319 | 12,462 |
| ASSET IMPAIRMENTS | 19,705 | 736 |
| Operating loss | (75,766) | (35,610) |
| INTEREST EXPENSE, NET | 1,333 | 1,862 |
| Loss before income taxes | (77,099) | (37,472) |
| INCOME TAX PROVISION (BENEFIT) | 443 | (4,377) |
| Net loss | (77,542) | (33,095) |
| Less: Preferred stock paid-in-kind dividends | (3,415) | — |
| Beneficial conversion feature on preferred stock | (14,877) | — |
| Deemed dividend to warrant holders | (967) | — |
| Net loss available to common shareholders | $(96,801) | $(33,095) |
| **BASIC LOSS PER SHARE:** | | |
| Basic loss per share | $ (2.46) | $ (0.85) |
| Basic weighted average common shares outstanding | 39,277 | 39,154 |
| **DILUTED LOSS PER SHARE:** | | |
| Diluted loss per share | $ (2.46) | $ (0.85) |
| Diluted weighted average common shares outstanding | 39,277 | 39,154 |

The accompanying notes are an integral part of these consolidated financial statements.

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF COMMON SHAREHOLDERS' EQUITY

### (In thousands, except share amounts)

| | Common stock | | Additional paid-in capital | Accumulated deficit | Accumulated other comprehensive income (loss) | Total shareholders' equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **BALANCE, January 28, 2006** . . . . . . . . . . . . . . . . | 39,087,652 | $391 | $133,853 | $ (26,201) | $11 | $108,054 |
| Cumulative effect of adjustment resulting from adoption of SAB No. 108, net of tax . . . . . . . . . | — | — | — | 962 | — | 962 |
| **BALANCE, January 28, 2006 as adjusted** . . . . . . . . | 39,087,652 | 391 | 133,853 | (25,239) | 11 | 109,016 |
| Net loss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (33,095) | — | (33,095) |
| Other comprehensive loss-foreign currency translation adjustment . . . . . . . . . . . . . . . . . . . . | — | — | — | — | (9) | (9) |
| Comprehensive loss . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | (33,104) |
| Compensation expense for options issued to employees . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 2,267 | — | — | 2,267 |
| Stock options exercised . . . . . . . . . . . . . . . . . . . . | 44,040 | — | 128 | — | — | 128 |
| Shares issued under the Company's employee stock purchase plan . . . . . . . . . . . . . . . . . . . . . . . . | 55,487 | 1 | 130 | — | — | 131 |
| Shares issued to non-employee directors . . . . . . . . . | 17,120 | — | 63 | — | — | 63 |
| **BALANCE, February 3, 2007** . . . . . . . . . . . . . . . . | 39,204,299 | 392 | 136,441 | (58,334) | 2 | 78,501 |
| Net loss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (77,542) | — | (77,542) |
| Other comprehensive loss-foreign currency translation adjustment . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | — |
| Comprehensive loss . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | (77,542) |
| Issuance of warrants in connection with Preferred Stock. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 5,266 | — | — | 5,266 |
| Paid-in-kind cumulative preferred stock dividend . . . | — | — | (2,984) | — | — | (2,984) |
| Preferred stock beneficial conversion feature ("BCF"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | — |
| Paid-in-kind cumulative preferred stock dividend — BCF component . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | — |
| Deemed dividend to warrant holders . . . . . . . . . . . . | — | — | — | — | — | — |
| Compensation expense for options issued to employees . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 1,608 | — | — | 1,608 |
| Shares issued under the Company's employee stock purchase plan . . . . . . . . . . . . . . . . . . . . . . . . | 79,385 | 1 | 92 | — | — | 93 |
| Shares issued to non-employee directors . . . . . . . . . | 53,219 | — | 77 | — | — | 77 |
| **BALANCE, February 2, 2008** . . . . . . . . . . . . . . . . | 39,336,903 | $393 | $140,500 | $(135,876) | $ 2 | $ 5,019 |

The accompanying notes are an integral part of these consolidated financial statements.

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

(In thousands)

| | For the years ended | |
| --- | --- | --- |
| | February 2, 2008 | February 3, 2007 |
| **OPERATING ACTIVITIES:** | | |
| Net loss | $(77,542) | $(33,095) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 11,318 | 12,462 |
| Amortization of deferred financing costs | 513 | 698 |
| Loss (gain) on disposal of assets | 107 | (13) |
| Asset impairments | 19,705 | 733 |
| Stock compensation expense | 1,608 | 2,267 |
| Deferred income taxes | 503 | 167 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (330) | 931 |
| Inventories | 16,590 | 10,748 |
| Prepaid expenses | 305 | (4,805) |
| Accounts payable and accrued expenses | (44) | 733 |
| Income taxes payable and other liabilities | (946) | (5,376) |
| Net cash used in operating activities | (28,213) | (14,550) |
| **INVESTING ACTIVITIES:** | | |
| Additions to property and equipment | (5,706) | (11,112) |
| Proceeds from sale of property and equipment | 20 | 79 |
| Net cash used in investing activities | (5,686) | (11,033) |
| **FINANCING ACTIVITIES:** | | |
| Proceeds from issuance of common stock, net | 171 | 322 |
| Net proceeds from issuance of preferred stock | 36,049 | — |
| Net proceeds from issuance of common stock warrants | 5,266 | — |
| Debt acquisition costs | (134) | (373) |
| Repayments of long-term debt | (20,000) | — |
| Other | — | (9) |
| Net cash provided by (used in) financing activities | 21,352 | (60) |
| **NET DECREASE IN CASH AND CASH EQUIVALENTS** | (12,547) | (25,643) |
| **CASH AND CASH EQUIVALENTS, beginning of year** | 19,909 | 45,552 |
| **CASH AND CASH EQUIVALENTS, end of year** | $ 7,362 | $ 19,909 |
| **SUPPLEMENTAL CASH FLOW INFORMATION:** | | |
| Cash paid (refunded) during the year for — | | |
| Interest | $ 1,531 | $ 2,829 |
| Income taxes | $ (364) | $ 219 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**February 2, 2008 and February 3, 2007**

**1    Summary of significant accounting policies**

*Nature of organization*

Wilsons The Leather Experts Inc. ("Wilsons Leather" or "the Company") a Minnesota corporation, is a specialty retailer of quality leather outerwear, accessories and apparel in the United States. At February 2, 2008, Wilsons Leather operated 391 stores (including 158 stores that we are liquidating — See Note 17, "Subsequent events,") located in 42 states, including 259 mall stores, 118 outlet stores and 14 airport locations. Operation of the Company's temporary seasonal stores was suspended in 2006 and for the foreseeable future.

*Basis of presentation*

The accompanying consolidated financial statements include those of the Company and all of its subsidiaries. All material intercompany balances and transactions between the entities have been eliminated in consolidation. At February 2, 2008, Wilsons Leather operated in one reportable segment: selling leather outerwear, accessories and apparel. The Company's chief operating decision-maker evaluates revenue and profitability performance on an enterprise basis to make operating and strategic decisions.

*Fiscal year*

The Company's fiscal year ends on the Saturday closest to January 31. The periods that will end or have ended January 31, 2009, February 2, 2008, and February 3, 2007 are referred to herein as fiscal years 2008, 2007 and 2006, respectively. Fiscal years 2008 and 2007 are 52 week years. Fiscal 2006 consisted of 53 weeks.

*Use of estimates*

The preparation of financial statements in conformity with U.S. generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Matters of significance in which management relies on these estimates relate primarily to the realizability of assets, such as inventories, property and equipment, and accounts receivable, and the adequacy of certain accrued liabilities and reserves. Ultimate results could differ from those estimates.

*Fair values of financial instruments*

The carrying value of the Company's current financial assets and liabilities, because of their short-term nature, approximates fair value.

*Cash and cash equivalents*

Cash equivalents consist principally of short-term investments with original maturities of three months or less and are recorded at cost, which approximates fair value. The short-term investments consist solely of money market funds. Interest income of $0.5 million and $1.6 million in fiscal years 2007 and 2006, respectively, is included in interest expense, net in the accompanying statements of operations.

*Inventories*

The Company values its inventories, which consist primarily of finished goods held for sale that have been purchased from domestic and foreign vendors, at the lower of cost or market value, determined by the retail inventory method on the last-in, first-out ("LIFO") basis. As of February 2, 2008 and February 3, 2007, the LIFO cost of inventories approximated the first-in, first-out cost of inventories. The inventory cost includes the cost of

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

merchandise, freight, duty, sourcing overhead, and other merchandise-specific charges. A periodic review of inventory quantities on hand is performed to determine if inventory is properly stated at the lower of cost or market. Factors related to current inventories such as future consumer demand, fashion trends, current aging, current and anticipated retail markdowns, and class or type of inventory are analyzed to determine estimated net realizable values. A provision is recorded to reduce the cost of inventories to the estimated net realizable values, if required.

Permanent markdowns designated for clearance activity are recorded at the point of decision, when the value of inventory has diminished, versus the point of sale. Factors considered in the determination of permanent markdowns include current and anticipated demand, customer preferences, age of the merchandise, and style trends. The corresponding reduction to gross margin is also recorded in the period that the decision is made.

Shrinkage is estimated as a percentage of sales for the period from the last inventory date to the end of the fiscal year. Physical inventories are taken at least biannually for all stores and the Company's distribution center and inventory records are adjusted accordingly. The shrink rate for the most recent physical inventory, in combination with current events and historical experience, is used as the accrual rate to record shrink for the next inventory cycle.

Any significant unanticipated changes in the factors noted above could have a significant impact on the value of the Company's inventories and its reported operating results.

Inventories consisted of the following (in thousands):

|  | February 2, 2008 | February 3, 2007 |
| --- | --- | --- |
| Raw materials | $ 1,348 | $ 2,940 |
| Finished goods | 56,959 | 71,957 |
| Total | $58,307 | $74,897 |

### *Property and equipment*

The Company's property and equipment consist principally of store leasehold improvements and store fixtures and are included in the "Property and equipment" line item in its consolidated balance sheets included in this report. Leasehold improvements include the cost of improvements funded by landlord incentives and lease costs during the pre-opening period of construction, renovation, fixturing, and merchandise placement (the "build-out" period). Prior to the third quarter of 2005, the Company capitalized rental costs incurred during the build-out period. Beginning with the third quarter of 2005, the Company has expensed all such build-out period rental costs pursuant to Financial Accounting Standards Board ("FASB") Staff Position No. FAS 13-1 ("FSP FAS 13-1"). Leasehold improvements are recorded at cost and are amortized using the straight-line method over the lesser of the applicable store lease term or the estimated useful life. The typical initial lease term for the Company's stores is 10 years and the estimated useful lives of the assets range from three to 10 years. Capital additions required for lease extensions subsequent to initial lease term are amortized over the term of the lease extension. Computer hardware and software and distribution center equipment are amortized over three to five years and 10 years, respectively. Property and equipment retired or disposed of are removed from cost and related accumulated depreciation accounts. Maintenance and repairs are charged directly to expense as incurred. Major renewals or replacements are capitalized after making the necessary adjustment to the asset and accumulated depreciation accounts for the items renewed or replaced.

### *Store closing and impairment of long-lived assets*

The Company continually reviews its stores' operating performance and assesses plans for store closures. Prior to 2007, the Company evaluated potential impairment for store assets using a geographic based market level approach. In 2007, the Company evaluated potential impairment for store assets on an individual store basis, as opposed to a geographic based market level approach. Losses related to the impairment of long-lived assets are

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

recognized when expected future cash flows are less than the asset's carrying value. When a store is closed or when a change in circumstances indicates the carrying value of an asset may not be recoverable, the Company evaluates the carrying value of the asset in relation to its expected future cash flows. If the carrying value is greater than the expected future cash flows, a provision is made for the impairment of the asset to write the asset cost down to its estimated fair value. As more fully described in Note 17, "Subsequent events," on February 15, 2008, the Company announced that it would liquidate up to 160 stores (subsequently revised to 158 stores) and eliminate 938 store-related positions. The Company had decided in January of 2008 that a partial store liquidation was required in order to cut costs and reduce working capital needs. As a result, the Company determined that the $9.3 million of assets located at these liquidation stores were impaired, as the future undiscounted cash flows of the liquidation sales would not be sufficient to recover the carrying value of those store assets. In addition, the Company determined another $10.4 million of store assets related to the 100 remaining mall stores and four outlet stores were also impaired, as the future undiscounted cash flows related to these stores would not be sufficient to recover the carrying value of those store assets. Accordingly, the Company recorded an impairment loss of $19.7 million in the fourth quarter of 2007 related to those store assets. Such assets were written down to fair value less the expected disposal value, if any, of such furniture, fixtures and equipment. The Company determined that these assets had no fair value, as the majority of such assets relate to leasehold improvements and other store-specific fixtures and equipment.

In the fourth quarter of 2006, the Company determined, based on its then current sales projections that certain geographic markets did not have sufficient future undiscounted cash flows to recover the carrying value of those markets' mall store fixed assets. Accordingly, the Company recorded an impairment loss of $0.7 million in the fourth quarter of 2006 related to those mall stores' assets. Such assets were written down to fair-value less the expected disposal value, if any, of such furniture, fixtures and equipment. Similar to 2007, the Company determined that these assets had no fair value, as the majority of such assets related to leasehold improvements and other store-specific fixtures and equipment. The 2007 and 2006 impairment losses are recorded on a separate line item entitled, "Asset impairments" in the accompanying Consolidated Statements of Operations.

When a store under a long-term lease is to be closed, the Company records a liability for any lease termination or broker fees at the time an agreement related to such closing is executed. At February 2, 2008 and February 3, 2007, the Company had no amounts accrued for store lease terminations.

*Debt issuance costs*

Debt issuance costs are amortized on a straight-line basis over the life of the related debt. Accumulated amortization amounted to approximately $3.8 million and $4.0 million at February 2, 2008 and February 3, 2007, respectively. Amortization expense is included in interest expense in the accompanying consolidated statements of operations.

*Operating leases*

The Company has approximately 392 noncancelable operating leases, primarily for retail stores, which expire at various times through 2017. These leases generally require the Company to pay costs, such as real estate taxes, common area maintenance costs and contingent rentals based on sales. In addition, these leases generally include scheduled rent increases and may include rent holidays. The Company accounts for these scheduled rent increases and rent holidays on a straight-line basis over the initial terms of the leases, including any rent holiday periods, commencing on the date the Company can take possession of the leased facility. Resulting liabilities are recorded as short-term or long-term deferred rent liabilities as appropriate. Rent expense for lease extensions subsequent to the initial lease terms are also calculated under a straight-line basis to the extent that they include scheduled rent increases or rent holidays. In addition, leasehold improvements funded by landlord incentives are recorded as short-term or long-term deferred rent liabilities as appropriate. These liabilities are then amortized as a reduction of rent expense on a straight-line basis over the life of the related lease. Prior to the third quarter of 2005, the Company

### WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

capitalized rental costs incurred during the build-out period. Beginning with the third quarter of 2005, the Company has expensed all such build-out period rental costs pursuant to FSP FAS 13-1.

*Revenue recognition*

The Company recognizes sales upon customer receipt of the merchandise generally at the point of sale. The Company has historically recognized layaway sales in full upon final payment and delivery of the merchandise to the customer. All customer payments prior to the final payment were recorded as customer deposits and included in accrued expenses in the Company's balance sheet. As of December 2006, the Company's layaway program was discontinued and all layaway sales had been recognized by the end of fiscal year 2006. Revenue for gift card sales and store credits is recognized at redemption. Wilsons Leather gift cards do not have expiration dates and the Company does not currently recognize gift card breakage for unused or unredeemed gift cards. A reserve is provided at the time of sale for projected merchandise returns based upon historical experience. The Company recognizes revenue for on-line sales at the time goods are received by the customer. An allowance for on-line sales is recorded for shipments in-transit at period end, as product is shipped to these customers Free on Board destination. Revenue on sales to wholesale customers is recognized upon the transfer of title and risk of ownership to such customers, which is generally upon shipment, as our standard terms are Free on Board origin. Wholesale revenue is recorded net of trade-term discounts and estimated returns and allowances. Generally, there are no return rights other than those for merchandise that is defective or in breach of any express warranties. Wholesale revenues may be recognized post shipment if the contractual shipping or right-of-return terms differ from the Company's standard terms.

*Store opening costs*

Non-capital expenditures, such as advertising and payroll costs related to new store openings, are charged to expense as incurred.

*Advertising costs*

Advertising costs included in selling, general and administrative expenses, are expensed when incurred. Advertising costs amounted to $5.6 million and $9.0 million in 2007 and 2006, respectively. Included in the Company's balance sheet in "Prepaid expenses" are prepaid advertising costs of approximately $0.5 million and $0.7 million as of February 2, 2008 and February 3, 2007, respectively.

*Income taxes*

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. In light of cumulative losses over the past five fiscal years, the Company believes this it is more likely than not that the Company's net deferred tax asset will not be realized. Accordingly, a full valuation allowance has been recorded against the Company's net deferred tax assets.

Significant judgment is required in determining the Company's provision/benefit for income taxes. In the ordinary course of business, the final tax outcome is uncertain for many transactions. Changes in estimates may create volatility in the Company's effective tax rate in future periods due to settlements with various tax authorities, expiration of the statute of limitations on certain tax positions and the availability of new information regarding certain tax positions that may cause changes to management's estimates. An uncertain income tax position is recognized in the Company's consolidated financial statements if it is more likely than not to be sustained. The tax

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

provisions are analyzed quarterly and applicable adjustments are made as events occur that warrant adjustments to those provisions.

### Sales taxes

The Company presents sales taxes on a net basis in its consolidated financial statements. For all periods presented, the Company's sales are recorded net of applicable sales taxes.

### Foreign currency translation

The functional currency for the Company's foreign operations is the applicable foreign currency. The translation from the applicable foreign currency to U.S. dollars is performed for balance sheet accounts using the current exchange rate in effect at the balance sheet date and for revenue and expense accounts using a weighted average exchange rate during the period. The gains or losses resulting from such translation are included in shareholders' equity as other comprehensive income (loss) and have been insignificant in all fiscal years presented. Transaction gains and losses are reflected in income. The Company did not enter into any hedging transactions during 2007 or 2006.

### Income (loss) per share

Basic net income (loss) per share is computed by dividing the net income (loss) available to common shareholders by the weighted average number of common shares outstanding during the year. Net income (loss) available to common shareholders is computed by subtracting the accrued paid-in-kind preferred stock dividend, the beneficial conversion feature on the Preferred Stock and the deemed dividend to warrant holders from the reported net income (loss). Diluted net income (loss) per share is computed by dividing the net income (loss) attributable to common shareholders as adjusted for impacts related to dilutive shares by the sum of the weighted average number of common shares outstanding plus all potentially dilutive shares. Potentially dilutive shares include common stock options and warrants calculated using the treasury stock method and convertible preferred stock calculated using the "as-if converted" method. Pursuant to the treasury method, in periods of net loss, potentially dilutive common shares related to stock options, warrants and conversion of the Company's preferred stock have been excluded from the calculation of weighted average shares outstanding, as their inclusion would have an anti-dilutive effect on net loss per share. The following table reconciles the number of shares utilized in the net income (loss) per share calculations (in thousands):

|  | For the years ended | |
|---|---|---|
|  | February 2, 2008 | February 3, 2007 |
| Weighted average common shares outstanding — basic | 39,277 | 39,154 |
| Effect of dilutive securities: stock options | — | — |
| Effect of dilutive securities: warrants | — | — |
| Weighted average common shares outstanding — diluted | 39,277 | 39,154 |

# Exhibit 5-C

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Potentially dilutive shares, which were excluded from the above calculations in 2007 and 2006, periods of net loss, as their inclusion would have had an anti-dilutive effect on net loss per share, are as follows (in thousands):

| | For the years ended | |
| --- | --- | --- |
| | February 2, 2008 | February 3, 2007 |
| Stock options | 2,990,651 | 1,471,660 |
| Warrants | 20,022,364 | 4,000,000 |
| Preferred stock[1] | 31,111,333 | — |
| Total potentially dilutive shares | 54,124,348 | 5,471,660 |

(1)   Weighted average shares of preferred stock using an "as if converted" method.

*Stock-based compensation*

On January 29, 2006, the Company adopted the provisions of Statement of Financial Accounting Standards ("SFAS") No. 123 (Revised 2004), *Share-Based Payment* ("SFAS No. 123R"), using the modified prospective transition method. Under this method, the Company recognizes compensation costs for new grants of stock-based awards, awards modified on or after the effective date of January 29, 2006 and the remaining portion of the fair value of the unvested awards at January 29, 2006. SFAS No. 123R requires the recognition of compensation expense in an amount equal to the fair market value of share-based payments granted to employees and non-employee directors. These share-based payments include employee stock options, employee stock purchases related to the Company's employee stock purchase plan and other stock-based awards ("stock-based compensation"). Prior to January 29, 2006, the Company accounted for employee stock-based compensation using the intrinsic-value method pursuant to Accounting Principles Board Opinion ("APB") No. 25, *Accounting for Stock Issued to Employees* ("APB No. 25"), and its related implementation guidance under which no compensation cost had been recognized. As permitted by SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), the Company adopted the disclosure provisions for employee stock-based compensation and only disclosed such compensation pro forma in the notes to the consolidated financial statements.

The Company adopted SFAS No. 123R using the modified prospective transition method. Under this method, the Company recognizes compensation costs for new grants of stock-based awards, awards modified on or after the effective date of January 29, 2006 and the remaining portion of the fair value of the unvested awards at January 29, 2006. The Company's consolidated financial statements as of and for the fiscal years ended February 2, 2008 and February 3, 2007 reflect the impact of SFAS No. 123R.

The following weighted average assumptions were used in the Black-Scholes option pricing model to estimate the grant date fair value of awards granted:

| | For the years ended | |
| --- | --- | --- |
| | February 2, 2008 | February 3, 2007 |
| Expected term (in years) | 3.8 | 4.1 |
| Expected volatility | 63.3% | 68.4% |
| Risk-free interest rate | 4.3% | 4.8% |
| Dividend yield | 0.0% | 0.0% |
| Weighted average fair value of options granted | $ 0.59 | $ 1.82 |

The weighted average expected term reflects the period of time for which options are expected to be outstanding. That is, from grant date to expected exercise or other expected settlement. The Company's calculation of expected term is based on historical experience of its option plans as well as expectations of future employee

F-12

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

stock option behavior. The expected volatility of the Company's stock price is based on the actual historical volatility over a period that is commensurate to the expected term of the option. The risk-free interest rate is based on the average implied yield on U.S. Treasury instruments with a term approximating the expected term of the option. The expected dividend yield is zero, as the Company has not declared a dividend in the past and the ability to pay cash dividends in the future is limited by certain provisions in the Company's senior credit facility.

The Company's SFAS No. 123R fair value calculations are based on a single-option valuation approach and applicable compensation cost is recognized on a straight-line basis over the vesting period of the stock-based award. A similar approach was taken for periods prior to January 29, 2006 under SFAS No. 123 for the required pro forma disclosures. In addition, the amount of stock-based compensation cost recognized during a period is based on the value of the portion of the awards that are ultimately expected to vest. SFAS No. 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In the pro forma disclosures required under SFAS No. 123 for the period prior to 2006, the Company factored estimated forfeitures as of the grant date into the compensation expense to be recognized. Pursuant to SFAS No. 123R, the stock-based compensation expense recognized in 2007 and 2006 has been reduced for estimated forfeitures. The estimated forfeiture rate is based on historical experience of the Company's option plans and any adjustment to the forfeiture rate in the future will result in a cumulative adjustment in the period that this estimate is changed. Ultimately, the total compensation expense recognized for any given stock-based award over its vesting period will only be for those shares that actually vest.

Stock-based compensation expense recognized under SFAS No. 123R for 2007 and 2006 totaled $1.6 million and $2.3 million, respectively, before income taxes primarily for expenses related to employee stock options. All of the Company's stock-based compensation is recognized as part of selling, general and administrative expenses.

In addition to the recognition of expense in the financial statements, under SFAS No. 123R, any excess tax benefits received upon exercise of options are to be presented as financing activity inflow in the statement of cash flows. Prior to the adoption of SFAS No. 123R, all tax benefits resulting from the exercise of stock options were included as operating cash flows. However, due to Wilsons Leather's net operating loss carryforward position and the valuation allowance recorded against the Company's deferred tax assets, there is no cash flow effect for any excess tax benefits from stock option exercises for 2007 or 2006. Excess tax benefits will be recorded when a deduction realized for income tax purposes related to settlement of a stock-based award exceeds the compensation costs recognized for financial reporting purposes.

*New accounting pronouncements*

In July 2006, the Financial Accounting Standards Board ("FASB") issued Financial Interpretation No. 48, Accounting for Uncertainty in Income Taxes - an interpretation of FASB Statement No. 109 ("FIN 48"). FIN 48 clarifies the accounting for and disclosure of uncertainty in income taxes recognized in accordance with SFAS No. 109, Accounting for Income Taxes. FIN 48 prescribes a recognition threshold and measurement attribute for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, and disclosure. In May 2007, the FASB issued Staff Position No. 48-1, Definition of Settlement in FASB Interpretation No. 48 ("FIN 48-1"), which is an amendment to FIN 48. FIN 48-1 provides guidance on how an enterprise should determine whether a tax position is effectively settled for the purpose of recognizing previously unrecognized tax benefits. The Company adopted FIN 48 and FIN 48-1 in the first quarter of fiscal 2007 resulting in an insignificant reduction of its tax reserves.

In September 2006, the FASB issued SFAS No. 157, Fair Value Measurements ("SFAS No. 157"), which is effective for fiscal years beginning after November 15, 2007 and for interim periods within those years. In November 2007, the FASB deferred, for one year, the fair value measurement requirements for non-financial assets and liabilities that are not required or permitted to be measured at fair value on a recurring basis. This statement

F-13

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

defines fair value, establishes a framework for measuring fair value and expands the related disclosure requirements. The Company is currently evaluating the impact of SFAS No. 157 on its consolidated financial statements.

In February 2007, the FASB issued SFAS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities — Including an Amendment of FASB Statement No. 115 ("SFAS 159"). SFAS 159 permits entities to choose to measure many financial assets and financial liabilities at fair value. Unrealized gains and losses on items for which the fair value option has been elected are reported in earnings. SFAS 159 is effective for fiscal years beginning after November 15, 2007. The Company is currently assessing the impact of SFAS 159 on its consolidated financial statements.

### 2  Liquidity/going concern

The Company has incurred net losses of $77.5 million and $33.1 million and used $28.2 million and $14.6 million in cash for operating activities during 2007 and 2006, respectively. In addition, the Company's $45.6 million cash balance at the beginning of 2006 has decreased to $7.4 million at the end of 2007. The Company's senior credit facility was amended on February 14, 2008. The amendment, among other things, allowed for the liquidation of 158 stores, revised the borrowing base by adding a $10.0 million reserve, prohibits borrowing under the revolving line of credit until the Company provides projections and a business plan that are acceptable to its lender, and requires a monthly appraisal of the Company's inventory. In order to execute its go forward plans, the Company will need to amend some of the restrictions in its current credit facility, or find alternative sources of credit, and raise additional capital during the second quarter of 2008. The Company is pursuing possible sources of funding, including possible sales of existing assets. However, there can be no assurance that additional funding will be available or can be obtained on terms that are favorable to the Company, or at all. The Company has not received an indication from the lender in its current credit facility that the lender will agree to amend the terms of the facility. If the Company is not able to obtain additional capital in the second quarter of 2008, it will not be able to continue its operations outside of bankruptcy. Under certain bankruptcy events, the Company may be required to redeem shares of its Preferred Stock at their liquidation value, which is the $45 million purchase price for those shares plus any accrued but unpaid dividends. However, the redemption would not be permitted by law, unless the Company is able to pay its debts as they come due, and would be prohibited by the terms of its existing credit facility. The Company's financial statements do not include any adjustments that might result from the outcome of this uncertainty.

### 3  Accounts receivable

Accounts receivable consisted of the following (in thousands):

|  | February 2, 2008 | February 3, 2007 |
|---|---|---|
| Trade receivables | $3,238 | $2,359 |
| Other receivables | 388 | 929 |
| Total | 3,626 | 3,288 |
| Less—Allowance for doubtful accounts | (48) | (71) |
| Less—Deferred sales[1] | (116) | (85) |
| Total | $3,462 | $3,132 |

---

(1)    Deferred in-transit e-commerce sales.

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**4   Other assets**

Other assets consisted of the following (in thousands):

|  | February 2, 2008 | February 3, 2007 |
|---|---|---|
| Debt issuance costs | $ 4,578 | $ 5,219 |
| Less—Accumulated amortization | (3,763) | (4,027) |
| Debt issuance costs, net | 815 | 1,192 |
| Other intangible assets, net | — | 58 |
| Total | $   815 | $ 1,250 |

Other intangible assets are being amortized over periods of five to 15 years. Amortization expense related to other intangible assets for the year ended February 2, 2008 was insignificant. These intangible assets were written down to zero in 2007, as the assets no longer had any value to the Company's go-forward business.

**5   Property and equipment**

Property and equipment consisted of the following (in thousands):

|  | February 2, 2008 | February 3, 2007 |
|---|---|---|
| Equipment and furniture | $ 66,324 | $ 74,420 |
| Leasehold improvements | 31,373 | 42,700 |
| Total | 97,697 | 117,120 |
| Less—Accumulated depreciation and amortization | (84,016) | (78,230) |
| Net property and equipment | $ 13,681 | $ 38,890 |

**6   Accrued expenses**

Accrued expenses consisted of the following (in thousands):

|  | February 2, 2008 | February 3, 2007 |
|---|---|---|
| Compensation and benefits | $ 4,708 | $ 5,137 |
| Taxes other than income taxes | 1,893 | 2,002 |
| Rent | 2,722 | 2,695 |
| Other | 3,395 | 4,700 |
| Total | $12,718 | $14,534 |

**7   Long-term debt**

Long-term debt consisted of the following (in thousands):

|  | February 2, 2008 | February 3, 2007 |
|---|---|---|
| Term B promissory note | $   — | $20,000 |
| Less—Current portion | — | — |
| Total long-term debt | $   — | $20,000 |

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Senior credit facility and Term B promissory note*

General Electric Capital Corporation ("GECC") has provided the Company with a senior credit facility, as amended, that provides for borrowings of up to $115.0 million in aggregate principal amount, including a $75.0 million letter of credit subfacility. The senior credit facility expiration is June 30, 2010, at which time all borrowings become due and payable.

The senior credit facility is collateralized by the Company's inventory, equipment, credit card and wholesale receivables, and substantially all other personal property. GECC has the right to appraise the Company's inventory monthly to determine the value of the Company's eligible inventory as if sold in an orderly liquidation, which is then used to establish borrowing limits under the senior credit facility. During 2006, through December 28, 2006, interest was payable on revolving credit borrowings at variable rates determined by the applicable LIBOR plus 1.25% to 1.75%, or the prime rate plus 0.0% to 0.5% (commercial paper rate plus 1.25% to 1.75% if the loan is made under the "swing line" portion of the revolver). As of December 29, 2006, interest is payable on revolving credit borrowings at variable rates determined by the applicable LIBOR plus 1.25% to 1.75%, or the prime rate plus 0.0% to 0.5% (commercial paper plus 1.25% to 1.75% if the loan is made under the "swing line" portion of the revolver). The applicable margins will be adjusted quarterly on a prospective basis as determined by the previous quarters' ratio of borrowings to borrowing availability. The Company pays monthly fees of 0.25% per annum on the unused portion of the senior credit facility, as defined, and per annum fees on the average daily amount of letters of credit outstanding during each month ranging from .625% to .875% in the case of trade letters of credit and from 1.25% to 1.75% in the case of standby letters of credit. Such fees are subject to quarterly adjustment in the same manner as our interest rate margins. Any reduction of the revolving credit borrowing capacity of the senior credit facility is subject to prepayment fees under most circumstances. Any such reduction would be subject to a 0.37% prepayment fee if the reduction is made on or prior to June 30, 2008, and a 0.185% prepayment fee if prepayment were made after June 30, 2008 but on or prior to December 31, 2008. After December 31, 2008, the revolving credit portion of the senior credit facility is prepayable without penalty.

The senior credit facility contains certain restrictions and covenants, which, among other things, restrict the Company's ability to acquire or merge with another entity; make investments, loans or guarantees; incur additional indebtedness; create liens or other encumbrances; or pay cash dividends or make other distributions. An amendment on June 15, 2007 specifically allowed for the Preferred Stock and Warrant financing discussed in Note 9, "Preferred stock and warrant financing," below. At February 2, 2008, the Company was in compliance with all covenants related to the senior credit facility. The Company is dependent on the senior credit facility to fund working capital and letter of credit needs. The Company will need to amend some of the restrictions in its current credit facility, or find alternative sources of credit, and raise additional capital during the second quarter in order to fund its working capital needs and continue its operations outside of bankruptcy. Under certain bankruptcy events, the Company may be required to redeem shares of its Preferred Stock at their liquidation value, which is the $45 million purchase price for those shares plus any accrued but unpaid dividends. However, the redemption would not be permitted by law, unless the Company is able to pay its debts as they come due, and would be prohibited by the terms of its existing credit facility.

At February 2, 2008 and February 3, 2007, there were no borrowings under the revolving portion of the senior credit facility. At February 2, 2008 and February 3, 2007, there were $12.2 million and $3.8 million, respectively, in letters of credit outstanding. At February 2, 2008, based on a formula, the Company had $21.0 million available under the revolving portion of the senior credit facility.

Prior to an amendment dated June 15, 2007, the senior credit facility provided for borrowings of up to $135.0 million in aggregate principal amount that included a $20.0 million Term B promissory note. The Term B promissory note was collateralized by the Company's equipment and was due and payable upon the expiration of the senior credit facility on June 30, 2010. Interest was payable on the Term B promissory note at a variable rate equal to the LIBOR plus 4.0%. The $20.0 million balance was repaid on June 15, 2007, without a prepayment fee per the consent of the senior lenders, with proceeds from the Preferred Stock and Warrant financing discussed below

F-16

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(See Note 9, "Preferred stock and warrant financing"). The Term B promissory note had a balance of $20.0 million on February 3, 2007.

**8    Income taxes**

The income tax provision (benefit) is comprised of the following (in thousands):

|  | For the years ended | |
|---|---|---|
|  | February 2, 2008 | February 3, 2007 |
| Current | | |
| Federal.................................. | $ — | $(2,708) |
| State ................................... | (60) | (1,836) |
| Deferred................................. | 503 | 167 |
| Total................................... | $443 | $(4,377) |

Reconciliations between the provision (benefit) for income taxes and the amount computed by applying the U.S. federal statutory income tax rate are as follows (in thousands):

|  | For the years ended | |
|---|---|---|
|  | February 2, 2008 | February 3, 2007 |
| Tax at statutory rate (35)% ........................... | $(26,985) | $(13,115) |
| State income taxes, net of federal benefit ................. | (4,850) | (3,076) |
| Change in valuation allowance ......................... | 31,862 | 12,188 |
| Adjustment of deferred tax balances ..................... | 503 | 167 |
| Adjustment of tax contingency reserves .................. | (167) | (947) |
| Other................................................ | 80 | 406 |
| Total ............................................ | $ 443 | $ (4,377) |

During 2007, the Company released state tax reserves of $0.2 million due to the adoption of FIN 48 and expiration of statutes of limitations. During 2006, the Company released state tax reserves of $0.9 million due to the expiration of statutes. Reconciliations of the U.S. federal statutory income tax rate to the effective rate are as follows:

|  | For the years ended | |
|---|---|---|
|  | February 2, 2008 | February 3, 2007 |
| Statutory rate ....................................... | (35.0)% | (35.0)% |
| State income taxes .................................... | (6.3)% | (8.2)% |
| Change in valuation allowance ......................... | 41.3% | 32.5% |
| Adjustment of deferred tax balances ..................... | 0.7% | 0.4% |
| Adjustment of tax contingency reserve ................... | (0.2)% | (2.5)% |
| Other................................................ | 0.1% | 1.1% |
| Total ............................................ | 0.6% | (11.7)% |

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the net deferred tax asset and liability were as follows (in thousands):

|  | February 2, 2008 | February 3, 2007 |
|---|---|---|
| Net deferred tax asset (liability) — current |  |  |
| Accrued liabilities | $  1,989 | $  1,854 |
| Inventories | (14,100) | (3,641) |
| Other | (150) | (469) |
| Less—Valuation allowance | 11,538 | 2,036 |
| Total deferred tax liability — current | (723) | (220) |
| Net deferred tax asset (liability) — long-term |  |  |
| Accrued liabilities | 7,746 | 5,408 |
| State net operating loss carryforwards | 12,191 | 6,556 |
| Property and equipment | 5,942 | 842 |
| Federal net operating loss | 47,897 | 19,606 |
| Other | 606 | 606 |
| Less — Valuation allowance | (74,382) | (33,018) |
| Total deferred tax asset (liability) — long-term | — | — |
| Net deferred tax liability | $    (723) | $    (220) |

The Company had historically filed its federal and state income tax returns based on a 52/53 week year ending on the Saturday closest to July 31. The Company elected to conform its tax year end with its fiscal year end as of February 3, 2007. As of the tax year ended February 2, 2008, the Company had federal net operating loss carryforwards of $136.1 million that expire in 2023, 2024, 2026, 2027, and 2028. In addition, the Company had state net operating loss carryforwards that expire at varying dates through 2028. The Company has not recorded a tax benefit on any of the federal or state tax loss carryforwards, as a full valuation allowance offsets these assets.

The ability to utilize net operating loss carryforwards to reduce future taxable income is limited under various provisions of the Internal Revenue Code, including Section 382. Based on the most recent analysis, the Company has determined that changes in ownership under this section have occurred on June 4, 2003 and May 30, 2006. These ownership changes result in $37.0 million of the total $136.1 million net operating loss carryforwards being limited. On an annual basis, approximately $4.1 million of the Section 382 limited net operating loss will become available to offset future taxable income during the carryforward periods. Subsequent changes in ownership could further limit the utilization of the federal and state net operating loss carryforwards, which could result in expiration of the loss carryforwards prior to their utilization.

In evaluating the Company's ability to recover deferred tax assets, the Company has considered all available positive and negative evidence including: past operating results, the existence of cumulative losses in the most recent fiscal years, forecasts of future taxable income including the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. In light of the cumulative losses in recent years, the Company believes that it is more likely than not that the Company's net deferred tax asset will not be realized. Accordingly, a full valuation allowance has been recorded against the Company's net deferred tax assets. Of the total valuation allowance, approximately $0.3 million will be allocated directly to equity if and when that portion of the valuation allowance is reversed.

F-18

**WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In July 2006, the FASB issued FIN 48. FIN 48 prescribes a recognition threshold and measurement attribute for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, and disclosure. FIN 48 is effective for fiscal years beginning after December 15, 2006. The Company's adoption of FIN 48 in the first quarter of its 2007 fiscal year resulted in an insignificant reduction of its tax reserves, which was recorded to earnings. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (in thousands):

|  | For the year ended February 2, 2008 |
|---|---|
| At adoption — February 4, 2007 | $ 889 |
| Additions based on tax positions of current year | 24 |
| Additions for tax positions of prior years | — |
| Reductions for tax provisions of prior years | — |
| Settlements | — |
| Lapse in statute of limitations | (112) |
| Balance at February 2, 2008 | $ 801 |
| Total reserve | $1,367 |
| Difference | $ (566) |
| Interest and penalties | $ 566 |
| At adoption — February 4, 2007 | $ 558 |
| Increase — penalty | 1 |
| Increase — interest | 44 |
| Decrease — penalty | (14) |
| Decrease — interest | (23) |
| Interest and penalties at February 2, 2008 | $ 566 |

**9    Preferred stock and warrant financing**

On June 1, 2007, the Company entered into a Securities Purchase Agreement (the "Purchase Agreement") that provided for the sale of 45,000 shares of Series A Convertible Preferred Stock (the "Preferred Stock") and warrants to purchase 15 million shares of common stock (the "Warrants") for a total purchase price of $45.0 million to four institutional investors (the "Preferred Stock and Warrant financing"). The Purchase Agreement required that, prior to closing, the Company should have filed the Certificate of Designations for the Series A Convertible Preferred Stock (the "Certificate of Designations") to establish this new class of shares. The new class of securities was established and the Preferred Stock and Warrant financing transaction closed on June 15, 2007.

The Preferred Stock is initially convertible into shares of common stock at a conversion price of $1.50 per share, or 30 million total shares of common stock. Going forward, the number of shares of common stock issuable upon conversion of the Preferred Stock at any time is equal to the stated value of each share of Preferred Stock ($1,000) divided by the conversion price then in effect. As of February 2, 2008, there were 46,667 shares of Preferred Stock outstanding that were convertible into 31.1 million shares of common stock. The Warrants to purchase an aggregate of 15 million shares of the Company's common stock are exercisable at a price of $2.00 per share and are exercisable for five years from the date of issuance, June 15, 2007. The Preferred Stock and the Warrants are subject to certain adjustments as defined in the Certificate of Designations and the form of Warrant. These adjustments relate to certain events including consolidations, mergers, stock dividends, stock splits, reclassifications or other changes in the corporate structure of the Company. The Preferred Stock and the Warrants

F-19

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

also provide for anti-dilution adjustments in the event of stock issuances below either the Company's then current common stock market price or the then applicable conversion price or exercise price. The holders of the Preferred Stock and the Warrants have certain demand and incidental registration rights with respect to the shares of common stock issuable upon conversion of the Preferred Stock and exercise of the Warrants.

The Preferred Stock is entitled to payment-in-kind cumulative dividends of 8.0% per year, issuable semi-annually, payable in shares of Preferred Stock. On December 1, 2007, dividends representing 1,667 shares of Preferred Stock were declared and were recorded at a fair value of $2.2 million and recorded in Preferred Stock and charged to additional paid-in capital in the accompanying consolidated balance sheets. The beneficial conversion feature of the declared dividend of $0.3 million was recorded in common shareholders paid-in capital. As of February 2, 2008, dividends representing an additional 643 shares of Preferred Stock since the December 1, 2007 dividend declaration have been accrued at a fair value of $0.8 million and recorded in preferred stock and charged to additional paid-in capital in the accompanying consolidated balance sheets. The beneficial conversion feature of the accrued dividend ($0.2 million) has been recorded in common shareholders' paid-in capital. Dividends on the Preferred Stock are reflected as a reduction of net income (increase in net loss) available to common shareholders in calculating earnings (loss) per share.

The Preferred Stock has certain redemption features that may require the Company to redeem the Preferred Stock at its liquidation value upon the occurrence of certain events. The triggering events that may lead to redemption, at the election of the holders of the Preferred Stock, are defined in the Certificate of Designations and include: conversion defaults, indebtedness defaults, events of bankruptcy, certain judgments against the Company, and uncured breaches of any representations, covenants or other conditions of the documents related to the Preferred Stock and Warrant financing that would have a material adverse effect on the Company. As of February 2, 2008, no such triggering events had transpired. In addition, the Company has the option to redeem the Preferred Stock beginning on June 1, 2010 if the Company's common stock is trading above a specified price and the Company has an effective registration statement for the resale of the common stock issuable upon conversion of the Preferred Stock.

Because the Preferred Stock includes redemption features that have the potential to be outside the control of the Company, the Company has classified the Preferred Stock outside of shareholders' equity in accordance with Emerging Issues Task Force ("EITF") Topic D-98, Classification and Measurement of Redeemable Securities ("EITF Topic D-98"). In accordance with EITF Topic D-98, the fair value allocated to the Preferred Stock at the date of issuance was recorded outside of common shareholders' equity in the accompanying consolidated balance sheets.

In conjunction with the issuance of the Preferred Stock and Warrants, the Company received gross proceeds of $45.0 million and incurred $3.7 million in financing and other costs, including a 1.0% transaction fee paid to the lead investor and reimbursement of $0.5 million of expenses incurred by the lead investor in connection with the transaction, resulting in net proceeds of $41.3 million. The remaining proceeds were used by the Company to repay its $20.0 million Term B promissory note and for general working capital purposes. The net proceeds were allocated to the Preferred Stock and Warrants based on their relative fair values. The Warrants were valued using the Black-Scholes model with the following assumptions: (1) common stock fair value of $1.78 per share, (2) expected volatility of 65.0%, (3) risk-free interest rate of 5.04%, (4) expected term of five years, and (5) no dividends, which resulted in a fair value of $11.0 million and a relative fair value allocation of $5.3 million that was recorded in additional paid-in capital.

In addition, in accordance with EITF No. 00-27, Application of Issue No. 98-5 to Certain Convertible Instruments, ("EITF No. 00-27"), the Company compared the proceeds allocated to the Preferred Stock to the fair value of the common stock that would be received upon conversion to determine if a beneficial conversion feature existed. The Company determined that a beneficial conversion feature of $14.9 million existed and, pursuant to EITF No. 00-27, recorded the full discount to common shareholders' additional paid-in capital classified within permanent equity, as it was immediately convertible at issuance. In accordance with EITF No. 98-5, Accounting for

F-20

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Convertible Securities with Beneficial Conversion Features or Contingently Adjustable Conversion Ratios, the beneficial conversion feature is analogous to a dividend and is included as a return to the Preferred Stock holders and reflected as a reduction of net income (increase in net loss) available to common shareholders in calculating loss per share.

The initial carrying value of the Preferred Stock, including allocated net proceeds, was $36.0 million. As of February 2, 2008, the carrying value of the Preferred Stock was $39.0 million, which includes $3.0 million of the total $3.4 million of payment-in-kind declared dividends accrued to date.

The Preferred Stock has a preference upon liquidation of the Company. The value of the liquidation preference is equal to $1,000 per share of Preferred Stock, the holders' initial investment, plus all accrued and unpaid dividends.

The holders of the Preferred Stock have the same voting rights as common shareholders on an as-converted basis. Each share of Preferred Stock will be entitled to the number of votes equal to the number of shares of common stock into which such shares of Preferred Stock could be converted.

In connection with the issuance of the Preferred Stock and Warrants upon closing of the Purchase Agreement, the number of shares of common stock and exercise price per share of common stock of the warrants issued by the Company in April and July of 2004 was adjusted pursuant to the anti-dilution provisions of those warrants, as amended. As a result of the triggering of these anti-dilution provisions, the exercise price per share was reduced from $3.00 to $2.39 and the aggregate number of shares of common stock issuable upon exercise of such warrants was increased by approximately 1.0 million shares to approximately 5.0 million shares (See Note 11, "Warrants"). Pursuant to the guidance under EITF No. 96-18, Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services, the Company measured the fair value of the warrants prior to the anti-dilution adjustments and after such adjustments using the Black-Scholes model. These estimates reflected an increase in fair value of $1.0 million that was recorded as a return to the warrant holders and treated similar to a preferred share dividend and reflected as an increase in net loss available to common shareholders in calculating earnings (loss) per share.

## 10    Employee stock benefit plans

*Stock options*

The Company has adopted the amended 1996 Stock Option Plan (the "1996 Plan"), the 1998 Stock Option Plan (the "1998 Plan") and the Amended and Restated 2000 Long Term Incentive Plan (the "2000 Plan")(collectively the "Plans"), pursuant to which options to acquire an aggregate of 6,450,000 shares of its common stock may be granted. As of February 2, 2008, the 1996 Plan had expired and no future awards may be granted under it. In addition, with the adoption of the 2000 Plan, no further grants are to be made under the 1998 Plan.

The Compensation Committee of the board of directors is responsible for administering the Plans and approves grants in connection therewith. The 2000 Plan provides that the Compensation Committee may grant incentive stock options, non-qualified stock options, stock appreciation rights, non-vested shares (restricted stock), performance share awards, and other stock-based awards, and determine the terms and conditions of each grant. All outstanding stock options granted since the Company became a publicly held corporation have been granted at an option price equal to the fair market value of the common stock on the date of grant and generally vest, cumulatively, on a prorated basis on the first, second and third anniversaries from the date of the grant and expire five to 10 years from the date of grant. In addition, the stock options generally provide for accelerated vesting if there is a change in control (as defined in the Plans).

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following is a summary of stock option information, weighted average exercise prices and remaining contractual life (in years) for the Company's stock option plans:

| | As of and for the years ended | | | | | |
|---|---|---|---|---|---|---|
| | February 2, 2008 | | | | February 3, 2007 | |
| | Shares | Weighted Average Exercise Price | Weighted Average Remaining Life | | Shares | Weighted Average Exercise Price |
| Outstanding, beginning of year | 2,722,247 | $5.50 | | | 3,470,736 | $ 6.79 |
| Granted | 978,000 | $1.16 | | | 429,000 | $ 3.20 |
| Exercised | — | $ — | | | (44,040) | $ 2.92 |
| Forfeited | (394,663) | $4.05 | | | (380,329) | $ 5.52 |
| Expired | (314,933) | $6.29 | | | (753,120) | $10.28 |
| Outstanding, end of year | 2,990,651 | $4.19 | 3.5 | | 2,722,247 | $ 5.50 |
| Exercisable, end of year | 1,471,660 | $5.77 | 3.4 | | 1,122,283 | $ 6.10 |
| Available for grant, end of year | 936,551 | | | | 1,439,568 | |

During 2007, no options were exercised. As of February 2, 2008, total unrecognized compensation costs related to unvested stock-based awards was approximately $1.0 million, which is expected to be recognized over a weighted average vesting period of approximately two years.

The following table summarizes information about the weighted average remaining contracted life (in years), the weighted average exercise prices and the aggregate intrinsic value for stock options outstanding as of February 2, 2008:

| | Options Outstanding and Exercisable by Price Range as of February 2, 2008 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Options Outstanding | | | | Options Exercisable | | | |
| Range of Exercise Prices | Number of Options | Weighted Average Remaining Life | Weighted Average Exercise Price | Aggregate Intrinsic Value | Number of Options | Weighted Average Exercise Price | Aggregate Intrinsic Value | |
| $ 0.00 - $ 2.07 | 967,000 | 4.2 | $ 1.15 | $— | — | $ — | $— | |
| $ 2.07 - $ 4.14 | 288,084 | 3.4 | $ 3.20 | — | 154,427 | $ 3.28 | — | |
| $ 4.14 - $ 6.21 | 1,541,331 | 3.2 | $ 5.69 | — | 1,165.996 | $ 5.63 | — | |
| $ 6.21 - $ 8.28 | 138,414 | 2.6 | $ 6.72 | — | 95,415 | $ 6.72 | — | |
| $ 8.28 - $10.34 | 8,028 | 0.5 | $ 9.33 | — | 8,028 | $ 9.33 | — | |
| $10.34 - $12.41 | 8,288 | 0.5 | $11.19 | — | 8,288 | $11.19 | — | |
| $12.41 - $14.48 | 8,550 | 2.4 | $14.16 | — | 8,550 | $14.16 | — | |
| $14.48 - $16.55 | 30,431 | 2.2 | $16.03 | — | 30,431 | $16.03 | — | |
| $16.55 - $18.62 | 525 | 2.4 | $16.94 | — | 525 | $16.94 | — | |
| | 2,990,651 | 3.5 | $ 4.19 | $— | 1,471,660 | $ 5.77 | $— | |

The aggregate intrinsic value in the preceding table represents the total pretax intrinsic value of in-the-money stock options based on Wilsons Leather's closing stock price of $0.69 as of February 2, 2008, which would have been received by the option holders had all such options been exercised as of that date. As of February 2, 2008, based on the weighted average exercise price, there were no outstanding in-the-money stock options.

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

A summary of the Company's unvested stock options as of February 2, 2008 and changes during the year ended February 2, 2008 is as follows:

| | Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Unvested, beginning of period | 1,599,964 | $2.92 |
| Granted | 978,000 | $0.59 |
| Vested | (664,310) | $3.15 |
| Forfeited | (394,663) | $2.34 |
| Unvested, end of period | 1,518,991 | $1.47 |

*Non-vested shares and other stock-related awards*

The Company can and has awarded non-vested share awards (restricted stock grants) to selected employees under the 2000 Plan. These non-vested share awards generally vested ratably over four years from the date of grant, subject to acceleration if certain performance targets were met. As of July 2004, all unvested outstanding non-vested share awards became vested due to a change in control pursuant to the Company's Plans, defined above. There have been no non-vested share awards granted since that time. Under SFAS No. 123R, the fair value of any future non-vested share awards will be estimated on the grant date based on the then current market value of the Company's stock and will be amortized to compensation expense on a straight-line basis over the related vesting period. The total number of non-vested share awards expected to vest will be adjusted by an estimated forfeiture rate.

Under the 2000 Plan, the Company may also issue other stock-based awards. Beginning with the Company's Annual Meeting of Shareholders held on June 1, 2006, each member of the Board of Directors who is not an officer or employee of the Company is entitled to receive one-half of their $25,000 annual retainer in unrestricted shares of the Company's common stock. In the second quarter of 2007, 53,219 shares of the Company's common stock were issued as annual retainers. In the second quarter of 2006, 17,120 shares of the Company's common stock were issued as annual retainers. These fully vested shares were issued based on the fair market value of the Company's common stock on the day preceding the applicable Annual Meeting of Shareholders, $1.46 and $3.65 for 2007 and 2006, respectively. The non-employee directors representing the investors in the Preferred Stock and Warrant financing described in Note 9, "Preferred stock and warrant financing," do not receive any director compensation.

*Employee stock purchase plan*

The Company has an employee stock purchase plan ("ESPP") that is qualified under Section 423 of the Internal Revenue Code of 1986. Employees are entitled to have payroll deductions withheld that are used to purchase company stock at a 15% discount at defined times during the year. The Company has allowed for 625,000 shares of common stock to be purchased under the ESPP. As of February 2, 2008, 507,035 shares had been issued under the plan and 117,965 were available for future issuance. Prior to January 29, 2006, under APB No. 25, the Company was not required to recognize stock-based compensation expense for the cost of stock options or shares issued under the ESPP. However, based on the provisions of the ESPP regarding purchase discounts, the plan is deemed compensatory under SFAS No. 123R. As such, compensation expense is recognized for the fair value of the option features of the ESPP purchases subsequent to January 29, 2006. The ESPP fair value is estimated using the Black-Scholes option pricing model with applicable assumptions and input variables. Stock-based compensation expense recognized under SFAS No. 123R during 2007 and 2006 related to the ESPP was insignificant.

F-23

## WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**11    Warrants**

The Company has from time-to-time issued warrants to purchase its common stock to certain parties who have invested in the Company. All of the outstanding warrants contain anti-dilution rights relating to certain events as defined in the applicable warrant agreements including but not limited to, issuance of common shares below either the market price and/or warrant exercise price, consolidations, mergers, stock dividends, stock splits and other similar events. The warrants are equity classified and amounts attributable to the warrants are classified within additional paid-in capital. As of February 2, 2008, warrants to purchase a total of 20,022,364 shares of the Company's common stock were issued and outstanding, as follows:

|  | | As of February 2, 2008 | | |
|---|---|---|---|---|
|  | Exercise Price | Shares | Weighted Average Exercise Price | Weighted Average Remaining Life |
| Warrants issued April 25, 2004[1] | $  2.39 | 2,511,182 | $2.39 | 1.23 |
| Warrants issued July 2, 2004[1] | $  2.39 | 2,511,182 | $2.39 | 1.41 |
| Warrants issued June 15, 2007[2] | $  2.00 | 15,000,000 | $2.00 | 4.37 |
| Outstanding, end of period | $2.00-$2.39 | 20,022,364 | $2.10 | 3.60 |
| Exercisable, end of period | $2.00-$2.39 | 20,022,364 | $2.10 | 3.60 |

(1)  In connection with an equity financing transaction completed in July of 2004, the Company issued four million warrants exercisable for five years to certain institutional investors at an exercise price of $3.00 per share of the Company's common stock. Pursuant to the anti-dilution provisions of the terms of these warrants, as a result of the June 2007 Preferred Stock and Warrant financing (see Note 9, "Preferred stock and warrant financing"), the exercise price of the warrants was reduced to $2.39 and the number of underlying shares of common stock increased from 4,000,000 to 5,022,364.

(2)  These warrants were issued in conjunction with the June 2007 Preferred Stock and Warrant financing and are exercisable for five years.

**12    401(k) profit sharing plan**

The Company has a defined contribution 401(k) profit sharing plan for eligible employees, which is qualified under Sections 401(a) and 401(k) of the Internal Revenue Code of 1986. Employees are entitled to make tax deferred contributions of up to 30% of their eligible compensation, subject to annual IRS limitations. As of January 1, 2006, for employees who have worked more than one year, the Company matches 100% of contributions, up to a maximum of 3% of the employee's eligible compensation and 50% of contributions up to the next 2% of eligible compensation. These Company matching contributions are 100% vested when made. Prior to January 1, 2006, for employees who had worked less than three years but more than one year, the Company matched 25% of contributions, up to a maximum of 4% of the employee's eligible compensation and for employees who had worked more than three years, the Company matched 50% of contributions, up to a maximum of 4% of the employee's eligible compensation. These Company matching contributions vest after three years of service or upon death of the employee. Company contributions net of forfeitures were approximately $0.6 million and $0.5 million in 2007 and 2006, respectively. The Company may also, at its discretion, make a profit sharing contribution to the 401(k) plan for each plan year. The Company's profit sharing contributions vest after five years. No profit sharing contributions were made during 2007 or 2006.

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**13   Commitments and contingencies**

*Leases*

The Company has noncancelable operating leases, primarily for retail stores, which expire through 2017. A limited number of the leases contain renewal options for periods ranging from one to five years. These leases generally require the Company to pay costs, such as real estate taxes, common area maintenance costs and contingent rentals based on sales. Net rental expense for all operating leases, excluding real estate taxes and common area maintenance costs, was as follows (in thousands):

|  | For the years ended | |
|---|---|---|
|  | February 2, 2008 | February 3, 2007 |
| Minimum rentals | $35,534 | $36,755 |
| Contingent rentals | 919 | 1,110 |
| Total | $36,453 | $37,865 |

As of February 2, 2008, the future minimum net rental payments due under operating leases were as follows (in thousands):

The Company is in the process of negotiating lease terminations for the liquidation stores and expects to reach settlement with its landlords during 2008.

|  | Continuing Operations |
|---|---|
| Fiscal years ending: |  |
| 2008 | $ 22,009 |
| 2009 | 20,490 |
| 2010 | 17,924 |
| 2011 | 14,070 |
| 2012 | 9,605 |
| Thereafter | 26,400 |
| Total | $110,498 |

*License agreements*

The Company has entered into license agreements that provide for royalty payments ranging from 1.0% to 17.0% of net sales or a flat dollar amount per unit purchased of the applicable licensed products. During the fourth quarter of 2007 the Company determined that it would no longer go forward with merchandise related to these agreements, and accordingly, accrued all minimum shortfalls through 2007 as well as 2008 minimum requirements. Minimum royalty payments required under these agreements, all of which were accrued as of February 2, 2008, are $0.8 million.

*Litigation*

In September 2005, the Company became aware of a kickback scheme involving its General Manager — Asia and certain vendors. On October 4, 2005, the General Manager — Asia admitted that he had received kickbacks from certain vendors over a period of eight years aggregating nearly $4.0 million. The General Manager — Asia was terminated and the Company's Audit Committee and outside auditors were informed of the acknowledged kickbacks and the termination. On October 14, 2005, the Company's Audit Committee retained outside counsel, and outside counsel investigated the extent of the kickback scheme, whether other employees were involved in or had knowledge of the kickbacks or similar arrangements and whether any violations of the Foreign Corrupt

F-25

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Practices Act had occurred in connection with the kickback arrangements. The investigation by outside counsel did not indicate that any employee other than the General Manager— Asia was involved in, or had previous knowledge of, the kickback scheme or similar arrangements or that there were any violations of the Foreign Corrupt Practices Act. The investigation also did not indicate that the magnitude of the kickbacks exceeded, or were less than, the nearly $4.0 million acknowledged by the former General Manager — Asia. Subsequent to his termination, the former General Manager — Asia paid Wilsons Leather approximately $0.5 million, which was recorded as a reduction of cost of sales in 2005. The acknowledged kickback arrangements did not have a material impact on the Company's previously issued financial statements.

The Company brought a civil lawsuit in U.S. District Court against the former General Manager — Asia and the Company's theft coverage insurance carrier in May 2007. In December 2007, the lawsuit was settled for payments to the Company in the aggregate amount of $1.6 million. This was recorded as a reduction of cost of sales in the fourth quarter of 2007.

The Company is involved in various other legal actions arising in the ordinary course of business. In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on the Company's consolidated financial position and results of operations.

*Guarantees*

As of February 2, 2008 and February 3, 2007, the Company had outstanding letters of credit of approximately $12.2 million and $3.8 million, respectively, which were primarily used to guarantee foreign merchandise purchase orders. See Note 7, "Long-term debt."

*Gain contingency*

In December 2006, the Company received $0.6 million from the VISA/MasterCard antitrust litigation settlement concerning alleged wrongful inflation of interchange fees. The Company recorded a gain of $0.6 million in the fourth quarter of 2006 related to these proceeds as a reduction of selling, general and administrative expenses.

14    Sale/leaseback of headquarters facility

During June 2002, the Company entered into an agreement for the sale and leaseback of its corporate headquarters and distribution center in Brooklyn Park, Minnesota, for net proceeds of $12.5 million. The initial term of the lease is 15 years, with an option to renew for an additional five-year period. The agreement includes an option for the Company to buy out the lease at the end of the tenth year for a price of $0.5 million. The buyout allows the Company to cancel the lease at its election and upon 12 months' written notice to their landlord. Such cancellation would be effective as of the day prior to the tenth anniversary of the commencement date of the lease agreement. On the effective cancellation date, the lease and the term would expire with the same effect as if said date were the originally scheduled expiration of the lease term. The buyout option does not involve repurchasing the property and the cancellation fee of $0.5 million terminates any further involvement with the property. The lease is classified as an operating lease in accordance with SFAS No. 13, *Accounting for Leases.*

The net book value of the building approximated $3.1 million and has been removed from the accounts. The $9.4 million gain on the sale has been deferred and the appropriate amounts properly classified under short- and long-term liabilities. This deferred gain is being recognized as a reduction to rent expense over the 15-year term of the lease. The short-term portion is included in "accrued expenses" and the long-term portion is included in "other long-term liabilities" on the balance sheet. Payments under the lease approximated $1.4 million for the first year, with an annual increase of 2.5% each year thereafter.

F-26

**WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

### 15   Related-party transactions

In 2007 and 2006, Richard Liu, Chairman of one of the Company's major suppliers (Superior Holdings International, Ltd.), was a greater than 5% shareholder of the Company's common stock. The Company purchased $5.4 million and $5.9 million of products from Superior Holdings International, Ltd. during 2007 and 2006, respectively. As of February 2, 2008, there was no balance owed by the Company to Superior Holdings International, Ltd. The Company believes that transactions with Superior Holdings International, Ltd. are on terms no less favorable to it than those obtainable in arm's-length transactions with unaffiliated third parties.

### 16   Supplemental cash flow information

The following non-cash investing and financing activities transpired during fiscal 2007 and 2006, respectfully (in thousands):

|  | For the years ended | |
|---|---|---|
|  | February 2, 2008 | February 3, 2007 |
| Investing activities: |  |  |
| Additions to property and equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    571 | $394 |
| Financing activities: |  |  |
| Preferred stock paid-in-kind dividends . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 3,415 | $ — |
| Beneficial conversion feature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $14,877 | $ — |
| Deemed dividend to warrant holders . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    967 | $ — |

### 17   Subsequent events

On February 14, 2008, the Company announced that it would liquidate up to 160 stores (subsequently revised to 154 mall stores and four outlet stores — the "liquidation stores") and eliminate approximately 938 store-related positions. The Company entered into an Agency Agreement (the "Agreement") with a joint venture comprised of Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC and Hilco Real Estate, LLC (the "Hilco/ Gordon Brothers Joint Venture") to liquidate the inventory in the 158 stores and assist in the discussions with landlords regarding lease terminations in approximately 130 of these stores. Pursuant to the Agreement, the Hilco/ Gordon Brothers Joint Venture will pay the Company a guaranteed amount of 77% of the cost value of the inventory, subject to certain adjustments. The Hilco/Gordon Brothers Joint Venture will be responsible for all expenses related to the sale. The liquidation stores were selected based on strategic criteria, including negative sales and earnings trends, projected real estate costs and location. The Company plans to remodel the 100 remaining mall stores to a new mall accessories store concept during 2008. As part of the launch of the new concept stores and ongoing cost reduction efforts, the Company realigned the organization to reflect its reduced store base and, as a result, eliminated 64 positions at its corporate headquarters, overseas offices and distribution center. The liquidation will be presented as discontinued operations commencing in the first quarter of 2008.

The Company estimates the pre-tax exit costs will approximate $21.3 million. The costs and charges related to the store closing sales and lease buyout negotiations will be recorded as settled during the first and second quarters of fiscal 2008. While not anticipated, it is possible that certain of the lease buyout costs may not be settled until the third quarter of fiscal 2008. The estimated amount and timing of these costs and charges are preliminary and may vary materially depending on various factors including the timing of the completion of the store closing sales, the outcome of negotiations with landlords and the accuracy of assumptions used by management in developing these

F-27

WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

estimates. The table below summarizes the types of expenses and identifies the estimated cash and non-cash charges associated with the store closing and lease buyout negotiations (in thousands):

|  | Cash | Non-Cash | Total |
|---|---|---|---|
| Net proceeds on inventory | $(9,175) | $ 4,784 | $(4,391) |
| Store asset write-offs | — | 9,287 | 9,287 |
| Lease contract termination costs | 8,600 | — | 8,600 |
| Deferred rent relief | — | (3,887) | (3,887) |
| Store closing, occupancy and selling expenses | 10,462 | — | 10,462 |
| Other administrative costs | 1,000 | — | 1,000 |
|  | $10,887 | $10,184 | $21,071 |

In the table above, "Net proceeds on inventory" represents the amount by which estimated proceeds from the inventory liquidation (which includes the 77% guarantee amount as well as estimated reimbursable Company operating expenses during the liquidation) exceed the carrying value of the inventory. The "Store asset write-offs" include the unrecoverable net book values of leasehold improvements, display fixtures and other store related assets that cannot or will not be redeployed and used in other of the Company's operations. "Lease contract termination costs" relate to the estimated lease buyout costs. "Deferred rent relief" represents the deferred rent liabilities that will be settled upon lease termination. "Store closing occupancy and selling expenses" represent the estimated reimbursed and un-reimbursed occupancy and selling expenses of the store closing sales. Lastly, "Other administrative costs" represent various administrative costs, primarily severance and retention.

The Company's senior credit facility was amended on February 14, 2008. The amendment, among other things, allowed for the liquidation, revised the borrowing base by adding a $10.0 million reserve, prohibits borrowing under the revolving line of credit until the Company provides projections and a business plan that are acceptable to its lender, and requires a monthly appraisal of the Company's inventory.

On March 14, 2008, Michael J. McCoy, who was serving as Chairman of the Audit Committee, resigned from the Board of Directors due to other commitments requiring his time.

On April 3, 2008, Michael M. Searles resigned as Chief Executive Officer and from the Board of Directors of the Company. On March 28, 2008, the Company and Mr. Searles entered into an agreement pursuant to which Mr. Searles would receive as severance pay his base salary for six months if he complies with the agreement. In order to comply with the agreement, Mr. Searles must release all claims he may have against the Company other than claims for indemnification, remain available to render consulting services for six months, maintain confidential information regarding the Company, refrain from competing with the Company for six months after his separation date, refrain from hiring or attempting to hire current or certain former employees of the Company for twelve months after his separation date and refrain from interfering with the Company's relationships with its customers, suppliers and other business contacts for twelve months after his separation date. In addition, the Company will pay the employer portion of the group health, dental and vision insurance premiums for up to six months if Mr. Searles elects to continue coverage.

**Schedule II**

Valuation and Qualifying Accounts
(In thousands)

| | Balance at Beginning of Period | Additions | | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | Charged to Costs and Expenses | Charged to Other Accounts | | |
| **Year ended February 3, 2007:** | | | | | |
| Allowance for doubtful accounts deducted from accounts receivable . . . . . . . . . . . . . . . . . . . | $76 | $277 | $— | $(282) | $71 |
| **Year ended February 2, 2008:** | | | | | |
| Allowance for doubtful accounts deducted from accounts receivable . . . . . . . . . . . . . . . . . . . | $71 | $188 | $— | $(211) | $48 |

Unless otherwise indicated, all documents incorporated herein by reference to a document filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act, as amended, are located under the SEC file number 0-21543.

## EXHIBIT INDEX

| Exhibit No. | Description | Method of Filing |
|---|---|---|
| 3.1 | Amended and Restated Articles of Incorporation of Wilsons The Leather Experts Inc. adopted June 16, 1998, as amended by the Articles of Amendment dated February 17, 2000, and the Articles of Amendment dated May 23, 2002.[1] | Incorporated by Reference |
| 3.2 | Restated Bylaws of Wilsons The Leather Experts Inc. as amended June 16, 1998, January 25, 2000, May 23, 2002, and February 5, 2004.[2] | Incorporated by Reference |
| 3.3 | Certificate of Designations for Series A Convertible Preferred Stock dated June 15, 2007.[3] | Incorporated by Reference |
| 4.1 | Specimen of common stock certificate.[4] | Incorporated by Reference |
| 4.2 | Registration Rights Agreement dated as of May 25, 1996, by and among CVS New York, Inc. (formerly known as Melville Corporation), Wilsons The Leather Experts Inc., the Managers listed on the signature pages thereto. Leather Investors Limited Partnership I and the Partners listed on the signature pages thereto.[5] | Incorporated by Reference |
| 4.3 | Amendment to Registration Rights Agreement dated as of August 12, 1999, by and among Wilsons The Leather Experts Inc. and the Shareholders listed on the attachments thereto.[6] | Incorporated by Reference |
| 4.4 | Common Stock and Warrant Purchase Agreement, dated as of April 25, 2004, by and among Wilsons The Leather Experts Inc. and the purchasers identified on the signatory pages thereto (the "Purchase Agreement").[7] | Incorporated by Reference |
| 4.5 | Registration Rights Agreement, dated as of April 25, 2004, by and among Wilsons The Leather Experts Inc. and the investors identified therein.[8] | Incorporated by Reference |
| 4.6 | Form of Warrant issued to the Purchasers named in the Purchase Agreement on April 25, 2004.[9] | Incorporated by Reference |
| 4.7 | Registration Rights Agreement dated as of June 15, 2007 by and among Wilsons The Leather Experts Inc., Marathon Fund Limited Partnership V, Peninsula Investment Partners, L.P., Quaker Capital Partners I, L.P., and Quaker Capital Partners II, L.P.[10] | Incorporated by Reference |
| 4.8 | Form of Warrant issued to Marathon Fund Limited Partnership V, Peninsula Investment Partners, L.P., Quaker Capital Partners I, L.P., and Quaker Capital Partners II, L.P. on June 15, 2007.[11] | Incorporated by Reference |
| 10.1 | Parent Guaranty dated as of May 25, 1996, by Wilsons The Leather Experts Inc., Wilsons Center, Inc., Rosedale Wilsons, Inc. and River Hills Wilsons, Inc. in favor of General Electric Capital Corporation.[12] | Incorporated by Reference |
| *10.2 | Corporate Leadership Team Incentive Plan, as amended.[13] | Incorporated by Reference |
| 10.3 | Fifth Amended and Restated Credit Agreement dated as of December 29, 2006, among Wilsons Leather Holdings Inc., General Electric Capital Corporation, as Agent, Lender, Term Lender and Swing Line Lender, and the Credit Parties and Lenders signatory thereto.[14] | Incorporated by Reference |
| 10.4 | Store Guarantors' Guaranty dated as of May 25, 1996, by Bermans The Leather Experts, Inc., Wilsons House of Suede, Inc., Wilsons Tannery West, Inc., the Georgetown Subsidiaries that are signatories thereto and the Individual Store Subsidiaries that are signatories thereto, in favor of General Electric Capital Corporation. (15) | Incorporated by Reference |
| 10.5 | Joinder Agreement dated as of May 24, 1999, by and between the Store Guarantors that are signatories thereto and General Electric Capital Corporation.[16] | Incorporated by Reference |

| Exhibit No. | Description | Method of Filing |
|---|---|---|
| 10.6 | Pledge Agreement dated as of May 24, 1999, by and between Wilsons Leather of Delaware Inc. and General Electric Capital Corporation, individually and as agent for the lenders signatory to the Credit Agreement.[17] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.7 | Pledge Agreement dated as of May 24, 1999, between Wilsons International, Inc. and General Electric Capital Corporation, individually and as agent for the lenders signatory to the Credit Agreement.[18] . . . . . | Incorporated by Reference |
| 10.8 | Pledge Agreement dated as of May 25, 1996, between Wilsons The Leather Experts Inc. and General Electric Capital Corporation, individually and as agent for the lenders signatory to the Credit Agreement.[19] . . . . . . . . . | Incorporated by Reference |
| 10.9 | Pledge Agreement dated as of May 25, 1996, between Wilsons Center, Inc. and General Electric Capital Corporation, individually and as agent for the lenders signatory to the Credit Agreement.[20] . . . . . . . . . . . . . . . . . . . | Incorporated by Reference |
| *10.10 | Wilsons The Leather Experts Inc. Amended 1996 Stock Option Plan.[4] . . | Incorporated by Reference |
| 10.11 | Pledge Agreement dated as of May 25, 1996, between Rosedale Wilsons, Inc. and General Electric Capital Corporation, individually and as agent for the lenders signatory to the Credit Agreement.[21] . . . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.12 | Pledge Agreement dated as of May 25, 1996, between River Hills Wilsons, Inc. and General Electric Capital Corporation, individually and as agent for the lenders signatory to the Credit Agreement.[22] . . . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.13 | Amendment No. 2 to Pledge Agreement dated as of July 31, 1997, between River Hills Wilsons, Inc. and General Electric Capital Corporation.[23] . . | Incorporated by Reference |
| 10.14 | Joinder Agreement dated as of July 31, 1997, by and between Wilsons International Inc. and General Electric Capital Corporation.[24] . . . . . . | Incorporated by Reference |
| 10.15 | Wilsons The Leather Experts Inc. 1998 Stock Option Plan.[25] . . . . . . . | Incorporated by Reference |
| 10.16 | Amended and Restated Security Agreement dated as of June 19, 2001, by and among Wilsons Leather Holdings Inc. and the other Grantors listed on the signature pages thereto, in favor of General Electric Capital Corporation, in its capacity as Agent for Lenders.[26] . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.17 | Joinder Agreement dated as of October 31, 2000, by and between the Store Guarantors that are signatories thereto and General Electric Capital Corporation.[27] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.18 | Pledge Amendment dated as of October 31, 2000, by River Hills Wilsons, Inc.[28] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.19 | Pledge Agreement dated as of October 31, 2000, by and between WWT, Inc. and General Electric Capital Corporation, individually and as agent for the lenders signatory to the Credit Agreement.[29] . . . . . . . . . . . . . . . . . . . | Incorporated by Reference |
| *10.20 | Wilsons The Leather Experts Inc. Amended and Restated 2000 Long Term Incentive Plan.[30] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.21 | Joinder Agreement dated as of April 13, 2001, by and between the Store Guarantors that are signatory thereto and General Electric Capital Corporation.[31] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.22 | Pledge Amendment, dated as of April 13, 2001, by WWT, Inc.[32] . . . . . | Incorporated by Reference |
| 10.23 | Pledge Agreement, dated as of April 13, 2001, between Bentley's Luggage Corp. and General Electric Capital Corporation, individually and as agent for the lenders signatory to the Credit Agreement.[33] . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.24 | Lease, IRET Properties Landlord to Bermans The Leather Experts, Inc. Tenant, dated June 21, 2002.[34] . . . . . . . . . . . . . . . . . . . . . . . . . . . | Incorporated by Reference |
| 10.25 | Joinder Agreement dated as of October 10, 2000, by and between Wilsons Leather Direct Inc. and General Electric Capital Corporation.[35] . . . . . . | Incorporated by Reference |
| *10.26 | Form of Non-Statutory Stock Option Agreement (Director) pursuant to the 1996 Stock Option Plan.[36] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Incorporated by Reference |

| Exhibit No. | Description | Method of Filing |
|---|---|---|
| *10.27 | Form of Non-Statutory Stock Option Agreement (Associate) pursuant to the 1996 Stock Option Plan.[37] | Incorporated by Reference |
| *10.28 | Form of Non-Statutory Stock Option Agreement (Director) pursuant to the 2000 Long Term Incentive Plan.[38] | Incorporated by Reference |
| *10.29 | Form of Non-Statutory Stock Option Agreement (Associate) pursuant to the 2000 Long Term Incentive Plan.[39] | Incorporated by Reference |
| *10.30 | Form of Restricted Stock Agreement (Associate) pursuant to the 2000 Long Term Incentive Plan.[40] | Incorporated by Reference |
| *10.31 | Employment Agreement, dated as of November 22, 2004, between the Company and Michael M. Searles.[41] | Incorporated by Reference |
| *10.32 | Form of Non-Statutory Stock Option Agreement between the Company and Michael M. Searles.[42] | Incorporated by Reference |
| *10.33 | Waiver and Modification, dated March 2, 2005, under Employment Agreement dated November 22, 2004, between Michael Searles and the Company.[43] | Incorporated by Reference |
| *10.34 | Amendment to Employment Agreement dated as of September 14, 2005, by and between Michael M. Searles and the Company.[44] | Incorporated by Reference |
| 10.35 | Letter Agreement dated December 29, 2006, between Wilsons Leather Holdings Inc. and General Capital Corporation.[45] | Incorporated by Reference |
| *10.36 | Second Amendment to Employment Agreement dated as of December 21, 2006 by and between the Company and Michael M. Searles.[46] | Incorporated by Reference |
| 10.37 | Reaffirmation of Guaranty dated as of December 29, 2006 by Wilsons The Leather Experts Inc., Wilsons Center, Inc., Rosedale Wilsons, Inc., River Hills Wilsons, Inc. and the Store Guarantors listed on the signature pages thereto in favor of General Electric Capital Corporation as Agent for Lenders.[47] | Incorporated by Reference |
| 10.38 | First Amendment to Fifth Amended and Restated Credit Agreement dated as of February 12, 2007, among Wilsons Leather Holdings Inc., General Electric Capital Corporation, as Agent, Lender, Term Lender and Swing Line Lender, and the Credit Parties and Lenders signatory thereto.[48] | Incorporated by Reference |
| *10.40 | Form of Stay Bonus Agreement.[49] | Incorporated by Reference |
| 10.43 | Securities Purchase Agreement dated as of June 1, 2007 among Wilsons The Leather Experts Inc. and the Purchasers set forth on Schedule 1 thereto, including the Exhibits thereto.[50] | Incorporated by Reference |
| 10.44 | Support Agreement, dated as of June 1, 2007, by and among Wilsons The Leather Experts Inc., Marathon Fund Limited Partnership V, Peninsula Investment Partners, L.P., Quaker Capital Partners I, L.P., and Quaker Capital Partners II, L.P.[51] | Incorporated by Reference |
| 10.45 | Second Amendment to Fifth Amended and Restated Credit Agreement dated as of June 15, 2007, among Wilsons Leather Holdings Inc., General Electric Capital Corporation, as Lender, Term Lender, Swing Line Lender and Agent, the Credit Parties signatory thereto and the Lenders signatory thereto.[52] | Incorporated by Reference |
| 10.46 | Reaffirmation of Guaranty dated as of June 15, 2007 by Wilsons The Leather Experts Inc., Wilsons Center, Inc., Rosedale Wilsons, Inc., River Hills Wilsons, Inc. and the Store Guarantors listed on the signature pages thereto in favor of General Electric Capital Corporation as Agent.[53] | Incorporated by Reference |
| 14.1 | Code of Business Ethics and Conduct.[54] | Incorporated by Reference |
| 21.1 | Subsidiaries of Wilsons The Leather Experts Inc. | Electronic Transmission |
| 23.1 | Consent of KPMG LLP | Electronic Transmission |

| Exhibit No. | Description | Method of Filing |
|---|---|---|
| 31.1 | Certification of Chairman of the Board of Directors (acting principal executive officer) pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Electronic Transmission |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Electronic Transmission |
| 32.1 | Certification of Chairman of the Board of Directors (acting principal executive officer) pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Electronic Transmission |
| 32.2 | Certification of Chief Financial Officer pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. . . . . . . . . . . . . . . . . . . | Electronic Transmission |

\* Management contract, compensating plan or arrangement required to be filed as an exhibit to this Annual Report on Form 10-K.

(1) Incorporated by reference to the same numbered exhibit to the Company's Report on Form 10-Q for the quarter ended May 4, 2002.

(2) Incorporated by reference to the same numbered exhibit to the Company's Report on Form 10-K for the fiscal year ended January 31, 2004.

(3) Incorporated by reference to Exhibit 3.1 to the Company's Report on Form 8-K filed with the Commission on June 21, 2007.

(4) Incorporated by reference to the same numbered exhibit to Amendment No. 1 to the Company's Registration Statement on Form S-1 (333-13967) filed with the Commission on December 24, 1996.

(5) Incorporated by reference to Exhibit 4.8 to the Company's Registration Statement on Form S-1 (333-13967) filed with the Commission on October 11, 1996.

(6) Incorporated by reference to Exhibit 4.5 to the Company's Report on Form 10-K for the fiscal year ended January 29, 2000, filed with the Commission.

(7) Incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K dated April 26, 2004.

(8) Incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K dated April 26, 2004.

(9) Incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8-K dated April 26, 2004.

(10) Incorporated by reference to Exhibit 4.1 to the Company's Report on Form 8-K filed with the Commission on June 21, 2007.

(11) Incorporated by reference to Exhibit 4.2 to the Company's Report on Form 8-K filed with the Commission on June 21, 2007.

(12) Incorporated by reference to Exhibit 10.8 to the Company's Report on Form 10-Q for the quarter ended August 2, 1997, filed with the Commission.

(13) Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed with the Commission on September 19, 2005.

(14) Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed with the Commission on January 5, 2007.

(15) Incorporated by reference to Exhibit 10.10 to the Company's Report on Form 10-Q for the quarter ended August 2, 1997, filed with the Commission.

(16) Incorporated by reference to Exhibit 10.3 to the Company's Report on Form 10-Q for the quarter ended May 1, 1999, filed with the Commission.

(17) Incorporated by reference to Exhibit 10.4 to the Company's Report on Form 10-Q for the quarter ended May 1, 1999, filed with the Commission.

(18) Incorporated by reference to Exhibit 10.5 to the Company's Report on Form 10-Q for the quarter ended May 1, 1999, filed with the Commission.

(19) Incorporated by reference to Exhibit 10.21 to Amendment No. 4 to the Company's Registration Statement on Form S-1 (333-13967) filed with the Commission on May 27, 1997.

(20) Incorporated by reference to Exhibit 10.22 to Amendment No. 4 to the Company's Registration Statement on Form S-1 (333-13967) filed with the Commission on May 27, 1997.

(21) Incorporated by reference to Exhibit 10.23 to Amendment No. 4 to the Company's Registration Statement on Form S-1 (333-13967) filed with the Commission on May 27, 1997.

(22) Incorporated by reference to Exhibit 10.24 to Amendment No. 4 to the Company's Registration Statement on Form S-1 (333-13967) filed with the Commission on May 27, 1997.

(23) Incorporated by reference to Exhibit 10.6 to the Company's Report on Form 10-Q for the quarter ended August 2, 1997, filed with the Commission.

(24) Incorporated by reference to Exhibit 10.7 to the Company's Report on Form 10-Q for the quarter ended August 2, 1997, filed with the Commission.

(25) Incorporated by reference to Exhibit 10.31 to the Company's Report on Form 10-K for the fiscal year ended January 31, 1998, filed with the Commission.

(26) Incorporated by reference to Exhibit 10.2 to the Company's Report on Form 8-K filed with the Commission on June 25, 2001.

(27) Incorporated by reference to Exhibit 10.4 to the Company's Report on Form 10-Q for the quarter ended October 28, 2000, filed with the Commission.

(28) Incorporated by reference to Exhibit 10.5 to the Company's Report on Form 10-Q for the quarter ended October 28, 2000, filed with the Commission.

(29) Incorporated by reference to Exhibit 10.6 to the Company's Report on Form 10-Q for the quarter ended October 28, 2000, filed with the Commission.

(30) Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed with the Commission on June 2, 2005.

(31) Incorporated by reference to Exhibit 10.1 to the Company's Report on Form 10-Q for the quarter ended May 5, 2001, filed with the Commission.

(32) Incorporated by reference to Exhibit 10.2 to the Company's Report on Form 10-Q for the quarter ended May 5, 2001, filed with the Commission.

(33) Incorporated by reference to Exhibit 10.3 to the Company's Report on Form 10-Q for the quarter ended May 5, 2001, filed with the Commission.

(34) Incorporated by reference to Exhibit 10.2 to the Company's Report on Form 10-Q for the quarter ended August 3, 2002, filed with the Commission.

(35) Incorporated by reference to Exhibit 10.33 to the Company's Report on Form 10-K for the year ended February 3, 2001, filed with the Commission.

(36) Incorporated by reference to Exhibit 10.4 to the Company's Report on Form 10-Q for the quarter ended July 31, 2004.

(37) Incorporated by reference to Exhibit 10.5 to the Company's Report on Form 10-Q for the quarter ended July 31, 2004.

(38) Incorporated by reference to Exhibit 10.6 to the Company's Report on Form 10-Q for the quarter ended July 31, 2004.

(39) Incorporated by reference to Exhibit 10.7 to the Company's Report on Form 10-Q for the quarter ended July 31, 2004.

(40) Incorporated by reference to Exhibit 10.8 to the Company's Report on Form 10-Q for the quarter ended July 31, 2004.

(41) Incorporated by reference to Exhibit 10.1 to the Company's Report on Form 8-K filed with the Commission on November 24, 2004.

(42) Incorporated by reference to Exhibit 10.2 to the Company's Report on Form 8-K filed with the Commission on November 24, 2004.

(43) Incorporated by reference to Exhibit 10.73 to the Company's Report on Form 10-K for the year ended January 29, 2005.

(44) Incorporated by reference to Exhibit 10.2 to the Company's Report on Form 8-K filed with the Commission on September 19, 2005.

(45) Incorporated by reference to Exhibit 10.37 to the Company's Report on Form 10-K for the year ended February 3, 2007.

(46) Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed with the Commission on December 28, 2006.

(47) Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, filed with the Commission on January 5, 2007.

(48) Incorporated by reference to Exhibit 10.40 to the Company's Report on Form 10-K for the year ended February 3, 2007.

(49) Incorporated by reference to Exhibit 10.1 to the Company's Report on Form 8-K filed with the Commission on February 1, 2007.

(50) Incorporated by reference to Exhibit 10.1 to the Company's Report on Form 8-K filed with the Commission on June 5, 2007.

(51) Incorporated by reference to Exhibit 10.1 to the Company's Report on Form 8-K filed with the Commission on June 21, 2007.

(52) Incorporated by reference to Exhibit 10.2 to the Company's Report on Form 8-K filed with the Commission on June 21, 2007.

(53) Incorporated by reference to Exhibit 10.3 to the Company's Report on Form 8-K filed with the Commission on June 21, 2007.

(54) Incorporated by reference to Exhibit 14.1 to the Company's Report on Form 10-K for the year ended January 31, 2004.

# Exhibit 6-A


10kWIZARD
SEC POWER SEARCH

# FORM 10-Q

## PreVu, INC - WLSN

**Filed: June 17, 2008 (period: May 03, 2008)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

10-Q - WILSONS THE LEATHER EXPERTS INC. 10-Q


## PART I

ITEM 1.      CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)
ITEM 2.      MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL
             CONDITION AND RESULTS OF OPERATIONS
ITEM 3.      QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT
             MARKET RISK
ITEM 4T.     CONTROLS AND PROCEDURES


## PART II

ITEM 1.      LEGAL PROCEEDINGS
ITEM 1A.     RISK FACTORS
ITEM 6.      EXHIBITS
SIGNATURE
INDEX TO EXHIBITS
EX-10.1 (AGENCY AGREEMENT)

EX-10.2 (THIRD AMENDMENT TO FIFTH AMENDED AND RESTATED CREDIT
AGREEMENT)
EX-10.3 (FOURTH AMENDMENT TO FIFTH AMENDED AND RESTATED CREDIT
AGREEMENT)
EX-10.4 (SEPARATION AGREEMENT)

EX-31.1 (RULE 13A-14(A)/15D-14(A) CERTIFICATION OF INTERIM CHIEF
EXECUTIVE OFFICER)
EX-31.2 (RULE 13A-14(A)/15D-14(A) CERTIFICATION OF CHIEF FINANCIAL
OFFICER)
EX-32.1 (CERTIFICATION OF INTERIM CHIEF EXECUTIVE OFFICER)

EX-32.2 (CERTIFICATION OF CHIEF FINANCIAL OFFICER)

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

**(Mark one)**

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended May 3, 2008**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number: 000-21543**

# WILSONS THE LEATHER EXPERTS INC.

(Exact name of registrant as specified in its charter)

| **MINNESOTA** | **41-1839933** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**7401 BOONE AVE. N.**
**BROOKLYN PARK, MN 55428**
(Address of principal executive offices)

**(763) 391-4000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐ No ☑

As of June 12, 2008, there were 39,893,039 shares of the Registrant's common stock, $0.01 par value per share, outstanding.

Source: PreVu, INC, 10-Q, June 17, 2008

## WILSONS THE LEATHER EXPERTS INC.

### INDEX

| | Page |
|---|---|
| **PART I — FINANCIAL INFORMATION** | 3 |
| Item 1. Consolidated Financial Statements (Unaudited) | 3 |
|     Consolidated Balance Sheets as of May 3, 2008 and February 2, 2008 | 3 |
|     Consolidated Statements of Operations for the three months ended May 3, 2008 and May 5, 2007 | 4 |
|     Consolidated Statements of Cash Flows for the three months ended May 3, 2008 and May 5, 2007 | 5 |
|     Notes to Consolidated Financial Statements | 6 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 11 |
| Item 3. Quantitative and Qualitative Disclosures About Market Risk | 20 |
| Item 4T. Controls and Procedures | 20 |
| **PART II — OTHER INFORMATION** | 20 |
| Item 1. Legal Proceedings | 20 |
| Item 1A. Risk Factors | 20 |
| Item 6. Exhibits | 21 |
| Signature | 22 |
|   Agency Agreement | |
|   Third Amendment to Fifth Amended and Restated Credit Agreement | |
|   Fourth Amendment to Fifth Amended and Restated Credit Agreement | |
|   Separation Agreement | |
|   Rule 13a-14(a)/15d-14(a) Certification of Interim Chief Executive Officer | |
|   Rule 13a-14(a)/15d-14(a) Certification of Chief Financial Officer | |
|   Certification of Interim Chief Executive Officer | |
|   Certification of Chief Financial Officer | |

2

## PART I — FINANCIAL INFORMATION

### ITEM 1. CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)

**WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS (UNAUDITED)**
**(In thousands, except share and per share amounts)**

| | May 3, 2008 | February 2, 2008(1) |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 9,313 | $ 7,362 |
| Accounts receivable, net | 2,750 | 3,462 |
| Inventories | 33,777 | 58,307 |
| Prepaid expenses | 3,007 | 6,821 |
| Income taxes receivable | 208 | 141 |
| **Total current assets** | 49,055 | 76,093 |
| Property and equipment, net | 14,789 | 13,681 |
| Other assets, net | 885 | 815 |
| **TOTAL ASSETS** | $ 64,729 | $ 90,589 |
| **LIABILITIES, PREFERRED STOCK AND COMMON SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 9,037 | $ 16,288 |
| Accrued expenses | 11,472 | 12,718 |
| Deferred income taxes | 430 | 723 |
| Current liabilities of discontinued operations | 8,918 | — |
| **Total current liabilities** | 29,857 | 29,729 |
| Income taxes payable | 1,398 | 1,367 |
| Other long-term liabilities | 11,962 | 15,441 |
| **Total liabilities** | 43,217 | 46,537 |
| Commitments and contingencies | | |
| Preferred stock, $.01 par value; 200,000 shares authorized; 46,667 shares issued and outstanding on May 3, 2008 and February 2, 2008 | 40,232 | 39,033 |
| **Shareholders' equity (deficit):** | | |
| Common stock, $.01 par value; 150,000,000 shares authorized; 39,372,209 and 39,336,903 shares issued and outstanding on May 3, 2008 and February 2, 2008, respectively | 394 | 393 |
| Additional paid-in capital | 139,124 | 140,500 |
| Accumulated deficit | (158,240) | (135,876) |
| Accumulated other comprehensive income | 2 | 2 |
| **Total shareholders' equity (deficit)** | (18,720) | 5,019 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | $ 64,729 | $ 90,589 |

(1)           Derived from audited consolidated financial statements.

The accompanying notes are an integral part of these consolidated financial statements.

3

Source: PreVu, INC, 10-Q, June 17, 2008

**WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except per share amounts)**

|  | Three months ended | |
|---|---|---|
|  | May 3, 2008 | May 5, 2007 |
| Net sales | $ 36,435 | $ 42,364 |
| Cost of goods sold, buying and occupancy costs | 31,464 | 36,205 |
| Gross margin | 4,971 | 6,159 |
| Selling, general and administrative expenses | 17,155 | 19,060 |
| Depreciation and amortization | 1,026 | 2,066 |
| Operating loss | (13,210) | (14,967) |
| Interest expense, net | 171 | 431 |
| Loss from continuing operations before income tax provision (benefit) | (13,381) | (15,398) |
| Income tax provision (benefit) | 23 | (73) |
| Loss from continuing operations | (13,404) | (15,325) |
| Loss from discontinued operations, net of income tax benefit of $269 and $0, respectively | (8,960) | (5,940) |
| Net loss | (22,364) | (21,265) |
| Preferred stock paid-in-kind dividends | 1,373 | — |
| Net loss attributable to common shareholders | $ (23,737) | $ (21,265) |
| **Loss per common share — basic and diluted** | | |
| Loss from continuing operations | $ (0.38) | $ (0.39) |
| Loss from discontinued operations | (0.22) | (0.15) |
| Net loss | $ (0.60) | $ (0.54) |
| Weighted average common shares outstanding — basic and diluted | 39,350 | 39,212 |

The accompanying notes are an integral part of these consolidated financial statements.

4

Source: PreVu, INC, 10-Q, June 17, 2008

**WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED)**
**(In thousands)**

| | Three months ended | |
| --- | --- | --- |
| | May 3, 2008 | May 5, 2007 |
| **OPERATING ACTIVITIES:** | | |
| Net loss | $ (22,364) | $ (21,265) |
| Loss from discontinued operations, net of income tax benefit | (8,960) | (5,940) |
| Loss from continuing operations | (13,404) | (15,325) |
| Adjustments to reconcile loss from continuing operations to net cash used in operating activities of continuing operations: | | |
| Depreciation and amortization | 1,026 | 2,066 |
| Amortization of deferred financing costs | 102 | 88 |
| Stock-based compensation expense (benefit) | (184) | 328 |
| Deferred income taxes | (23) | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | 711 | 788 |
| Inventories | 2,744 | 12,434 |
| Prepaid expenses | 3,669 | 508 |
| Accounts payable and accrued expenses | (9,025) | (5,098) |
| Income taxes payable and other liabilities | (502) | 116 |
| Net cash used in operating activities from continuing operations | (14,886) | (4,095) |
| Net cash provided by (used in) operating activities from discontinued operations | 18,655 | (5,167) |
| Net cash provided by (used in) operating activities | 3,769 | (9,262) |
| **INVESTING ACTIVITIES:** | | |
| Additions to property and equipment | (1,652) | (1,187) |
| Net cash used in investing activities | (1,652) | (1,187) |
| **FINANCING ACTIVITIES:** | | |
| Proceeds from issuance of common stock, net | 7 | 27 |
| Debt issuance costs | (173) | (18) |
| Net cash provided by (used in) financing activities | (166) | 9 |
| **NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | 1,951 | (10,440) |
| CASH AND CASH EQUIVALENTS, beginning of period | 7,362 | 19,909 |
| **CASH AND CASH EQUIVALENTS, end of period** | $ 9,313 | $ 9,469 |
| **CASH PAID DURING THE PERIOD:** | | |
| Interest | $ 142 | $ 602 |
| Income taxes | 82 | (13) |
| **SUPPLEMENTAL DISCLOSURES:** | | |
| Investing Activities — non-cash additions to property and equipment | $ 529 | $ 1,012 |
| Financing Activities — preferred stock paid-in-kind dividends | 1,373 | — |

The accompanying notes are an integral part of these consolidated financial statements.

5

Source: PreVu, INC, 10-Q, June 17, 2008

# WILSONS THE LEATHER EXPERTS INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (UNAUDITED)

**1.  Basis of Presentation**

The accompanying consolidated financial statements include the accounts of Wilsons The Leather Experts Inc. ("Wilsons Leather" or the "Company"), a Minnesota corporation, and its direct and indirect subsidiaries. All material intercompany balances and transactions have been eliminated in consolidation. The Company operates in one reportable segment as a specialty retailer of quality leather outerwear, accessories and apparel in the United States. At May 3, 2008, the Company operated 228 stores located in 39 states, including 100 mall stores, 114 outlet stores and 14 airport locations.

The accompanying consolidated financial statements have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC") applicable to interim financial information. Accordingly, the significant accounting policies and certain financial information normally included in financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP"), but which are not required for interim reporting purposes, have been condensed or omitted. In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting only of normal recurring adjustments) considered necessary for a fair presentation in accordance with GAAP. The Company's business is highly seasonal, and accordingly, interim results are not necessarily indicative of results for the full fiscal year. These interim consolidated financial statements and the related notes should be read in conjunction with the consolidated financial statements and notes included in the Company's Annual Report on Form 10-K for the fiscal year ended February 2, 2008, filed with the SEC on April 14, 2008.

*Use of estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Matters of significance in which management relies on these estimates relate primarily to the realizability of assets, such as inventories, property and equipment, and accounts receivable, and the adequacy of certain accrued liabilities and reserves. Ultimate results could differ from those estimates.

*Fiscal year*

The Company's fiscal year ends on the Saturday closest to January 31. The periods that will end or have ended January 31, 2009, February 2, 2008 and February 3, 2007 are referred to herein as fiscal years 2008, 2007 and 2006, respectively. Fiscal years 2008 and 2007 are 52 week years. Fiscal 2006 consisted of 53 weeks.

**2.  Summary of Significant Risks and Uncertainties and Going Concern Assessment**

Over the past few years, mall traffic has been trending downward, off-mall retail venues have gained popularity and competition has continued to increase from non-specialty discounters and mass merchandisers, as they have significantly expanded into leather outerwear at promotional price points. The declining mall traffic and increased competition has adversely affected the performance of the Company's stores. Further compounding these issues for the Company was an extremely challenging retail environment for outerwear in 2007. In addition, the Company's strategic initiative undertaken in 2006 and 2007 to transition its customer base to a more contemporary and upscale target customer is taking more time than anticipated, further negatively impacting store performance.

For the three months ended May 3, 2008 and May 5, 2007 and the years ended February 2, 2008 and February 3, 2007, the Company has incurred net losses of $22.4 million, $21.3 million, $77.5 million and $33.1 million, respectively, and generated (used) $3.8 million, ($9.3) million, ($28.2) million and ($14.6) million, respectively, in cash for operating activities. In addition, the Company's $45.6 million cash balance at the beginning of 2006 has decreased to $9.3 million as of May 3, 2008. The Company executed amendments to its credit agreement in February 2008. These amendments, among other things, added a $10.0 million reserve to the borrowing base for revolver borrowings; however, until the Company provides projections and a business plan that are acceptable to its lender, revolver borrowings are prohibited and the aggregate amount of letters of credit outstanding is limited to $21.0 million. In addition, the amendments require a

6

monthly appraisal of the Company's inventory, which is then used to establish borrowing limits under the credit agreement.

On February 15, 2008, the Company commenced the liquidation of 154 mall stores and four outlet stores. The February credit agreement amendments allowed for the store liquidations but limit the aggregate amount that can be paid to settle the leases of the liquidated stores. The store liquidations resulted in the closing of approximately 130 stores prior to the end of their respective lease terms. The remaining terms on these leases average approximately 40 months and range from less than one year to up to ten years. There is uncertainty as to when, and at what cost, the Company will fully settle all remaining lease obligations. The Company is currently in negotiations with its landlords to obtain settlements for these leases; however, the settlement negotiations may not result in terms that are acceptable to the Company or its lender and may have an adverse impact on the leases of the Company's remaining stores.

In order to execute its go forward plans, the Company will need to amend some of the restrictions in its current credit agreement, or find alternative sources of credit, and raise additional capital during the second quarter of 2008. The Company is pursuing possible sources of funding, including possible sales of existing assets. The Company is also considering additional store closures to optimize cash flow. As of May 3, 2008, all of the Company's assets were considered "held-and-used" as the criteria considered for "held-for-sale" accounting had not been met. As of May 3, 2008, the Company evaluated the potential for impairment of long-lived assets using a weighted average of estimated expected future cash flows by store and cash flows from the sale of assets. This analysis did not result in an impairment of long-lived assets as of May 3, 2008. If the criteria for "held-for-sale" accounting is met, the Company can only consider the expected cash flows from the sale of the assets, net of transaction costs, in its analysis, which may result in future impairment charges.

There can be no assurance that additional funding will be available or can be obtained on terms that are favorable to the Company, or at all. There is no assurance that the Company's current lender will agree to amend the terms of the credit agreement. If the Company is not able to obtain additional capital in the second quarter of 2008, it will not be able to continue its operations outside of bankruptcy. Under certain bankruptcy events, the Company may be required to redeem shares of its preferred stock at their liquidation value. As of May 3, 2008, the aggregate liquidation value was $48.2 million, including accrued but unpaid dividends. However, the redemption would not be permitted by law, unless the Company is able to pay its debts as they come due, and would be prohibited by the terms of its existing credit agreement. The Company's financial statements do not include any adjustments that might result from the outcome of this uncertainty.

## 3. Recent Accounting Pronouncements

In February 2007, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities — Including an amendment of FASB Statement No. 115" ("SFAS 159"). SFAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value. Unrealized gains and losses on items for which the fair value option has been elected are reported in earnings. SFAS 159 was effective for fiscal years beginning after November 15, 2007. Upon adoption, the Company did not elect the fair value option for any items within the scope of SFAS 159 and, therefore, the adoption of SFAS 159 did not have an impact on its consolidated financial statements.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair measurements. SFAS 157, as originally issued, was effective for fiscal years beginning after November 15, 2007 and for interim periods within those years. However, in February 2008, the FASB issued FASB Staff Position No. FAS 157-2, which deferred the effective date of SFAS 157 for one year, as it relates to the fair value measurement requirements for non-financial assets and non-financial liabilities that are not required or permitted to be measured at fair value on a recurring basis. The adoption of SFAS 157 for the Company's financial assets and financial liabilities did not have a material impact on its consolidated financial statements. The Company is evaluating the impact that the implementation of SFAS 157 for its non-financial assets and non-financial liabilities will have on its consolidated financial statements.

## 4. Reorganization and Partial Store Liquidation and Discontinued Operations

On February 15, 2008, the Company announced that it would liquidate up to 160 stores (subsequently revised to 154 mall stores and four outlet stores — the "liquidation stores") and eliminate approximately 938 store-related positions. The Company entered into an Agency Agreement (the "Agreement") with a joint venture comprised of Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC and Hilco Real Estate, LLC (the "Hilco/Gordon Brothers Joint Venture") to liquidate the inventory in the 158 stores and assist in the discussions with landlords regarding early lease terminations in approximately 130 of these stores. The liquidation stores were selected based on strategic criteria, including negative sales and earnings trends, projected real estate costs and location.

The Company plans to remodel the 100 remaining mall stores to a new mall accessories store concept during 2008. As part of the launch of the new concept stores and ongoing cost reduction efforts, the Company realigned its organization to reflect its reduced store base and, as a result, eliminated 64 positions at its corporate headquarters, overseas offices and distribution center. Selling, general and administrative expenses of continuing operations for the three months ended May 3, 2008 include $0.8 million of employee separation costs incurred by the Company in connection with these eliminated positions, of which $0.6 million was paid in the period. The remaining balance of accrued employee separation costs at May 3, 2008 of $0.4 million is included in accrued expenses of continuing operations. The Company expects to complete all payments by the third quarter of fiscal 2008.

Source: PreVu, INC, 10-Q, June 17, 2008

In addition to the liquidation stores, the Company also closed five mall stores during the three months ended May 3, 2008, primarily related to natural lease terminations. The liquidation stores and other closings totaled 163 stores, of which 44 closings resulted in the exit from 38 of the Company's markets and the other 119 closings resulted in a significant reduction in stores in the Company's remaining 81 markets. The Company does not expect a significant migration of closed store customers to another of its existing stores or its e-commerce site. Accordingly, the results of operations for the 163 closed stores qualified for discontinued operations under SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS 144"), and are presented separately in the accompanying statements of operations for all periods presented. No consolidated buying costs (which consist of merchandising and distribution expenses), indirect selling, general and administrative expenses (which include field sales management and loss prevention) or interest expense have been allocated to discontinued operations. The Company recorded asset impairment charges related to the liquidation stores of $9.3 million during the fourth quarter of fiscal 2007, which eliminated most of the remaining net book value of assets located in the closed stores reported as discontinued operations.

7

Source: PreVu, INC, 10-Q, June 17, 2008

The components of loss from discontinued operations of the stores closed in 2008 were as follows:

| | Three Months Ended | |
| | May 3, 2008 | May 5, 2007 |
|---|---|---|
| (In thousands) | | |
| Net sales | $ 30,161 | $ 15,231 |
| Cost of goods sold and occupancy costs | 28,966 | 14,939 |
| Gross margin | 1,195 | 292 |
| Selling, general and administrative expenses | 10,377 | 5,459 |
| Depreciation and amortization | 47 | 773 |
| Loss before income tax benefit | (9,229) | (5,940) |
| Income tax benefit | (269) | — |
| Loss from discontinued operations, net of tax | $ (8,960) | $ (5,940) |

The current liabilities of discontinued operations consisted of the following:

| | May 3, 2008 |
|---|---|
| (In thousands) | |
| Compensation and benefits | $ 144 |
| Taxes other than income taxes | 292 |
| Rent | 2,346 |
| Estimated fair value of remaining lease obligations | 5,274 |
| Due to Hilco/Gordon Brothers Joint Venture | 701 |
| Other | 161 |
| Current liabilities of discontinued operations | $ 8,918 |

The store liquidations and vacating of the leased premises were substantially complete as of the end of the first quarter of fiscal 2008. Accordingly, the loss from discontinued operations for the three months ended May 3, 2008 includes the costs and charges related to the liquidation sales and estimated fair value of the remaining lease obligations of certain of the liquidation stores in accordance with SFAS No.146, "Accounting for Costs Associated with Exit or Disposal Activities" ("SFAS 146"). Pursuant to the Agreement, the Hilco/Gordon Brothers Joint Venture paid the Company a guaranteed amount of 77% of the cost value of the inventory, subject to certain adjustments. The Hilco/Gordon Brothers Joint Venture was responsible for all expenses related to the sale. The estimated fair value of the remaining lease obligations is preliminary and may vary materially depending on various factors, including the outcome of negotiations with landlords, the ability to obtain lease assignments or subtenants for the vacated premises and the accuracy of assumptions used by management in developing these estimates. The Company will adjust the estimated fair value of remaining lease obligations to the lease buyout amount plus negotiation costs in the period lease settlements are executed. A summary of the net cost of the liquidation included in loss from discontinued operations for the three months ended May 3, 2008 is as follows:

| | Period from February 15, 2008 through May 3, 2008 | | |
| | Cash | Non-cash | Total |
|---|---|---|---|
| (In thousands) | | | |
| Net proceeds from inventory liquidation (1) | $ (7,688) | $ 4,613 | $ (3,075) |
| Store asset recovery (2) | (219) | — | (219) |
| Estimated fair value of remaining lease obligations (3) | 5,319 | — | 5,319 |
| Deferred rent credits (4) | — | (2,918) | (2,918) |
| Store closing, occupancy and selling expenses (5) | 9,344 | 79 | 9,423 |
| Other administrative costs (6) | — | — | — |
| Net cost of liquidation before income tax benefit | $ 6,756 | $ 1,774 | $ 8,530 |

(1) Represents the amount by which the gross proceeds from the inventory liquidation (total of the guaranteed amount, as adjusted, and reimbursed store operating expenses) exceeded the carrying value of the liquidated inventory.

(2) An asset impairment charge for the unrecoverable net book value of leasehold improvements, display fixtures and other store related assets of $9.3 million was recorded in the fourth quarter of fiscal 2007.

(3) Includes the estimated fair value of the remaining lease obligations of 130 liquidation stores that are still in lease buyout negotiations with the landlords, accrued in accordance with SFAS 146.

(4)   Represents the write-off of the remaining unrecognized deferred rent credits related to the straight-line recognition of scheduled rent increases over the lease term.

(5)   Represents store selling, occupancy and other operating expenses, including expenses reimbursed by the Hilco/Gordon Brothers Joint Venture.

(6)   Excluded from store liquidation expenses are administrative costs, primarily employee separation costs, of $0.8 million incurred in connection with the organizational realignment. These costs are included in selling, general and administrative expenses of continuing operations.

8

Source: PreVu, INC, 10-Q, June 17, 2008

## 5.  Cash and Cash Equivalents

Cash equivalents at May 3, 2008 and February 2, 2008 were $11.3 million and $11.7 million, respectively, and consisted entirely of money market funds. For the three months ended May 3, 2008 and May 5, 2007, interest income earned on money market funds of $0.1 million and $0.3 million, respectively, is included in interest expense, net.

## 6.  Debt

The Company has a credit agreement with General Electric Capital Corporation ("GECC") that provides for revolving loan commitments of up to $115.0 million in aggregate principal amount, including a sublimit of $75.0 million for letter of credit obligations. Amounts outstanding under the credit agreement are subject to limits, as defined, and are collateralized by the Company's inventory, equipment, credit card and wholesale receivables and substantially all other personal property. The credit agreement expires June 30, 2010, at which time all amounts outstanding become due and payable. The Company executed amendments to its credit agreement in February 2008. These amendments, among other things, allowed for the store liquidations, but limit the aggregate amount that can be paid to settle the leases of the liquidated stores. The amendments added a $10.0 million reserve to the borrowing base for revolver borrowings; however, until the Company provides projections and a business plan that are acceptable to its lender, revolver borrowings are prohibited and the aggregate amount of letters of credit outstanding is limited to $21.0 million. The amendments also require a monthly appraisal of the Company's inventory to determine the value of eligible inventory as if sold in an orderly liquidation, which is then used to establish borrowing limits under the credit agreement. The appraised inventory values are generally lower than the carrying value of inventory and fluctuate throughout the year due to a variety of factors, including seasonality. For the three months ended May 3, 2008 and May 5, 2007, the Company had no revolver borrowings outstanding. The Company had outstanding letters of credit at May 3, 2008 and February 2, 2008 of $10.7 million and $12.2 million, respectively.

As of May 3, 2008, the Company had not yet provided the projections and business plan required by the amendments. In addition, the Company is continuing to negotiate settlement agreements with the landlords of the liquidation stores. The final settlement amounts could vary from the Company's estimates and could exceed the amount allowed by the credit agreement.

## 7.  Other Long-Term Liabilities

Other long-term liabilities primarily consist of the deferred rent liability resulting from the straight-line recognition of scheduled rent increases over the lease term. Other long-term liabilities at February 2, 2008 included $3.2 million related to stores subsequently reported as discontinued operations. The loss from discontinued operations for the three months ended May 3, 2008 includes a non-cash credit of $2.9 million related to the elimination of the deferred rent liability. The remaining balance of $0.3 million was reclassified to current liabilities of discontinued operations at May 3, 2008.

## 8.  Preferred Stock and Warrant Financing

On June 15, 2007, the Company completed the sale of 45,000 shares of Series A Convertible Preferred Stock (the "Preferred Stock") and warrants to purchase 15 million shares of common stock (the "Warrants") for a total purchase price of $45.0 million to four institutional investors (the "Preferred Stock and Warrant financing"). The Preferred Stock was initially convertible into shares of common stock at a conversion price of $1.50 per share, or 30 million total shares of common stock. Going forward, the number of shares of common stock issuable upon conversion of the Preferred Stock at any time is equal to the stated value of each share of Preferred Stock ($1,000) divided by the conversion price then in effect. As of May 3, 2008, there were 46,667 shares of Preferred Stock outstanding convertible into 31.1 million shares of common stock. The Preferred Stock is entitled to payment-in-kind cumulative dividends of 8.0% per year, issuable semi-annually on June 1 and December 1. As of May 3, 2008 the Company has accrued dividends representing an additional 1,571 shares of Preferred Stock since the December 1, 2007 dividend declaration, which include 928 shares accrued for the three months ended May 3, 2008. For the three months ended May 3, 2008, the fair value of the accrued dividends of $1.2 million was recorded in preferred stock and charged to additional paid-in capital. The related beneficial conversion feature of the accrued dividend of $0.2 million was recorded within additional paid-in capital.

The initial carrying value of the Preferred Stock, including allocated net proceeds, was $36.0 million. As of May 3, 2008 and February 2, 2008, the carrying value of the Preferred Stock was $40.2 million and $39.0 million, respectively, which included payment-in-kind declared and accrued dividends to date of $4.2 million and $3.0 million, respectively, exclusive of the beneficial conversion feature accrued to date and recorded within additional paid-in capital of $0.6 million and $0.4 million respectively.

The Preferred Stock has certain redemption features that may require the Company to redeem the Preferred Stock at its liquidation value upon the occurrence of certain events. The value of the liquidation preference is equal to $1,000 per share of Preferred Stock, the holders' initial investment, plus all accrued and unpaid dividends. As of May 3, 2008, the aggregate liquidation value of the Preferred Stock was $48.2 million. However, the redemption would not be permitted by law, unless the Company is able to pay its debts as they come due, and would be prohibited by the terms of the Company's credit agreement. As of May 3, 2008, no such triggering events had transpired.

## 9.  Stock-Based Compensation

The Company's Amended and Restated 2000 Long Term Incentive Plan (the "2000 Plan") provides for the grant of incentive stock options, non-qualified stock options, stock appreciation rights, non-vested shares (restricted stock), performance share awards, and other stock-based awards. The Company also has options outstanding under its amended 1996 Stock Option Plan (the "1996 Plan")

and the 1998 Stock Option Plan (the "1998 Plan"). No future awards may be granted under the 1996 Plan or 1998 Plan. There were no grants made under the 2000 Plan during the three months ended May 3, 2008.

The Company's stock-based compensation is primarily related to employee stock options. For the three months ended May 3, 2008 and May 7, 2007, the Company recognized stock-based compensation expense (benefit) of ($0.2) million and $0.3 million, respectively, net of adjustments for forfeitures of unvested shares of $0.4 million and $0.2 million, respectively. Stock-based compensation (benefit) is recognized as part of selling, general and administrative expenses.

During the three months ended May 3, 2008 and May 5, 2007, there were no options exercised. As of May 3, 2008, total unrecognized compensation costs related to unvested stock-based awards was $0.4 million, which is expected to be recognized over a weighted average vesting period of approximately 1.9 years.

9

Source: PreVu, INC, 10-Q, June 17, 2008

Table of Contents

**10.  Income taxes**

For the three months ended May 3, 2008, the Company's income tax provision on continuing operations was $23 thousand, consisting of $32 thousand related to an increase in the Company's liability for certain unrecognized state income tax benefits, $14 thousand related to current state income taxes and a benefit of $23 thousand related to a decrease in the Company's LIFO inventory deferred tax liability. The income tax benefit on loss from discontinued operations of $0.3 million was related to a decrease in the Company's LIFO inventory deferred tax liability related to discontinued operations.

For the three months ended May 5, 2007, the Company's income tax benefit on continuing operations of $0.1 million was related to a decrease in the Company's liability for certain unrecognized state income tax benefits. There was no income tax benefit on the loss from discontinued operations.

Due to the cumulative losses over the past five fiscal years and in the three months ended May 3, 2008, the Company believes that it is more likely than not that its deferred tax asset will not be realized. Accordingly, as of May 3, 2008 and February 2, 2008, a full valuation allowance has been recorded against the net deferred tax assets, including potentially unrealizable net operating losses.

The ability to utilize net operating loss carryforwards to reduce future taxable income is limited under various provisions of the Internal Revenue Code, including Section 382. Changes in ownership could severely limit the utilization of the federal and state net operating loss carryforwards, which could result in expiration of the loss carryforwards prior to their utilization.

**11.  Loss Per Common Share**

Basic and diluted loss per share is computed by dividing loss attributable to common shareholders by the weighted average number of common shares outstanding for the period. Pursuant to the treasury stock method, in periods with a loss, potentially dilutive common shares related to stock options, warrants and Preferred Stock have been excluded from the calculation of diluted loss per share, as their inclusion would have been anti-dilutive.

The following table presents the computation of basic and diluted loss per share:

|  | Three Months Ended | |
|---|---|---|
| (In thousands, except per share amounts) | May 3, 2008 | May 5, 2007 |
| Loss from continuing operations: | | |
| Loss from continuing operations | $  (13,404) | $  (15,325) |
| Preferred stock paid-in-kind dividends | 1,373 | — |
| Loss from continuing operations attributable to common shareholders | $  (14,777) | $  (15,325) |
| | | |
| Loss from discontinued operations, net of income tax benefit | $   (8,960) | $   (5,940) |
| | | |
| Net loss attributable to common shareholders: | | |
| Loss from continuing operations | $  (13,404) | $  (15,325) |
| Loss from discontinued operations, net of income tax benefit | (8,960) | (5,940) |
| Net loss | (22,364) | (21,265) |
| Preferred stock paid-in-kind dividends | 1,373 | — |
| Net loss attributable to common shareholders | $  (23,737) | $  (21,265) |
| | | |
| Weighted average common shares outstanding — basic and diluted | 39,350 | 39,212 |
| | | |
| Loss per common share — basic and diluted: | | |
| Loss from continuing operations | $     (0.38) | $     (0.39) |
| Loss from discontinued operations | (0.22) | (0.15) |
| Net loss | $     (0.60) | $     (0.54) |

10

Source: PreVu, INC, 10-Q, June 17, 2008

Potentially dilutive shares related to stock options, warrants and Preferred Stock excluded from the dilution calculations were as follows:

| | Three Months Ended | |
| --- | --- | --- |
| | May 3, 2008 | May 5, 2007 |
| Stock options | 2,311,018 | 2,495,524 |
| Warrants | 20,022,364 | 4,000,000 |
| Preferred Stock (1) | 31,111,333 | — |
| Total potentially dilutive shares | 53,444,715 | 6,495,524 |

_____

(1)    Shares of Preferred Stock using an "as if converted" method.

### 12.  Commitments and contingencies

As of May 3, 2008, the Company had $10.7 million of standby and documentary letters of credit outstanding. The Company also has store operating leases that it has committed to in the ordinary course of business. Of the 163 stores closed by the Company during the first quarter of 2008, approximately 130 stores were closed prior to the end of their respective lease terms. The remaining lease terms average approximately 40 months and range from less than one year to up to ten years. The leases have a total of approximately $40.0 million of future minimum payments due over their remaining terms. The Company is currently in negotiations with its landlords to obtain settlements for these leases. As of May 3, 2008, current liabilities of discontinued operations include $2.3 million of accrued rent and $5.3 million for the estimated fair value of remaining lease obligations accrued in accordance with SFAS 146. The Company will adjust the estimated fair value of remaining lease obligations to the lease buyout amount plus negotiation costs in the period lease settlements are executed.

The Company is involved in various legal actions arising in the ordinary course of business. In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on the Company's consolidated financial position or results of operations.

### 13. Supplemental Balance Sheet Information

| (In thousands) | May 3, 2008 | | February 2, 2008 | |
| --- | --- | --- | --- | --- |
| Accounts receivable, net: | | | | |
| Trade receivables | $ | 2,274 | $ | 3,238 |
| Other receivables | | 546 | | 388 |
| Total | | 2,820 | | 3,626 |
| Allowance for doubtful accounts | | (35) | | (48) |
| Deferred sales | | (35) | | (116) |
| Total accounts receivable, net | $ | 2,750 | $ | 3,462 |
| | | | | |
| Inventories: | | | | |
| Raw materials | $ | 1,389 | $ | 1,348 |
| Finished goods | | 32,388 | | 56,959 |
| Total inventories | $ | 33,777 | $ | 58,307 |
| | | | | |
| Property and equipment, net: | | | | |
| Equipment and furniture | $ | 53,884 | $ | 66,324 |
| Leasehold improvements | | 22,927 | | 31,373 |
| Total | | 76,811 | | 97,697 |
| Accumulated depreciation and amortization | | (62,022) | | (84,016) |
| Net property and equipment | $ | 14,789 | $ | 13,681 |
| | | | | |
| Other assets, net: | | | | |
| Debt issuance costs | $ | 4,751 | $ | 4,578 |
| Accumulated amortization | | (3,866) | | (3,763) |
| Total | $ | 885 | $ | 815 |
| | | | | |
| Accrued expenses: | | | | |
| Compensation and benefits | $ | 3,486 | $ | 4,708 |
| Taxes other than income taxes | | 1,782 | | 1,893 |
| Rent | | 3,550 | | 2,722 |

| | | |
|---|---|---|
| Other | 2,654 | 3,395 |
| Total | $ 11,472 | $ 12,718 |

## ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion of the financial condition and results of operations of Wilsons The Leather Experts Inc. and its wholly owned subsidiaries should be read in conjunction with our most recent audited consolidated financial statements and related notes included in our 2007 Annual Report on Form 10-K. When we refer to "we," "our," "us" or "Wilsons Leather," we mean Wilsons The Leather Experts Inc. and its subsidiaries, including its predecessor companies.

Our fiscal year ends on the Saturday closest to January 31. The periods that will end or have ended January 31, 2009, February 2, 2008 and February 3, 2007 are referred to herein as fiscal years 2008, 2007 and 2006, respectively. Fiscal years 2008 and 2007 are 52 week years. Fiscal 2006 consisted of 53 weeks.

11

## Overview

We are a specialty retailer of quality leather outerwear, accessories and apparel in the United States. Our multi-channel store locations are designed to target a broad customer base with a superior level of customer service. At May 3, 2008, we operated 228 stores located in 39 states, including 100 mall stores, 114 outlet stores and 14 airport locations. Through our international leather sourcing network and relationships with vendors of nationally recognized designer brands, we are able to consistently provide our customers with quality, fashionable merchandise at attractive prices. Our business structure results in shorter lead times, allowing us to react quickly to popular and emerging fashion trends and customer preferences, rapidly replenish fast-selling merchandise and minimize fashion risk.

We measure performance using such key operating statistics as comparable store sales, net sales per square foot, gross margin percentage, and store operating expenses, with a focus on labor, as a percentage of net sales. These results translate into store operating contribution and store cash flow, which we use to evaluate overall performance on an individual store basis. Store operating contribution is calculated by deducting a store's operating expenses from its gross margin and is measured as a percentage of net sales. Store operating contribution gives us an overall measure as to whether or not individual locations and markets are meeting our financial objectives.

In addition, general and administrative expenses are monitored in absolute amount, as well as on a percentage of net sales basis. We continue to monitor product costing and promotional activity and their impact on margin levels. In 2007, our inventory markdowns were higher than in the past as we aggressively liquidated certain merchandise and repositioned our inventory mix pursuant to our strategic initiatives of offering designer brand merchandise and a greater mix of accessories. Our gross margins are influenced by the mix of merchandise between accessories and outerwear in our total net sales.

We also measure and evaluate investments in our retail locations, including inventory and property and equipment. Inventory performance is primarily measured by inventory turns, or the number of times store inventory turns over in a given period, and amounts of owned inventory at various times based on payment terms from our vendors. The most significant investments in property and equipment are made at the time we open a store.

We generate a significant portion of our net sales from October through January, which includes the holiday selling season. We generated 50.4% of our annual net sales in that time period in 2007, and 23.5% in December alone. As part of our strategy to improve operating margins, maximize revenue and minimize losses during non-peak selling seasons, we have increased the number of outlet locations since 2000, which are less seasonal, and modified our product mix to emphasize accessories.

Comparable store sales from continuing operations decreased 8.8% for the three months ended May 3, 2008, compared to a 20.8% decrease in comparable store sales in the same period of last year. A store is included in the comparable store sales calculation after it has been open and operated by us for more than 52 weeks. The percentage change is computed by comparing total net sales for comparable stores as thus defined at the end of the applicable reporting period with total net sales from comparable stores for the comparable period in the prior year.

Our strategic goals for 2008 are to aggressively reduce costs and working capital needs and to launch a new mall accessories store concept.

*Reorganization and Partial Store Liquidation.* On February 15, 2008, we announced that we would liquidate up to 160 mall stores (subsequently revised to 154 mall stores and four outlet stores — the "liquidation stores") and eliminate approximately 938 store-related positions. We retained a third party liquidator and real estate firm to assist in this process. The liquidation is part of a strategy aimed at reducing our mall store base, aggressive cost cutting measures and the launch of a new mall accessories store concept. Concurrent with these store closures and using the liquidation sale proceeds, our 100 remaining mall stores will be remodeled to a new mall accessories store concept that has been tested in four different regions of the country. As part of the launch of the mall accessories store concept and ongoing cost reduction efforts, we have also realigned our organization to reflect the reduced store base and decreased overseas sourcing needs. As a result, we eliminated 64 positions at our corporate headquarters, overseas offices and distribution center. Our net sales and expenses will be significantly reduced going forward as a result of the liquidation.

In addition to the liquidation stores, we also closed five mall stores during the three months ended May 3, 2008, primarily related to lease terminations. The liquidation stores and other closings totaled 163 stores, and we have presented their results of operations separately as discontinued operations in the accompanying statements of operations for all periods presented in accordance with Statement of Financial Accounting Standards ("SFAS") No. 144, "Accounting for the Impairment and Disposal of Long-Lived Assets" ("SFAS 144").

*New Mall Accessories Store Concept.* Our current focus is on the new mall accessories store concept instead of other selling channels. During the 2007 holiday season, we began testing a new mall accessories store concept in four stores to address our customer traffic issues and elevate our designer brand positioning. With that test, we identified an accessories centered offering that appeals to an important buying demographic.

This new accessories concept will be a designer brand driven store for women, focusing on fashion accessories with a limited selection of outerwear. We have kept only our best mall stores in the best locations for this concept. Our plan is to remodel every remaining mall store to this new concept during 2008. With handbags generally priced from $100 - $400, this new concept will provide an upscale boutique feel for customers in the emerging or mass luxury category and will be an alternative to the department store homogenization that has occurred in this category.

In order to execute our go forward plans, we will need to amend some of the restrictions in our current credit agreement, or find alternative sources of credit, and raise additional capital during the second quarter of 2008. We are pursuing possible sources of funding, including possible sales of existing assets. As of May 3, 2008, all of our assets were considered "held-and-used," as the criteria considered for "held-for-sale" accounting had not been met. As of May 3, 2008, we evaluated the potential for impairment of long-lived assets using a weighted average of estimated expected future cash flows by store and cash flows from the sale of assets. This analysis did not result in an impairment of long-lived assets as of May 3, 2008. If the criteria for "held-for-sale" accounting is met, we can only consider the expected cash flows from the sale of the assets, net of transaction costs, in our analysis, which may result in future impairment charges.

There can be no assurance that additional funding will be available or can be obtained on terms that are favorable to us, or at all. See "Liquidity and Capital Resources" and Note 2 of Notes to Consolidated Financial Statements for additional information.

12

Source: PreVu, INC, 10-Q, June 17, 2008

In June 2007, we completed a $45.0 million private placement of a newly created series of convertible preferred stock and warrants to purchase our common stock (the "Preferred Stock and Warrant financing"). The net proceeds were used to repay our outstanding $20.0 million Term B promissory note and to fund general working capital requirements going forward, including the rollout of our designer brand merchandise initiative. This transaction is described in greater detail below in "Liquidity and Capital Resources—Capital Resources." In addition to the influx of capital, the private placement brought us a large new investor, Goldner Hawn Private Equity, to assist in setting our long-term strategic direction.

We intend the discussion of our financial condition and results of operations that follows to provide information that will assist in understanding our current liquidity, consolidated financial statements, the changes in certain key items in those consolidated financial statements from period to period and the primary factors that accounted for those changes, as well as how certain accounting principles, policies and estimates affect our consolidated financial statements.

**Critical Accounting Policies**

We consider our critical accounting policies to be those related to inventories and property and equipment impairment as discussed in the section with this title in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" that begins on page 23 of our 2007 Annual Report on Form 10-K. No material changes occurred to these policies in the periods covered by this quarterly report.

**Results of Operations**

Unless otherwise noted, the tables and discussion that follow relate only to results from continuing operations.

The following table sets forth items from our consolidated statements of operations as a percentage of net sales:

| | Three months ended | |
| --- | --- | --- |
| | May 3, 2008 | May 5, 2007 |
| Net sales | 100.0% | 100.0% |
| Cost of goods sold, buying and occupancy costs | 86.4 | 85.5 |
| Gross margin | 13.6 | 14.5 |
| Selling, general and administrative expenses | 47.1 | 45.0 |
| Depreciation and amortization | 2.8 | 4.9 |
| Operating loss | (36.3) | (35.3) |

A summary of certain operational data for the periods listed is presented below:

| | Three months ended | |
| --- | --- | --- |
| | May 3, 2008 | May 5, 2007 |
| Net sales (in thousands) | $ 36,435 | $ 42,364 |
| | | |
| Comparable store sales (1) | | |
| Total | (8.8)% | (20.8)% |
| | | |
| By division | | |
| Mens | (21.7) | (28.2) |
| Womens | (27.1) | (25.2) |
| Accessories | 7.8 | (12.1) |
| | | |
| By channel | | |
| Mall stores | (27.1) | (25.1) |
| Outlet stores | (1.4) | (15.4) |
| Airport stores | 8.3 | (16.2) |
| | | |
| Number of stores: | | |
| Beginning of period | 228 | 254 |
| Opened | — | — |
| Closed | — | (3) |
| End of period | 228 | 251 |
| Discontinued operations | 163 | 163 |

---

(1)                                                                 Comparable store sales for 2007 include discontinued operations.

*Net Sales.* Net sales for the three months ended May 3, 2008 decreased 14.0% to $36.4 million compared to net sales of $42.4 million for the three months ended May 5, 2007. The decrease was primarily due to a comparable store sales decline for the

quarter of 8.8%. In addition, we had 25 fewer average stores in continuing operations during the first quarter of 2008 compared to the same period in 2007. Comparable store sales improved each month of the first quarter of 2008 and were positive in the last month of the quarter. Comparable store sales results by division for the first quarter of 2008 reflect our strategic shift toward a predominantly accessories based assortment. Our accessories division had a 7.8% comparable store sales increase for the first quarter of 2008, driven by a 28.1% increase in handbag comparable store sales.

*Cost of Goods Sold, Buying and Occupancy Costs.* Cost of goods sold, buying and occupancy costs decreased $4.7 million, or 13.1%, for the three months ended May 3, 2008, compared to the three months ended May 5, 2007. This

13

Source: PreVu, INC, 10-Q, June 17, 2008

decrease was primarily attributable to a $2.2 million decrease in markdowns. Our overall inventory levels were lower during the first quarter of 2008, which contributed to less slow-moving inventory. We also transferred certain unwanted inventory to the liquidation stores that was sold as part of the liquidation. Any markdowns on this inventory are included in the loss from discontinued operations. Markdowns during the first quarter of 2007 were impacted by actions taken to move certain unwanted spring/summer outerwear and certain accessories merchandise including oversized handbags.

Our product costs decreased by $1.1 million for the first quarter of 2008 compared to the first quarter of 2007, primarily due to lower sales volume in the first quarter of 2008, and total buying and occupancy costs decreased by $1.2 million. Buying costs decreased by $0.6 million in the first quarter of 2008 compared to the first quarter of 2007. This decrease was primarily attributable to staff reductions related to the closure of 163 stores. Occupancy costs decreased by $0.6 million, primarily due to 25 fewer average stores in continuing operations during the first quarter of 2008 compared to the same period in 2007.

Gross margin as a percentage of net sales decreased 90 basis points to 13.6% for the first quarter of 2008 compared to 14.5% for the first quarter of 2007. This decrease in gross margin rate was primarily driven by a 150 basis point increase in buying and occupancy costs as a percentage of net sales. As our occupancy costs are relatively fixed, comparable store sales performance will have a positive or negative impact on these costs as a percentage of net sales. The gross margin decrease was partially offset by a net improvement to gross margin of 30 basis points as a result of lower markdowns, net of lower initial markups. In addition, delivery and other costs of goods sold as a percentage of net sales decreased by 30 basis points.

***Selling, General and Administrative Expenses.*** Selling, general and administrative ("SG&A") expenses decreased $1.9 million to $17.2 million for the first quarter of 2008 from $19.1 million for the first quarter of 2007. As a percentage of net sales, SG&A expenses increased to 47.1% from 45.0%, reflecting the decrease in comparable store sales.

As a result of staff reductions in connection with ongoing cost reduction efforts and the realignment of our organization to reflect the reduced store base, we experienced savings in payroll, related taxes and benefits of $2.0 million, consisting of $1.5 million in administrative, $0.4 million in store supervisory and $0.1 million related to our wholesale operations. In addition, stock-based compensation decreased by $0.5 million in the first quarter of 2008, primarily due to the staff reductions. The savings related to staff reductions were partially offset by employee separation costs incurred during the first quarter of 2008 of $0.8 million.

During the first quarter of 2008, we incurred design and promotion expenses in connection with our new accessories concept of $0.8 million. These expenses were offset by decreases in store payroll and related taxes and benefits of $0.3 million and other store expenses of $0.1 million due to lower sales and an average of 25 fewer stores in continuing operations, a decrease of $0.1 million in supervisory expense related to travel and outside services due to the lower store base and $0.3 million of other cost reductions, primarily related to professional fess and other outside services.

***Depreciation and Amortization.*** Depreciation and amortization decreased to $1.0 million for the three months ended May 3, 2008, from $2.1 million in the comparable period last year. Depreciation and amortization as a percentage of net sales was 2.8% for the first quarter of 2008 compared to 4.9% for the first quarter of 2007. The $1.0 million decrease was primarily due to asset impairment charges related to continuing operations of $10.4 million, recognized in accordance with SFAS 144 during the fourth quarter of 2007. The asset impairment charges eliminated the remaining net book value of assets located in all of our mall stores and in four of our outlet stores.

***Operating Loss.*** Operating loss for the three months ended May 3, 2008 was $13.2 million, or 36.3% of net sales, compared to an operating loss of $15.0 million, or 35.3% of net sales, for the comparable period last year. The $1.8 million decrease in operating loss in the first quarter of 2008 was due to decreases of $1.9 million in SG&A expense and $1.0 million in depreciation expense, partially offset by $1.2 million in lower gross margin dollars as compared to the first quarter of 2007.

***Interest Expense, Net.*** Net interest expense decreased to $0.2 million in the first quarter of 2008 from $0.4 million in the first quarter of 2007. We incurred $0.5 million of interest expense on our Term B promissory note during the first quarter of 2007. We repaid this debt during the second quarter of 2007 with proceeds from the Preferred Stock and Warrant financing. We had no outstanding revolver borrowings during the first three months of 2008 and 2007. The lower interest expense was partially offset by a $0.2 million decrease in interest income earned on lower average cash balances during the first quarter of 2008 compared to the first quarter of 2007.

14

Source: PreVu, INC, 10-Q, June 17, 2008

*Income Tax Provision (Benefit).* For the first three months of 2008, the income tax provision, primarily related to an increase in certain state income tax reserves, was partially offset by an income tax benefit related to a decrease in our LIFO inventory deferred tax liability. The $0.1 million income tax benefit for the first three months of 2007 related to a reduction in certain state income tax reserves.

Due to cumulative losses sustained over the past five fiscal years and in the current year-to-date period ended May 3, 2008, we believe that it is more likely than not that our deferred tax assets will not be realized. Accordingly, a full valuation allowance has been recorded against the net deferred tax assets including potentially unrealizable net operating losses. The ability to utilize net operating loss carryforwards is limited under various provisions of the Internal Revenue Code. See Note 10 of Notes to Consolidated Financial Statements for additional information.

*Loss from Continuing Operations.* Loss from continuing operations for the three months ended May 3, 2008 was $13.4 million compared to a loss of $15.3 million for the three months ended May 5, 2007. Loss from continuing operations attributable to common shareholders for the first quarter of 2008 was $0.38 per basic and diluted share, compared to a loss of $0.39 per basic and diluted share for the first quarter of 2007. The loss from continuing operations attributable to common shareholders for the first quarter of 2008 was $14.8 million and includes paid-in-kind dividends on our Preferred Stock of $1.4 million. As we issued the Preferred Stock in the second quarter of 2007, there were no Preferred Stock dividends in the first quarter of 2007.

*Discontinued Operations.* The loss from discontinued operations for the three months ended May 3, 2008, net of income tax benefit of $0.3 million, was $9.0 million, or $0.22 per basic and diluted share, compared to a loss of $5.9 million, or $0.15 per basic and diluted share, for the three months ended May 5, 2007. There was no tax benefit on the loss from discontinued operations for the first quarter of 2007. The loss from discontinued operations for the first quarter of 2008 includes a charge for the estimated fair value of remaining lease obligations of $5.3 million, partially offset by a non-cash credit of $2.9 million related to the elimination of the deferred rent liability associated with the recognition of scheduled rent increases on a straight-line basis over the lease term. Our estimated fair value of remaining lease obligations will be adjusted to the lease buyout amount plus negotiation costs in the period lease settlements are executed. Loss from discontinued operations for the first quarter of 2007 included $0.8 million of depreciation expense. Asset impairment charges during the fourth quarter of 2007 eliminated nearly all of the remaining net book value of assets located in the closed stores reported as discontinued operations.

*Net Loss Attributable to Common Shareholders.* Net loss attributable to common shareholders for the first quarter of 2008 was $23.7 million, or $0.60 per basic and diluted share, compared to a net loss for the first quarter of 2007 of $21.3 million, or $0.54 per basic and diluted share. The net loss attributable to common shareholders for the first quarter of 2008 includes loss from continuing operations of $13.4 million, paid-in-kind dividends on our Preferred Stock of $1.4 million and loss from discontinued operations of $9.0 million. The loss attributable to common shareholders for the first quarter of 2007 includes loss from continuing operations of $15.3 million and loss from discontinued operations of $5.9 million.

**Liquidity and Capital Resources**

*Liquidity.* For the three months ended May 3, 2008 and May 5, 2007 and the years ended February 2, 2008 and February 3, 2007, we have incurred net losses of $22.4 million, $21.3 million, $77.5 million, and $33.1 million, respectively, and generated (used) $3.8 million, ($9.3) million, ($28.2) million, and ($14.6) million, respectively, in cash for operating activities. In addition, our $45.6 million cash balance at the beginning of 2006 has decreased to $9.3 million as of May 3, 2008. In connection with our reorganization and partial store liquidation, we stopped making payments under certain of our licensing and lease agreements. We executed amendments to our credit agreement in February 2008. These amendments, among other things, allowed for the liquidation of 158 stores, but limit the amount that can be paid to settle the leases of the liquidated stores. The amendments added a $10.0 million reserve to the borrowing base for revolver borrowings; however, until we provide projections and a business plan that are acceptable to our lender, revolver borrowings are prohibited and the aggregate amount of letters of credit outstanding is limited to $21.0 million. The amendments also require a monthly appraisal of our inventory. As of May 3, 2008, we had not yet provided the projections and business plan required by the amendments. In addition, we are continuing to negotiate settlement agreements with the landlords of the liquidation stores. The final settlement amounts could vary from our estimates and could exceed the amount allowed by our credit agreement.

In order to execute our go forward plans, we will need to amend some of the restrictions in our current credit agreement, or find alternative sources of credit, and raise additional capital during the second quarter of 2008. We are pursuing possible sources of funding, including possible sales of existing assets. However, there can be no assurance

15

that additional funding will be available or can be obtained on terms that are favorable to us, or at all. There is no assurance that the lender in our current credit agreement will agree to amend the terms of the credit agreement. If we are not able to obtain additional capital in the second quarter of 2008, we will not be able to continue our operations outside of bankruptcy. Under certain bankruptcy events, we may be required to redeem shares of our Preferred Stock at their liquidation value. As of May 3, 2008, the aggregate liquidation value of our Preferred Stock, including accrued but unpaid dividends, was $48.2 million. However, the redemption would not be permitted by law, unless we are able to pay our debts as they come due, and would be prohibited by the terms of our existing credit agreement. Our financial statements do not include any adjustments that might result from the outcome of these uncertainties. See Note 2 of Notes to Consolidated Financial Statements for additional information.

*Capital resources.* Our capital requirements are primarily driven by our seasonal working capital needs, investments in new stores, remodeling existing stores, enhancing information systems, and increasing efficiency for our distribution center. In addition, implementation of our key initiatives relating to our new mall accessories store concept will require significant resources, including capital dollars. We plan to largely fund the remodel of our 100 remaining mall stores to the new accessories store concept with proceeds from the liquidation sale; however, we will need additional capital in order to complete this project. Our peak working capital needs typically occur during the period from August through early December as inventory levels are increased in advance of our peak selling season from October through January.

Our future capital requirements depend on the sustained demand for our leather and accessories products. Many factors affect the level of consumer spending on our products, including, among others, general economic conditions, including rising energy prices, customer shopping patterns, interest rates, the availability of consumer credit, weather, the outbreak of war, acts of terrorism or the threat of either, other significant national and international events, taxation, and consumer confidence in future economic conditions. Consumer purchases of discretionary items such as our products tend to decline during periods when disposable income is lower. Consumer spending habits have shifted toward large discount retailers, which has decreased mall traffic, resulting in lower net sales on a quarterly and annual basis.

Our credit agreement, as amended, with General Electric Capital Corporation ("GECC") provides for revolving loan commitments of up to $115.0 million in aggregate principal amount, including a sublimit of $75.0 million for letter of credit obligations. Revolving credit borrowings are currently prohibited under the credit agreement until we provide projections and a business plan that are acceptable to GECC. Upon our satisfaction of these requirements, provided we are in compliance with the covenants to the credit agreement, the aggregate amount of available revolving credit borrowings is limited to:

- 100% of the book value of credit card receivables;

- plus the lesser of $10 million or 100% of the book value of eligible wholesale accounts receivable;

- plus 102.5% of the then applicable discount rate applied in appraising eligible retail inventories times the appraised eligible retail inventories, plus 102.5% of such discount rate times our future retail inventories subject to trade letters of credit;

- plus the lesser of $10 million, or 60% of the book value of our wholesale inventory, including in-transit inventory but minus the book value of in-transit inventory in excess of $5 million;

- plus 60% of the book value of our future wholesale inventories related to trade letters of credit;

- minus a reserve equal to 10% of the lesser of $115.0 million and the maximum amount calculated under the formula described above, plus $10.0 million, plus other reserves as set forth by GECC;

- plus the amount of cash deposited in certain banks under the control of GECC;

- minus the aggregate of letter of credit obligations and certain other advances;

In addition, GECC requires a monthly appraisal of our inventory to determine the value of eligible inventory as if sold in an orderly liquidation, which is then used to establish borrowing limits under the credit agreement. The appraised inventory values are generally lower than the carrying value of inventory and fluctuate throughout the year due to a variety of factors, including seasonality.

16

Source: PreVu, INC, 10-Q, June 17, 2008

During the three months ended May 3, 2008 and as of February 2, 2008, we had no outstanding revolving credit borrowings. We had $10.7 million in outstanding letters of credit at May 3, 2008.

Interest is currently payable on revolving credit borrowings at variable rates determined by the applicable LIBOR plus 1.25% to 1.75%, or the prime rate plus 0.0% to 0.5% (commercial paper rate plus 1.25% to 1.75% if the loan is made under the "swing line" portion of the revolver). The applicable margins will be adjusted quarterly on a prospective basis as determined by the previous quarters' ratio of borrowings to borrowing availability.

We pay monthly fees of 0.25% per annum on the unused portion of the revolving credit commitments, as defined, and per annum fees on the average daily amount of letters of credit outstanding during each month ranging from .625% to .875% in the case of trade letters of credit and from 1.25% to 1.75% in the case of standby letters of credit. Such fees are subject to quarterly adjustment in the same manner as our interest rate margins. The credit agreement expires June 30, 2010, at which time all revolving credit borrowings become due and payable. Any reduction of the revolving credit portion of the credit agreement is subject to prepayment fees under most circumstances. Any such reduction would be subject to a 0.37% prepayment fee if the reduction is made on or prior to June 30, 2008, and 0.185% prepayment fee if prepayment were made after June 30, 2008 but on or prior to December 31, 2008. After December 31, 2008, the revolving credit portion of the credit agreement is prepayable without penalty.

Prior to an amendment dated June 15, 2007, the credit agreement also provided for a $20.0 million Term B promissory note. Interest was payable on the Term B promissory note at a variable rate equal to the LIBOR plus 4.0%. We repaid the $20.0 million balance on June 15, 2007, without a prepayment fee per the consent of the senior lenders, with proceeds from our Preferred Stock and Warrant financing.

The credit agreement, as amended, contains certain restrictions and covenants, which, among other things, restrict our ability to acquire or merge with another entity; make investments, loans or guarantees; incur additional indebtedness; create liens or other encumbrances; or pay cash dividends or make other distributions. Effective with amendments to the credit agreement in February 2008, we are required to provide a daily borrowing base certificate and a monthly appraisal of the inventory value. These amendments also limit the aggregate amount that can be paid to settle the leases of the liquidated stores. Our ability to fund our future working capital requirements are dependent on the availability of revolving credit borrowings and our ability to obtain letters of credit under our credit agreement. As described above, we will need to amend some of the restrictions in our current credit agreement, or find alternative sources of credit, and raise additional capital during the second quarter of 2008 in order to fund our working capital needs and continue our operations outside of bankruptcy. The Preferred Stock has certain redemption features that may require us to redeem the Preferred Stock at its liquidation value upon the occurrence of certain events, including certain bankruptcy events. The liquidation value is equal to $1,000 per share of Preferred Stock, the holders' initial investment, plus all accrued and unpaid dividends. As of May 3, 2008, the aggregate liquidation value of the Preferred Stock was $48.2 million. However, the redemption would not be permitted by law, unless we are able to pay our debts as they come due, and would be prohibited by the terms of our existing credit agreement. As of May 3, 2008, no such triggering events had transpired.

On June 15, 2007, we completed the sale of shares of Series A Convertible Preferred Stock (the "Preferred Stock") and warrants to purchase common stock (the "Warrants") for a total purchase price of $45.0 million to four institutional investors. The Preferred Stock was initially convertible into shares of common stock at a conversion price of $1.50 per share, or 30 million total shares of common stock. Going forward, the number of shares of common stock issuable upon conversion of the Preferred Stock at any time is equal to the stated value of each share of Preferred Stock ($1,000) divided by the conversion price then in effect. As of May 3, 2008, we had 46,667 shares outstanding of Preferred Stock convertible into 31.1 million shares of common stock. The Preferred Stock is entitled to payment-in-kind cumulative dividends of 8.0% per year, issuable semi-annually on June 1 and December 1. As of May 3, 2008, we have accrued dividends representing an additional 1,571 shares of Preferred Stock since the December 1, 2007 declaration, which include 928 shares accrued for the three months ended May 3, 2008.

**Cash Flow Analysis**

*Cash and Cash Equivalents.* We ended the first quarter of 2008 with $9.3 million of cash and cash equivalents, compared with $7.4 million at the end of fiscal 2007. This increase was primarily attributable to the timing of payment of certain expenses of the liquidation sales, net of expense reimbursements from the liquidator.

*Operating Activities.* For the three months ended May 3, 2008, cash generated by operating activities of $3.8 million included the first quarter net loss of $22.4 million, comprised of loss from continuing operations of $13.4 million and loss from discontinued operations of $9.0 million. The first quarter loss from continuing operations included non-cash

17

depreciation and amortization from continuing operations of $1.0 million and a stock-based compensation benefit of $0.2 million.

Cash generated related to changes in operating assets and liabilities included a $2.7 million decrease in inventory, a $0.7 million decrease in net accounts receivable, primarily driven by lower credit card sales volume during the quarter, and a $3.7 million decrease in prepaid expenses, primarily due to the timing of rent payments. The decrease in inventory is net of $21.8 million of inventory attributable to discontinued operations.

Uses of cash related to changes in operating assets and liabilities of continuing operations included a $9.0 million decrease in accounts payable and accrued expenses, primarily driven by lower inventory levels, the reduction in store count, and timing of payments, and a $0.5 million decrease in income taxes payable and other liabilities.

The first quarter 2008 loss from discontinued operations included a non-cash deferred tax credit of $0.3 million, a decrease in inventory of $21.8 million, accrued expenses related to discontinued operations of $8.9 million and a rent credit of $2.9 million related to the write-off of the remaining unrecognized deferred rent credits associated with the straight-line recognition of scheduled rent increases over the lease term. The decrease in inventory included the sale of approximately $21.4 million of inventory through the liquidation sales during the first quarter of 2008. The accrued expenses of discontinued operations consist primarily of $5.3 million for the estimated fair value of the remaining lease obligations, $2.3 million of other accrued rents and a payable of $0.7 million related to the liquidation sales. See Note 4 of Notes to Consolidated Financial Statements for additional information about the liquidation sales.

For the first three months of 2007, the $9.3 million of cash used in operating activities included the first quarter net loss of $21.3 million, comprised of loss from continuing operations of $15.3 million and loss from discontinued operations of $5.9 million. Uses of cash related to changes in operating assets and liabilities included a $5.1 million decrease in accounts payable and accrued expenses, primarily due to the timing of inventory receipts and related payments as well as decreases in gift card liabilities and other volume related expense accruals.

These uses of cash were somewhat offset by non-cash adjustments of $2.1 million for depreciation and amortization of continuing operations and $0.3 million related to stock-based compensation. Cash generated related to changes in operating assets and liabilities included a $12.4 million decrease in inventory, a $0.8 million decrease in net accounts receivable, including a volume driven decrease in credit card receivables and a $0.5 million decrease in prepaid expenses, primarily related to prepaid insurance premiums, marketing programs and store supplies.

The first quarter 2007 loss from discontinued operations included $0.8 million of non-cash expense related to depreciation and amortization.

*Investing Activities.* Cash used in investing activities of $1.7 million and $1.2 million for the three months ended May 3, 2008 and May 5, 207, was entirely for capital expenditures. Our capital expenditures for the first three months of 2008 were primarily related to the renovation and improvement of our outlet and mall stores. We will need additional capital in order to continue our capital expenditure plans for the remainder of fiscal 2008, which include the completion of the remodel of our remaining mall stores. See "Liquidity and Capital Resources" for additional information.

Our capital expenditures for the first three months of 2007 included $0.7 million primarily related to the renovation and improvement of existing stores and leasehold improvements for new mall stores, $0.4 million for certain information systems projects, primarily new point-of-sale software, and $0.1 million in other administrative fixed assets.

*Financing Activities.* Cash used in financing activities for the first three months of 2008 of $0.2 million was primarily attributable to costs incurred related to amendments to our credit agreement executed in February 2008. The first quarter 2008 issuance of common stock from our employee stock purchase plan was a nominal amount.

Cash used in financing activities for the first three months of 2007 was negligible as the first quarter 2007 issuance of common stock from our employee stock purchase plan was mostly offset by costs incurred related to amending our credit agreement.

### Contractual obligations

At May 3, 2008, we had $0.8 million and $0.6 million of unrecognized tax benefits and related accrued interest and penalties, respectively, recognized as long-term liabilities. We are uncertain as to how much, if any, of these contingent liabilities may ultimately be settled in cash. We had $10.7 million of standby and documentary letters of credit outstanding

18

Source: PreVu, INC, 10-Q, June 17, 2008

at May 3, 2008. We also have store operating leases that we have committed to in the ordinary course of business. Of the 163 stores we closed during the first quarter of 2008, approximately 130 stores were closed prior to the end of their respective lease terms. The remaining lease terms average approximately 40 months and range from less than one year to up to ten years. The leases have a total of approximately $40.0 million of future minimum payments due over their remaining terms. The Company is currently in negotiations with its landlords to obtain settlements for these leases. As of May 3, 2008, current liabilities of discontinued operations include $2.3 million of accrued rent and $5.3 million for the estimated fair value of remaining lease obligations accrued in accordance with SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." We will adjust the estimated fair value of remaining lease obligations to the lease buyout amount plus negotiation costs in the period lease settlements are executed.

**Off-balance sheet arrangements**

We have operating lease commitments as noted above. There are no other off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in our financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors.

**Seasonality and inflation**

A majority of our net sales and operating profit is generated in the peak selling period from October through January, which includes the holiday selling season. As a result, our annual operating results have been, and will continue to be, heavily dependent on the results of our peak selling period. Net sales are generally lowest during the period from April through July, and we typically do not become profitable, if at all, until the fourth quarter of a given year. Most of our stores are unprofitable during the first three quarters. Conversely, in a typical year nearly all of our stores are profitable during the fourth quarter, even those that may be unprofitable for the full year. During the fourth quarter of 2007, most of our mall stores were not profitable due to poor operating performance and asset impairment charges. Historically, we have opened most of our stores during the last half of the year. As a result, new mall stores opened just prior to the fourth quarter produce profits in excess of their annualized profits since the stores typically generate losses in the first nine months of the year.

We do not believe that inflation has had a material effect on the results of operations during the past three years; however, there can be no assurance that our business will not be affected by inflation in the future.

**Recently issued accounting pronouncements**

For information regarding recent accounting pronouncements and their expected impact on our future consolidated results of operations and financial condition, see Note 3 of Notes to Consolidated Financial Statements.

**Forward-looking statements**

Except for historical information, matters discussed in Item 2. "Management's Discussion and Analysis of Financial Condition and Results of Operations" contain certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements involve risks and uncertainties, and actual results may be materially different. Because actual results may differ, readers are cautioned not to place undue reliance on forward-looking statements. Such statements are based on information available to management as of the time of such statements and include statements related to, among other things, future comparable store sales results, business strategies, changes to merchandise mix, and future sales results. Factors that could cause actual results to differ include: our ability to obtain necessary funding during the second quarter of 2008, which may also require an amendment to our credit agreement; potential delisting of our common stock if we are unable to satisfy the Nasdaq listing requirements; our ability to exit store leases for 130 of the liquidation stores on terms acceptable to us and our lender; our ability to utilize our tax net operating loss carryforwards; our ability to expand our accessories business and acquire suitable accessories brands; risks associated with our ability to strengthen our existing store base and develop our accessories concept; continued declines in comparable store sales; dependence on our key suppliers to implement our designer brand merchandise strategy; changes in customer shopping patterns; the potential for additional impairment losses if our operating performance does not improve; competition in our markets; uncertainty in general economic conditions; unseasonably warm weather; our ability to effectively respond to changes in fashion trends and consumer demands; decreased availability and increased cost of leather; risks associated with foreign sourcing and international business; seasonality of our business; the public sale into the market of common stock issued pursuant to options granted under our employee benefit plans or shares issued in our 2004 equity financing or issuable upon exercise

19

Source: PreVu, INC, 10-Q, June 17, 2008

of warrants delivered in connection with our 2004 equity financing, as well as shares issuable upon conversion and exercise of the preferred stock and warrants issued in connection with the financing that was completed on June 15, 2007; risks associated with estimates made by management based on our critical accounting policies; changes to financial accounting standards that may affect our results of operations; loss of key members of our senior management team; concentration of ownership of our common stock; volatility of the market price of our common stock; reliance on third parties for upgrading and maintaining our management information systems; war, acts of terrorism or the threat of either; and interruption in the operation of our corporate offices and distribution center. For a further description of our risk factors, please see "Risk Factors" as detailed in Part I, Item 1A. that begins on page 10 of our 2007 Annual Report on Form 10-K and the changes to our risk factors detailed in Part II, Item 1A. "Risk Factors."

### ITEM 3.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Outstanding borrowings under our credit agreement carry interest rate risk that is generally related to LIBOR, the commercial paper rate or the prime rate. If any of those rates were to change while we were borrowing under the credit agreement, interest expense would increase or decrease accordingly. As of May 3, 2008, we had no outstanding revolver borrowings and had $10.7 million in outstanding letters of credit.

### ITEM 4T.  CONTROLS AND PROCEDURES

#### Disclosure Controls and Procedures

We have established and maintain disclosure controls and procedures that are designed to ensure that material information relating to us and to our subsidiaries required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our interim chief executive officer and our chief financial officer as appropriate to allow timely decisions regarding required disclosure. We carried out an evaluation, under the supervision and with the participation of our management, including our interim chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, our interim chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of the date of such evaluation.

#### Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### PART II — OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

Refer to Note 12 of Notes to Consolidated Financial Statements for information about legal proceedings.

### ITEM 1A. RISK FACTORS

There have been no material changes in the risk factors we disclosed under Part I, Item 1A. "Risk Factors" that begins on page 10 of our 2007 Annual Report on Form 10-K, except for the modifications reflected in the risk factors listed below:

*We may not be able to maintain our listing on The Nasdaq Global Market if we are unable to demonstrate our ability to achieve and sustain compliance over an extended period and, if we fail to do so, the price and liquidity of our common stock may decline.*

On June 3, 2008, we received a Nasdaq Staff Determination indicating that our securities are subject to delisting from The Nasdaq Global Market. We have requested a hearing before a Nasdaq Listing Qualifications Panel ("Panel") to review the Staff Determination. On April 15, 2008, Nasdaq advised us that we failed to comply with the minimum $10.0 million stockholders' equity requirement for continued listing on The Nasdaq Global Market as set forth in Marketplace Rule 4450(a)(3). We subsequently responded to Nasdaq on April 30, 2008, outlining a plan for regaining compliance and requesting an additional period of time to execute our plan before facing possible delisting from The

20

Nasdaq Global Market. The June 3rd Nasdaq letter reported the Nasdaq Staff's determination that our plan did not demonstrate a definitive plan to achieve near term compliance or sustain compliance over an extended period.

Furthermore, on February 15, 2008, the Staff notified us that the closing bid price of our common stock had been below $1.00 for 30 consecutive trading days, and accordingly, that we did not comply with Marketplace Rule 4450(a)(5). In addition, on May 1, 2008, the Staff notified us that the minimum market value of our publicly held common shares had been below $5.0 million for 30 consecutive trading days, and accordingly, that we did not comply with Marketplace Rule 4450(a)(2).

We cannot provide any assurance that the Panel will decide to allow us to remain listed or that our actions will prevent the delisting of our common stock from The Nasdaq Global Market. Our common stock will remain listed under the symbol "WLSN" on The Nasdaq Global Market until the Panel makes a formal decision following the appeal hearing. Delisting of our common stock would have a negative effect on the market price for our shares and could limit our ability to raise additional capital.

### Our comparable store sales declined during each of the last three fiscal years.

Our comparable store sales decreased 8.8% in the three months ended May 3, 2008. Our comparable store sales decreased by 10.4% in fiscal 2007, including a 2.4% decrease in the fourth quarter. In fiscal 2006, our comparable store sales declined 17.2%, including a 21.6% decrease in the fourth quarter. Our comparable store sales declined 2.9% in fiscal 2005. Our comparable store sales are affected by a variety of factors, including:

- general economic conditions and, in particular, the retail sales environment;
- consumer shopping preferences;
- transition of our target customer base;
- level of acceptance of our designer brand merchandise offerings;
- acceptance of the *Wilsons Leather* brand;
- actions by competitors or mall anchor tenants;
- weather conditions;
- fashion trends;
- changes in our merchandise mix;
- the timing of new store openings and the relative proportion of new stores to mature stores;
- maintaining appropriate inventory levels;
- calendar shifts of seasonal periods; and
- timing of promotional events.

A continued inability to generate comparable store sales increases in the future would erode operating margins if we were unable to implement additional cost reductions and could have a material adverse effect on our business, financial condition and results of operations.

### We may need to record additional impairment charges in the future.

We continually review our stores' operating performance and evaluate the carrying value of their assets in relation to their expected future cash flows. In those cases where circumstances indicate that the carrying value of the applicable assets may not be recoverable, we record an impairment loss related to the long-lived assets. In order to execute our go forward plans, we are pursuing possible sources of funding, including possible sales of existing assets. We are also considering additional store closures to optimize cash flow. As of May 3, 2008, all of our assets were considered "held-and-used" as the criteria considered for "held-for-sale" accounting had not been met. As of May 3, 2008, we evaluated the potential for impairment of long-lived assets as "held-and-used" and our analysis did not result in an impairment of long-lived assets as of May 3, 2008. If the criteria for "held-for-sale" accounting is met, we can only consider the expected cash flows from the sale of the assets, net of transaction costs, in our analysis, which may result in future impairment charges.

### ITEM 6. EXHIBITS

The exhibits listed on the accompanying exhibit index are filed or incorporated by reference (as stated therein) as part of this Quarterly Report on Form 10-Q.

21

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

WILSONS THE LEATHER EXPERTS INC.

By:    /s/ STACY A. KRUSE
       Stacy A. Kruse
       Chief Financial Officer and Treasurer

Date: June 17, 2008

22

**INDEX TO EXHIBITS**

| Exhibit No | Description | Method of Filing |
|---|---|---|
| 3.1 | Amended and Restated Articles of Incorporation of Wilsons The Leather Experts Inc. adopted June 16, 1998, as amended by the Articles of Amendment dated February 17, 2000, and the Articles of Amendment dated May 23, 2002. (1) | Incorporated by Reference |
| 3.2 | Restated Bylaws of Wilsons The Leather Experts Inc. as amended June 16, 1998, January 25, 2000, May 23, 2002, and February 5, 2004. (2) | Incorporated by Reference |
| 4.1 | Specimen of common stock certificate. (3) | Incorporated by Reference |
| 4.2 | Registration Rights Agreement dated as of May 25, 1996, by and among CVS New York, Inc. (formerly known as Melville Corporation), Wilsons The Leather Experts Inc., the Managers listed on the signature pages thereto, Leather Investors Limited Partnership I and the Partners listed on the signature pages thereto. (4) | Incorporated by Reference |
| 4.3 | Amendment to Registration Rights Agreement dated as of August 12, 1999, by and among Wilsons The Leather Experts Inc. and the Shareholders listed on the attachments thereto. (5) | Incorporated by Reference |
| 4.4 | Common Stock and Warrant Purchase Agreement, dated as of April 25, 2004, by and among Wilsons The Leather Experts Inc. and the Purchasers identified on the signatory pages thereto (the "Purchase Agreement"). (6) | Incorporated by Reference |
| 4.5 | Registration Rights Agreement, dated as of April 25, 2004, by and among Wilsons The Leather Experts Inc. and the Investors identified therein. (7) | Incorporated by Reference |
| 4.6 | Form of Warrant issued to the Purchasers named in the Purchase Agreement on April 25, 2004. (8) | Incorporated by Reference |
| 10.1† | Agency Agreement dated as of February 14, 2008 between a joint venture composed of Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC and HRE Holdings, LLC and Rosedale Wilsons, Inc., Wilsons Leather Holdings Inc. and the other parties thereto. | Electronic Transmission |
| 10.2 | Third Amendment to Fifth Amended and Restated Credit Agreement dated as of February 14, 2008, among Wilsons Leather Holdings Inc., General Electric Capital Corporation, as Lender, Term Lender, Swing Line Lender and Agent, the Credit Parties signatory thereto and the Lenders signatory thereto. | Electronic Transmission |
| 10.3 | Fourth Amendment to Fifth Amended and Restated Credit Agreement dated as of February 25, 2008, among Wilsons Leather Holdings Inc., General Electric Capital Corporation, as Lender, Term Lender, Swing Line Lender and Agent, the Credit Parties signatory thereto and the Lenders signatory thereto. | Electronic Transmission |
| 10.4 | Separation Agreement dated March 28, 2008 by and between Michael Searles and Wilsons The Leather Experts Inc. | Electronic Transmission |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of Interim Chief Executive Officer. | Electronic Transmission |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of Chief Financial Officer. | Electronic Transmission |
| 32.1 | Certification of Interim Chief Executive Officer pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | Electronic Transmission |

23

Source: PreVu, INC, 10-Q, June 17, 2008

| Exhibit No | Description | Method of Filing |
|---|---|---|
| 32.2 | Certification of Chief Financial Officer pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | Electronic Transmission |

---

1.  Incorporated by reference to the same numbered exhibit to the Company's Report on Form 10-Q for the quarter ended May 4, 2002 (File No. 000-21543).

2.  Incorporated by reference to the same numbered exhibit to the Company's Report on Form 10-K for the year ended January 31, 2004 (File No. 000-21543).

3.  Incorporated by reference to the same numbered exhibit to Amendment No. 1 to the Company's Registration Statement on Form S-1 (333-13967) filed with the Commission on December 24, 1996.

4.  Incorporated by reference to Exhibit 4.8 to the Company's Registration Statement on Form S-1 (333-13967) filed with the Commission on October 11, 1996.

5.  Incorporated by reference to Exhibit 4.5 to the Company's Report on Form 10-K for the fiscal year ended January 29, 2000, filed with the Commission (File No. 000-21543).

6.  Incorporated by reference to Exhibit 4.1 to the Company's Report on Form 8-K filed with the Commission on April 27, 2004.

7.  Incorporated by reference to Exhibit 4.2 to the Company's Report on Form 8-K filed with the Commission on April 27, 2004.

8.  Incorporated by reference to Exhibit 4.3 to the Company's Report on Form 8-K filed with the Commission on April 27, 2004.

†  Certain portions of this exhibit have been omitted pursuant to a request for confidential treatment and have been filed separately with the Securities and Exchange Commission.

Source: PreVu, INC, 10-Q, June 17, 2008

Exhibit 10.1

## AGENCY AGREEMENT

This Agency Agreement is made as of this 14th day of February, 2008, by and between a joint venture composed of HILCO MERCHANT RESOURCES, LLC, GORDON BROTHERS RETAIL PARTNERS, LLC and HILCO REAL ESTATE, LLC (the "Agent") and ROSEDALE WILSONS, INC., WILSONS LEATHER HOLDINGS INC., AND THOSE ENTITIES LISTED ON EXHIBIT 1A HERETO, all with a principal place of business at 7401 Boone Avenue North, Brooklyn Park, Minnesota 55428 (jointly and severally, the "Merchant").

## R E C I T A L S

WHEREAS, the Merchant desires that the Agent act as the Merchant's exclusive agent for the limited purpose of (a) selling the Merchandise (as hereinafter defined) in Merchant's retail store locations listed on Exhibit 1B attached hereto (each, individually, a "Store", and, collectively, the "Stores"), by means of a promotional, store closing or similar sale (the "Store Closing Sale"), (b) selling the FF&E located at the Stores (the "FF&E Sale"), and (c) selling, assigning, terminating or otherwise mitigating Merchant's damages with respect to, the leases (each, a "Lease" and, collectively, the "Leases") of the properties listed on Exhibit 1C attached hereto (each, a "Leased Property" and, collectively, the "Leased Properties") (collectively with the Store Closing Sale and the FF&E Sale, the "Comprehensive Sale").

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and the Merchant hereby agree as follows:

Section 1. Defined Terms. All capitalized terms used herein shall have the meanings ascribed to them in this Agreement:

\*\*\*

Material has been omitted pursuant to a request for confidential treatment and such material has been filed separately with the Securities and Exchange Commission. A series of three asterisks within brackets denotes omissions.

Section 2. <u>Appointment of Agent</u>. The Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as the Merchant's exclusive agent for the limited purpose of conducting the Comprehensive Sale in accordance with the terms and conditions of this Agreement.

Section 3. <u>Consideration to Merchant and Agent for Store Closing Sale.</u>

3.1 <u>Payment(s) to Merchant.</u>

(a) (i) As a guaranty of Agent's performance hereunder, Merchant shall receive from Agent the sum of 77% of the aggregate Cost Price of the Merchandise, except for Transfer Merchandise and Warehouse Merchandise received at the Stores on and after the Cutoff Date, as to which such percentage shall be the product of 77% times the complement of the then prevailing Store Closing Sale discount at the time of the receipt of such Merchandise at the Stores (the "<u>Guaranteed Amount</u>"). The "<u>Cutoff Date</u>" shall mean twenty-one (21) days after the Sale Commencement Date, provided that, the aggregate Cost Price of Transfer Merchandise, On-Order Merchandise, and Warehouse Merchandise received at the Stores between the 14th and 21st day after the Sale Commencement Date shall not exceed $1,000,000. In addition, Agent guarantees that Proceeds shall be no less than the sum of the Guaranteed Amount and Expenses hereunder.

(ii) To the extent that Proceeds exceed the sum of the Guaranteed Amount, plus all Expenses, plus the Agent's Fee ("<u>Sharing Threshold</u>"), Merchant shall receive from Agent 50% of such excess Proceeds (the "<u>Recovery Amount</u>").

(iii) Agent shall pay to Merchant the Guaranteed Amount and the Recovery Amount, if any, in the manner and at the times specified in <u>Section 3.3</u> below. The Guaranteed Amount, the Recovery Amount and the Agent's Fee will be calculated based upon (A) the aggregate Cost Price of items of Merchandise established in accordance with Section 5.1

2

hereof and (B) reconciliation by Merchant and Agent of Transfer Merchandise and Warehouse Merchandise received at the Stores in the manner provided herein.

(b) The Guaranteed Amount and Recovery Amount have been calculated and agreed upon based upon Merchant's representation that (i) the aggregate Cost Price of the Merchandise in the Stores on the Sale Commencement Date will not be more than 20.8 million (the "Merchandise Ceiling") and (ii) all such Merchandise will conform to Merchant's representations and warranties contained herein, and that no representations, warranties or covenants of Merchant hereunder have been breached. Merchant and Agent agree that in the event that the Cost Price of Merchandise is more than the Merchandise Ceiling, then the percentage on which the Guaranteed Amount is based shall be reduced as provided in Exhibit 3.1 attached hereto.

3.2 Compensation to Agent. Agent shall receive as its base compensation for services rendered to Merchant in connection with the Store Closing Sale, excess Proceeds of the Store Closing Sale after payment of the Guaranteed Amount and all Expenses, in an amount up to 7.3% of the aggregate Cost Price of the Merchandise (the "Agent's Fee"). In addition, following payment of the Guaranteed Amount, all Expenses and the Agent's Fee, if any, Agent shall receive and/or retain 50% of any excess Proceeds of the Store Closing Sale above the Sharing Threshold ("Agent's Additional Fee").

Provided that no Event of Default has occurred and continues to exist on the part of the Agent, all Merchandise remaining at the conclusion of the Store Closing Sale shall become the property of Agent, free and clear of all liens, claims and encumbrances of any kind or nature; provided, however, that Agent shall use commercially reasonable efforts to sell all Merchandise to the piece by the conclusion of the Store Closing Sale.

3

3.3 <u>Time of Payments</u>. Immediately following the weekly Store Closing Sale reconciliation by Merchant and Agent pursuant to <u>Section 8.8</u> below, until the Guaranteed Amount has been paid in full, Merchant shall retain the Proceeds from sales of Merchandise during the prior week (i.e., Sunday through Saturday) less the Expenses incurred during such week (the "<u>Weekly Net Proceeds</u>"), which Weekly Net Proceeds shall be applied to and credited against the Guaranteed Amount. After the amount of Weekly Net Proceeds applied and credited against the Guaranteed Amount equals the Guaranteed Amount, all Weekly Net Proceeds collected by Merchant shall be paid by Merchant to Agent. Any Expenses incurred directly by Agent shall be paid by Merchant to Agent by wire transfer of immediately available funds on such weekly basis.

The Guaranteed Amount attributable to Transfer Merchandise, Warehouse Merchandise and Returned Merchandise received at the Stores after the Cutoff Date shall be reconciled on a weekly basis for all such items received during the prior week (i.e., Sunday through Saturday). Any such payment shall be made immediately following the weekly Store Closing Sale reconciliation by Merchant and Agent pursuant to <u>Section 8.8</u> below.

Within ten (10) days after completion by Merchant and Agent of the final Store Closing Sale reconciliation pursuant to <u>Section 8.8</u> below, Agent shall pay to Merchant any unpaid portion of the Guaranteed Amount and the Recovery Amount due hereunder, if any.

All payments by Merchant to Agent or Agent to Merchant hereunder shall be by wire transfer of immediately available funds; provided, however, Merchant agrees that any amounts due by Agent to Merchant pursuant to this <u>Section 3</u> may in Agent's discretion be offset by the amount of Proceeds which have not, as of the applicable date of payment by Agent to Merchant, been transferred by Merchant to Agent.

4

3.4 <u>Agent Letter of Credit</u>. To secure payment of the Guaranteed Amount, Expenses, and any other amounts due from Agent to Merchant hereunder, Agent shall deliver to Merchant an irrevocable standby letter of credit in the original face amount of $5,000,000 naming Merchant as beneficiary, substantially in the form of <u>Exhibit 3.4</u> attached hereto (the "<u>Agent Letter of Credit</u>"). Agent shall use its best efforts to cause the Agent Letter of Credit to be delivered no later than two (2) business days following the Sale Commencement Date. The Agent Letter of Credit shall be issued by a bank selected by Agent and reasonably acceptable to Merchant, and shall contain terms, provisions and conditions mutually acceptable to Agent and Merchant. In the event that Agent shall fail to pay to Merchant any amount required to be paid hereunder, Merchant shall be entitled to draw on the Agent Letter of Credit to fund such amount following five (5) days' written notice to Agent of Merchant's intention to do so, provided that no material default or Event of Default has then occurred on the part of the Merchant hereunder and is continuing. The Agent Letter of Credit shall expire on June 30, 2008, provided that in the event that Agent shall have paid to Merchant the Guaranteed Amount prior to such date, Merchant agrees to surrender the original Agent Letter of Credit to the issuer thereof together with written notification that the Agent Letter of Credit may be terminated. Merchant and Agent agree that the face amount of the Agent Letter of Credit may be reduced from time to time after payment of amounts due hereunder upon mutual agreement of Agent and Merchant in good faith.

3.5 <u>Merchant Letter of Credit</u>. To secure payment of the Agent's Fee, Agent's Additional Fee, Expenses paid by Agent and any other amounts due from Merchant to Agent hereunder, including, without limitation, amounts paid by Agent or required to be paid to Agent under <u>Section 17</u> hereof, Merchant shall deliver to Agent an irrevocable standby letter of

5

# Exhibit 6-B

credit in the original face amount of $3,000,000 naming Agent as beneficiary, substantially in the form of <u>Exhibit 3.5</u> attached hereto (the "<u>Merchant Letter of Credit</u>"). Merchant shall use its best efforts to cause the Merchant Letter of Credit to be delivered no later than two (2) business days following the Sale Commencement Date. The Merchant Letter of Credit shall be issued by a bank selected by Merchant and reasonably acceptable to Agent, and shall contain terms, provisions and conditions mutually acceptable to Agent and Merchant. In the event that Merchant shall fail to pay to Agent any amount required to be paid hereunder, Agent shall be entitled to draw on the Merchant Letter of Credit to fund such amount following five (5) days' written notice to Merchant of Agent's intention to do so, provided that no material default or Event of Default has then occurred on the part of the Agent hereunder. On the day that is five (5) days after the final reconciliation of the Store Closing Sale pursuant to <u>Section 8.8</u> hereof, but in no event later than June 30, 2008, the face amount of the Merchant Letter of Credit shall be reduced to $1,000,000, provided, that, as of such date, the Agent's Fee, Agent's Additional Fee, and the Expenses have been paid to or escrowed on behalf of Agent. The Merchant Letter of Credit shall expire on January 31, 2009, provided that in the event that the final reconciliation of the Store Closing Sale pursuant to <u>Section 8.8</u> hereof shall have been completed and all amounts paid by Agent or required to be paid to Agent under <u>Section 17</u> hereof shall have been paid prior to such date, Agent agrees to surrender the original Merchant Letter of Credit to the issuer thereof together with written notification that the Merchant Letter of Credit may be terminated.

Section 4. <u>Expenses of the Store Closing Sale</u>.

4.1 <u>Expenses</u>. Agent shall be solely responsible for all Expenses incurred in conducting the Store Closing Sale; provided, however, that Expenses shall be paid by

6

Merchant as provided in <u>Section 3.3</u> hereof. Notwithstanding the foregoing, Agent shall be responsible for all Expenses, even if Proceeds are insufficient. To the extent the incurrence of any Expense is discretionary, Agent shall consult with Merchant with respect to the amount and type of such Expense utilized during the Sale Term. Agent shall provide an accounting to Merchant of all Expenses from time to time upon Merchant's request during the Sale Term and as part of the final reconciliation. As used herein, "<u>Expenses</u>" shall mean Store-level operating expenses of the Store Closing Sale that arise during the Sale Term at the Stores limited to the following:

(a) base payroll and commissions for Retained Employees for actual days/hours worked during the Sale Term;

(b) amounts actually payable in respect of FICA, unemployment taxes, worker's compensation and health care insurance benefits for Retained Employees (excluding vacation days or vacation pay, sick days or sick leave, maternity leave or other leaves of absence, termination or severance pay, union dues, pension benefits, ERISA coverage and similar contributions), in an amount not to exceed 22% of base payroll (exclusive of Retention Bonuses) for the Retained Employees in the aggregate (the "<u>Benefits Cap</u>");

(c) Agent's commercially reasonable supervision fees and expenses (including, without limitation, travel costs and bonuses);

(d) advertising and signage expenses (at Agent's actual documented cost);

(e) long distance telephone expenses incurred in the conduct of the Store Closing Sale;

7

Source: PreVu, INC, 10-Q, June 17, 2008

(f) credit card and bank card fees and discounts (at Merchant's actual costs), chargebacks and costs of returned checks;

(g) costs of security personnel in the Stores and for armored car service;

(h) a pro-rata portion of Merchant's casualty insurance premiums attributable to the Merchandise;

(i) costs of transfers of Merchandise during the Sale Term between the Stores, excluding any cost associated with transferring Transfer Merchandise, On-Order Merchandise and Warehouse Merchandise to the Stores;

(j) Retention Bonuses as described in Section 9.4 below;

(k) Agent's documented letter of credit fees for the Agent Letter of Credit;

(l) Agent's reasonable legal fees and expenses and other transaction reasonable costs, including, without limitation, Agent's out-of-pocket costs, such as travel and other incidental costs incurred by Agent in connection with performance of the transactions contemplated hereby and in accordance with Merchant's Travel Policy, which shall be provided to Agent;

(m) costs and expenses of additional Supplies as provided in Section 8.4;

(n) Occupancy Expenses, limited on a per diem per Store basis and limited to those amounts and categories as described in Exhibit 4.1 attached hereto;

(o) Actual costs incurred by Agent of obtaining all permits, licenses, consents and approvals required under Section 10(a) hereof;

8

Source: PreVu, INC, 10-Q, June 17, 2008

(p) the costs and expenses of providing such additional services that the Agent in its reasonable discretion deems appropriate; and

(q) 50% of the fees and costs of the inventory taking service to conduct the Inventory Taking.

"Expenses" shall not include: (i) Excluded Benefits; (ii) any rent or occupancy expenses related to the Stores other than Occupancy Expenses; (iii) Central Service Expenses; (iv) any rent, occupancy and other expenses relating to the Warehouse or for the transfer of Transfer Merchandise, On-Order Merchandise or Warehouse Merchandise to the Stores; (v) any costs, expenses and liabilities that would otherwise constitute "Expenses" hereunder but that were not disclosed to Agent prior to the date of this Agreement and (vi) except for costs, expenses or liabilities subject to bona fide disputes, any other costs, expenses or liabilities payable by Merchant, all of which shall be paid by Merchant promptly when due for and during the Sale Term. Notwithstanding anything herein to the contrary, to the extent that any Expense listed in Section 4.1 is also included on Exhibit 4.1, then Exhibit 4.1 shall control and such Expense shall not be double counted.

As used herein, the following terms have the following respective meanings:

"Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Store Closing Sale, including, but not limited to, sales audit, MIS services, POS systems, payroll processing, cash reconciliation, inventory processing and handling and data processing and reporting.

"Excluded Benefits" means (i) vacation days or vacation pay, sick days or sick leave, maternity leave or other leaves of absence, termination or severance pay, union dues,

9

Source: PreVu, INC, 10-Q, June 17, 2008

pension benefits, ERISA coverage and similar contributions and (ii) payroll taxes, worker's compensation and health insurance benefits in excess of the Benefits Cap.

"Occupancy Expenses" means base rent, percentage rent, HVAC, utilities, CAM, real estate and use taxes, merchant's association dues, merchant's marketing and promotional funds, merchant's sprinkler fees and building insurance relating to the Stores, limited on a per diem, per Store basis and limited to those amounts and categories as described on Exhibit 4.1 attached hereto.

4.2 Payment of Expenses. All Expenses incurred during each week of the Store Closing Sale (i.e., Sunday through Saturday) shall be paid by Merchant out of Proceeds as provided in Section 3.3 above, immediately following the weekly Store Closing Sale reconciliation by Merchant and Agent pursuant to Section 8.8 below, based upon invoices and other documentation reasonably satisfactory to Agent and Merchant.

Section 5. Inventory Valuation; Merchandise.

5.1 Inventory Taking

Merchant and Agent shall cause to be taken a SKU or "scan" price inventory of the Merchandise and an audit of the Ticketed Price of the Merchandise (the "Inventory Taking") commencing at the close of business at each of the Stores on a date mutually agreed upon by Agent and Merchant (the date of the Inventory Taking at each Store being the "Inventory Date" for such Store). Merchant and Agent shall jointly employ RGIS, WIS or another mutually acceptable inventory taking service to conduct the Inventory Taking. Agent shall be responsible for 50% of the costs and fees of the inventory taking service as an Expense hereunder, and the balance of such costs and fees shall be paid by Merchant, provided, however, that Merchant shall not be responsible for out-of-pocket costs (which costs shall be treated as an Expense hereunder)

10

Source: PreVu, INC, 10-Q, June 17, 2008

incurred by Agent in connection with the presence of Agent's employees or representatives at the Inventory Taking. Except as provided in the immediately preceding sentence, Merchant and Agent shall bear their respective costs and expenses relative to the Inventory Taking. Merchant and Agent shall each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the inventory taking service. Merchant agrees that during the conduct of the Inventory Taking at each Store such Store shall be closed to the public and no sales or other transactions shall be conducted. The procedures to be used in the conduct of the Inventory Taking and its verifications are set forth on Exhibit 5.1 attached hereto. In order to facilitate the Inventory Taking, Merchant agrees to make its SKU data files and related computer hardware and software available to Agent and the inventory taking service commencing prior to the Inventory Date. In connection with the Inventory Taking, but prior to the final verification thereof, Agent and Merchant shall perform an audit of the Ticketed Price by comparing a sample of SKU selling prices of items of Merchandise ascertained from the Inventory Taking with the actual prices at which such items of Merchandise were offered to the public at the Stores as of the Inventory Date. The procedures for this audit shall be agreed upon between Merchant and Agent in good faith. If the SKU selling price is greater than the actual price at which items of Merchandise were offered to the public as of the Inventory Date, Merchant and Agent shall agree on an adjustment to the Cost Price to account for such discrepancy in good faith.

5.2 In the event that the Store Closing Sale commences at any Store prior to the completion of the Inventory Taking at such Store, then for the period from the Sale Commencement Date for such Store until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes ("Gross

11

Source: PreVu, INC, 10-Q, June 17, 2008

Rings") and (ii) cash reports of sales within such Store. Register receipts shall show for each item sold, the SKU and price paid for such item in connection with such sale. All such records and reports, including the master inventory file, shall be made available to Agent and Merchant during regular business hours upon reasonable notice. Merchant and Agent will reconcile each item of Merchandise reflected in the Gross Rings against the master inventory file of Merchant as of the Sale Commencement Date to establish the unadjusted Retail Price, Ticketed Price and Cost Price of such item of Merchandise. The unadjusted Retail Price, Ticketed Price, and Cost Price determined in accordance with the above, will each be adjusted (i) to account for shrinkage by multiplying them by 101.3% and (ii) to address Defective Merchandise by a process to be agreed to by Merchant and Agent..

   5.3 Merchandise Subject to this Agreement. (a) For purposes of this Agreement, "Merchandise" shall mean all: (i) first quality finished goods inventory that is located at the Stores as of the Sale Commencement Date saleable in the ordinary course of business; (ii) Repair and Special Order Merchandise that is not picked up by customers prior to the Cutoff Date; (iii) Transfer Merchandise; (iv) Warehouse Merchandise; and (v) On-Order Merchandise. Notwithstanding the foregoing, "Merchandise" shall not include: (1) Defective Merchandise; (2) goods that belong to third party sublessees, licensees or concessionaires of Merchant other than Merchant; (3) goods held by Merchant on memo, on consignment or as bailee for a third party other than Merchant; (4) furnishings, trade fixtures, equipment and improvements to real property which are located in the Stores or the Warehouse (collectively, "FF&E"); (5) Transfer Merchandise, On-Order Merchandise and Warehouse Merchandise received at any Store after the Cutoff Date, unless Agent in its discretion elects to include such goods in Merchandise; (6) goods so damaged that they are not saleable in the ordinary course of

12

Source: PreVu, INC, 10-Q, June 17, 2008

business at any price; (7) Returned Defective Merchandise; and (8) Repair and Special Order Merchandise picked up by customers prior the Cutoff Date.

(b) As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise that is agreed upon and identified by Agent and Merchant as defective or otherwise not saleable in the ordinary course because it is dented, worn, scratched, broken, faded, torn, mismatched or affected by other similar defects rendering it not first quality, but that is not so damaged that it is not saleable in the ordinary course of business at any price. Sample merchandise and merchandise on display shall not per se be deemed to be Defective Merchandise so long as (x) the original packaging (including warranty information, if any warranty applies, and all supplied accessories) for such Merchandise is intact and available if needed to make the item saleable in the ordinary course, and (y) such Merchandise remains subject to its original warranty, if applicable.

"Repair and Special Order Merchandise" means all items of Merchandise held at the Stores for repair, or customer-specific special orders for goods, in each case where (i) the documentation is clear as to the name, address, telephone number, date of last payment and balance due from the customer, and (ii) the goods subject to repair or special order are properly identified, segregated and in a condition as described in the documentation.

"Transfer Merchandise" means first quality seasonal store Merchandise, outlet distribution center Merchandise, and closing store Merchandise (i) received at the Stores no later than the Cutoff Date, (ii) ticketed at Merchant's expense and in accordance with Merchant's historic ticketing practices upon delivery to the Warehouse or the Stores, and (iii) set forth on Exhibit 5.2(b) attached hereto. The Cost Price for Transfer Merchandise received at the

13

Stores on or after Cutoff Date shall be reduced by a number equal to the Cost Price multiplied by the complement of the prevailing discount at the Store on the day on which such Transfer Merchandise is received by such Store.

"Warehouse Merchandise" means first-quality, in season goods located at Merchant's warehouse in Minneapolis, Minnesota (the "Warehouse") on the Sale Commencement Date and which (i) at Merchant's cost (including, without limitation, costs of labor, freight and supplies) are transferred to the Stores from the Warehouse on or before the Cutoff Date, (ii) are ticketed by Merchant at its expense and in accordance with Merchant's historic ticketing practices prior to or upon delivery to the Stores, (iii) are consistent as to type, quality and assortment as Merchandise presently located at the Stores, and (iv) are set forth on Exhibit 5.2(b) attached hereto. The Cost Price for Warehouse Merchandise received at the Stores on or after Cutoff Date shall be reduced by a number equal to the Cost Price multiplied by the complement of the prevailing discount at the Store on the day on which such Warehouse Merchandise is received by such Store.

"On-Order Merchandise" means first-quality, in season goods, ordered by Merchant for sale in the Stores in the ordinary course of business prior to the Sale Commencement Date and listed on Exhibit 5.2(b), but that have not been received at the Stores by the Cutoff Date. The Cost Price for On Order Merchandise received at the Stores on or after Cutoff Date shall be reduced by a number equal to the Cost Price multiplied by the complement of the prevailing discount at the Store on the day on which such On Order Merchandise is received by such Store.

14

Source: PreVu, INC, 10-Q, June 17, 2008

5.4 Valuation.

(a) For purposes of this Agreement, "Retail Price" shall mean, with respect to each item of Merchandise, the file price of such item identified as "Retail" on Merchant's books and records as provided during the due diligence period.

(b) For purposes of this Agreement, "Cost Price" shall mean, with respect to each item of Merchandise, the current weighted average cost for such item reflected in any of Merchant's books and records.

(c) For purposes of this Agreement, "Ticketed Price" shall mean the lowest ticketed or marked price set forth on each item of Merchandise identified as "Ticket" on Merchant's books and records as provided during the due diligence period.

The Ticketed Price, Retail Price and the Cost Price of any item of Merchandise shall exclude all Sales Taxes, and Merchant represents that (a) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (b) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law. If an item of Merchandise has more than one Ticketed Price or Retail Price, as applicable, or if multiple items of the same SKU are marked at different prices, the lowest Retail Price on any such item shall prevail for such item or for all such items within the same SKU, as the case may be, unless it is clear that the lowest Ticketed Price or Retail Price, as applicable, was mismarked.

5.5 Excluded Goods. Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder. Defective Merchandise will be segregated and

15

Source: PreVu, INC, 10-Q, June 17, 2008

transferred out of the Stores at Merchant's sole cost and expense. Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6. <u>Store Closing Sale Term</u>.

6.1 <u>Term</u>. Subject to satisfaction of the conditions precedent set forth in <u>Section 10</u> hereof, the Store Closing Sale shall commence at each Store on February 15, 2008 (such date with respect to each Store being the "<u>Sale Commencement Date</u>"). The Agent shall complete the Store Closing Sale at each Store no later than May 31, 2008, unless the Store Closing Sale is extended pursuant to <u>Section 8.10</u> hereof or by mutual written agreement of Agent and Merchant (the "<u>Sale Termination Date</u>;" the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "<u>Sale Term</u>"). The Agent may, in its discretion, terminate the Store Closing Sale at any Store or Stores at any time or from time to time within the Sale Term (a) upon the occurrence of an Event of Default by Merchant that continues beyond any applicable period for cure or (b) upon not less than ten (10) days' prior written notice to Merchant.

6.2 <u>Vacating the Stores</u>. At the conclusion of the Store Closing Sale, Agent agrees to leave the Stores in "broom clean" condition, ordinary wear and tear excepted, except for remaining Supplies and unsold items of FF&E.

6.3 <u>Intentionally Omitted</u>..

Section 7. <u>Store Closing Sale Proceeds</u>.

7.1 <u>Proceeds</u>. For purposes of this Agreement, "<u>Proceeds</u>" shall mean the aggregate of: (a) the total amount (in dollars) of all sales of Merchandise made under this

16

Agreement, exclusive of (i) Sales Taxes and (ii) returns, allowances and customer credits and (b) all proceeds of Merchant's insurance for loss or damage to Merchandise or loss of Store cash arising from events occurring during the Sale Term.

7.2 Deposit of Proceeds. All cash Proceeds shall be deposited in existing accounts of Merchant (such accounts, the "Agency Accounts"). Merchant and its lender, General Electric Capital Corporation ("GECC") shall exercise sole signatory authority and control with respect to the Agency Accounts. Proceeds collected in the Agency Accounts shall be reconciled weekly in accordance with Section 8.8 hereof and, immediately after such reconciliation, Merchant shall pay to Agent any amounts due under Section 3.3 hereof. After payment of the Guaranteed Amount, (a) Agent shall have the right (but not the obligation) to open new accounts for which Agent shall exercise sole signatory authority into which all cash Proceeds of the Store Closing Sale shall be deposited, and (b) to the extent that Agent shall elect to continue to use the Agency Accounts, (i) all Proceeds deposited in such accounts will constitute the property of Agent and shall be held in trust by Merchant for Agent, and (ii) commencing on the first business day following the date upon which the Guaranteed Amount is paid in full, and on each business day thereafter, Merchant shall pay to Agent by wire funds transfer all collected funds constituting Proceeds deposited in such accounts. At any time during the Sale Term, upon request by Agent, Merchant shall deliver to Agent documentation reflecting the deposit and wire transfers of such Proceeds. Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term.

7.3 Credit Card Proceeds. Prior to the payment of the Guaranteed Amount, Agent shall use Merchant's credit card facilities (including Merchant's credit card

17

Source: PreVu, INC, 10-Q, June 17, 2008

terminals and processor(s), credit card processor coding, merchant identification number(s) and existing bank accounts) for credit card Proceeds. Merchant shall continue to process credit card transactions applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to down-load data from all credit card terminals each day during the Sale Term and to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions under Merchant's merchant identification number(s). Prior to payment in full of the Guaranteed Amount, Merchant and Agent shall reconcile credit card Proceeds weekly as provided in Section 8.8 of this Agreement. After payment in full of the Guaranteed Amount, (a) all credit card Proceeds will constitute the property of the Agent and shall be held by Merchant in trust for Agent and (b) Merchant shall deposit all credit card Proceeds into a designated account and shall transfer such Proceeds to Agent daily (on the date received by Merchant if received prior to 12:00 noon, or otherwise within one business day) by wire transfer of immediately available funds. In addition, after payment in full of the Guaranteed Amount, at Agent's request, Merchant shall cooperate with Agent to establish merchant identification numbers under Agent's name to enable Agent to process all credit card Proceeds for Agent's account. Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all credit card fees, charges and chargebacks related to the Store Closing Sale, whether received during or after the Sale Term; provided, however, the Merchant shall inform Agent of any chargebacks as promptly as practicable.

Section 8. Conduct of the Store Closing Sale.

8.1 Rights of Agent. Subject to the terms of all leases, reciprocal easement agreements and other similar agreements relating to the occupancy of the Stores and/or the Warehouse (collectively, "Occupancy Agreements"), Agent shall be permitted to conduct the

18

Source: PreVu, INC, 10-Q, June 17, 2008

Store Closing Sale as a "store closing" or similar sale throughout the Sale Term; provided, however, that notwithstanding anything set forth in any Occupancy Agreement, Agent shall attempt to conduct the Store Closing Sale as a "store closing" or similar sale throughout the Sale Term,; provided further, in no event shall Agent be precluded from using the "Everything Must Go" handle during the Sale Term with industry standard signage reflecting such message. To the extent that Agent is precluded from using the "Everything Must Go" handle during the Sale Term, Agent and Merchant shall mutually agree on a remedy to address such a situation. Merchant shall use its best efforts to assist Agent in connection with implementing the Store Closing Sale as contemplated by this Agreement. Agent shall conduct the Comprehensive Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with (i) the terms of this Agreement and (ii) provisions of applicable laws, regulations and ordinances. In addition to any other rights granted to Agent hereunder, in conducting the Store Closing Sale, Agent, in the exercise of its sole discretion, shall have the right, subject to the immediately preceding sentence:

(a) to establish and implement advertising, signage and promotion programs consistent with the "store closing" theme (including, without limitation, by means of media advertising, banners, A-frame and similar interior and exterior signs and use of sign walkers), provided, that Agent shall not use the term "going out of business" in any signage and, subject to the preamble to this Section, be responsive to Merchant's reasonable requests regarding alteration or modification of any signage;

(b) to establish Store Closing Sale prices and Store hours;

(c) to use without charge during the Sale Term all FF&E, advertising materials, bank accounts, Store-level customer lists and mailing lists, computer hardware and

19

Source: PreVu, INC, 10-Q, June 17, 2008

software, Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores and any other assets of Merchant located at the Stores or the Warehouse (whether owned, leased or licensed); and

(d) to have the benefit of, without charge, (i) Merchant's central office facilities, POS systems, central and administrative services and personnel to process payroll, perform MIS services, sales audit and cash reconciliation and provide other central office services, necessary for the Comprehensive Sale and (ii) one office located at Merchant's central office facility.

8.2 <u>Terms of Sales to Customers</u>. All sales of Merchandise will be "final sales" and "as is," and all advertisements and sales receipts will reflect the same. In addition, Agent shall indicate on any Merchandise sold that such sale is "final," "as is," and shall be marked in such a way as to prevent consumers from returning the goods at other of Merchant's stores. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturer's warranties to customers. All sales will be made only (a) for cash, or (b) by bank credit cards currently accepted by Merchant. Agent shall accept Merchant gift certificates/gift cards, Store credits, and other promotional items providing the customer with an additional discount on Store Merchandise that have been issued by Merchant prior to the Sale Commencement Date, provided that Merchant agrees to reimburse Agent in cash for the face amount of any such items within five (5) days after Agent's request therefor.

8.3 <u>Sales Taxes</u>. During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise (other than taxes on income) payable to any

20

Source: PreVu, INC, 10-Q, June 17, 2008

taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent on behalf of Merchant at the time of sale. The Agent shall draw checks on the Agency Accounts payable to the applicable taxing authorities in the amount so collected, which shall be delivered together with accompanying schedules to Merchant on a timely basis for payment of taxes when due. Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Merchant will be given access to the computation of gross receipts for verification of all such tax collections.

8.4 Supplies. Agent shall have the right to use, without charge, all existing supplies located at the Stores and the Warehouse, including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"). In the event that additional Supplies are required in any of the Stores during the Store Closing Sale, Merchant agrees promptly to provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor. Merchant does not warrant that the existing Supplies in the Stores as of the Sale Commencement Date are adequate for the purposes of the Store Closing Sale. Supplies have not been since January 1, 2008, and shall not be prior to the Sale Commencement Date, transferred by Merchant between or among the Stores and/or the Warehouse, so as to alter the mix or quantity of Supplies at the Stores from that existing on such date, other than in the ordinary course of business.

8.5 Returns of Merchandise. During the Sale Term, the Agent shall accept returns only of defective goods sold by Merchant from the Stores prior to the Sale Commencement Date ("Returned Merchandise"), provided such goods are accompanied by the original Store receipt. Merchant shall reimburse Agent in cash for the amount of any store credit

21

Source: PreVu, INC, 10-Q, June 17, 2008

or refund given to any customer in respect of Returned Defective Merchandise. Any Returned Defective Merchandise shall be disposed of by Agent in accordance with instructions received from Merchant and at Merchant's sole cost and expense. Any reimbursements due to Agent as result of Returned Defective Merchandise shall be accounted for and paid by Merchant immediately following the weekly Store Closing Sale reconciliation pursuant to Section 8.8 hereof.

8.6 Repair and Special Order Merchandise. Promptly after the execution of this Agreement, Merchant shall notify each customer for which Merchant holds Repair and Special Order Merchandise of the Store Closing Sale and request such customers to pick up and pay for the applicable item(s) by the Cutoff Date. Any amounts paid for Repair and Special Order Merchandise on or before the close of business on the Cutoff Date shall be for the sole account of Merchant. Subject to applicable law, any Repair and Special Order Merchandise unclaimed by customers by the Cutoff Date shall be included in Merchandise and the Guaranteed Amount shall be adjusted to account for such items in accordance with this Agreement. Prior to the Cutoff Date, Agent shall administer all Repair and Special Order Merchandise in accordance with the documents and agreements relating thereto, provisions of applicable law and Merchant's historic policies. In the event that Agent is required to issue refunds to customers in respect of Repair and Special Order Merchandise, Merchant shall reimburse Agent in cash for all such amounts. At the end of the Sale Term, Agent shall transfer responsibility for any remaining items of Layaway, Repair and Special Order Merchandise back to Merchant after appropriate and legally required communications to customers and reconciliation between Agent and Merchant. All payments by Agent and Merchant required under this Section 8.6 shall be made

22

Source: PreVu, INC, 10-Q, June 17, 2008

immediately following the weekly Store Closing Sale reconciliation by Agent and Merchant pursuant to <u>Section 8.8</u> hereof.

8.7 <u>Compliance with Law</u>. Agent shall comply in the conduct of the Comprehensive Sale with (i) all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities, including, without limitation, all so called "going out of business laws" and all laws and regulations relating to treatment of employees and (ii) all of Merchant's employee rules, regulations, guidelines and policies, which have been provided to Agent in writing and which are listed in <u>Exhibit 8.7</u> attached hereto. Merchant agrees to cooperate with Agent to facilitate Agent's obtaining all required permits and otherwise comply with such laws and regulations.

8.8 <u>Store Closing Sale Reconciliation</u>. On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile sales, Expenses, credit card Proceeds, receipts of Transfer Merchandise, On-Order Merchandise, Warehouse Merchandise and Returned Defective Merchandise at the Stores (including quantities and Cost Price thereof), Gross Rings and such other Store Closing Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent. Immediately thereafter, Merchant shall pay to Agent all amounts due to Agent pursuant to <u>Section 3.3</u> hereof. Within thirty (30) days after the end of the Sale Term, Agent and Merchant shall complete a final reconciliation of the Store Closing Sale, the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent with respect to the Store Closing Sale.

23

Source: PreVu, INC, 10-Q, June 17, 2008

8.9 <u>Force Majeure</u>. If any casualty or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any Store, such Store and the Merchandise located at such Store shall, in Agent's discretion, be eliminated from the Comprehensive Sale and considered to be deleted from this Agreement as of the date of such event (unless Agent and Merchant otherwise agree in writing), and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; <u>provided</u>, <u>however</u>, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Store Closing Sale which is not the subject of insurance proceeds, and Merchant shall reimburse Agent for the amount the Guaranteed Amount is so reduced prior to the end of the Sale Term.

8.10 <u>Extraordinary Events</u>. If any extraordinary external event occurs that may be reasonably expected to have a material adverse effect upon the Store Closing Sale (e.g., terrorist attack), notwithstanding anything set forth in this Agreement to the contrary, Agent shall have the right, but not the obligation, to extend the Sale Term for any Store (provided, Agent pays all Expenses during such extended Sale Term in accordance with the provisions hereof) and/or to remove Merchandise from the Stores and sell it through other channels (provided, all proceeds of such sales through other channels shall be treated as Proceeds of the Store Closing Sale hereunder).

8.11 <u>Early Closures</u>. If Agent is unable to operate the Sale for the Sale Term due to lease expirations for the Stores set forth on Exhibit 8.11 or if Agent is unable to operate the Sale for the Sale Term at any Store due to an action by a landlord, such Store and the

24

Source: PreVu, INC, 10-Q, June 17, 2008

Merchandise located at such Store shall, in Agent's discretion, be eliminated from the Comprehensive Sale and considered to be deleted from this Agreement as of the date of such lease expiration or order precluding the Sale (unless Agent and Merchant otherwise agree in writing), and Agent shall have no further rights or obligations hereunder with respect thereto, provided, however, that Agent will use commercially reasonable efforts to remain in the Store premises for the Sale Term, provided further, in the event that 66% of the Cost Price of the Merchandise located at such Store as of the Cutoff Date has been sold by the date of such lease expiration or order precluding the Sale, Agent shall have the right, but not the obligation, to remove Merchandise from the Store and sell it through other Stores (provided, all proceeds of such sales through other Stores shall be treated as Proceeds of the Store Closing Sale hereunder) and/or to extend the Sale Term for any other Store (provided, Agent pays all Expenses during such extended Sale Term in accordance with the provisions hereof and such extension does not extend beyond the Sale Termination Date).

Section 9. <u>Employee Matters</u>.

9.1 <u>Merchant's Employees</u>. Agent may use Merchant's employees in the conduct of the Comprehensive Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and schedule the number and type of Merchant's employees required for the Comprehensive Sale. Agent shall identify any such employees to be used in connection with the Comprehensive Sale (each such employee, a "<u>Retained Employee</u>") prior to the Sale Commencement Date; provided, however, that Agent acknowledges that all Store-level employees shall be Retained Employees. Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent. Merchant and Agent agree that except to the extent that wages and benefits of Retained

25

Source: PreVu, INC, 10-Q, June 17, 2008

Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Comprehensive Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations or any other amounts required to be paid by statute or law; nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of its employees on or after the date of this Agreement.

9.2 Termination of Employees. Agent may in its discretion stop using any Retained Employee at any time during the Comprehensive Sale. In the event of termination of any Retained Employee, Agent will use all reasonable efforts to notify Merchant at least five (5) days prior thereto, except for termination "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Merchant shall be required, provided Agent shall notify Merchant as soon as practicable after such termination. From and after the date of this Agreement, Merchant shall not transfer or dismiss employees of the Stores outside the ordinary course of business without Agent's prior consent except "for cause". Without limiting the foregoing, Merchant has not distributed, and shall not distribute, any notice to its employees under the WARN Act without Agent's prior written consent.

9.3 Payroll Matters. During the Sale Term, Merchant shall process the base payroll for all Retained Employees. On Wednesday of each week a payroll is to be paid during the Sale Term, Merchant or Agent, as the case may be, shall transfer from the Agency

26

Source: PreVu, INC, 10-Q, June 17, 2008

Accounts to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, worker's compensation and benefits for such week that constitute Expenses hereunder.

9.4 <u>Employee Retention Bonuses</u>. In Agent's sole discretion, Proceeds may be used to pay, as an Expense, retention bonuses ("<u>Retention Bonuses</u>") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable) to Retained Employees who do not voluntarily leave employment and are not terminated "for cause." Such Retention Bonuses shall be processed through Merchant's payroll system.

Section 10. <u>Conditions Precedent</u>. The willingness of Agent to enter into the transactions contemplated under this Agreement are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(a) Prior to the Sale Commencement Date, Agent shall have made or initiated all required filings and registrations and shall obtain all permits, licenses, consents, authorizations and approvals required under applicable laws, rules, regulations and court or administrative orders for Merchant to execute and deliver this Agreement and to consummate the Comprehensive Sale; provided that Merchant agrees to cooperate fully with Agent in obtaining such permits, licenses, consents, authorizations and approvals.

(b) All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default by Merchant shall have occurred at and as of the date hereof and as of the Sale Commencement Date.

(c) Prior to the Sale Commencement Date, Merchant shall have provided Agent reasonable access to all pricing and cost files, computer hardware, software and

27

Source: PreVu, INC, 10-Q, June 17, 2008

data files, inter-Store transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores.

(d) Agent shall have had the opportunity to inspect the Stores, the Warehouse and the inventory preceding the Sale Commencement Date.

Section 11. <u>Representations, Warranties and Covenants</u>.

11.1 <u>Merchant Representations, Warranties and Covenants</u>. Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a) Each of the entities of which Merchant is jointly and severally composed: (i) is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted and (iii) is, and until the end of the Marketing Period with respect to all of the Leases will continue to be, duly authorized and qualified as a foreign corporation to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b) Each of the entities of which Merchant is jointly and severally composed has the right, power and authority to execute and deliver this Agreement and each other document and agreement incorporated herein (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder. Each of the entities of which Merchant is jointly and severally composed has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for any of them to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Comprehensive Sale. Each of the Agency Documents has been duly executed and delivered by each of the entities of which

28

Source: PreVu, INC, 10-Q, June 17, 2008

Merchant is jointly and severally composed and constitutes the legal, valid and binding obligation of each of them enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for the Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party that will not be obtained prior to the Sale Commencement Date is required therefor except for consents under the Occupancy Agreements. Subject to Merchant's obtaining the consent of GECC, no contract or other agreement to which the Merchant is a party or by which the Merchant is otherwise bound will prevent or impair the consummation of the Comprehensive Sale and the transactions contemplated by this Agreement.

(c) From January 1, 2008 through the Sale Commencement Date, the Merchant has operated and will operate the Stores in the ordinary course of business consistent with historical operations. Without limiting the foregoing, from January 1, 2008 through the Sale Commencement Date (unless otherwise agreed by Agent), (i) Merchant has not conducted and will not conduct any promotions or advertised sales at the Stores except promotions and sales in the ordinary course of business consistent with historic promotions and sales for comparable periods last year, all as described in Exhibit 11.1(c) attached hereto, (ii) Merchant has continued and will continue to replenish the Stores with new Merchandise in a manner consistent with historic practices and (iii) all rack jobbers and service vendors have continued and will continue to service the Stores in the ordinary course; provided, however, that Agent acknowledges that Merchant will transfer the Warehouse Merchandise and Transfer Merchandise to the Stores in accordance herewith.

29

(d) Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the inventory at the Stores and the Warehouse and all inventory on order by the Merchant, including, without limitation, the Merchandise free and clear of all liens, claims and encumbrances of any nature except liens granted to GECC. Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds except for the lien in favor of GECC.

(e) Merchant has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein, except for the promotions and sales described in Section 11.1(c). All pricing files and records since January 1, 2008 relative to the Merchandise have been made available to Agent and are listed in Exhibit 11.1(e). All such pricing files, including, but not limited to, files related to Cost Price, Retail Price and Ticket Price, and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods as of the dates and for the periods indicated therein.

(f) As of the Sale Commencement Date, the levels of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Stores, the On-Order Merchandise, Warehouse Merchandise and the Transfer Merchandise are in all material respects described in Exhibit 11.1(f) attached hereto. To the extent that the levels of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Stores as of the Sale Commencement Date are materially different from that described on

30

Source: PreVu, INC, 10-Q, June 17, 2008

Exhibit 11.1(f), the Merchant and Agent shall mutually agree on a downward adjustment to the Cost Price of the Merchandise.

(g) As of the Sale Commencement Date, all normal course permanent markdowns on inventory located at the Stores will have been taken on a basis consistent with Merchant's historical practices and policies and consistent with Merchant's other stores in the comparable mall or outlet channel.

(h) Merchant has not and will not have from January 1, 2008 through the Sale Commencement Date, marked up or raised the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance merchandise, except in the ordinary course of business.

(i) Merchant shall ticket or mark all items of inventory received at the Stores prior to the Sale Commencement Date (including, without limitation, all On-Order Merchandise, Transfer Merchandise and Warehouse Merchandise), in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's historic practices and policies relative to pricing and marking inventory and consistent with Merchant's other stores in the comparable mall or outlet channel.

(j) Unless otherwise agreed by Agent and contemplated by Section 5.2(b), Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Store Closing Sale.

(k) [Intentionally omitted.]

(l) No action, arbitration, suit, notice or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or

31

Source: PreVu, INC, 10-Q, June 17, 2008

affects Merchant that if adversely determined, would adversely affect the conduct of the Comprehensive Sale.

(m) Exhibit 11.1(m) attached hereto sets forth (i) historic sales at the Stores for the months ending January 2007 through December 2007 and (ii) the levels and mix of inventories at the Stores during such periods.

(n) Merchant covenants that from January 1, 2008 through the Sale Commencement Date, it has and will continue to operate the Stores in the ordinary course of business, including, specifically (i) selling inventory during such period at customary prices, (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public (except for Merchant's historic and customary promotions for all of its locations as set forth in Exhibit 11.1(c) attached hereto), (iii) not returning inventory to vendors and not transferring inventory or supplies between or among Stores and the Warehouse outside the ordinary course of business, except as permitted under Section 8.4 above and except for cancellations of orders of goods by Merchant and (iv) not making any management personnel moves or changes at the Stores outside the ordinary course of business without Agent's prior written consent (which consent will not be unreasonably withheld).

(o) To the best of Merchant's knowledge, all Merchandise is in compliance with all applicable federal, state or local product safety laws, rules and standards.

(p) As of the date of the Agreement, no event of default or event which with the giving of notice, the passage of time or both has occurred on the part of the Merchant under any Occupancy Agreement that could have a material adverse effect on the Comprehensive Sale. From and after the Sale Commencement Date, except as provided in Section 8.11 and subject to Section 8.1, the Agent shall have the right to the unencumbered use

32

Source: PreVu, INC, 10-Q, June 17, 2008

and occupancy of, and peaceful and quiet possession of, each of the Stores, the assets currently located at the Stores and the utilities and other services provided at the Stores. Merchant shall maintain in good working order, condition and repair, at its sole expense, all cash registers, heating systems, air conditioning systems, elevators, escalators, Store alarm systems and all other mechanical devices used in the ordinary course of operation of the Stores.

(q) Subject to Agent's obligation to fund Expenses hereunder, Merchant has paid and will continue to pay throughout the Sale Term, (i) all self-insured or Merchant funded employee benefit programs for employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs, (ii) all casualty, liability, worker's compensation and other insurance premiums, (iii) all utilities provided to the Stores and (iv) all applicable taxes. Following the conclusion of the Comprehensive Sale, Merchant shall pay all earned but unused vacation to applicable Retained Employees in the ordinary course in accordance with Merchant's policies.

(r) Merchant has not and shall not throughout the Sale Term take any actions the result of which is to materially increase the cost of operating the Comprehensive Sale, including, without limitation, increasing salaries or other amounts payable to employees.

(s) Except as disclosed on Exhibit 11.1(s) attached hereto, (i) Merchant is not a party to any collective bargaining agreements with its employees, (ii) to the best of Merchant's knowledge, no labor unions represent Merchant's employees at the Stores and (iii) to the best of Merchant's knowledge, there are currently no strikes, work stoppages or other labor disturbances affecting the Stores, Merchant's central office facilities or the Warehouse.

(t) As of the date of this Agreement, Merchant is not delinquent in payment of all telephone, utilities, taxes, insurance and advertising liabilities such that any

33

Source: PreVu, INC, 10-Q, June 17, 2008

delinquency would detrimentally impact the Comprehensive Sale. Merchant agrees that in the event that Agent receives notice that any such liability is materially overdue or unpaid, or Agent is unable to advertise the Comprehensive Sale with any newspapers, magazines, radio or television stations or other media providers which target or serve the market areas of the Stores or is unable to obtain Merchant's contract rate with any such provider as a result of the Merchant's failure to pay its outstanding balances with such providers, Merchant shall immediately pay such applicable balances in full.

(u) (i) As of the Sale Commencement Date, the aggregate Cost Price of the Merchandise divided by the aggregate Retail Price of the Merchandise (the "Cost Factor") shall be no greater than 34.5%. In the event the Cost Factor is greater than 34.5%, the Cost Price shall be adjusted as set forth on Exhibit 11.1(u) hereto and (ii) as of the Sale Commencement Date, the aggregate Cost Price of the Merchandise divided by the aggregate Ticketed Price of the Merchandise (the "Ticket Factor") shall be no greater than 21.3%. In the event the Ticket Factor is greater than 21.3%, the Cost Price shall be adjusted as set forth on Exhibit 11.1(u) hereto. In the event that the representation and warranty set forth in the immediately preceding sentence of this Section 11.1(u) is breached by Merchant with respect to any item of Merchandise, Merchant and Agent shall use reasonable efforts to agree on an adjustment to the Cost Price of such item of Merchandise in good faith during the five (5) day cure period set forth in Section 14 hereof.

(v) Merchant has provided Agent with all information requested by Agent and all information so provided is true, correct and complete in all material respects.

(w) Merchant has maintained each of the Leased Properties, including, without limitation, the roof, foundation and structure of all improvements thereon and all mechanical systems thereat including heating, cooling, ventilating, electrical and plumbing

34

fixtures and systems and all appliances, in good working order, condition and repair, except for those for which the respective landlords are responsible under the Leases governing the Leased Properties. To the best of Merchant's knowledge, to the extent any landlord is responsible for maintenance of any of the foregoing under the Lease governing such landlord's Leased Property, such landlord has fulfilled its obligations under the applicable lease to maintain the foregoing. In the event any repairs or maintenance with respect to any of the foregoing are required on or after the Sale Commencement Date in order to avoid a detrimental impact on the Store Closing Sale, Merchant shall immediately perform such repairs or maintenance; provided, however, that in the event the landlord with respect to any Leased Property is responsible for performing such repairs or maintenance under the Lease governing such Leased Property, Merchant shall use its best efforts to immediately cause such landlord to perform such repairs or maintenance.

(x) Merchant's relationship with Agent is solely that of agent and principal, not that of joint venturers or partners.

(y) There has not occurred any unauthorized or illegal emission, leak, discharge, spill or release into the environment of any Hazardous Materials (as defined below) by Merchant or any use of Hazardous Materials on or from any Leased Property which, in any material respect, violates any applicable federal, state or local law, rule, regulation governing the use, storage, treatment, handling, production or disposal of such Hazardous Materials or any other Environmental Laws (as defined below) that would result in liability to Merchant or such Leased Property. For purposes of this <u>Section 11.1(y)</u>, the term "<u>Hazardous Materials</u>" shall include, without limitation, any asbestos, PCBs, pollutants, contaminants, chemicals, wastes and other carcinogenic, ignitable, corrosive, reactive, toxic or otherwise hazardous substance or materials (whether solid, liquid or gaseous) subject to regulation, control or remediation under

35

Source: PreVu, INC, 10-Q, June 17, 2008

the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, the Hazardous Materials Transportation Act, as amended, the Resources Conservation and Recovery Act, as amended, the Toxic Substances Control Act, as amended, the Clean Water Act, as amended, the Safe Drinking Water Act, as amended, the Clean Air Act, as amended, the Occupational Safety and Health Act, as amended, the Atomic Energy Act of 1954, as amended, and all analogous or related laws and in the regulations adopted and publications promulgated pursuant thereto, or any other federal, state or local environmental law, ordinance, rule or regulation (collectively, the "Environmental Laws").

(z) No action, arbitration, suit, notice or legal, administrative or other proceeding before any court or governmental body has been instituted by or against Merchant or any Leased Property, or has been settled or resolved, or has been threatened against or affects Merchant or any Leased Property, which if adversely determined, would give rise to a lien or other encumbrance on any Leased Property, or have a material adverse effect upon any Leased Property, Merchant's ability to perform its obligations under this Agreement or the conduct of the Comprehensive Sale.

(aa) The relationship between Cost Price and Ticketed Price shall be as set forth on Exhibit 11.1(aa).

(bb) The information concerning the Leases set forth on Exhibit 1C hereto is true and correct in all material respects.

(cc) The Merchant has delivered to the Agent, or shall have delivered to the Agent no later than fifteen (15) calendar days after the date of this Agreement, true, complete and correct copies of all Leases and any writings concerning any current actual defaults or breaches thereunder. Merchant shall also use commercially reasonable efforts to provide Agent

36

Source: PreVu, INC, 10-Q, June 17, 2008

with all correspondence with the landlords under the Leases, including without limitation, any writings in printed or electronic format concerning any proposed modification, assignment or termination of the Leases.

(dd) No third party (other than Rosedale Wilsons, Inc.) ("Guarantor")) has guaranteed or is responsible for any of the Merchant's obligations under any of the Leases.

(ee) The Merchant has not received notice of any claim, action, suit, or proceeding with respect to any of the Leases that remains unresolved.

11.2 <u>Agent Representations and Warranties</u>. Agent hereby represents, warrants and covenants in favor of the Merchant as follows:

(a) Each member of Agent: (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority under its operating agreement to consummate the transactions contemplated hereby and (iii) is and until the end of the Marketing Period with respect to all of the Leases will continue to be, duly authorized and qualified as a foreign limited liability company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b) Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents. Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No contract or other agreement to which Agent is a

37

party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c) No action, arbitration, suit, notice or legal, administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by the Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon the Agent's ability to perform its obligations under this Agreement.

Section 12. Insurance.

12.1 Merchant's Liability Insurance. Merchant shall continue at its cost and expense until the end of the Marketing Period with respect to all of the Leases, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall cause Agent to be named an additional named insured with respect to all such policies. Exhibit 12.1 attached hereto contains a description of all such policies. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change. In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability

38

Source: PreVu, INC, 10-Q, June 17, 2008

arose by reason of the wrongful acts or omissions or negligence of Agent, or Agent's employees, independent contractors or agents (other than Merchant's employees).

12.2 <u>Merchant's Casualty Insurance</u>. Merchant will provide during the Sale Term, at Agent's cost as an Expense hereunder, fire, flood, theft and extended coverage casualty insurance covering the unsold Merchandise in a total amount equal to no less than the Cost Price thereof. <u>Exhibit 12.2</u> attached hereto contains a description of all such policies. From and after the date of this Agreement until the end of the Sale Term, all such policies will name Agent as loss payee. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise plus any self insurance amounts and the amount of any deductible (which amounts shall be paid by Merchant), shall constitute Proceeds hereunder and shall be paid to Agent; provided, however, in no event shall Agent receive more than Cost Price of the Merchandise. In the event of such a loss, Agent and Merchant shall work jointly to adjust the loss with the Insurer. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming the Agent as loss payee, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change. Merchant shall not agree to any increases in the amount of any deductibles or self insurance amounts prior to the end of the Sale Term without Agent's prior written consent.

12.3 <u>Agent's Insurance</u>. Agent shall maintain at Agent's cost and expense until the end of the Marketing Period with respect to all of the Leases, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the

39

Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Exhibit 12.3 attached hereto contains a description of all such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).

12.4 <u>Worker's Compensation Insurance</u>. Merchant shall at all times maintain in full force and effect worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of Merchant's insurance broker or carrier evidencing such insurance.

12.5 <u>Risk of Loss</u>. Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Comprehensive Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Merchant and Agent agree that Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises

40

Source: PreVu, INC, 10-Q, June 17, 2008

from the acts or omissions of Agent, or its supervisors or employees located at the Stores (an "<u>Agent Claim</u>"). In the event of any such liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's historic policies and procedures, and shall provide a copy of the initial documentation relating to such claim to Agent. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide a copy of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party.

12.6 <u>Non-Assumption of Liability</u>. Agent shall not assume any debt, liability or obligation of Merchant, except as expressly agreed to herein. Even with respect to such expressly assumed debts, liabilities and obligations, Agent's only liability for such amounts shall be its obligations to Merchant hereunder. Under no circumstances shall Agent have any direct liability to any third party by virtue of this Agreement. Without limiting the foregoing, Agent does not assume any liability to third parties with respect to any Leased Property. Agent does not hereby assume any control or possession of any Leased Property, and no property rights in favor of Agent are granted hereby other than the rights to payment of fees and reimbursement of expenses set forth herein.

Section 13. <u>Indemnification</u>.

13.1 <u>Merchant Indemnification</u>. Provided that Agent makes a written demand on Merchant for indemnification on or prior to January 31, 2009, Merchant shall

41

Source: PreVu, INC, 10-Q, June 17, 2008

indemnify and hold Agent and its members, managers, officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

(c) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d) any consumer warranty or products liability claims relating to Merchandise or Merchant Consignment Goods;

(e) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act), except for Agent Claims and

(f) the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents or representatives.

13.2 Agent Indemnification. Provided that Merchant makes a written demand on Agent for indemnification on or prior to January 31, 2009, Agent shall indemnify and

42

Source: PreVu, INC, 10-Q, June 17, 2008

hold Merchant and its officers, directors, employees, agents and representatives harmless form and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

(a) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its representatives;

(c) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment;

(d) any Agent Claims and

(e) the gross negligence or willful misconduct of Agent or any of its officer, directors, employees, agents or representatives.

Section 14. Defaults. The following shall constitute "Events of Default" hereunder:

(a) Merchant's or Agent's failure to perform any of their respective material obligations hereunder which failure is not cured within five (5) days after receipt by the non-performing party of written notice specifying the failure;

(b) Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made;

(c) A bankruptcy, reorganization, receivership or other similar proceeding is filed by or against Merchant or Agent or

43

Source: PreVu, INC, 10-Q, June 17, 2008

(d) Except as set forth in Section 6.1 above, the Store Closing Sale is terminated at a Store for any reason other than (i) an Event of Default by Agent, (ii) any other breach or action by Agent not authorized hereunder, (iii) removal of a Store from the Store Closing Sale in accordance with Section 8.11 hereof, or (iv) an event administered pursuant to Section 8.9 above.

In the event of an Event of Default, the non-defaulting party or, in the case of an Event of Default under Section 14(d), the Agent, may, in its discretion, upon five (5) days' written notice to the other party (or in the case of an Event of Default under Section 14(c), without any notice), (x) elect to terminate this Agreement and (y) exercise any rights otherwise available to it under applicable law. Any party's damages or entitlement to equitable relief hereunder shall be determined by a court of competent jurisdiction located in the State of Illinois.

Section 15. Intentionally Omitted.

Section 16. Sale of FF&E. Agent shall advertise in the context of advertising for the Store Closing Sale that items of FF&E at the Stores are for sale, and shall contact and solicit known purchasers and dealers of furniture and fixtures. Merchant shall notify Agent if any such items of FF&E are to be excluded from sale and/or if terms and conditions of sale are to be set or restricted in any manner. In consideration of providing such services, Agent shall retain twenty-two and one half percent (22.5%) of receipts (net of Sales Taxes) from all sales or other dispositions of FF&E. In addition, Merchant shall reimburse Agent for Agent's reasonable documented out-of-pocket expenses incurred in connection with the liquidation of FF&E that have been previously approved by Merchant, including, without limitation, costs of commissions and advertising. Merchant and Agent shall mutually agree on an expense budget for the sale of the FF&E prior to incurring FF&E sale related expenses. Agent shall have the right to abandon

44

Source: PreVu, INC, 10-Q, June 17, 2008

any unsold FF&E at the Stores or to cause Merchant to transfer title to any FF&E at any Store that remains unsold as of the date of termination or assignment of any Store lease to the landlord or Designee with respect to such lease for no consideration. Agent shall have no liability to Merchant for its failure to sell any or all of the FF&E.

Section 17. Leases.

17.1 Agent for Disposition of Leases. Agent shall serve as the Merchant's exclusive agent for the purpose of selling, assigning or terminating the Leases. All communications and inquiries regarding the sale, assignment or termination of the Leases, whether directed to the Merchant (including but not limited to its officers, agents and employees) shall be redirected to Agent. Agent shall promptly advise the Merchant of all offers made with respect to the Leases. Agent is authorized only to negotiate the terms of a termination or subleasing agreement at the direction and on the behalf of the Merchant, but not to commit the Merchant to any such agreement or arrangement or to sign any instrument on behalf of the Merchant. The Merchant and Agent may designate additional leasehold interests as a "Leased Property" or drop Leased Properties upon mutual consent. Merchant and Agent shall mutually agree on a compensation structure for the purpose of selling, assigning or terminating the leases set forth on Exhibit 17.1 within 7 days of this Agreement.

17.2 Term.

The authority granted to Agent in Section 17.1 shall commence upon the execution hereof and shall expire twelve (12) months from the date of this Agreement. Thereafter the Agreement shall automatically renew for successive sixty (60) day periods until cancelled by either party upon thirty (30) days prior written notice to the other party.

45

Source: PreVu, INC, 10-Q, June 17, 2008

# Exhibit 6-C

17.3 <u>Marketing Period for Leased Properties</u>.

(a) For each Leased Property, the period commencing on the Sale Commencement Date and ending on the Leased Property Termination Date, shall be known as the "<u>Marketing Period</u>" for such Leased Property.

(b) With respect to each Leased Property, the "<u>Leased Property Termination Date</u>" shall be the first to occur of (i) the closing date of the assignment or termination of the Lease with respect to such Leased Property, (ii) the stated termination date of the Lease with respect to such Leased Property, and (iii) the term, as may be extended, as set forth in Section 17.2.

17.4 <u>Marketing Period Costs</u>.

On the Sale Commencement Date, the Merchant shall allocate an amount (the "<u>Lease Fund</u>") for the payment of Occupancy Expenses (excluding Occupancy Expenses payable to third parties other than landlords), termination fees and assignment fees with respect to the Leased Properties. The Lease Fund equals the aggregate of, for each Lease, the lesser of (i) seven (7) months' Occupancy Expenses, or (ii) Occupancy Expenses for the number of months remaining on the term of the applicable lease (excluding Occupancy Expenses payable to third parties other than landlords) for each of the Leased Properties. The Lease Fund shall not be used to pay any Occupancy Expenses of any Store arising during the Sale Term for such Store. In addition, from the Sale Termination Date through the end of the Marketing Period for each Store Lease (collectively, the "<u>Lease Fund Period</u>"), unless Merchant and Agent otherwise agree, Merchant shall pay Occupancy Expenses (excluding Occupancy Expenses payable to third parties other than landlords) for each of the Leased Properties from the Lease Fund. All other costs and expenses relating to the Leased Properties arising during the Lease Fund Period, including, without limitation, extraordinary or structural maintenance and repairs for which

46

Merchant is responsible under the Leases of the Leased Properties, shall be paid by Merchant, but shall not be paid or deducted from the Lease Fund.

17.5 Procedures for Dispositions of Leases.

(a) During the Marketing Period for each of the Leased Properties, unless otherwise mutually agreed by the parties, Agent shall use reasonable commercial efforts to market and attempt to assign the Leases, to obtain agreements from landlords to terminate the Leases, or to otherwise mitigate Merchant's damages with respect to the Leases.

(b) Following the Sale Commencement Date, Merchant agrees to cooperate with Agent to arrange for the sale of the leasehold interests of Merchant in the Leased Properties as provided in this Agreement. Without limiting the generality of the foregoing, Merchant agrees (i) to provide Agent with all such diligence materials and information in Merchant's possession as Agent shall reasonably request in connection with its efforts to market and attempt to sell the Leases (including, without limitation, existing real property surveys, environmental reports, real estate tax and utility records) and (ii) to cooperate with Agent, its agents and any potential purchasers of any of the Leases to provide reasonable access to the Leased Properties. Agent shall provide Merchant with copies of all written offers and letters of intent for the Leases. Likewise, in the event Merchant receives any written offer or letter of intent for any of the Leases, Merchant shall provide Agent with a copy of such offer or letter of intent.

(c) From the date hereof through and until the applicable Leased Property Termination Date, Merchant shall not enter into, extend, reject or otherwise terminate any material agreement with respect to any Leased Property, or grant any party a lien or security interest in any or all of the Leases or Leased Properties, in each case without the prior written consent of Agent.

47

Source: PreVu, INC, 10-Q, June 17, 2008

17.6 <u>Reconciliation; Agent's Lease Disposition Fees</u> (a) As compensation for Agent's services, upon disposition, by assignment, sale, sublease, termination or otherwise of a Leased Property, Agent shall earn a base fee of [***] (the "Base Fee"). In the event that (a) [***] or more of the Leases are terminated, sold or assigned during the Marketing Period and (b) the aggregate amount paid by Merchant to obtain landlord consent to assignment or termination of the Leases, including any payments (not otherwise indemnifiable under this Agreement) arising from or in satisfaction of any breach of any Lease caused by Agent or occurring in furtherance of the purposes of this Agreement (the "<u>Buyout Amount</u>") is less than the aggregate amount of the Lease Fund minus the aggregate amount of the Lease Fund utilized to pay Occupancy Expenses for the Leased Properties during the Lease Fund Period (the "<u>Net Lease Fund</u>"), Agent's Base Fee shall be adjusted as follows:

| Buyout Amount | Base Fee |
|---|---|
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |
| [***] | [***] |

For purposes hereof:

"Gross Occupancy Cost" is defined as the sum of all prime rent, common area maintenance expenses, real estate taxes, insurance, tenant improvements, advertising allowance, and other obligations of Merchant which would otherwise have been due and payable by the Merchant had it performed its obligations as they came due under each Lease.

48

Source: PreVu, INC, 10-Q, June 17, 2008

"Gross Occupancy Cost Savings" is defined as the sum of (a) the amount of Total Occupancy Cost that will not have to be paid, by the Merchant, as a result of all of the Leased Properties which are assigned, transferred, subleased, terminated, or otherwise disposed of by Agent pursuant to the terms of this Agreement, and (b) any amounts received by the Merchant in consideration for transferring or assigning any Leased Property to a third party.

"Total Occupancy Cost" is defined as the sum of Gross Occupancy Cost for all Leased Properties.

17.7 <u>Calculation of Net Lease Fund and Buyout Amount.</u>

For purposes hereof, neither the amount subtracted from the Lease Fund to arrive at the Net Lease Fund nor the Buyout Amount shall include any amounts paid to the subject landlord on account of unpaid amounts due under the Lease but relating to periods prior to the Lease Fund Period, including, without limitation, CAM and tax reconciliations for periods prior to the Lease Fund Period, non-depreciated/amortized tenant improvements or brokerage commissions, all of which shall be paid by Merchant. To the extent that Agent is not successful in completing transactions for all of the Leases, the funds required to buyout the balance of the Leases shall not impact the Buyout Amount or Net Lease Fund.

17.8 <u>Reimbursement of Expenses in Performing Lease Services.</u>

Merchant shall reimburse Agent for all reasonable and customary Reimbursable Expenses (defined below) incurred in connection with Agent's efforts to sell, terminate or otherwise mitigate Merchant's damages with respect to the Leases. "Reimbursable Expenses" means all out-of-pocket expenses, approved in advance by Merchant, and incurred in connection with Agent's performance of the contemplated services, including reasonable expenses related

49

Source: PreVu, INC, 10-Q, June 17, 2008

economy travel and transportation in accordance with Merchant's Travel Policy, which shall be provided to Agent.

17.9 <u>Vacating the Stores and Leased Properties</u>.

(a) Agent shall vacate each Store whose Occupancy Agreements do not include a Lease to be marketed by Agent pursuant to this Agreement on or before the Sale Termination Date with respect to such Store, at which time Agent shall surrender and deliver the Store premises and Store keys to Merchant. From and after the Sale Termination Date with respect to each such Store, Agent shall have no further liability with respect to such Store whatsoever.

(b) Agent shall vacate each Leased Property whose Lease is not assigned or terminated and has not expired prior to the end of the Marketing Period for such Lease on the day following the end of the Marketing Period for such Lease, at which time Agent shall surrender and deliver the Leased Property premises and keys to Merchant. From and after the day following the Marketing Period with respect to each such Leased Property, Agent shall have no further liability with respect to such Leased Property whatsoever.

Section 18. <u>Miscellaneous</u>.

18.1 <u>Notices</u>. All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

50

Source: PreVu, INC, 10-Q, June 17, 2008

If to the Agent:          Hilco Merchant Resources, LLC
One Northbrook Place
5 Revere Drive, Suite 206
Northbrook, Illinois 60062
Attn: Cory Lipoff
Telecopy No. (847) 509-1150

Hilco Real Estate, LLC
One Northbrook Place
5 Revere Drive, Suite 320
Northbrook, IL 60062
Attn: Gregory Apter
Telecopy No. (847) 897-0867

and

c/o Hilco Merchant Resources, LLC
Hilco Real Estate, LLC
One Northbrook Place
5 Revere Drive, Suite 206
Northbrook, Illinois 60062
Attn: Joseph Malfitano
Telecopy No. (847) 897-0868

If to the Merchant:      Rosedale Wilsons, Inc.
7401 Boone Avenue North
Brooklyn Park, MN 55428
Attn: Corrie Lapinsky
Telecopy No. (763) 391-4343

Wilsons Leather Holdings Inc.
7401 Boone Avenue North
Brooklyn Park, MN 55428
Attn: Corrie Lapinsky
Telecopy No. (763) 391-4343

    18.2 <u>Governing Law; Consent to Jurisdiction</u>. This Agreement shall be governed and construed in accordance with the laws of the State of Illinois without regard to conflicts of laws principles thereof. The parties hereto agree that any legal action or proceeding arising out of or in connection with this Agreement may be brought in the federal or state courts

Source: PreVu, INC, 10-Q, June 17, 2008

located in the State of Illinois, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such courts in personam with respect to any such action or proceeding.

18.3 <u>Termination</u>. This Agreement shall remain in full force and effect until the first to occur of: (a) receipt by Merchant of written notice from Agent that any of the conditions specified in <u>Section 10</u> hereof have not been satisfied; (b) termination by the non-defaulting party after an Event of Default pursuant to <u>Section 14</u> hereof or (c) the end of the Marketing Period with respect to all of the Leases and completion and certification by Merchant and Agent of the final reconciliation pursuant to <u>Section 17.6</u> hereof. Notwithstanding the foregoing, the representations and warranties of Merchant and Agent contained herein and the provisions <u>Section 13</u> above shall survive the termination of this Agreement pursuant to this <u>Section 18.3</u>.

18.4 <u>Entire Agreement</u>. This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

18.5 <u>Amendments</u>. This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

18.6 <u>No Waiver</u>. No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or

52

Source: PreVu, INC, 10-Q, June 17, 2008

default in the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

18.7 <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, and their respecting successors and assigns; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

18.8 <u>Execution in Counterparts; Facsimile</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one agreement. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

18.9 <u>Section Headings</u>. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

18.10 <u>Survival</u>. All representations, warranties, covenants and agreements made by the parties hereto shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

18.11 <u>Severability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any

53

provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

18.12 <u>Joint and Several Liability</u>. The undersigned members of Agent, jointly and severally, guarantee the prompt payment by, and performance of the obligations of Agent, including, without limitation, Agent's indemnification obligations contained herein, as set forth in this Agreement.

18.13 <u>Confidentiality</u>. Agent agrees (a) not to use any Confidential Information (as defined below) for any purpose except in furtherance of its obligations under this Agreement, (b) that it shall disclose Confidential Information only to its employees, contractors, attorneys and accountants on a need-to-know basis, and (c) to treat all Confidential Information of the other party with the same degree of care as it accords its own Confidential Information of a similar nature, but in no event with less than a reasonable degree of care. "Confidential Information" as used in this Agreement means any and all proprietary and non-public information disclosed by Merchant regardless of the form of such information. Confidential Information shall not include information that (i) was in the public domain at the time it was disclosed or has subsequently entered the public domain through no fault of Agent; (ii) was rightfully in Agent's possession free of any obligation of confidentiality at the time of disclosure; or (iii) is disclosed pursuant to a valid order by a court or governmental body or otherwise pursuant to legal process.

54

Source: PreVu, INC, 10-Q, June 17, 2008

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

JOINT VENTURE COMPOSED OF
HILCO MERCHANT RESOURCES, LLC, HILCO REAL
ESTATE, LLC AND GORDON BROTHERS
RETAIL PARTNERS, LLC

|  | /s/ Cory Lipoff |
|---|---|
| By: | Cory Lipoff |
| Its: | Executive Vice President and Principal of Hilco |
|  | Merchant Resources for the Joint Venture |

ROSEDALE WILSONS, INC., on behalf of itself
and on behalf of those entities listed on
Exhibit 1A hereto

|  | /s/ Stacy A. Kruse |
|---|---|
| By: | Stacy A. Kruse |
| Its: | Chief Financial Officer and Treasurer |

WILSONS LEATHER HOLDINGS INC.

|  | /s/ Stacy A. Kruse |
|---|---|
| By: | Stacy A. Kruse |
| Its: | Chief Financial Officer and Treasurer |

55

AGENCY AGREEMENT

Dated as of

February 14, 2008

Between

A JOINT VENTURE COMPOSED OF
HILCO MERCHANT RESOURCES, LLC, HILCO REAL ESTATE, LLC AND GORDON
BROTHERS RETAIL PARTNERS, LLC,

as Agent

and

ROSEDALE WILSONS, INC.,
WILSONS LEATHER HOLDINGS INC., AND
THOSE ENTITIES LISTED ON EXHIBIT 1A HERETO

as Merchant

Source: PreVu, INC, 10-Q, June 17, 2008

Exhibit 10.2

EXECUTION COPY

**THIRD AMENDMENT TO**
**FIFTH AMENDED AND RESTATED CREDIT AGREEMENT**

This THIRD AMENDMENT TO FIFTH AMENDED AND RESTATED CREDIT AGREEMENT (this "Amendment") is entered into as of this 14th day of February, 2008 among WILSONS LEATHER HOLDINGS INC., a Minnesota corporation ("Borrower"), GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, as Lender, Term Lender, Swing Line Lender and as Agent ("Agent"), the Credit Parties signatory hereto and the Lenders signatory hereto. Unless otherwise specified herein, capitalized terms used in this Amendment shall have the meanings ascribed to them by the Credit Agreement (as hereinafter defined).

RECITALS

WHEREAS, Borrower, certain Credit Parties, Agent and Lenders have entered into that certain Fifth Amended and Restated Credit Agreement dated as of December 29, 2006 (as amended, supplemented, restated or otherwise modified from time to time, the "Credit Agreement"); and

WHEREAS, Borrower, the Credit Parties signatories to the Credit Agreement, the Lenders and Agent wish to amend certain provisions of the Credit Agreement, as more fully set forth herein.

NOW THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**Section 1 Amendments to the Credit Agreement.** Subject to the satisfaction of the conditions precedent set forth in Section 3 hereof, the parties hereto hereby agree to amend the Credit Agreement as follows:

(a)    The third sentence of Section 1.1(a)(i) of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"The aggregate amount of Revolving Credit Advances outstanding shall not exceed at any time the lesser of (A) the Maximum Amount less the sum of 100% of the Letter of Credit Obligations, 100% of the Eligible Trade L/C Obligations and 100% of the Swing Line Loan outstanding and (B) the Borrowing Base plus the aggregate amount of unrestricted cash on deposit in a deposit account of Borrower under the control of the Agent, at a bank or other financial institution acceptable to Agent and subject to a tri-party blocked account agreement by and among Agent, such bank or financial institution and Borrower in form and substance satisfactory to Agent, less the sum of 100% of the Letter of Credit Obligations, 100% of the Eligible Trade L/C Obligations and 100% of the Swing Line Loan outstanding at such time (such amount, "Borrowing Availability")."

(b)    The second sentence of Section 1.1(c)(i) of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

Source: PreVu, INC, 10-Q, June 17, 2008

"The aggregate amount of Swing Line Advances outstanding shall not exceed the lesser of (A) the Swing Line Commitment and (B) the Borrowing Base plus the aggregate amount of unrestricted cash on deposit in a deposit account of Borrower under the control of the Agent, at a bank or other financial institution acceptable to Agent and subject to a tri-party blocked account agreement by and among Agent, such bank or financial institution and Borrower in form and substance satisfactory to Agent, less the sum of the outstanding balance of the Revolving Credit Advances, 100% of outstanding Letter of Credit Obligations and 100% of outstanding Eligible Trade L/C Obligations ("Swing Line Availability")."

(c)    The third sentence of Section 1.2 of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"In addition, the sum of 100% of the Letter of Credit Obligations and 100% of outstanding Eligible Trade L/C Obligations shall not exceed the Borrowing Base, plus the aggregate amount of unrestricted cash on deposit in a deposit account of Borrower under the control of the Agent, at a bank or other financial institution acceptable to Agent and subject to a tri-party blocked account agreement by and among Agent, such bank or financial institution and Borrower in form and substance satisfactory to Agent, less the then outstanding Revolving Credit Advances and Swing Line Loan."

(d)    Section 1.19 of the Credit Agreement is hereby amended by adding the following new sentence at the end thereof:

"Notwithstanding anything to the contrary set forth herein, any Inventory-Apparel located at the Closed Stores shall not constitute Eligible Inventory-Apparel following the date on which Borrower has received the Guaranteed Amount (as defined in the Agency Agreement)."

(e)    Section 1.21 of the Credit Agreement is hereby amended by adding the following new sentence at the end thereof:

"Notwithstanding anything to the contrary set forth herein, any In-Transit Inventory in transit to or from a Closed Store shall not constitute Eligible In-Transit Inventory-Retail following the date on which Borrower has received the Guaranteed Amount (as defined in the Agency Agreement)."

(f)    Section 1.24 of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"1.24 [Intentionally Omitted]"

(g)    Section 6.8(a) of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"(a) (i) the sale of Inventory in the ordinary course of business and (ii) (v) sales of Inventory and other assets (collectively, the "Merchandise") of Borrower and certain other Credit Parties (collectively, the "Merchants") which are located at Merchants' retail

2

store locations listed on Schedule K attached hereto (collectively, the "Closed Stores"), solely to the extent such sales are consummated in the Closed Stores by means of a promotional, store closing or similar sale (the "Store Closing Sale"), (x) sales (the "FF&E Sale") of furnishings, trade fixtures, Equipment and real property improvements in connection with the Store Closing Sale which are located at the Closed Stores(the "FF&E"), (y) the sale or termination or other mitigation of damages with respect to the leases of the real property listed on Schedule L attached hereto (the actions and events described in this clause (y), the "Lease Mitigations" and together with the Store Closing Sale and the FF&E Sale are collectively being referred to herein as, the "Comprehensive Sale") and (z) upon completion of the Comprehensive Sale the transfer by Merchants to Hilco/Gordon Brothers Joint Venture, or to a landlord or a designee of Hilco/Gordon Brothers Joint Venture (as applicable) title to all Merchandise and any FF&E remaining at the Closed Stores at the conclusion of the Comprehensive Sale pursuant to terms and conditions of the Agency Agreement (and Agent and Lenders hereby agree that all security interests held by Agent in and to such Merchandise and the FF&E transferred pursuant to above clause (z) shall be deemed released upon such transfer by Merchants and Lenders hereby direct Agent to release such security interest, and Agent hereby further agrees to prepare, execute and deliver to Borrower, at Credit Parties' expense, an appropriate UCC financing statement amendment as soon after the completion of the Comprehensive Sale as practicable to evidence the release of Agent's security interests on such Merchandise and FF&E),"

(h)    Section 6 of the Credit Agreement is hereby amended by adding the following Section 6.20 thereto which shall read in its entirety as follows:

"6.20 Lease Mitigations

No Credit Party shall directly or indirectly make payments in connection with one or more Lease Mitigations in an aggregate amount in excess of $8,600,000 on or after the Third Amendment Effective Date."

(i)    Section 5 of the Credit Agreement is hereby amended by adding the following Section 5.11 thereto which shall read in its entirety as follows:

"5.11 Additional Deliveries.

On or prior to February 25, 2008, Borrower shall deliver to Agent Ultimate Parent's forecasted consolidated balance sheets, profit and loss statements, cash flow statements and borrowing availability projections on a monthly basis for the remaining period in the Fiscal Year ending in January, 2009 and for the Fiscal Year ending in January, 2010, which, in each case, shall be (i) prepared in a manner consistent with the historical Financial Statements of Ultimate Parent together with appropriate supporting details and a statement of underlying assumptions and (ii) in form and substance reasonably satisfactory to Agent (the "Updated Projections"); provided that, notwithstanding anything to the contrary contained herein or otherwise, from and after the Third Amendment Effective Date through and including the date of receipt by Agent of the Updated Projections, in form and substance reasonably satisfactory to Agent, no

3

Source: PreVu, INC, 10-Q, June 17, 2008

Revolving Loans may be outstanding under this Agreement (other than Letter of Credit Obligations and Eligible Trade L/C Obligations)."

(j)    Clause (b) of Section 8.1 of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"(b) Any Credit Party shall fail or neglect to perform, keep or observe any of the provisions of Sections 1.4, 1.8, 5.4, 5.11 or 6, or any of the provisions set forth in Schedule E, respectively."

(k)    Schedule A to the Credit Agreement is hereby amended by adding the following new definitions in alphabetical order therein:

"Agency Agreement" means that certain Agency Agreement dated as of February 14, 2008 by and among the Borrower, the Credit Parties signatories thereto and the Hilco/Gordon Brothers Joint Venture as in effect on the Third Amendment Effective Date.

"Closed Stores" has the meaning set forth in Section 6.8 of the Credit Agreement.

"Comprehensive Sale" has the meaning set forth in Section 6.8 of the Credit Agreement.

"FF&E" has the meaning set forth in Section 6.8 of the Credit Agreement.

"FF&E Sale" has the meaning set forth in Section 6.8 of the Credit Agreement.

"Hilco/Gordon Brothers Joint Venture" means a joint venture composed of Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC and Hilco Real Estate, LLC.

"Lease Mitigations" has the meaning set forth in Section 6.8 of the Credit Agreement.

"Merchandise" has the meaning set forth in Section 6.8 of the Credit Agreement.

"Merchants" has the meaning set forth in Section 6.8 of the Credit Agreement.

"Store Closing Sale" has the meaning set forth in Section 6.8 of the Credit Agreement.

"Third Amendment" shall mean that certain Third Amendment to the Fifth Amended and Restated Credit Agreement entered into as of the 14th day of February, 2008 among the Borrower, the Agent, the Credit Parties signatory thereto and the Lenders.

"Third Amendment Effective Date" shall mean the date on which the conditions precedent set forth in the Third Amendment have been satisfied."

4

(l)     Each of the following definitions set forth in <u>Schedule A</u> to the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"<u>Borrowing Base</u>" shall mean, as of any date of determination, the sum of:

(a)     100% of the book value of Eligible Accounts-Retail at all times; <u>plus</u>

(b)     the lesser of (i) $10,000,000 or (ii) 100% of the book value of Eligible Accounts-Wholesale at all times; <u>plus</u>

(c)     102.5% of the NOLV of Eligible Inventory-Apparel and 102.5% of the NOLV of the Inventory-Apparel which shall exist upon a draw on the applicable Eligible Trade L/C-Retail; <u>plus</u>

(d)     the lesser of (i) $10,000,000 or (ii) 60% of (A) the book value of Eligible Inventory-Wholesale (including Eligible In-Transit Inventory-Wholesale) at all times <u>minus</u> (B) the book value of Eligible In-Transit Inventory-Wholesale in excess of $5,000,000 at all times; <u>plus</u>

(e)     60% of the book value of the Eligible Inventory-Wholesale, which shall exist upon a draw on the applicable Eligible Trade L/C-Wholesale;

less the Minimum Excess Availability Reserve and less any additional Reserve established by Agent at such time.

"<u>Minimum Excess Availability Reserve</u>" shall mean a special Reserve established by Agent on the Closing Date and maintained by Agent in an amount at all times equal to the sum of (x) 10% of the lesser of (i) the Maximum Amount and (ii) the sum of the amounts set forth in <u>clauses (a), (b), (c), (d) and (e)</u> of the definition of Borrowing Base plus (y) $10,000,000."

(m)     The first sentence of <u>clause (a)</u> of <u>Schedule B</u> to the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"Subject to the terms and conditions of this Agreement, Agent agrees to incur from time to time, upon the request of Borrower on behalf of Borrower and for Borrower's account, Letter of Credit Obligations and Eligible Trade L/C Obligations by causing Letters of Credit and Eligible Trade L/Cs to be issued on terms acceptable to Agent and by Agent, a subsidiary of Agent or a bank or other legally authorized Person acceptable to Agent and Borrower (each, an "<u>L/C Issuer</u>") for Borrower's account and guaranteed by Agent; <u>provided</u>, <u>however</u>, that the aggregate amount of the sum of all such Letter of Credit Obligations <u>plus</u> Eligible Trade L/C Obligations shall not at any time exceed the lesser of (i) Seventy-Five Million Dollars ($75,000,000) (the "<u>L/C Sublimit</u>"), or (ii) the Maximum Amount <u>less</u> the aggregate outstanding principal balance of the Revolving Credit Advances; <u>provided further</u> that Letter of Credit Obligations plus Eligible Trade L/C Obligations shall not exceed the Borrowing Base <u>plus</u> the aggregate amount of unrestricted cash on deposit in a deposit account of Borrower under the control of the Agent, at a bank or other financial institution acceptable to Agent and subject to a

5

Source: PreVu, INC, 10-Q, June 17, 2008

tri-party blocked account agreement by and among Agent, such bank or financial institution and Borrower in form and substance satisfactory to Agent <u>less</u> the outstanding balance of the Revolving Credit Advances and Swing Line Advances."

(n)    <u>Clause (a)</u> of <u>Schedule H</u> is hereby amended and restated to read in its entirety as follows:

"(a)    To Agent, (1) no less frequently than daily by 1:00 p.m. (Chicago time) on each day, a Borrowing Base Certificate with respect to Borrower, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion, which shall be prepared by the Borrower as of the previous day and (2) on or prior to 5 Business Days after the end of each Fiscal Month, a Borrowing Base Certificate with respect to Borrower, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion, which shall be prepared by the Borrower as of the last day of the immediately preceding Fiscal Month; and"

(o)    <u>Schedule H</u> to the Credit Agreement is hereby amended by adding the following new <u>clauses (h)</u> and <u>(i)</u> at the end thereof:

"(h)    Borrower, at its own expense, shall deliver to Agent on or prior to the first Friday to occur following the commencement of the Comprehensive Sale and each Friday thereafter until the Comprehensive Sale is completed a summary of the cash proceeds and disbursements of fees, costs and other expenses relating to the Comprehensive Sale, in form and substance satisfactory to Agent.

(i)    Borrower, at its own expense, shall deliver to Agent from and after the Third Amendment Effective Date, (x) on or prior to the fifth day of each calendar month, an updated appraisal, prepared on a NOLV basis and by a Person and in a form reasonably acceptable to Agent, of the Inventory owned by the Borrower as of the last day of the then immediately preceding calendar month and (y) upon Agent's request, by 12:00 p.m. (Chicago time) on Wednesday of each week, an updated appraisal, prepared on a NOLV basis and by a Person and in a form reasonably acceptable to Agent, of the Inventory owned by the Borrower as of the last Friday of the immediately preceding week."

(p)    The Credit Agreement is hereby amended to add as <u>Schedules K</u> and <u>L</u> thereto the <u>Schedules K</u> and <u>L</u> attached hereto.

**Section 2 <u>Representations and Warranties</u>**. Borrower and the Credit Parties who are party hereto represent and warrant that:

(a)    the execution, delivery and performance by Borrower and such Credit Parties of this Amendment have been duly authorized by all necessary corporate action and this Amendment is a legal, valid and binding obligation of Borrower and such Credit Parties enforceable against Borrower and such Credit Parties in accordance with its terms, except as the enforcement thereof may be subject to (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally and (ii) general

6

principles of equity (regardless of whether such enforcement is sought in a proceeding in equity or at law);

(b)    each of the representations and warranties contained in the Credit Agreement (as amended hereby) is true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date;

(c)    neither the execution, delivery and performance of this Amendment nor the consummation of the transactions contemplated hereby does or shall contravene, result in a breach of, or violate (i) any provision of Borrower's or Credit Parties' certificate or articles of incorporation or bylaws, (ii) any law or regulation, or any order or decree of any court or government instrumentality or (iii) indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrower, the Credit Parties or any of their Subsidiaries is a party or by which Borrower, the Credit Parties or any of their Subsidiaries or any of their property is bound, except in any such case to the extent such conflict or breach has been waived by a written waiver document a copy of which has been delivered to Agent on or before the date hereof; and

(d)    no Default or Event of Default will exist or result after giving effect hereto.

**Section 3 <u>Conditions to Effectiveness</u>.** This Amendment will be effective only upon satisfaction of the following:

(a)    Execution and delivery of this Amendment by Borrower, the Credit Parties that are listed on the signature pages hereto, the Agent and each Lender;

(b)    Delivery to Agent of certified copies of (i) that certain Agency Agreement dated as of February 14, 2008 by and among the Borrower, the Credit Parties signatories thereto and the Hilco/Gordon Brothers Joint Venture, and (ii) all other agreements, documents and instruments executed and/or delivered in connection with the foregoing; and

(c)    Payment of an amendment fee to Agent, for the benefit of Lenders signatory hereto, in an amount equal to $172,500, which amendment fee shall be fully earned and payable on the date hereof.

**Section 4 <u>Reference to and Effect Upon the Credit Agreement</u>.**

(a)    Except as specifically set forth herein, the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

(b)    The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of Agent or any Lender under the Credit Agreement or any Loan Document, nor constitute a waiver of any provision of the Credit Agreement or any Loan Document, except as specifically set forth herein. Upon the effectiveness of this Amendment, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of similar import shall mean and refer to the Credit Agreement as amended hereby.

7

**Section 5 <u>Waiver and Release</u>.**

In consideration of the foregoing, each of Borrower and each Credit Party hereby waives, releases and covenants not to sue Agent or any Lender with respect to, any and all claims it may have against Agent or any Lender, whether known or unknown, arising in tort, by contract or otherwise prior to the date hereof relating to one or more Loan Documents.

**Section 6 <u>Costs and Expenses.</u>**

As provided in <u>Section 11.3</u> of the Credit Agreement, Borrower agrees to reimburse Agent for all fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with this Amendment.

**Section 7 <u>Governing Law.</u>**

THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS.

**Section 8 <u>Headings.</u>**

Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purposes.

**Section 9 <u>Counterparts.</u>**

This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original but all such counterparts shall constitute one and the same instrument.

**Section 10 <u>Confidentiality</u>.**

The matters set forth herein are subject to Section 11.18 of the Credit Agreement, which is incorporated herein by reference.

[signature page follows]

8

Source: PreVu, INC, 10-Q, June 17, 2008

IN WITNESS WHEREOF, this Amendment has been duly executed as of the date first written above.

**BORROWER:**

WILSONS LEATHER HOLDINGS INC.

By:    /s/ Stacy A. Kruse
Title:  Chief Financial Officer and Treasurer

**LENDERS:**

GENERAL ELECTRIC CAPITAL
CORPORATION, as Agent, Lender, Term
Lender and Swing Line Lender

By:    /s/ Kristina M. Miller
Title:  Duly Authorized Signatory

[Signature Page to Third Amendment]

The undersigned are executing this Amendment in their capacity as Credit Parties:

Wilsons The Leather Experts Inc.

By: /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer


Wilsons Center, Inc.

By: /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer


Rosedale Wilsons, Inc.

By: /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer


River Hills Wilsons, Inc.

By /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer


Bermans The Leather Experts Inc.

By: /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer


[Signature Page to Third Amendment]

**Schedule K**
**List of Closed Stores**

Store List

prepared: 02/10/08

| Store # | Segment | Name | Address | | City | State | Close Date |
|---|---|---|---|---|---|---|---|
| 2 | Mall | East Towne Mall | 57 East Towne Mall | | Madison | WI | 04/23/08 |
| 4 | Mall | Northtown | 364 Northtown Drive | | Blaine | MN | 05/01/08 |
| 5 | Mall | Southridge | 5300 South 76th Street | | Greendale | WI | 04/30/08 |
| 8 | Mall | Rosedale | 1010 Rosedale Center | Spc 500 | Roseville | MN | 05/03/08 |
| 11 | Mall | Brookfield Square | 95 North Moorland Road | Spc C-18 | Brookfield | WI | 04/23/08 |
| 12 | Mall | Maplewood | 3001 White Bear Avenue | Ste 1037 | St. Paul | MN | 04/27/08 |
| 14 | Mall | Merle Hay Mall | 3800 Merle Hay Road | Spc 511 | Des Moines | IA | 04/13/08 |
| 15 | Mall | Cherryvale | E-110 Cherryvale Mall | | Rockford | IL | 05/01/08 |
| 20 | Mall | N. Riverside Park | 7501 West Cermak Road | | North Riverside | IL | 04/27/08 |
| 21 | Mall | W/S Fox Valley | 2140 Fox Valley Center | | Aurora | IL | 04/27/08 |
| 23 | Mall | Burnsville Center | 2020 Burnsville Center | | Burnsville | MN | 04/30/08 |
| 27 | Mall | W/S Louis Joliet | 3340 Mall Loop Drive | Spc 1216 | Joliet | IL | 04/20/08 |
| 33 | Mall | Harlem Irving | 4180 North Harlem Avenue | Spc 60 | Norridge | IL | 04/30/08 |
| 34 | Mall | Great Lakes Mall | 7850 Mentor Road | Spc 550 | Mentor | OH | 03/30/08 |
| 36 | Mall | W/S Hawthorn | 518 Hawthorn Center | | Vernon Hills | IL | 04/27/08 |
| 40 | Mall | W/S Richland | 620 Richland Mall | | Mansfield | OH | 04/13/08 |
| 45 | Mall | W/S Great Northern | 640 Great Northern Mall | | North Olmsted | OH | 04/23/08 |
| 47 | Mall | Valley View Mall | 3800 State Road 16 | Ste 161 | LaCrosse | WI | 04/23/08 |
| 49 | Mall | Empire | 1630 Empire Mall | Spc 416 | Sioux Falls | SD | 05/04/08 |
| 51 | Mall | Florence Mall | 1137 Florence Mall | | Florence | KY | 04/30/08 |
| 53 | Mall | Glenbrook Square | 4201 Coldwater Road | #M12 | Fort Wayne | IN | 04/30/08 |
| 54 | Mall | Southpark | 4500 16th Street | #160 | Moline | IL | 03/30/08 |
| 55 | Mall | Northpark | 320 Kimberly Road | #621 | Davenport | IA | 04/20/08 |
| 57 | Mall | Regency | 5716 Durand Avenue | #D412 | Racine | WI | 04/13/08 |
| 68 | Mall | Chapel Hill | 2000 Brittain Road | Ste 201 | Akron | OH | 04/20/08 |
| 71 | Mall | White Oaks | 2501 Wabash Avenue | Spc G-08 | Springfield | IL | 04/20/08 |
| 72 | Mall | Eastland Mall | 800 North Green River Road | #226 | Evansville | IN | 04/20/08 |
| 77 | Mall | W/S Belden Village | 4140 Belden Village Mall | Spc C-16 | Canton | OH | 05/01/08 |
| 79 | Mall | River Oaks | 159 & Torrence Avenue | Spc A-33 | Calumet City | IL | 05/04/08 |
| 82 | Mall | Market Place | 2000 North Neil Street | Spc D-13 | Champaign | IL | 04/23/08 |
| 93 | Mall | Evergreen Plaza | 9700 South Western Avenue | Spc G6A | Evergreen Park | IL | 04/30/08 |
| 101 | Mall | Kirkwood Plaza | 883 Kirkwood Plaza | | Bismarck | ND | 04/30/08 |
| 102 | Mall | Southern Park | 7401 Market Street | Spc 721 | Youngstown | OH | 04/27/08 |
| 106 | Mall | Citadel | 750 Citadel Drive East | Spc 2006 | Colorado Springs | CO | 04/27/08 |
| 108 | Mall | Eastwood | 5555 Youngstown-Wareen Road | Spc 669 | Niles | OH | 03/30/08 |
| 109 | Mall | Eastland Mall | 1615 East Empire Street | Spc 7 | Bloomington | IL | 04/23/08 |
| 113 | Mall | Jefferson Mall | 4801 Outer Loop | Spc A264 | Louisville | KY | 04/13/08 |
| 125 | Mall | Boulevard Mall | 1207 Niagra Falls Boulevard | | Amherst | NY | 05/01/08 |
| 133 | Mall | Westgate | 7701 West Interstate 40 | Ste 516 | Amarillo | TX | 04/27/08 |
| 142 | Mall | Hickory Hollow | 5252 Hickory Hollow Mall | Spc 2001 | Antioch | TN | 03/22/08 |
| 148 | Mall | McKinley Mall | 3701 McKinley Parkway | Spc 719 | Buffalo | NY | 04/13/08 |
| 150 | Mall | South Plains | 6002 Slide Road | Spc G27 | Lubbock | TX | 04/20/08 |
| 158 | Mall | Millcreek Mall | 260 Millcreek Mall | | Erie | PA | 05/04/08 |
| 160 | Mall | Lynnhaven Mall | 701 Lynnhaven Parkway | Spc E-10 | Virginia Beach | VA | 04/30/08 |
| 165 | Mall | Battlefield Mall | 2825 South Glen Stone | Spc G-10C | Springfield | MO | 04/06/08 |
| 166 | Mall | Northwoods | 2200 West War Memorial Drive | Spc CU13/14 | Peoria | IL | 04/23/08 |
| 167 | Mall | Muncie | 3501 North Granville Avenue | Spc L-3A | Muncie | IN | 03/30/08 |
| 174 | Mall | Dover | 5020A Dover Mall | | Dover | DE | 04/23/08 |
| 181 | Mall | Oakwood | 4800 Golf Road | Spc 330 | Eau Claire | WI | 04/23/08 |
| 202 | Mall | Westmoreland Mall | 5256 Route 30 | Spc 130 | Greensburg | PA | 03/30/08 |
| 203 | Mall | Holyoke | 50 Holyoke Street | Spc B-228 | Holyoke | MA | 04/23/08 |
| 206 | Mall | Rivergate | 1000 Rivergate Parkway | Ste 1830 | Goodlettsville | TN | 03/30/08 |
| 210 | Mall | Monmouth | Routes 35 & 36 | Spc 324 | Eatontown | NJ | 04/13/08 |
| 218 | Mall | Crossgates Mall | 1 Crossgates Mall Road | Spc B115 | Albany | NY | 05/04/08 |
| 220 | Mall | W/S Wheaton Plaza | 11160 Veirs Mill Road | Spc G-10C | Wheaton | MD | 03/30/08 |
| 240 | Mall | Ford City | 7601 South Cicero Avenue | Spc 1260 | Chicago | IL | 04/27/08 |
| 242 | Mall | Lincolnwood TC | 3333 West Touhy Avenue | | Lincolnwood | IL | 04/30/08 |
| 2022 | Mall | Vintage Faire | 163 Vintage Faire Mall | | Modesto | CA | 04/23/08 |
| 2023 | Mall | Sunrise | 6034 Sunrise Mall | | Citrus Heights | CA | 03/22/08 |
| 2032 | Mall | NewPark | 1041 Newpark Mall | | Newark | CA | 03/30/08 |
| 2036 | Mall | Southland | 350 Southland Mall | | Hayward | CA | 04/23/08 |
| 2038 | Mall | Sunvalley | 129 Sunvalley Mall | Spc B-122 | Concord | CA | 04/23/08 |
| 2041 | Mall | Northridge SC | 1422 Northridge Shopping Center | Spc 3 | Salinas | CA | 04/13/08 |
| 2088 | Mall | Montgomery Mall | 276 Montgomery Mall | Spc F-11 | North Wales | PA | 04/20/08 |
| 2090 | Mall | Century III | 3075 Clairton Road | Spc 816 | West Mifflin | PA | 04/27/08 |
| 2110 | Mall | Northlake | 4800 Briarcliff Road | Spc 1141 | Atlanta | GA | 03/30/08 |
| 2121 | Mall | Marketplace | 410 Miracle Mile Drive | | Rochester | NY | 04/30/08 |
| 2124 | Mall | Cross County | 4A Mall Walk | | Yonkers | NY | 04/23/08 |
| 2131 | Mall | Serramonte | 5A Serramonte Center | | Daly City | CA | 04/30/08 |
| 2135 | Mall | Towne East | 7700 East Kellogg Street | Spc 773 | Wichita | KS | 04/30/08 |
| 2138 | Mall | W/S South Shore | 1701 Sunrise Highway | Spc B-9/10 | Bay Shore | NY | 03/30/08 |
| 2141 | Mall | Fox Run | 50 Fox Run Road | Ste 92 | Portsmouth | NH | 05/03/08 |
| 2142 | Mall | Greece Ridge | 1354 Long Pond Road | Spc 14 | Greece | NY | 04/23/08 |
| 2146 | Mall | North Dartmouth | 138 North Dartmouth Mall | | North Dartmouth | MA | 04/13/08 |

Source: PreVu, INC, 10-Q, June 17, 2008

**Schedule K**
**List of Closed Stores**
**Store List**

prepared: 02/10/08

| Store # | Segment | Name | Address | | City | State | Close Date |
|---------|---------|------|---------|--|------|-------|------------|
| 2155 | Mall | Mall New Hampshire | 1500 South Willow Street | Spc E-19 | Manchester | NH | 05/04/08 |
| 2160 | Mall | W/S Oakridge | 925 Blossom Hill Road, Ste 1114 | Box B, Door 9 | San Jose | CA | 04/13/08 |
| 2168 | Mall | W/S Solano | 1350 Travis Boulevard | Spc H-11 | Fairfield | CA | 04/10/08 |
| 2178 | Mall | Beaver Valley | 644 Beaver Valley Mall | | Monaca | PA | 04/20/08 |
| 2180 | Mall | Whitney Field | 100 Commercial Road | Spc #46 | Leominster | MA | 03/30/08 |
| 2181 | Mall | Bangor Mall | 663 Stillwater Avenue | Spc G-16 | Bangor | ME | 05/02/08 |
| 2197 | Mall | Harrisburg Mall | Paxton Street & I-83 | Spc J-3A | Harrisburg | PA | 05/02/08 |
| 2221 | Mall | Rogue Valley | 1600 North Riverside | Spc 1136 | Medford | OR | 03/30/08 |
| 2228 | Mall | Hamilton Mall | 4403 Blackhorse Pike | Spc 123 | Mays Landing | NJ | 04/13/08 |
| 2243 | Mall | Galleria Wht Plains | 100 Main Street | Spc 326 | White Plains | NY | 03/19/08 |
| 2244 | Mall | Great Northern | 4081 Route 31 | Box 2206 | Clay | NY | 04/20/08 |
| 2262 | Mall | Boise Town Square | 350 North Milwaukee | Spc 2101 | Boise | ID | 04/27/08 |
| 2285 | Mall | Emerald Square | 346 Emerald Square | Spc W325 | North Attleborough | MA | 04/20/08 |
| 2287 | Mall | Bayshore | 3300 Broadway | | Eureka | CA | 04/06/08 |
| 2295 | Mall | W/S Vancouver | 8700 Vancouver Mall Drive | | Vancouver | WA | 04/13/08 |
| 2302 | Mall | Southland | 23000 Eureka Road & Pardee | | Taylor | MI | 04/20/08 |
| 2303 | Mall | Genesee Valley | 3329 South Linden Road | | Flint | MI | 04/20/08 |
| 2304 | Mall | Westland SC | 35000 West Warren Road | Spc 624 | Westland | MI | 04/23/08 |
| 2305 | Mall | Fashion Square | 4856 Fashion Square Mall | | Saginaw | MI | 05/04/08 |
| 2307 | Mall | Lansing | 5786 West Saginaw Highway | | Lansing | MI | 03/30/08 |
| 2311 | Mall | Crossroads | 6650 South Westnedge Avenue | Spc 119 | Portage | MI | 04/20/08 |
| 2314 | Mall | Lakeview Square | 5775 Beckley Road | Spc B-111 | Battle Creek | MI | 03/18/08 |
| 2317 | Mall | W/S Chicago Ridge | 580 Chicago Ridge Mall | Spc A-7 | Chicago Ridge | IL | 04/30/08 |
| 2324 | Mall | Orland Square | 652 Orland Square | Spc F-13 | Orland Park | IL | 04/30/08 |
| 2330 | Mall | Spring Hill | 1258 Spring Hills Mall | | West Dundee | IL | 04/23/08 |
| 2331 | Mall | Stratford Square | 408 Stratford Square | Spc # D8 | Bloomingdale | IL | 04/27/08 |
| 2333 | Mall | Eastgate | 4601-348 Eastgate Boulevard | | Cincinnati | OH | 04/20/08 |
| 2334 | Mall | W/S Southlake | 1961 Southlake Mall, Dock D | | Merrillville | IN | 04/30/08 |
| 2400 | Mall | York Galleria | 2899 Whiteford Road | Spc 122 | York | PA | 04/20/08 |
| 2402 | Mall | W/S Parkway Plaza | 449 Parkway Plaza | Spc N-10 | El Cajon | CA | 05/01/08 |
| 2405 | Mall | Arden Fair | 1689 East Arden Way | Spc 2114 | Sacramento | CA | 04/13/08 |
| 2408 | Mall | Four Seasons T/C | 400 Four Seasons Mall | Ste 123A | Greensboro | NC | 04/27/08 |
| 2421 | Mall | Paradise Valley | 4550 East Cactus Road | Spc G-16 | Phoenix | AZ | 03/02/08 |
| 2426 | Mall | Southern Hills | 4400 Sergeant Road | | Sioux City | IA | 04/27/08 |
| 2431 | Mall | River Hills | 1850 Adams | Ste 416 | Mankato | MN | 04/27/08 |
| 2443 | Mall | St. Charles T/C | 11110 Mall Circle | Ste 1023 | Waldorf | MD | 04/13/08 |
| 2445 | Mall | Northtown | 4750 North Division Street | Ste 146 | Spokane | WA | 04/20/08 |
| 2453 | Mall | Cumberland | 1000 Cumberland Parkway N.W. | Spc 216 | Atlanta | GA | 04/27/08 |
| 2462 | Mall | Broadway Square | 4601 South Broadway | Spc 1016 | Tyler | TX | 03/30/08 |
| 2463 | Mall | Cross Creek | 222 Cross Creek Mall | | Fayetteville | NC | 05/03/08 |
| 2464 | Mall | Grand Traverse | 3200 South Airport Road West | Spc 207 | Traverse City | MI | 04/23/08 |
| 2466 | Mall | W/S Meriden Square | 470 Lewis Avenue | Spc 1004 | Meriden | CT | 05/01/08 |
| 2471 | Mall | Sandusky | 4314 Milan Road | Spc 255 | Sandusky | OH | 03/22/08 |
| 2477 | Mall | Rushmore | 2200 North Maple | Spc 316 | Rapid City | SD | 05/01/08 |
| 2492 | Mall | Coronado Center | 6600 Menaul Northeast | Ste 219 | Albuquerque | NM | 04/27/08 |
| 2501 | Mall | Square One | 1277 Broadway Drive | Spc S-219 | Saugus | MA | 04/20/08 |
| 2508 | Mall | W/S Downtown Plaza | 545 L Street | Spc 1011 | Sacramento | CA | 04/23/08 |
| 2629 | Mall | Oglethorpe | 7804 Abercorn Extension, | Spc 103 | Savannah | GA | 03/22/08 |
| 2642 | Mall | W/S Plaza Camino | 2525 El Camino Real | Ste 244 | Carlsbad | CA | 04/23/08 |
| 2647 | Mall | Bay Park | 263 Bay Park Square | | Green Bay | WI | 04/27/08 |
| 2651 | Mall | Cottonwood Mall | 10,000 Coors Boulevard N.W. | Spc E-233 | Albuquerque | NM | 04/23/08 |
| 2662 | Mall | Wolfchase | 2760 North Germantown Pkwy | Ste 118 | Memphis | TN | 04/27/08 |
| 2666 | Mall | Spokane Valley | 14700 East Indiana Avenue | Spc 1052 | Spokane Valley | WA | 04/20/08 |
| 2671 | Mall | Brass Mill | 495 Union Street | Spc 2138 | Waterbury | CT | 03/30/08 |
| 2679 | Mall | W/S South County | 34 South County Centerway | | St. Louis | MO | 04/27/08 |
| 2681 | Mall | W/S Independence | 3500 Oleander Drive | Spc 1060 | Wilmington | NC | 04/30/08 |
| 2689 | Mall | Regency Square | 9501 Arlington Expressway | Spc 270 | Jacksonville | FL | 04/20/08 |
| 2698 | Mall | Flatiron Crossing | 2248 West Flatiron Circle | | Broomfield | CO | 04/23/08 |
| 2701 | Mall | Johnstown Galleria | 500 Galleria Drive | Ste 278B | Johnstown | PA | 04/13/08 |
| 2709 | Mall | Highland Mall | 6001 Airport Boulevard | Ste 1400 | Austin | TX | 03/30/08 |
| 2720 | Mall | Patrick Henry | 12300 Jefferson Avenue | Ste 813 | Newport News | VA | 05/01/08 |
| 2722 | Mall | Arbor Place | 2080 Arbor Place Mall | | Douglasville | GA | 04/13/08 |
| 2731 | Mall | Lima Mall | 2400 Elida Road | Spc 356 | Lima | OH | 03/22/08 |
| 2737 | Mall | Mall at Stonecrest | 2929 Turner Hill Road | Ste 2370 | Lithonia | GA | 04/20/08 |
| 2747 | Mall | Honey Creek | 3401 South US Highway 41 | Spc E-7 | Terre Haute | IN | 03/30/08 |
| 2759 | Mall | Seminole Towne | 131 Towne Center Circle | Spc F03-B | Sanford | FL | 03/22/08 |
| 2764 | Mall | Volusia Mall | 1700 West International Speedway Boulevard | #570 | Daytona Beach | FL | 04/23/08 |
| 2768 | Mall | Bowie Town Center | 15518 Emerald Way | Spc B11 | Bowie | MD | 03/22/08 |
| 2769 | Mall | Bay City Mall | 4101 East Wilder Road | Spc B213 | Bay City | MI | 04/13/08 |
| 2771 | Mall | Lakes Mall | 5600 Harvey Street | Spc 2026 | Muskegon | MI | 04/27/08 |
| 2776 | Mall | Fairfield Commons | 2727 North Fairfield Road | Spc E261 | Beavercreek | OH | 03/30/08 |
| 2782 | Mall | Virginia Commons | 10101 Brook Road | Ste 336 | Glen Allen | VA | 04/13/08 |
| 2788 | Mall | W/S Countryside | 27001 US Highway 19 North | Ste 2019 | Clearwater | FL | 04/27/08 |
| 2789 | Mall | Cordova Mall | 5100 North 9th Avenue | | Pensacola | FL | 04/13/08 |
| 2805 | Mall | Chesapeake Square | 4200 Portsmouth Boulevard | Spc 848A | Chesapeake | VA | 03/30/08 |
| 2824 | Mall | Valley River | 264 Valley River Center | | Eugene | OR | 04/20/08 |
| 2831 | Mall | Oakland Mall | 342 West 14 Mile Road | | Troy | MI | 03/30/08 |
| 2836 | Mall | W/S Connecticut Post | 1201 Boston Post Road | Spc 2445 | Milford | CT | 04/20/08 |
| 2837 | Mall | W/S Plaza Bonita | 3030 Plaza Bonita Road | Ste 1070 | National City | CA | 04/23/08 |
| 2839 | Mall | Regency Square | 1420 Parham Road | Spc K230 | Richmond | VA | 03/22/08 |
| 3050 | Outlet | Great Lakes Crossing | 4574 Baldwin Road | Spc 816 | Auburn Hills | MI | 04/20/08 |
| 3057 | Outlet | Tanger Myrtle Bch II | 4620 Factory Stores Boulevard | Spc N-240 | Myrtle Beach | SC | 03/22/08 |
| 3107 | Outlet | Cincinnati Mills | 809 Cincinnati Mills Drive | | Cincinnati | OH | 04/13/08 |

Source: PreVu, INC, 10-Q, June 17, 2008

| 3122 Outlet | The Source | 1504 Old Country Road | Spc J07 | Westbury | NY | 04/06/08 |

**158 Stores to Close**

## Schedule L
## List of Leases

| The Leases | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | prepared: 02/10/08 | |
| Store # | Segment | Location | City | State | Developer | Guarantor | SQ FT | Expiration | Comments |
| 2 | Mall | East Towne Mall | Madison | WI | CBL & Assoc. | ROS | 2,454 | 1/31/2009 | |
| 8 | Mall | Rosedale | Roseville | MN | Jones Lang LaSalle | NONE | 4,246 | 01/31/2013 | |
| 11 | Mall | Brookfield Square | Brookfield | WI | CBL & Assoc. | NONE | 2,440 | 01/31/2018 | |
| 12 | Mall | Maplewood | St. Paul | MN | Simon Property | NONE | 3,019 | 01/31/2016 | |
| 14 | Mall | Merle Hay Mall | Des Moines | IA | Merle Hay | NONE | 2,500 | 01/31/2009 | |
| 15 | Mall | Cherryvale | Rockford | IL | CBL & Assoc. | NONE | 2,554 | 01/31/2013 | |
| 20 | Mall | N. Riverside Park | North Riverside | IL | Urban Retail | ROS | 3,120 | 01/31/2014 | |
| 21 | Mall | W/S Fox Valley | Aurora | IL | Westfield Corp. | NONE | 3,006 | 01/31/2011 | |
| 23 | Mall | Burnsville Center | Burnsville | MN | CBL & Assoc. | ROS | 2,500 | 01/31/2014 | |
| | Mall | W/S Louis Joliet | Joliet | IL | Westfield Corp. | ROS | | | 120 days from |
| 27 | | | | | | | 1,946 | 5/31/2009 | 2/1/09 |
| 33 | Mall | Harlem Irving | Norridge | IL | Harlem-Irving | NONE | 4,030 | 01/31/2014 | |
| 34 | Mall | Great Lakes Mall | Mentor | OH | Simon Property | NONE | 3,134 | 02/28/2015 | |
| 36 | Mall | W/S Hawthorn | Vernon Hills | IL | Westfield Corp. | ROS | 3,216 | 02/28/2010 | |
| | Mall | W/S Richland | Mansfield | OH | Westfield Corp. | ROS | | | 90 days from |
| 40 | | | | | | | 2,723 | 4/30/2009 | 2/1/09 |
| 47 | Mall | Valley View Mall | LaCrosse | WI | PREIT-Rubin | NONE | 2,641 | 01/31/2012 | |
| 49 | Mall | Empire | Sioux Falls | SD | Macerich | ROS | 3,381 | 01/31/2013 | |
| 51 | Mall | Florence Mall | Florence | KY | General Growth | NONE | 2,732 | 01/31/2012 | |
| 53 | Mall | Glenbrook Square | Fort Wayne | IN | General Growth | ROS | 2,482 | 01/31/2011 | |
| 54 | Mall | Southpark | Moline | IL | Simon Property | NONE | 2,309 | 01/31/2010 | |
| 55 | Mall | Northpark | Davenport | IA | Simon Property | NONE | 2,595 | 01/31/2011 | |
| | Mall | Regency | Racine | WI | CBL & Assoc. | ROS | | | 90 days from |
| 57 | | | | | | | 2,475 | 12/31/2008 | 09/30/08 |
| 68 | Mall | Chapel Hill | Akron | OH | CBL & Assoc. | NONE | 2,941 | 01/31/2013 | |
| | Mall | White Oaks | Springfield | IL | Simon Property | NONE | | | 90 days from |
| 71 | | | | | | | 2,910 | 4/30/2009 | 1/31/09 |
| 72 | Mall | Eastland Mall | Evansville | IN | Simon Property | NONE | 2,908 | 01/31/2013 | |
| 77 | Mall | W/S Belden Village | Canton | OH | Westfield Corp. | ROS | 3,000 | 04/30/2015 | |
| 79 | Mall | River Oaks | Calumet City | IL | Simon Property | NONE | 3,296 | 01/31/2010 | |
| 82 | Mall | Market Place | Champaign | IL | General Growth | NONE | 2,308 | 01/31/2009 | |
| 102 | Mall | Southern Park | Youngstown | OH | Simon Property | NONE | 2,325 | 01/31/2016 | |
| 106 | Mall | Citadel | Colorado Springs | CO | Macerich | ROS | 4,030 | 01/31/2009 | |
| 108 | Mall | Eastwood | Niles | OH | Cafaro | ROS | 2,560 | 01/31/2010 | |
| 109 | Mall | Eastland Mall | Bloomington | IL | CBL & Assoc. | NONE | 2,200 | 01/31/2009 | |
| 113 | Mall | Jefferson Mall | Louisville | KY | CBL & Assoc. | NONE | 3,262 | 01/31/2011 | |
| 125 | Mall | Boulevard Mall | Amherst | NY | Forest City | NONE | 2,076 | 01/31/2009 | |
| 133 | Mall | Westgate | Amarillo | TX | Jones Lang LaSalle | ROS | 1,740 | 01/31/2009 | |
| 150 | Mall | South Plains | Lubbock | TX | Macerich | ROS | 2,220 | 01/31/2009 | |
| 158 | Mall | Millcreek Mall | Erie | PA | Cafaro | NONE | 2,882 | 01/31/2010 | |
| 160 | Mall | Lynnhaven Mall | Virginia Beach | VA | General Growth | NONE | 2,160 | 01/31/2011 | |
| 165 | Mall | Battlefield Mall | Springfield | MO | Simon Property | NONE | 1,957 | 01/31/2015 | |
| 166 | Mall | Northwoods | Peoria | IL | Simon Property | NONE | 2,065 | 01/31/2009 | |
| 174 | Mall | Dover | Dover | DE | Simon/Mills | NONE | 2,480 | 01/31/2010 | |

Source: PreVu, INC, 10-Q, June 17, 2008

## Schedule L
## List of Leases

| The Leases |
|---|

prepared: 02/10/08

| Store # | Segment | Location | City | State | Developer | Guarantor | SQ FT | Expiration | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 203 | Mall | Holyoke | Holyoke | MA | Pyramid | ROS | 2,277 | 01/31/2013 | |
| 206 | Mall | Rivergate | Goodlettsville | TN | CBL & Assoc. | ROS | 2,191 | 01/31/2010 | |
| 210 | Mall | Monmouth | Eatontown | NJ | Vornado Realty | ROS | 2,299 | 01/31/2013 | |
| 218 | Mall | Crossgates Mall | Albany | NY | Pyramid | ROS | 3,576 | 01/31/2012 | |
| 240 | Mall | Ford City | Chicago | IL | CBL & Assoc. | ROS | 2,899 | 01/31/2011 | |
| 242 | Mall | Lincolnwood TC | Lincolnwood | IL | Simon Property | NONE | 2,526 | 01/31/2011 | |
| 2022 | Mall | Vintage Faire | Modesto | CA | Macerich | ROS | 1,765 | 01/31/2011 | |
| 2038 | Mall | Sunvalley | Concord | CA | Taubman | ROS | 2,383 | 01/31/2010 | |
| 2041 | Mall | Northridge SC | Salinas | CA | Macerich | NONE | 2,601 | 01/31/2012 | |
| 2110 | Mall | Northlake | Atlanta | GA | Simon Property | NONE | 2,811 | 01/31/2012 | |
| 2121 | Mall | Marketplace | Rochester | NY | Wilmorite | NONE | 1,972 | 01/31/2012 | |
| 2124 | Mall | Cross County | Yonkers | NY | Macerich | NONE | 1,835 | 12/31/2010 | |
| 2131 | Mall | Serramonte | Daly City | CA | Jones Lang LaSalle | NONE | 3,809 | 01/31/2013 | SVKO, but over sales threshold |
| 2135 | Mall | Towne East | Wichita | KS | Simon Property | NONE | 3,388 | 01/31/2010 | |
| 2141 | Mall | Fox Run | Portsmouth | NH | Jones Lang LaSalle | ROS | 2,033 | 01/31/2009 | |
| 2142 | Mall | Greece Ridge | Greece | NY | Wilmorite | ROS | 2,594 | 06/30/2011 | |
| 2146 | Mall | North Dartmouth | North Dartmouth | MA | PREIT-Rubin | ROS | 2,640 | 01/31/2011 | |
| 2155 | Mall | Mall New Hampshire | Manchester | NH | Simon Property | NONE | 2,420 | 01/31/2017 | |
| 2160 | Mall | W/S Oakridge | San Jose | CA | Westfield Corp. | NONE | 2,348 | 01/31/2010 | |
| 2168 | Mall | W/S Solano | Fairfield | CA | Westfield Corp. | NONE | 2,113 | 01/31/2010 | |
| 2178 | Mall | Beaver Valley | Monaca | PA | PREIT-Rubin | ROS | 2,500 | 01/31/2010 | |
| 2180 | Mall | Whitney Field | Leominster | MA | Jones Lang LaSalle | NONE | 1,500 | 12/31/2008 | |
| 2197 | Mall | Harrisburg Mall | Harrisburg | PA | Feldman Properties | NONE | 2,200 | 01/31/2009 | |
| 2221 | Mall | Rogue Valley | Medford | OR | General Growth | ROS | 1,467 | 01/31/2012 | |
| 2228 | Mall | Hamilton Mall | Mays Landing | NJ | Kravco Simon | ROS | 1,832 | 01/31/2010 | |
| 2262 | Mall | Boise Town Square | Boise | ID | General Growth | NONE | 3,027 | 01/31/2012 | |
| 2285 | Mall | Emerald Square | North Attleborough | MA | Simon Property | NONE | 2,437 | 01/31/2010 | |
| 2295 | Mall | W/S Vancouver | Vancouver | WA | Westfield Corp. | ROS | 3,088 | 04/30/2011 | |
| 2302 | Mall | Southland | Taylor | MI | General Growth | NONE | 2,460 | 12/13/2012 | |
| 2303 | Mall | Genesee Valley | Flint | MI | Jones Lang LaSalle | NONE | 2,467 | 01/31/2015 | |
| 2304 | Mall | Westland SC | Westland | MI | Jones Lang LaSalle | NONE | 4,117 | 01/31/2011 | |
| 2305 | Mall | Fashion Square | Saginaw | MI | CBL & Assoc. | NONE | 3,837 | 01/31/2011 | |
| 2307 | Mall | Lansing | Lansing | MI | General Growth | NONE | 2,505 | 01/31/2013 | |
| 2311 | Mall | Crossroads | Portage | MI | General Growth | NONE | 2,086 | 01/31/2014 | |
| 2317 | Mall | W/S Chicago Ridge | Chicago Ridge | IL | Westfield Corp. | NONE | 2,442 | 01/31/2010 | |
| 2324 | Mall | Orland Square | Orland Park | IL | Simon Property | NONE | 3,574 | 01/31/2010 | |
| 2330 | Mall | Spring Hill | West Dundee | IL | General Growth | NONE | 3,470 | 3/31/2009 | 90 days from 02/01/09 |
| 2331 | Mall | Stratford Square | Bloomingdale | IL | Feldman Equities | NONE | 2,377 | 3/31/2009 | |
| 2333 | Mall | Eastgate | Cincinnati | OH | CBL & Assoc. | ROS | 2,456 | 01/31/2010 | |
| 2334 | Mall | W/S Southlake | Merrillville | IN | Westfield Corp. | NONE | 3,852 | 01/31/2017 | |

Source: PreVu, INC, 10-Q, June 17, 2008

**Schedule L**
**List of Leases**

| The Leases |
|---|
| prepared: 02/10/08 |

| Store # | Segment | Location | City | State | Developer | Guarantor | SQ FT | Expiration | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 2400 | Mall | York Galleria | York | PA | CBL & Assoc. | ROS | 3,080 | 01/31/2011 | |
| 2402 | Mall | W/S Parkway Plaza | El Cajon | CA | Westfield Corp. | ROS | 2,370 | 01/31/2011 | |
| 2405 | Mall | Arden Fair | Sacramento | CA | Macerich | ROS | 3,527 | 01/31/2011 | |
| 2408 | Mall | Four Seasons T/C | Greensboro | NC | General Growth | ROS | 3,265 | 01/31/2011 | |
| 2426 | Mall | Southern Hills | Sioux City | IA | Macerich | ROS | 2,661 | 2/28/2009 | 60 days from 01/01/09 |
| 2438 | Mall | River Hills | Mankato | MN | General Growth | NONE | 2,339 | 01/31/2016 | |
| 2443 | Mall | St. Charles T/C | Waldorf | MD | Simon Property | NONE | 2,132 | 01/31/2016 | |
| 2445 | Mall | Northtown | Spokane | WA | General Growth | NONE | 2,847 | 01/31/2013 | |
| 2453 | Mall | Cumberland | Atlanta | GA | General Growth | NONE | 2,460 | 01/31/2013 | |
| 2462 | Mall | Broadway Square | Tyler | TX | Simon Property | NONE | 2,190 | 01/31/2013 | |
| 2463 | Mall | Cross Creek | Fayetteville | NC | CBL & Assoc. | NONE | 2,495 | 01/31/2013 | |
| 2465 | Mall | Grand Traverse | Traverse City | MI | General Growth | NONE | 3,040 | 01/31/2013 | |
| 2466 | Mall | W/S Meriden Square | Meriden | CT | Westfield Corp. | ROS | 2,564 | 04/30/2013 | |
| 2471 | Mall | Sandusky | Sandusky | OH | Cafaro | NONE | 2,574 | 01/31/2010 | |
| 2477 | Mall | Rushmore | Rapid City | SD | Macerich | ROS | 2,355 | 12/31/2012 | |
| 2492 | Mall | Coronado Center | Albuquerque | NM | General Growth | NONE | 2,173 | 01/31/2009 | |
| 2501 | Mall | Square One | Saugus | MA | Simon Property | NONE | 1,934 | 01/31/2010 | |
| 2508 | Mall | W/S Downtown Plaza | Sacramento | CA | Westfield Corp. | NONE | 2,017 | 01/31/2015 | |
| 2642 | Mall | W/S Plaza Camino | Carlsbad | CA | Westfield Corp. | NONE | 1,936 | 01/31/2009 | |
| 2647 | Mall | Bay Park | Green Bay | WI | Simon Property | NONE | 1,820 | 01/31/2009 | |
| 2651 | Mall | Cottonwood Mall | Albuquerque | NM | Simon Property | NONE | 2,161 | 01/31/2009 | |
| 2662 | Mall | Wolfchase | Memphis | TN | Simon Property | ROS | 2,183 | 01/31/2009 | |
| 2666 | Mall | Spokane Valley | Spokane Valley | WA | General Growth | NONE | 2,201 | 01/31/2010 | |
| 2679 | Mall | W/S South County | St. Louis | MO | CBL & Assoc. | ROS | 2,183 | 01/31/2010 | |
| 2689 | Mall | Regency Square | Jacksonville | FL | General Growth | NONE | 2,557 | 01/31/2010 | |
| 2698 | Mall | Flatiron Crossing | Broomfield | CO | Macerich | NONE | 3,458 | 12/31/2010 | |
| 2709 | Mall | Highland Mall | Austin | TX | General Growth | ROS | 2,169 | 01/31/2010 | |
| 2720 | Mall | Patrick Henry | Newport News | VA | PREIT-Rubin | ROS | 2,452 | 01/31/2011 | |
| 2722 | Mall | Arbor Place | Douglasville | GA | CBL & Assoc. | ROS | 2,803 | 01/31/2011 | |
| 2731 | Mall | Lima Mall | Lima | OH | Simon Property | NONE | 1,698 | 01/31/2011 | |
| 2737 | Mall | Mall at Stonecrest | Lithonia | GA | Forest City | NONE | 2,235 | 01/31/2012 | |
| 2747 | Mall | Honey Creek | Terre Haute | IN | CBL & Assoc. | NONE | 2,555 | 01/31/2011 | |
| 2759 | Mall | Seminole Towne | Sanford | FL | Simon Property | NONE | 2,913 | 11/30/2009 | 90 days from 09/01/09 |
| 2764 | Mall | Volusia Mall | Daytona Beach | FL | CBL & Assoc. | NONE | 2,269 | 01/31/2012 | |
| 2768 | Mall | Bowie Town Center | Bowie | MD | Simon Property | NONE | 2,821 | 01/31/2012 | |
| 2771 | Mall | Lakes Mall | Muskegon | MI | CBL & Assoc. | ROS | 2,592 | 01/31/2012 | |
| 2776 | Mall | Fairfield Commons | Beavercreek | OH | Glimcher Properties | NONE | 2,251 | 06/30/2010 | |
| 2782 | Mall | Virginia Commons | Glen Allen | VA | Simon Property | NONE | 2,614 | 01/31/2012 | |
| 2788 | Mall | W/S Countryside | Clearwater | FL | Westfield Corp. | ROS | 2,785 | 01/31/2012 | |
| 2789 | Mall | Cordova Mall | Pensacola | FL | Simon Property | NONE | 2,855 | 01/31/2012 | |

Source: PreVu, INC, 10-Q, June 17, 2008

### Schedule L
### List of Leases

| The Leases |
|---|
| prepared: 02/10/08 |

| Store # | Segment | Location | City | State | Developer | Guarantor | SQ FT | Expiration | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 2805 | Mall | Chesapeake Square | Chesapeake | VA | Simon Property | NONE | 2,777 | 01/31/2013 | |
| 2824 | Mall | Valley River | Eugene | OR | Macerich | NONE | 1,850 | 01/31/2013 | |
| 2831 | Mall | Oakland Mall | Troy | MI | Oakland Mall Ltd. | ROS | 2,000 | 5/31/2009 | 60 days from 02/28/09 |
| 2836 | Mall | W/S Connecticut Post | Milford | CT | Westfield Corp. | NONE | 2,250 | 01/31/2016 | |
| 2837 | Mall | W/S Plaza Bonita | National City | CA | Westfield Corp. | NONE | 1,422 | 5/31/2009 | 120 days from 02/01/09 |
| 2839 | Mall | Regency Square | Richmond | VA | Taubman | ROS | 2,008 | 3/31/2010 | 60 days from 02/01/10 |
| 3050 | Outlet | Great Lakes Crossing | Auburn Hills | MI | Taubman | ROS | 4,124 | 1/31/2018 | |
| 3057 | Outlet | Tanger Myrtle Bch II | Myrtle Beach | SC | Tanger | NONE | 3,768 | 12/31/2009 | |
| 3107 | Outlet | Cincinnati Mills | Cincinnati | OH | Mills Corp. | ROS | 5,005 | 01/31/2012 | |
| 3122 | Outlet | The Source | Westbury | NY | Simon Property | NONE | 4,189 | 01/31/2012 | |

130

Source: PreVu, INC, 10-Q, June 17, 2008

Exhibit 10.3

**FOURTH AMENDMENT TO**
**FIFTH AMENDED AND RESTATED CREDIT AGREEMENT**

This FOURTH AMENDMENT TO FIFTH AMENDED AND RESTATED CREDIT AGREEMENT (this "Amendment") is entered into as of this 25th day of February, 2008 among WILSONS LEATHER HOLDINGS INC., a Minnesota corporation ("Borrower"), GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, as Lender, Term Lender, Swing Line Lender and as Agent ("Agent"), the Credit Parties signatory hereto and the Lenders signatory hereto. Unless otherwise specified herein, capitalized terms used in this Amendment shall have the meanings ascribed to them by the Credit Agreement (as hereinafter defined).

RECITALS

WHEREAS, Borrower, certain Credit Parties, Agent and Lenders have entered into that certain Fifth Amended and Restated Credit Agreement dated as of December 29, 2006 (as amended, supplemented, restated or otherwise modified from time to time, the "Credit Agreement"); and

WHEREAS, Borrower, the Credit Parties signatories to the Credit Agreement, the Lenders and Agent wish to amend certain provisions of the Credit Agreement, as more fully set forth herein.

NOW THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**Section 1  Amendments to the Credit Agreement.** Subject to the satisfaction of the conditions precedent set forth in Section 3 hereof, the parties hereto hereby agree to amend the Credit Agreement as follows:

   (a)   The third sentence of Section 1.1(a)(i) of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"The aggregate amount of Revolving Credit Advances outstanding shall not exceed at any time the lesser of (A) the Maximum Amount less the sum of 100% of the Letter of Credit Obligations, 100% of the Eligible Trade L/C Obligations and 100% of the Swing Line Loan outstanding and (B) the Borrowing Base plus the aggregate amount of unrestricted cash on deposit in an account of Borrower under the control of the Agent, at a bank or other financial institution acceptable to Agent and subject to a tri-party account control agreement by and among Agent, such bank or financial institution and Borrower in form and substance satisfactory to Agent, less the sum of 100% of the Letter of Credit Obligations, 100% of the Eligible Trade L/C Obligations and 100% of the Swing Line Loan outstanding at such time (such amount, "Borrowing Availability")."

   (b)   The second sentence of Section 1.1(c)(i) of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"The aggregate amount of Swing Line Advances outstanding shall not exceed the lesser of (A) the Swing Line Commitment and (B) the Borrowing Base plus the aggregate amount of unrestricted cash on deposit in an account of Borrower under the control of the Agent, at a bank or other financial institution acceptable to Agent and subject to a tri-party account control agreement by and among Agent, such bank or financial institution and Borrower in form and substance satisfactory to Agent, less the sum of the outstanding balance of the Revolving Credit Advances, 100% of outstanding Letter of Credit Obligations and 100% of outstanding Eligible Trade L/C Obligations ("Swing Line Availability")."

(c)    The third sentence of Section 1.2 of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"In addition, the sum of 100% of the Letter of Credit Obligations and 100% of outstanding Eligible Trade L/C Obligations shall not exceed the Borrowing Base, plus the aggregate amount of unrestricted cash on deposit in an account of Borrower under the control of the Agent, at a bank or other financial institution acceptable to Agent and subject to a tri-party account control agreement by and among Agent, such bank or financial institution and Borrower in form and substance satisfactory to Agent, less the then outstanding Revolving Credit Advances and Swing Line Loan."

(d)    Section 5.11 of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"5.11 Additional Deliveries.

On or prior to March 18, 2008, Borrower shall deliver to Agent Ultimate Parent's forecasted consolidated balance sheets, profit and loss statements, cash flow statements and borrowing availability projections on a monthly basis for the remaining period in the Fiscal Year ending in January, 2009 and for the Fiscal Year ending in January, 2010, which, in each case, shall be (i) prepared in a manner consistent with the historical Financial Statements of Ultimate Parent together with appropriate supporting details and a statement of underlying assumptions and (ii) in form and substance reasonably satisfactory to Agent (the "Updated Projections"); provided that, notwithstanding anything to the contrary contained herein or otherwise, from and after the Third Amendment Effective Date through and including the date of receipt by Agent of the Updated Projections, in form and substance reasonably satisfactory to Agent, (x) no Revolving Loans (other than Letter of Credit Obligations and Eligible Trade L/C Obligations) may be outstanding under this Agreement and (y) the aggregate amount of the sum of all outstanding Letter of Credit Obligations plus Eligible Trade L/C Obligations may not at any time exceed Twenty-One Million Dollars ($21,000,000)."

(e)    The first sentence of clause (a) of Schedule B to the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"Subject to the terms and conditions of this Agreement, Agent agrees to incur from time to time, upon the request of Borrower on behalf of Borrower and for

2

Source: PreVu, INC, 10-Q, June 17, 2008

Borrower's account, Letter of Credit Obligations and Eligible Trade L/C Obligations by causing Letters of Credit and Eligible Trade L/Cs to be issued on terms acceptable to Agent and by Agent, a subsidiary of Agent or a bank or other legally authorized Person acceptable to Agent and Borrower (each, an "L/C Issuer") for Borrower's account and guaranteed by Agent; provided, however, that the aggregate amount of the sum of all such Letter of Credit Obligations plus Eligible Trade L/C Obligations shall not at any time exceed the lesser of (i) Seventy-Five Million Dollars ($75,000,000) (the "L/C Sublimit"), or (ii) the Maximum Amount less the aggregate outstanding principal balance of the Revolving Credit Advances; provided further that Letter of Credit Obligations plus Eligible Trade L/C Obligations shall not exceed the Borrowing Base plus the aggregate amount of unrestricted cash on deposit in an account of Borrower under the control of the Agent, at a bank or other financial institution acceptable to Agent and subject to a tri-party account control agreement by and among Agent, such bank or financial institution and Borrower in form and substance satisfactory to Agent less the outstanding balance of the Revolving Credit Advances and Swing Line Advances."

**Section 2  Representations and Warranties**. Borrower and the Credit Parties who are party hereto represent and warrant that:

(a)  the execution, delivery and performance by Borrower and such Credit Parties of this Amendment have been duly authorized by all necessary corporate action and this Amendment is a legal, valid and binding obligation of Borrower and such Credit Parties enforceable against Borrower and such Credit Parties in accordance with its terms, except as the enforcement thereof may be subject to (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally and (ii) general principles of equity (regardless of whether such enforcement is sought in a proceeding in equity or at law);

(b)  each of the representations and warranties contained in the Credit Agreement (as amended hereby) is true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date;

(c)  neither the execution, delivery and performance of this Amendment nor the consummation of the transactions contemplated hereby does or shall contravene, result in a breach of, or violate (i) any provision of Borrower's or Credit Parties' certificate or articles of incorporation or bylaws, (ii) any law or regulation, or any order or decree of any court or government instrumentality or (iii) indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrower, the Credit Parties or any of their Subsidiaries is a party or by which Borrower, the Credit Parties or any of their Subsidiaries or any of their property is bound, except in any such case to the extent such conflict or breach has been waived by a written waiver document a copy of which has been delivered to Agent on or before the date hereof; and

(d)  no Default or Event of Default will exist or result after giving effect hereto.

3

Source: PreVu, INC, 10-Q, June 17, 2008

**Section 3** <u>**Conditions to Effectiveness.**</u> This Amendment will be effective only upon its execution and delivery by Borrower, the Credit Parties that are listed on the signature pages hereto, the Agent and each Lender.

**Section 4** <u>**Reference to and Effect Upon the Credit Agreement.**</u>

(a)    Except as specifically set forth herein, the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

(b)    The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of Agent or any Lender under the Credit Agreement or any Loan Document, nor constitute a waiver of any provision of the Credit Agreement or any Loan Document, except as specifically set forth herein. Upon the effectiveness of this Amendment, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of similar import shall mean and refer to the Credit Agreement as amended hereby.

**Section 5** <u>**Waiver and Release.**</u>

In consideration of the foregoing, each of Borrower and each Credit Party hereby waives, releases and covenants not to sue Agent or any Lender with respect to, any and all claims it may have against Agent or any Lender, whether known or unknown, arising in tort, by contract or otherwise prior to the date hereof relating to one or more Loan Documents.

**Section 6** <u>**Costs and Expenses.**</u>

As provided in <u>Section 11.3</u> of the Credit Agreement, Borrower agrees to reimburse Agent for all fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with this Amendment.

**Section 7** <u>**Governing Law.**</u>

THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS.

**Section 8** <u>**Headings.**</u>

Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purposes.

**Section 9** <u>**Counterparts.**</u>

This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original but all such counterparts shall constitute one and the same instrument.

**Section 10** <u>**Confidentiality.**</u>

4

The matters set forth herein are subject to Section 11.18 of the Credit Agreement, which is incorporated herein by reference.

[signature page follows]

5

Source: PreVu, INC, 10-Q, June 17, 2008

IN WITNESS WHEREOF, this Amendment has been duly executed as of the date first written above.

**BORROWER:**

WILSONS LEATHER HOLDINGS INC.

By:     /s/ Stacy A. Kruse

Title:  Chief Financial Officer and
        Treasurer

**LENDERS:**

GENERAL ELECTRIC CAPITAL
CORPORATION, as Agent, Lender, Term Lender
and Swing Line Lender

By:     /s/ Kristina M. Miller

Title:  Duly Authorized Signatory

[Signature Page to Fourth Amendment]

The undersigned are executing this Amendment in their capacity as Credit Parties:

Wilsons The Leather Experts Inc.

By:    /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Wilsons Center, Inc.

By:    /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Rosedale Wilsons, Inc.

By:    /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

River Hills Wilsons, Inc.

By    /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

Bermans The Leather Experts Inc.

By:    /s/ Stacy A. Kruse
Title: Chief Financial Officer and Treasurer

[Signature Page to Fourth Amendment]

Source: PreVu, INC, 10-Q, June 17, 2008

Exhibit 10.4

**CONFIDENTIAL**

## AGREEMENT

THIS AGREEMENT (this "Agreement") is made and entered into by and between Michael M. Searles, a resident of Minnesota ("Executive"), and Wilsons The Leather Experts Inc., a Minnesota corporation (the "Company").

## BACKGROUND

A.    Executive was employed by the Company as its Chief Executive Officer, pursuant to an Employment Agreement dated November 22, 2004, as modified and amended March 2, 2005, September 14, 2005 and December 21, 2006 (the "Employment Agreement").

B.    The parties have agreed that it is in their mutual interests that Executive resign as an employee, officer, and director of the Company effective at the end of the day on April 3, 2008 (the "Separation Date") and that the parties provide for a smooth transition in connection with Executive's resignations.

C.    The Company desires to secure cooperation from Executive with the transition of his duties, and to ensure Executive's availability to consult with the Company from time to time with respect to the business and operations of the Company.

D.    The parties are concluding their relationship amicably, but mutually recognize that such a relationship may give rise to potential claims or liabilities. The parties desire to resolve all issues Executive may have relating to the termination of Executive's relationship with the Company, as set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual promises and provisions contained in this Agreement and the Release referred to below, the parties, intending to be legally bound, agree as follows:

**CONFIDENTIAL**

## AGREEMENTS

1.   **Resignation.** By signing this Agreement, Executive confirms his resignation as an employee, officer and director of the Company, effective April 3, 2008. Executive will sign such other documents as deemed reasonably necessary to accurately reflect such resignations in the Company's corporate records.

2.   **Final Pay/Benefits Continuation.** Executive confirms that he has been paid in full for his base salary, compensation, and benefits owing to him to date, and the Company will pay Executive's final base salary and accrued and unused vacation time in the amount of $3,018.31 (10.46 hours), earned through the Separation Date, in accordance with the regular payroll practices of the Company. Executive acknowledges and agrees that he will not receive an incentive bonus award under the Wilsons Leather Corporate Leadership Team Incentive Plan for the fiscal year ending February 2, 2008 or under any other annual incentive bonus plan. Executive will have the right to continue his group health, dental and/or vision insurance coverage after the Separation Date under such terms as are made available to similarly-situated former employees of the Company, pursuant to the terms of the applicable plan documents and laws regarding continuation coverage. Except as provided in subparagraph 5.b of this Agreement, such continuation coverage will be at Executive's own expense. To the extent that Executive is currently a participant in any retirement, pension, or profit sharing plans of the Company, Executive will be entitled to his rights and benefits under these plans at the times and under the terms and conditions set forth in any such plan.

3.   **Expense Reimbursement.** The Company will reimburse Executive for his regular and necessary business expenses incurred through the Separation Date in accordance

Source: PreVu, INC, 10-Q, June 17, 2008

CONFIDENTIAL

with the Company's regular policies and practices. Executive will submit all requests for reimbursement to the Company no later than April 30, 2008.

    **4.**   **Release by Executive.** At the same time that Executive executes this Agreement, he shall execute a Release in the form attached to this Agreement as Exhibit A (the "Release"). This Agreement will not be interpreted or construed to limit the Release in any manner.

    **5.**   **Severance Arrangements.** The Company will make the severance payments and other consideration set forth in subparagraphs 5.a. and 5.b. below in lieu of any further payments or compensation that Executive would otherwise be entitled to receive under any agreement with the Company or any affiliate or as an employee, officer or director of the Company or any Affiliate. The Company will make such payments and provide such consideration only if (i) Executive has signed this Agreement and the Release and has not rescinded this Agreement or the Release within the rescission period set forth in paragraph 23 below (the "Rescission Period"), and (ii) Executive has not breached his obligations pursuant to this Agreement, the Release or the continuing provisions of the Employment Agreement.

    **a.**   **Salary Continuation.** The Company will pay Executive as salary continuation an amount equal to Executive's monthly base salary as of the Separation Date for a period of six (6) months. Payment will be made in accordance with the Company's regular payroll schedule for the pay period commencing after expiration of the Rescission Period and continuing for six (6) months thereafter.

    **b.**   **Health Insurance.** If Executive elects to continue his group health, dental and/or vision insurance under the terms of paragraph 2 above and the terms of the applicable plans, Executive will complete all paperwork necessary to carry out such election

3

**CONFIDENTIAL**

effective April 30, 2008, as specified by the Company or its agents in accordance with the applicable plans.
Upon such election by Executive, the Company will pay on Executive's behalf a portion of the cost of the
premiums that he is required to pay to maintain such continuation coverage for a period of up to six (6) months
following the Separation Date, or, if earlier, until such continuation coverage ceases in accordance with the
terms and conditions of the applicable plans and laws. The premium portion to be paid by the Company will be
equal to the portion of the health, dental and/or vision insurance premiums that would be paid by the Company
if Executive were an employee of the Company, at the same level of coverage that was in effect on the
Separation Date. The Company will deduct Executive's portion of such premiums from payments to Executive
pursuant to subparagraph 5.a., provided, however, if payments owed to Executive pursuant to subparagraph 5.a.
are not sufficient to cover Executive's portion of the premiums, Executive will pay such portion to the
Company in accordance with the requirements of continuation coverage.

   6.   **Stock Options**. Executive acknowledges and agrees that the options listed in this paragraph below are
Executive's only options to purchase shares of the common stock of the Company, and that such options are
exercisable only to the extent reflected in the "Amount Exercisable" column below. All such options were
granted pursuant to the Company's 2000 Long Term Incentive Plan, as amended and restated (the "Plan").
Executive further agrees and acknowledges that all of the options to purchase common stock of the Company
will expire and cease to be outstanding in accordance with the terms of the applicable Stock Option Agreements
and the Plan.

| Date of Grant | Exercise Price | Number of Shares | Amount Exercisable |
|---|---|---|---|
| 12/01/04 | $5.00 | 350,000 | 350,000 |
| 06/02/05 | $5.88 | 450,000 | 300,000 |
| 12/13/07 | $1.10 | 100,000 | 0 |

4

Source: PreVu, INC, 10-Q, June 17, 2008

CONFIDENTIAL

    **b.**    **Restricted Stock.** Executive acknowledges and agrees that he owns no restricted stock of the Company.

    **7.**    **Confidential Information and Restrictive Covenants.** Executive acknowledges and confirms his continuing obligations following the Separation Date to comply with the provisions of the Employment Agreement that continue and survive after termination of his employment, including without limitation the obligations set forth in Sections 6, 8, 9, 12 and 13 of the Employment Agreement, except that Executive and the Company agree that the obligations of Executive under Section 8(a) of the Employment Agreement shall end six (6) months following the Separation Date and the obligations of Executive under Sections 8(b) and 8(c) of the Employment Agreement shall end twelve (12) months following the Separation Date.

    **8.**    **Cooperation; Consulting Services.** At any time upon reasonable request and notice from the Company, Executive will, without further consideration but at no expense to Executive, (a) timely execute and deliver such acknowledgements, instruments, certificates, and other ministerial documents (including without limitation, certification as to specific actions performed by Executive in his capacity for the Company or any of its affiliates) as may be necessary or appropriate to formalize and complete the Company's or any affiliate's corporate records; provided, however, that nothing in this paragraph 8 will require Executive to take any action that he reasonably believes to be unlawful or unethical or to make any inaccurate statement of actual facts, and (b) provide complete and truthful information to, and otherwise cooperate fully with, the Company, any of its affiliates, and any of its or their legal counsel, agents, insurers and representatives in connection with any investigations, litigation or other matters relating to the Company or any of its affiliates in which the

5

CONFIDENTIAL

Company determines that Executive may have relevant information. In addition, at the Company's reasonable request and upon reasonable notice, for a period of six (6) months following the Separation Date, Executive will make himself reasonably available, without further consideration, to discuss and consult with the Company regarding business matters, including without limitation matters with which he was directly and substantially involved while employed by the Company, and to assist in transitioning his duties as Chief Executive Officer.

9.    **Claims Involving the Company.** Executive will not recommend or suggest to any potential claimants or plaintiffs or their attorneys or agents that they initiate claims or lawsuits against the Company, any of its affiliates, or any of its or their directors, officers, employees, or agents, nor will Executive voluntarily aid, assist, or cooperate with any claimants or plaintiffs or their attorneys or agents in any claims or lawsuits now pending or commenced in the future against the Company, any of its affiliates, or any of its or their directors, officers, employees, or agents; provided, however, that this paragraph 9 will not be interpreted or construed to prevent Executive from providing information to any governmental or law enforcement agency or from giving testimony in response to questions asked pursuant to a legally enforceable subpoena, deposition notice or other legal process.

10.    **Records, Documents, and Property.** Executive confirms that he has delivered to the Company any and all Company or affiliate records and any and all Company or affiliate property in his possession or under his control, including without limitation, manuals, books, blank forms, documents, letters, memoranda, notes, notebooks, reports, printouts, computer disks, computer tapes, digital storage media, data, tables, or calculations and all copies thereof, documents that in whole or in part contain any trade secrets or confidential, proprietary, or other secret information of the Company or of any of its

6

CONFIDENTIAL

affiliates, and all copies thereof, and keys, access cards, access codes, source codes, passwords, raw materials, products, product samples, credit cards, personal computers, telephones, and other electronic equipment belonging to the Company or any of its affiliates; provided, however, that Executive may retain the laptop computer and BlackBerry he used in connection with his employment but prior to the Separation Date will allow the Company to inspect such equipment and to remove all Company software and information.

11.    **Non-Disparagement.** Executive will not at any time disparage, defame or besmirch the reputation, character, image, products or services of the Company, any of its affiliates, or the reputation or character of any of their current or former directors, officers, employees or agents.

12.    **Actions Taken by Executive.** Executive represents and warrants that, during the entire period that he has been an employee or officer of the Company or any of its affiliates, he acted in good faith and had no reasonable cause to believe that his conduct was unlawful.

13.    **Indemnification.** Notwithstanding Executive's separation from the Company, with respect to events that occurred during his tenure as an employee, officer or director of the Company, Executive will be entitled, as a former employee, officer or director of the Company, to the same rights that are afforded to other current or former employees, officers or directors of the Company, now or in the future, to indemnification and advancement of expenses as provided in the charter documents of the Company and under applicable law, and to indemnification and a legal defense to the extent provided from time to time to current officers or directors by any applicable general liability and/or directors' and officers' liability insurance policies maintained by the Company.

14.    **Confidentiality.**

7

Source: PreVu, INC, 10-Q, June 17, 2008

**CONFIDENTIAL**

a.   <u>**General Standard**</u>. It is understood and agreed that this Agreement and summaries thereof may be disclosed in filings with the Securities and Exchange Commission and summarized in proxy statements disseminated to shareholders of the Company. Notwithstanding such public filings, in order to minimize disruption and distraction from on-going business operations, it is the intent of the parties that the terms of Executive's separation from the Company, including the provisions of this Agreement and the Release (collectively "Confidential Separation Information"), will be forever treated as confidential. Accordingly, except as provided in subparagraph 14.b. below, Executive will not disclose Confidential Separation Information to anyone at any time and will not comment on Confidential Separation Information to anyone at any time.

b.   <u>**Exceptions**</u>.

i.   It will not be a violation of this Agreement for Executive to disclose Confidential Separation Information in reports to governmental agencies as required by law, including, but not limited to, any federal or state tax authority.

ii.  It will not be a violation of this Agreement for Executive to disclose Confidential Separation Information to his immediate family, his attorneys, his accountants or tax advisors.

iii. It will not be a violation of this Agreement for Executive to disclose Confidential Separation Information in connection with any litigation proceeding involving the parties' rights or obligations under this Agreement or the Release.

iv.  It will not be a violation of this Agreement for Executive to disclose Confidential Separation Information in the course of any job search, in response to questions from prospective employers about Executive's departure from the Company or Executive's obligations under paragraph 7 of this Agreement, or under the Employment Agreement.

15.  <u>**Full Compensation**</u>. Executive understands that the payments made and other consideration provided by the Company under this Agreement will fully compensate

8

Source: PreVu, INC, 10-Q, June 17, 2008

**CONFIDENTIAL**

Executive for and extinguish any and all of the potential claims Executive is releasing in the Release, including without limitation, his claims for attorneys' fees and costs and any and all claims for any type of legal or equitable relief.

16.    **Withholding of Taxes**. The Company shall withhold from payments and benefits hereunder income and employment taxes and other amounts to the extent required by law. It is the intention of the parties that no amounts payable hereunder constitute deferred compensation subject to the requirements of Section 409A of the Internal Revenue Code, and this Agreement should be interpreted accordingly.

17.    **No Admission of Wrongdoing**. Executive understands that this Agreement does not constitute an admission that the Company, any of its affiliates, or any of its or their directors, officers, employees, or agents has violated any local ordinance, state or federal statute, or principle of common law, or that the Company, any of its affiliates, or any of its or their directors, officers, employees, or agents has engaged in any unlawful or improper conduct toward Executive. Executive will not characterize this Agreement or the payment of any money or other consideration in accordance with this Agreement as an admission that the Company or any of its affiliates has engaged in any unlawful or improper conduct toward him or treated him unfairly.

18.    **Authority**. Executive represents and warrants that he has the authority to enter into this Agreement and the Release, and that no causes of action, claims, or demands released pursuant to this Agreement and the Release have been assigned to any person or entity not a party to this Agreement and the Release.

19.    **Legal Representation**. Executive acknowledges that he has been advised by the Company to consult with his own attorney before executing this Agreement and the Release, that he has had a full opportunity to consider this Agreement and the Release, that

9

Source: PreVu, INC, 10-Q, June 17, 2008

**CONFIDENTIAL**

he has had a full opportunity to ask any questions that he may have concerning this Agreement, the Release, or the settlement of his potential claims against the Company and others, and that he has not relied upon any statements or representations made by the Company, its affiliates or its or their attorneys, written or oral, other than the statements and representations that are explicitly set forth in this Agreement, the Release, and any qualified employee benefit plans sponsored by the Company in which Executive is a participant.

   20.   **Assignment.** This Agreement shall not be assignable, in whole or in part, by Executive without the prior written consent of the Company. The Company may, without the consent of Executive, assign its rights and obligations under this Agreement.

   21.   **Entire Agreement.** This Agreement, the Release, the continuing provisions of the Employment Agreement and any qualified employee benefit plans sponsored by the Company in which Executive is a participant are intended to define the full extent of the legally enforceable undertakings of the parties, and no promises or representations, written or oral, that are not set forth explicitly in this Agreement, the Release, the Employment Agreement or any qualified employee benefit plans sponsored by the Company in which Executive is a participant are intended by either party to be legally binding. All other agreements and understandings between Executive and the Company or any of its affiliates are hereby cancelled, terminated, and superseded.

   22.   **Period to Consider the Release and the Agreement.** Executive understands that he has 21 days to consider whether to sign this Agreement and the Release. If Executive signs this Agreement and the Release before the end of the 21-day period, it will be his voluntary decision to do so because he has decided he does not need any additional time to decide whether to sign this Agreement and the Release.

10

Source: PreVu, INC, 10-Q, June 17, 2008

**CONFIDENTIAL**

23. **Right to Rescind or Revoke.** Executive understands that he has the right to rescind or revoke this Agreement and the Release for any reason within fifteen (15) calendar days after he signs them. Executive understands that this Agreement will not become effective or enforceable unless and until he has not rescinded this Agreement or the Release and the Rescission Period has expired. Executive understands that if he wishes to rescind, the rescission must be in writing and hand-delivered or mailed to the Company. If hand-delivered, the rescission must be (a) addressed to Corrie Lapinsky, Director Legal Services, 7401 Boone Avenue North, Brooklyn Park, Minnesota 55428, and (b) delivered to Corrie Lapinsky within the fifteen-day period. If mailed, the rescission must be (a) postmarked within the fifteen-day period and (b) addressed to Corrie Lapinsky at the address in the preceding sentence.

24. **Headings.** The descriptive headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

25. **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

26. **Governing Law.** This Agreement and the Release will be interpreted and construed in accordance with, and any dispute or controversy arising from any breach or asserted breach of this Agreement or the Release will be governed by, the laws of the State of Minnesota.

11

<u>**CONFIDENTIAL**</u>

IN WITNESS WHEREOF, the parties have executed this Agreement on the date stated below.

Dated: March 26, 2008          /s/ Michael M. Searles
                               Michael M. Searles

Dated: March 28, 2008          **Wilsons The Leather Experts Inc.**

                               BY:    /s/ Michael T. Sweeney
                                      Michael T. Sweeney
                                      Its Chairman of the Board
                                      12

Source: PreVu, INC, 10-Q, June 17, 2008

CONFIDENTIAL

## RELEASE BY MICHAEL M. SEARLES

**Definitions.** I intend all words used in this Release to have their plain meanings in ordinary English. Specific terms that I use in this Release have the following meanings:

A.    I, me, and my include both me and anyone who has or obtains any legal rights or claims through me.

B.    Wilsons means Wilsons The Leather Experts Inc., any company related to Wilsons The Leather Experts Inc. in the present or past (including without limitation any of their predecessors, parents, subsidiaries, affiliates, and joint venture partners), and any successors of Wilsons The Leather Experts Inc.

C.    Company means Wilsons; the present and past officers, directors, committees, and employees of Wilsons; any company providing insurance to Wilsons in the present or past; the present and past fiduciaries of any employee benefit plan sponsored or maintained by Wilsons (other than multiemployer plans); the attorneys for Wilsons; and anyone who acted on behalf of Wilsons or on instructions from Wilsons.

D.    Agreement means the Agreement between Wilsons and me that I have executed on the same date as I am executing this Release, including all of the documents attached to the Agreement.

E.    My Claims mean all of my rights that I now have to any relief of any kind from the Company, whether or not I now know about those rights, including without limitation:

1.    all claims arising out of or relating to my employment with Wilsons, my status as an officer and/or director of Wilsons, or the termination of such relationships;

2.    all claims arising out of or relating to the statements, actions, or omissions of the Company;

3.    all claims for any alleged unlawful discrimination, harassment, retaliation or reprisal, or other alleged unlawful practices arising under any federal, state, or local statute, ordinance, or regulation, including without limitation, claims under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, 42 U.S.C. § 1981, the Employee Retirement Income Security Act, the Equal Pay Act, the Worker Adjustment and Retraining Notification Act, the Family and Medical Leave Act, the Sarbanes-Oxley Act, the Fair Credit Reporting Act, the Minnesota Human Rights Act, and workers' compensation non-interference or non-retaliation statutes (such as Minn. Stat. § 176.82);

**EXHIBIT A**

Source: PreVu, INC, 10-Q, June 17, 2008

**CONFIDENTIAL**

4.  all claims for alleged wrongful discharge; breach of contract; breach of implied contract; failure to keep any promise; breach of a covenant of good faith and fair dealing; breach of fiduciary duty; estoppel; my activities, if any, as a "whistleblower"; defamation; infliction of emotional distress; fraud; misrepresentation; negligence; harassment; retaliation or reprisal; constructive discharge; assault; battery; false imprisonment; invasion of privacy; interference with contractual or business relationships; any other wrongful employment practices; and violation of any other principle of common law;

5.  all claims for compensation of any kind, including without limitation, bonuses, commissions, stock-based compensation or stock options, vacation pay, relocation expenses, perquisites, and expense reimbursements;

6.  all claims for back pay, front pay, reinstatement, other equitable relief, compensatory damages, damages for alleged personal injury, liquidated damages, and punitive damages;

7.  all rights I have under California Civil Code section 1542, which states that: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;" and

8.  all claims for attorneys' fees, costs, and interest.

However, My Claims do not include any claims that the law does not allow to be waived, any claims that may arise after the date on which I sign this Release, or any claims for breach of the Agreement.

**Agreement to Release My Claims.** I will receive consideration from Wilsons as set forth in the Agreement if I sign and do not rescind this Release as provided below. I understand and acknowledge that the consideration is in addition to anything of value that I would be entitled to receive from Wilsons if I did not sign this Release or if I rescinded this Release. In exchange for that consideration I give up and release all of My Claims (including but not limited to any rights under California Civil Code section 1542). I will not make any demands or claims against the Company for compensation or damages relating to My Claims. The consideration that I am receiving is a fair compromise for the release of My Claims.

**Additional Agreements and Understandings.** Even though Wilsons will provide consideration for me to settle and release My Claims, the Company does not admit that it is responsible or legally obligated to me. In fact, the Company denies that it is responsible or legally obligated to me for My Claims, denies that it engaged in any unlawful or improper conduct toward me, and denies that it treated me unfairly.

**Confidentiality.** I understand that the terms of this Release are confidential and that I may not disclose those terms to any person except under the circumstances described in the Agreement.

A-2

**CONFIDENTIAL**

**Advice to Consult with an Attorney.** I understand and acknowledge that I am hereby being advised by the Company to consult with an attorney prior to signing this Release and I have done so. My decision whether to sign this Release is my own voluntary decision made with full knowledge that the Company has advised me to consult with an attorney.

**Period to Consider the Release.** I understand that I have 21 days from the day that I receive this Release, not counting the day upon which I receive it, to consider whether I wish to sign this Release. If I sign this Release before the end of the 21-day period, it will be my voluntary decision to do so because I have decided that I do not need any additional time to decide whether to sign this Release. I also agree that any changes made to this Release or the Agreement before I sign it, whether material or immaterial, will not restart the 21-day period.

**My Right to Rescind this Release.** I understand that I may rescind this Release at any time within 15 days after I sign it, not counting the day upon which I sign it. This Release will not become effective or enforceable unless and until the 15-day rescission period has expired without my rescinding it.

**Procedure for Accepting or Rescinding the Release.** To accept the terms of this Release, I must deliver the Release, after I have signed and dated it, to Wilsons by hand or by mail within the 21-day period that I have to consider this Release. To rescind my acceptance, I must deliver a written, signed statement that I rescind my acceptance to Wilsons by hand or by mail within the 15-day rescission period. All deliveries must be made to Wilsons at the following address:

> Corrie Lapinsky
> Director, Legal Services
> Wilsons Leather
> 7401 Boone Avenue North
> Brooklyn Park, Minnesota 55428

If I choose to deliver my acceptance or the rescission of my acceptance by mail, it must be postmarked within the period stated above and properly addressed to Wilsons at the address stated above.

**Interpretation of the Release.** This Release should be interpreted as broadly as possible to achieve my intention to resolve all of My Claims against the Company. If this Release is held by a court to be inadequate to release a particular claim encompassed within My Claims, this Release will remain in full force and effect with respect to all the rest of My Claims.

**My Representations.** I am legally able and entitled to receive the consideration being provided to me in settlement of My Claims. I have not been involved in any personal bankruptcy or other insolvency proceedings at any time since I began my employment with Wilsons. No child support orders, garnishment orders, or other orders requiring that money owed to me by Wilsons be paid to any other person are now in effect.

A-3

**CONFIDENTIAL**

I have read this Release carefully. I understand all of its terms. In signing this Release, I have not relied on any statements or explanations made by the Company except as specifically set forth in the Agreement and the Release signed by Wilsons. I am voluntarily releasing My Claims against the Company. I intend this Release and the Agreement to be legally binding.


Dated: _____        _____

                                       Michael M. Searles
                                                A-4

Exhibit 31.1

**CERTIFICATION OF INTERIM CHIEF EXECUTIVE OFFICER, WILSONS THE LEATHER EXPERTS INC.**

I, Timothy G. Becker, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Wilsons The Leather Experts Inc.

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ TIMOTHY G. BECKER
**Timothy G. Becker**
**Interim Chief Executive Officer**

Date: June 17, 2008

Source: PreVu, INC, 10-Q, June 17, 2008

Exhibit 31.2

**CERTIFICATION OF CHIEF FINANCIAL OFFICER, WILSONS THE LEATHER EXPERTS INC.**

I, Stacy A. Kruse, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Wilsons The Leather Experts Inc.

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ STACY A. KRUSE
**Stacy A. Kruse**
**Chief Financial Officer and Treasurer**

Date: June 17, 2008

Exhibit 32.1

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350 AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Wilsons The Leather Experts Inc. (the "Company") on Form 10-Q for the fiscal quarter ended May 3, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Timothy G. Becker, Interim Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ TIMOTHY G. BECKER
**Timothy G. Becker**
**Interim Chief Executive Officer**

Date: June 17, 2008

Source: PreVu, INC, 10-Q, June 17, 2008

Exhibit 32.2

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350 AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Wilsons The Leather Experts Inc. (the "Company") on Form 10-Q for the fiscal quarter ended May 3, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Stacy A. Kruse, Chief Financial Officer and Treasurer of the Company, certify, pursuant to 18 U.S.C. Section 1350, adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ STACY A. KRUSE
**Stacy A. Kruse**
**Chief Financial Officer and Treasurer**

Date: June 17, 2008

Created by 10K Wizard    www.10KWizard.com

# Exhibit 7



AOL | MY AOL | MAIL | MAKE AOL MY HOMEPAGE

AOL money & finance
BETA

NEWS   INVESTING   PERSONAL FINANCE   SPECIALS   BILL PAY   PORTFOLIOS   SMALL BUSINESS

NEWS   MONEY   Video   News   Local   more »

Web   Images

Real-Time Quote
WLSN
Symbol Lookup

NEWS   MONEY   SMALL BUSINESS   SPORTS   TECHNOLOGY   WEATHER

SEARCH

Live Updates: On | Off

Help & Feedback

U.S. Markets open in 9 hrs. 29 mins

| | | | | |
|---|---|---|---|---|
| DJIA | 11,440.05 | 207.53 ↑ | 1.85% |
| NASDAQ | 2,312.30 | 27.45 ↑ | 1.20% |
| S&P 500 | 1,260.32 | 14.96 ↑ | 1.20% |

Choose a Broker    Fidelity

WILSONS THE LEATHER EXPERTS

WLSN

Get Quote Details for:
WLSN    Go

**0.09  -0.02 ↓ -18.18%**

as of 01:59 PM EDT on 07/17/2008 in USD. NASDAQ Delay (15 min.)

Real-Time Quote
Only available during pre-market and regular market hours.

**Quote Details**

Historical Prices
Dividends & Splits
Average Monthly Returns
Classic Chart
Advanced Chart BETA
Real-Time Headlines
News & Analysis
Trade Publications
Regional
Press Releases

| | | | |
|---|---|---|---|
| Day Low | 0.085 | 52-Wk Low | 0.06 |
| Day High | 0.109 | 52-Wk High | 2.28 |
| Volume | 117,808 | Prev. Close | 0.11 |
| 30-Day Avg. Vol. | 140,000 | Today's Open | 0.091 |
| Market Cap. | 3.59 M | Dividend (TTM) | 0.00 |
| Shares Out. | 39.89 M | Div. Yield (TTM) | 0.00% |
| Revenue | 280.43 M | Beta | 0.2763 |
| Earnings | -77.54 M | P/E Ratio (TTM) | — |
| EPS (TTM) | -2.52 | P/E Ratio (Fwd.) | — |

Market Movers | Stock Screener | ETFs

Add to Portfolio | Add to Alerts

**Real-Time Headlines: WLSN**    Customize

All | News | Trade Pubs | Regional | PR | Blogs

7/14/08   SEC Filing: Current Event

7/14/08   SEC Filing: Quarterly Financials

7/9/08   G-III Apparel shares surge after Wilsons deal
View all Related Articles - AP Online

7/9/08   http://www.tradingmarkets.com/.site/news/Stock%20l/News/1744096/

# Exhibit 8

BALLON STOLL BADER & NADLER, P.C.
COUNSELLORS AT LAW                    FOUNDED 1931

1450 Broadway, New York, NY 10018-2268
Tel: 212-575-7900  Fax: 212-764-5060
www.ballonstoll.com

Affiliate offices:
Hackensack, New Jersey
Philadelphia, Pennsylvania

Vano I. Haroutunian
(212) 575-7900 x 204
vharoutunian@ballonstoll.com

November 19, 2007

**Via Federal Express**
Ms. Stacy A. Kruse
Chief Financial Officer,
Wilson The Leather Experts, Inc.
7401 Boone Avenue North
Brooklyn Park, MN 55428

>          Re:          **Pacific Connections, Inc. with Wilson Leather Stores**
>                       **C/M 16534.028**

Dear Ms. Kruse:

Our client, PACIFIC CONNECTIONS, Inc., has referred here your debt of $336,524.46 for store fixtures delivered to and installed in Wilsons retail locations on or about August 14, 2006.

Although your company accepted the delivery of these fixtures, duly paid the freight charges for them and has never denied that it is using them in your retail business operations, Pacific Connections has not yet received your payment for them by way of reimbursement for the items' cost to our client.

Under the circumstances our client insists upon being paid without further delay.  If payment is not received by us on or before November 29, 2007, our client has authorized us to take such further steps as may be necessary, without further notice to Wilson The Leather Experts, Inc., except as required by law.

If there are any questions, they should be brought to my attention by the above date.

Very truly yours,

VANO I. HAROUTUNIAN

VH/lma

cc:    Mr. Martin Terzian

# Exhibit 9



November 28, 2007

**Via Federal Express**
**Overnight Delivery**

Vano I. Haroutunian
Ballon Stoll Bader & Nadler, P.C.
1450 Broadway
New York, NY  10018-2268

Re:  Your Client – Pacific Connections, Inc.

Dear Mr. Haroutunian:

I am in receipt of your letter dated November 19, 2007, regarding the demand of your client, Pacific Connections, Inc., for payment in the amount of $336,524.46 for store fixtures.

I have looked into this matter and have found that the store fixtures were produced by PCI as part of broader design services, payment for which was covered under a Letter Agreement dated October 19, 2006.  Although your demand letter indicates that the fixtures were delivered on or about August 14, 2006, PCI has never submitted an invoice for the cost of the fixtures to Wilsons Leather, which supports Wilsons Leather's position that the fixtures were covered by the payments made pursuant to the above referenced Letter Agreement.  If you have any documentation that reflects an agreement by Wilsons Leather to pay PCI separately for the cost of such fixtures, please send it to my attention at the address set forth below.

Wilsons Leather denies any liability for costs related to such fixtures.

Sincerely,

*Corrine A. Lapinsky*

Corrine G. Lapinsky
Director, Legal Services

c:  Stacy Kruse

**Wilsons Leather**

7401 Boone Avenue North
Brooklyn Park, Minnesota 55428
763.391.4000
www.wilsonsleather.com