UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
PACIFIC CONNECTIONS OF CALIFORNIA, INC.        Docket No.

                            Plaintiff,

    -against-

WILSONS LEATHER HOLDINGS INC.,
PREVU INCORPORATED
                       Defendants.
-----------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND ATTACHMENT

BALLON STOLL BADER & NADLER, P.C.

Vano I. Haroutunian (VH 1010)
*Attorneys for Plaintiff*
729 7th Ave., 17th Floor
New York, New York, 10019
(212) 575-7900

## STATEMENT OF FACTS AND PRELIMINARY STATEMENT

In April of 2006, Plaintiff Pacific Connections of California Inc. ("PCI") and defendants PreVu Incorporated ("PreVu") (then known as Wilsons The Leather Experts Inc. ("WLE")) and Wilsons Leather Holdings Inc. ("WLH") (collectively "defendants" or "Wilsons") began a joint venture to help Wilsons rebrand its image and turn around its slumping sales. (Affidavit of Martin Terzian "Terz. Aff." ¶ 2). The parties worked closely together and PCI invested large sums of money into Wilsons' success. (Terz. Aff. ¶¶ 4-6, Exhibit A)[1]. As part of the rebranding campaign, PCI purchased shoe rack fixtures (the "racks") for Wilsons' stores. (Terz. Aff. ¶¶ 7,9, Exhibit C). Wilsons was supposed to ensure that PCI was compensated for the racks, including by placing products on the racks for which PCI was to be paid a commission. (Terz. Aff. ¶ 10). In September 2006, Wilsons began to breach various parts of its agreement with PCI. (Terz. Aff. ¶ 11). Wilsons also stopped placing products on the racks, the sales of which were to produce sales and generate commissions for PCI, but retained possession of the racks. (Terz. Aff. ¶ 11). As a consequence of the breach, the parties entered into a Settlement Agreement on October 19, 2006, (the "Settlement Agreement") settling some of their disagreements. (Terz. Aff. ¶¶ 12-13, Exhibit D). The Settlement Agreement did not address the issue of the racks and PCI never transferred ownership of the racks to Wilsons. (Terz. Aff. ¶¶ 14-15,19, Exhibit D). PCI continued to demand payment for the racks, which Wilsons retained despite PCI's ownership. (Terz. Aff. ¶¶ 17, 20-21). Wilsons claimed that the Settlement Agreement covered the racks, notwithstanding the fact that the Settlement Agreement did not address the issue of the racks at all. (Terz. Aff. ¶¶ 15,22-23, Exhibit D, Exhibit G, Affirmation of Vano Haroutunian "Har. Aff."

---

[1] The lettered exhibits are attached to the Declaration of Martin Terzian; the numbered exhibits are attached to the Declaration of Vano I. Haroutunian

1

¶ 38-39, Exhibit 9). Wilsons' business has continued to worsen and Wilsons has started liquidating its stores, including a recent sale of 116 outlet stores. (Terz. Aff. ¶¶ 24-26, Har. Aff. ¶¶ 7-35, Exhibits 1,5,6 and 7). Among the assets sold by Wilsons were plaintiff's racks. (Har. Aff. 27,29 and 32, Exhibit 1). Wilsons has also warned in its latest annual statement that it has lost $77.5 million over the 2007 fiscal year and faces bankruptcy this year. (Har. Aff. ¶¶ 8,9,23 Exhibit 5).

**POINT I**
**PLAINTIFF IS ENTITLED TO ATTACHMENT AGAINST DEFENDANT PREVU INCORPORATED[2] IN THE AMOUNT OF $372,143.95**

**F.R.C.P. 64(a)** states "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the State where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." **F.R.C.P. 64(b)** makes it clear that attachment is one of the remedies available.

New York law provides "[a]n order of attachment may be granted in any action... where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants, when... the defendant... is a foreign corporation not qualified to do business in the state." **CPLR 6201(1)**. In addition, the plaintiff must prove "by affidavit and such other written evidence as may be submitted, that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." **CPLR 6212(a)**. "Although evidentiary facts making out a prima facie case must be shown, plaintiff must be given the

---

[2] PCI is not seeking attachment against defendant Wilsons Leather Holdings Inc. because it is authorized to do business in New York. PCI, however, is seeking a preliminary injunction against both defendants as will be discussed below.

benefit of all legitimate inferences and deductions that can be made from the facts stated." Considar, Inc. v. Redi Corp. Establishment, 238 A.D.2d 111 (1st Dept. 1997).

As demonstrated by Exhibits 1 through 4, defendant PreVu is a foreign corporation not authorized to do business in New York, satisfying **§ 6201(1)**. (Har. Aff. ¶¶ 3-6).

It is also clear that giving PCI "the benefit of all legitimate inferences and deduction that can be made," PCI makes out a cause of action. PCI alleges five causes of action, all of which arise from the same simple facts: PCI purchased racks, which it allowed Wilsons to use and for which Wilsons promised to later compensate PCI. (Terz. Aff. ¶¶ 7,9,10). It is undisputed that PCI, not Wilsons, paid for the racks. (Terz. Aff. ¶ 7,9, Exhibit C, Exhibit 9). Plaintiff never transferred ownership of the racks to Wilsons. (Terz. Aff. ¶ 19). Wilsons sold most, if not all, of plaintiff's racks as part of its sales of its stores. (Terz. Aff. ¶¶ 25-26, Har. Aff. ¶ 27,29,31,32, Exhibit 1). When confronted with their continued possession and nonpayment for PCI's racks, defendants claimed that the issue was dealt with in the Settlement Agreement. (Terz. Aff. ¶ 22, 23, Exhibit G, Har. Aff. ¶ 38 Exhibit 9). However it is clear that the racks were not discussed in the Settlement Agreement. (Terz. Aff. ¶¶ 13-15, Exhibit D).

Defendant is liable under these facts under several equitable and legal theories. Wilsons has been unjustly enriched because "the acts of [Wilsons] ha[s] placed in the possession of [Wilsons] money, or its equivalent, (the racks) under such circumstances that in equity and good conscience [Wilsons] ought not to retain it, and which *ex aequo et bono* belongs to [PCI]." Rule v. Brine, 85 F.3d 1002, 1011 (2nd Cir. 1996).

Wilsons has also converted PCI's property because Wilsons "intentionally and without authority, assume[d] or exercise[d] control over personal property belonging [PCI], interfering with [PCI]'s right of possession." Colavito v. Colavito, 8 N.Y.3d 43, 50 (2006).

3

Wilsons' conversion also provides the necessary elements for an action in quasi-contract. Under the quasi-contract theory, PCI has the right to ratify the conversion, treat Wilsons' actions as a sale and request recovery of the value of the racks. *See* Dentist Supply Company of New York v. Cornelius, 281 A.D. 306 (1st Dept. 1953) ("Plaintiff, therefore, apparently has waived the tort of conversion and is suing in quasi contract on the theory that he has ratified the transfer as if it were a sale. The right of an owner of goods so to elect is well recognized in the law.") *See also* David Siegel, New York Practice 4th Edition, p. 362 ("Theft from P gives P a conversion claim against the thief, but in that situation New York law also allows P in effect to ratify the conversion and sue instead in contract on the theory of an implied obligation to repay the loss.")

In addition, plaintiff is entitled to the imposition of a **constructive trust**. "New York law generally requires four elements for a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject res made in reliance on that promise; and (4) unjust enrichment. The fourth element is the most important since the purpose of the constructive trust is prevention of unjust enrichment." Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.), 377 F.3d 209, 212 (2nd Cir. 2004).

These four elements, while comprising a common test for constructive trust, are not to be construed strictly. As the Second Circuit explained:

> "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919). The court "'reserves freedom to apply this remedy to whatever knavery human ingenuity can invent.'" Simonds v. Simonds, 45 N.Y.2d 233, 241, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359, 363 (1978) (quoting Bogert, Trusts and Trustees § 471 at 29 (2d ed. rev. 1978)). And, "'[a] constructive trust will be erected wherever necessary to satisfy the demands of justice. . . . Its application is limited only by the inventiveness of men who find

4

new ways to enrich themselves unjustly by grasping what should not belong to them.'"
Republic of Philippines v. Marcos, 806 F.2d 344, 355 (2nd Cir. 1986)

Although PCI feels this test should be construed loosely with an eye focused on the fourth factor, it can easily meet all four elements set forth in Ochs. PCI and Wilsons were engaged in a joint venture, which both parties viewed as a partnership and as a long term relationship. (Terz. Aff. ¶¶ 4-6, Exhibit A). Wilsons made a promise to compensate PCI for the racks at a later date. (Terz. Aff. ¶ 10). PCI placed its racks into Wilsons' possession in reliance on that promise. (Terz. Aff. ¶¶ 10). And, as previously explained, Wilsons was unjustly enriched by its retention of PCI's racks.

PCI also meets the final prong of § 6212 as the claim exceeds all known counterclaims.[3] (Terz. Aff. ¶ 28, Har. Aff. ¶ 40).

## POINT II
## PCI IS ENTITLED TO A PRELIMINARY INJUNCTION AGAINST WILSONS UNDER F.R.C.P. 65

"A party seeking a preliminary injunction in this circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." County of Nassau v. Leavitt, 524 F.3d 408, 414 (2nd Cir. 1998)

A. PCI Will Suffer Irreparable Harm in the Absence of an Injunction.

Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they

---

[3] PCI acknowledges that even after meeting all these factors, this Court still retains discretion to deny attachment. PCI therefore directs the court's attention to Point II, discussing the irreparable harm that plaintiff will suffer in the absence of an attachment (or similar remedy) as a reason why the Court should exercise its discretion to grant attachment.

5

previously occupied." Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2nd Cir. 1999). Therefore "insolvency supports finding of irreparable harm." *Id.* at 250 (*internal citations omitted*). "Accordingly, monetary injury may suffice to establish irreparable harm in situations "where the party that might ultimately be ordered to pay the monetary damages is insolvent or facing imminent bankruptcy, or is in a perilous financial state." Centauri Shipping Ltd. v. Western Bulk Carriers KS, 528 F. Supp. 2d 186 quoting Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Authority, 2004 U.S. Dist. LEXIS 6643 (Dist. Conn. 2004), emphasis added.

Wilsons, in their own words, admit "If we are not able to obtain additional capital in the second quarter, we will not be able to continue our operations outside of bankruptcy." (Exhibit 5, p. 10). Wilsons admits "Without additional capital, we may run out of cash in the second quarter of 2008" and that "there can be no assurance that additional funding will be available or can be obtained on terms that are favorable to us, or at all." *Id.* (*emphasis added*). "These conditions led [Wilsons'] independent registered public accounting firm to include an explanatory paragraph in its report expressing substantial doubt about [Wilsons'] ability to continue as a going concern." *Id.* As will be discussed, since Wilsons made this statement, its fortunes have unfortunately gotten worse, not better.

Wilsons' downward spiral has been sharp and accelerating. Wilsons lost $33.1 million in 2006 and their losses more than doubled to $77.5 million in 2007. (Exhibit 5, at 26). This has led their stock to plummet from $23.50 a share in 2001 to $0.09 today, a loss of 99.75% of its value, including a loss of 90% of its value this year this year alone. (Har. Aff. ¶ 14). NASDAQ has already informed Wilsons that it will be delisted and Wilsons is currently appealing that decision. (Har. Aff. ¶ 11, Exhibit 6). Even if Wilsons wins its appeal, it still faces delisting for

6

two other violations of the NASDAQ rules. (Har. Aff. ¶ 11, Exhibit 6). This near inevitable delisting will "have a negative effect on the market price for [Wilsons'] shares and could limit [Wilsons'] ability to raise additional capital" which, as admitted by Wilsons, would lead to their bankruptcy. (Exhibit 5, p. 10.). Wilsons' credit situation has also become significantly worse as a result of a July 8, 2008 amendment to its credit agreement which drastically lowered its lender's commitments from $115 million to $30 million, and its letter of credit sub-limit from $75 million to $20 million.

As a result of Wilsons' financial problems, it has been liquidating its assets. <u>The main asset it has been liquidating is its stores</u>. First, Wilsons decided to liquidate 158 stores (Exhibits 5, 6). Among the assets being liquidated are the fixtures at the liquidated stores, including the shoe rack fixtures Wilsons took from PCI (Exhibits 5 and 6). Recently, on July 8, 2008, defendants sold another 116 outlet stores, including plaintiff's racks (Exhibit 1).

**Wilsons' desperation has reached the point where it has sold even its own name and trademarks**. (Har. Aff. ¶ 33).

In sum, Wilsons' financial situation has been getting worse, it has sold off its main assets, and its prospects of additional capital investment are nearly non-existent. Wilsons' financial situation makes it a classical case of where "insolvency threatens to frustrate a damage award." <u>Brenntag Int'l Chems., Inc. v. Norddeutsche Landesbank GZ</u>, 9 F. Supp. 2d 331, 345 (S.D.N.Y. 1998)

B. <u>PCI has Shown a Likelihood of Success on the Merits</u>

As discussed above in Point I, PCI has established a likelihood of success on the merits. To avoid repetition, PCI will not go through the causes of action in full again but would like to stress the basic elements of its claims and the strength of the proofs in brief. It is undisputed that

PCI paid for the racks at issue (Exhibit C). The receipts clearly name PCI as the purchaser of the racks and Wilsons, in their emails and letter to PCI, do not dispute this fact (Exhibits C, G, 9). But when PCI asked for compensation for the racks, Wilsons claimed that the Settlement Agreement covered the racks (Exhibits G, 9). Wilsons did not claim any other event or occasion on which PCI transferred the racks (Exhibits G, 9). It is clear that the racks are not covered at all in the Settlement Agreement, a fact easily discernable from the face of the Agreement (Exhibit D). Emails in the period leading to the Settlement Agreement support the conclusion that the Agreement was not intended to be a comprehensive settlement of all the parties' disagreements, as can also been seen from the Settlement Agreement itself. (Exhibits and E). In light of the foregoing, plaintiff has established enough factual evidence to succeed on the merits.

C. The Balance of Hardships Tips Decidedly in PCI's Favor

Although balance of hardships only comes into play when a plaintiff merely proves "sufficiently serious questions going to the merits to make them a fair ground for litigation" and not likelihood of success on the merits, County of Nassau v. Leavitt, 524 F.3d 408, 414 (2nd Cir. 1998), PCI will briefly discuss this issue in the event, *arguendo*, the Court does not find likelihood of success on the merits.

The remedies PCI asks for in its injunction, of either a) a bond for $ 372,143.95 or b) a lien on its property in the amount of $372,143.95, will have minimal or no impact on Wilsons. A bond would require Wilsons to put up only a small fraction of the monies at issue in this case and a lien would have no affect on Wilsons. In contrast, a failure to grant a preliminary injunction leaves PCI with no chance of collecting its money when Wilsons files for bankruptcy or at best collecting cents on the dollar. See Serio v. Black, Davis & Shue Agency, Inc., 2005 U.S. Dist. LEXIS 39018 (S.D.N.Y. 2005)(Finding the balance of hardships favored plaintiff where

8

"plaintiff bears a significant risk that defendant's assets will prove inadequate to satisfy such a judgment" even though the injunction required defendant to place in escrow a "sum… no less than $1,491,215.76.)

## CONCLUSION

For the abovementioned reasons, this Court should grant plaintiff an attachment against defendant PreVu and/or a preliminary injunction against both defendants in the amount of $372,143.95

Dated:   New York, New York
         July 22, 2008

                                      Respectfully submitted,

                                      BALLON STOLL BADER & NADLER, P.C.

                                      By:_____
                                      Vano I. Haroutunian (VH 1010)
                                      Attorneys for Plaintiff
                                      729 7th Ave. 17th Floor
                                      New York, NY 10019